# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA
ex rel, Kimberly Herman, Amy Lestage
and Kevin Roseff,

     Plaintiffs,

vs.

COLOPLAST A/S, COLOPLAST CORP.,
CONVATEC, INC., HOLLISTER INC.,
180 MEDICAL INC. A-MED HEALTH
CARE, INC., BYRAM MEDICAL
SUPPLIES, INC., CCS MEDICAL
SUPPLIES, INC., LIBERTY MEDICAL
SUPPLY, INC., LIBERATOR MEDICAL
SUPPLY, INC., SHIELD MEDICAL,
INC., and UROMED, INC.

     Defendants.

_____/

**CIVIL ACTION NO:**

**FILED IN CAMERA AND UNDER
SEAL PURSUANT TO FALSE
CLAIMS ACT, 31 U.S.C. § 3729 et seq**

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT
## AND DEMAND FOR JURY TRIAL

The United States of America ("United States"), by and through Kimberly Herman,

Amy Lestage and Kevin Roseff (individually and collectively the "Relators"), sue

Defendants Coloplast A/S, Coloplast Corp., ConvaTec, Inc., Hollister, Inc., 180 Medical,

Inc., A-Med Health Care, Inc., Byram Medical Supplies, Inc., CCS Medical Supplies, Inc.,

Liberty Medical Supply, Inc., Liberator Medical Supply, Inc., Shield Medical, Inc., and

Uromed, Inc. (individually and collectively "Defendants") and allege as follows:

## Nature of the Action

1.     This is an action under the False Claims Act, 31 U.S.C. § 3729-33 to recover treble damages, restitution, civil penalties, attorney's fees and costs against Defendants and their co-conspirators for submitting and causing to be submitted false or fraudulent claims to federal health care programs, including but not limited to Medicare and Medicaid, as a result of numerous kickbacks paid by Defendant medical device manufacturers Coloplast A/S and its wholly-owned U.S. subsidiary Coloplast Corp. (collectively "Coloplast"), ConvaTec, Inc., and Hollister Inc. (individually and collectively "Defendant DME Manufacturers") to Defendant durable medical equipment ("DME") suppliers 180 Medical, Inc., A-Med Health Care, Byram Medical Supplies, Inc., CCS Medical Supplies, Inc., Liberty Medical Supply, Inc., Liberator Medical Supply, Inc., Shield Medical, Inc., and Uromed, Inc. (individually and collectively "Defendant DME Suppliers"), and others, in violation of the federal anti-kickback statute, 42 USC 1320a-7b(b), during the period from at least 2003 through the present.

2.     As more fully alleged below, these kickbacks took various forms, including patient referrals, cash payments or cash equivalents, patient conversion bonus payments to sales representatives, free product inventory, market share "incentive payments," rebates, below-market discounts, and free value-added patient discharge services.  Many of these kickbacks and financial inducements were conditioned on the conversion of patients to specific Defendant Manufacturer product lines, and all of them were intended to induce medical providers and suppliers to recommend the referral, order and purchase of Defendant DME Manufacturers' medical products.

3.     The DME products at the center of these unlawful practices pertain to the Ostomy, Continence Care and Advanced Wound and Skin Care markets.  Approximately 85 to 90 per cent of the medical claims related to these products are submitted to federal health care programs, including without limitation, Medicare, Medicaid, the Federal Employee Health Benefits Program, and TRICARE/CHAMPUS.

4.     Congress enacted the Civil False Claims Amendment of 1986 to strengthen the federal government's ability to recover damages from, and to assess penalties against, persons who commit fraud against the United States. The 1986 amendment includes *qui tam* provisions which permit any person having knowledge of a false or fraudulent claim against the government to bring an action in federal court for himself and on behalf of the United States, and to share in any recovery.  By operation of law, a *qui tam* complaint must be filed and maintained under seal for at least sixty (60) days, without service on any defendant during such period, while the government conducts its own investigation of those allegations and determines whether to join suit.  31 U.S.C. § 3730.

5.     The Relators are all current and former executives and managers of Defendant Coloplast, and have served in various senior sales and marketing positions within the company, all of which provided them with direct knowledge of the Defendants' industry-wide improper kickback scheme.

3

6.     Defendants' fraudulent kickback scheme as alleged in this Complaint has been operating, since at least 2003, and to the Relators' knowledge, continue to operate. As a result of the Defendants' unlawful conduct outlined in this Complaint, the United States has suffered substantial damages.  Between just 2007 and the present day, the Relators estimate that the United States has paid out more than $3 billion dollars on DME reimbursement claims for which it would not have paid had it known about, at the time of submission, the illegal kickbacks and inducements provided to influence the referral, ordering or provision of these DME products.

## The Parties

7.     The Plaintiff in this action is the United States.  At all times material to this civil action, Medicare and Medicaid were government-funded programs dedicated to providing medical care.  Medicare is funded and administered directly by the United States. The United States, acting through the Department of Health and Human Services ("HHS"), administers Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid").

8.     The Relator, Kimberly Herman, is a resident of Minnesota.  Ms. Herman is the former President of Chronic Care, Coloplast Corp.   In March 2010, Ms. Herman was promoted to President after several months as Coloplast Corp.'s Vice President of Marketing. Prior to this position, Ms. Herman worked for several months as a consultant for Coloplast.

9.     Ms. Herman became aware of the facts upon which the allegations of this Complaint are based in the course of her employment with Coloplast.  She has direct and independent personal knowledge of the information upon which this action is based, is an

4

original source as defined by 31 U.S.C. § 3729 *et seq.*, and has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1). The information upon which these allegations are based voluntarily was provided by Ms. Herman to the federal government prior to filing this action.

10.     The Relator, Amy Lestage, is a resident of Massachusetts. Ms. Lestage is the current Key Account Manager ("KAM") for Coloplast Corp. and, prior to that promotion, was a sales manager with the company for six (6) years. Coloplast Corp. employs about one hundred (100) sales reps nationwide. Ms. Lestage has worked for Coloplast Corp. since March 2004.

11.     Ms. Lestage became aware of the facts upon which the allegations of this Complaint are based in the course of her employment with Coloplast Corp. She has direct and independent personal knowledge of the information upon which this action is based, is an original source as defined by 31 U.S.C. § 3729 *et seq.*, and has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1). The information upon which these allegations are based voluntarily was provided by the Ms. Lestage to the federal government prior to filing this action.

12.     The Relator, Kevin Roseff, is a resident of Florida. Mr. Roseff is the former Director of Distribution for Coloplast Corp.

13.     Mr. Roseff became aware of the facts upon which the allegations of this Complaint are based in the course of his employment at Coloplast Corp. He has direct and independent personal knowledge of the information upon which this action is based, is an original source as defined by 31 U.S.C. § 3729 *et seq.*, and has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1). The information upon which these allegations are based

voluntarily was provided by Mr. Roseff to the federal government prior to filing this action.

14.     Defendant Coloplast A/S is an international company, headquartered in Humlebaek, Denmark that develops, manufactures and markets medical products and services related to Ostomy, Urology & Continence Care, and Advanced Wound Treatment and Skin Care. The company does business in the United States through its wholly-owned subsidiary, Defendant Coloplast Corp. Coloplast Corp. is based in Minneapolis, Minnesota, oversees all of Coloplast's U.S. sales and marketing programs, and transacts business throughout the United States. At all times relevant to this civil action, Coloplast Corp. has transacted business in the Federal Judicial District of the District of Massachusetts.

15.     Defendant ConvaTec, Inc. ("ConvaTec") is a corporation based in Skillman, New Jersey that develops, manufactures and markets medical products and services related to Ostomy, Urology & Continence Care, and Advanced Wound Treatment and Skin Care. ConvaTec markets and sells these products throughout the United States. At all times relevant to the civil action, ConvaTec has transacted business in the Federal Judicial District of the District of Massachusetts.

16.     Defendant Hollister, Inc. ("Hollister") is a corporation based in Chicago, Illinois that develops, manufactures and markets medical products and services related to Ostomy, Urology & Continence Care, and Advanced Wound Treatment and Skin Care. Hollister markets and sells these products throughout the United States. At all times relevant to the civil action, Hollister has transacted business in the Federal Judicial District of the District of Massachusetts.

17.     Defendant 180 Medical, Inc. ("180 Medical") is a corporation based in

6

Oklahoma City, Oklahoma that provides and distributes DME Continence Care and Urology products to Medicare and Medicaid beneficiaries, and submits reimbursement claims to Medicare and Medicaid related to the supply of those products. Through its wholly-owned subsidiary, South Shore Medical Supply, based in Easton, Massachusetts, Defendant 180 Medical transacts business in the Federal Judicial District of the District of Massachusetts. Defendant 180 Medical also provides medical products and transacts business throughout the United States, including the Federal Judicial District of the District of Massachusetts

18.     Defendant A-Med Health Care, Inc. ("A-Med") is a corporation based in Huntington Beach, California that provides and distributes DME Ostomy, Continence Care and Urology products to Medicare and Medicaid beneficiaries, and submits reimbursement claims to Medicare and Medicaid related to the supply of those products. Defendant A-Med provides medical products and transacts business throughout the United States, including the Federal Judicial District of the District of Massachusetts.

19.     Defendant Byram Medical Supplies, Inc. ("Byram") is a corporation based in White Plains, New York that provides and distributes DME Ostomy, Advanced Wound and Skin Care, Continence Care and Urology products to Medicare and Medicaid beneficiaries, and submits reimbursement claims to Medicare and Medicaid related to the supply of those products. Defendant Byram provides medical products and transacts business throughout the United States, including the Federal Judicial District of the District of Massachusetts.

20.     Defendant CCS Medical Supplies, Inc. ("CCS") is a corporation based in Dallas, Texas that provides and distributes DME Ostomy, Advanced Wound and Skin Care, Continence Care and Urology products to Medicare and Medicaid beneficiaries, and submits

reimbursement claims to Medicare and Medicaid related to the supply of those products. Prior to the fall of 2011, Defendant CCS was based in Clearwater, Florida. With seven (7) different office locations and with more than 1500 employees, Defendant CCS provides medical products and transacts business throughout the United States, including the Federal Judicial District of the District of Massachusetts.

21.    Defendant Liberty Medical Supply, Inc. ("Liberty") is a corporation based in Port St. Lucie, Florida that provides and distributes DME Ostomy, Advanced Wound and Skin Care, Continence Care and Urology products to Medicare and Medicaid beneficiaries, and submits reimbursement claims to Medicare and Medicaid related to the supply of those products. Defendant Liberty provides medical products and transacts business throughout the United States, including the Federal Judicial District of the District of Massachusetts.

22.    Defendant Liberator Medical Supply, Inc. ("Liberator") is a corporation based in Stuart, Florida that provides and distributes DME Ostomy, Continence Care and Urology products to Medicare and Medicaid beneficiaries, and submits reimbursement claims to Medicare and Medicaid related to the supply of those products. Defendant Liberator provides medical products and transacts business throughout the United States, including the Federal Judicial District of the District of Massachusetts.

23.    Defendant RGH Enterprise, Inc. d/b/a/ Edgepark Medical Supplies, Inc. ("Edgepark") is a corporation based in Twinsburg, Ohio that provides and distributes DME Ostomy, Continence Care and Urology products to Medicare and Medicaid beneficiaries, and submits reimbursement claims to Medicare and Medicaid related to the supply of those products. Defendant Edgepark provides medical products and transacts business throughout

8

the United States, including the Federal Judicial District of the District of Massachusetts.

24.     Defendant Shield Medical, Inc. ("Shield") is a corporation based in Valencia, California that provides and distributes DME Ostomy, Continence Care and Urology products to Medicare and Medicaid beneficiaries, and submits reimbursement claims to Medicare and Medicaid related to the supply of those products. Defendant Shield provides medical products and transacts business throughout the United States, including the Federal Judicial District of the District of Massachusetts.

25.     Defendant Uromed, Inc. ("Uromed") is a corporation based in Suwanee, Georgia that provides and distributes DME Continence Care and Urology products to Medicare and Medicaid beneficiaries, and submits reimbursement claims to Medicare and Medicaid related to the supply of those products. Defendant Uromed provides medical products and transacts business throughout the United States, including the Federal Judicial District of the District of Massachusetts.

## Jurisdiction & Venue

26.     This Court has subject matter jurisdiction over the claims in this Complaint, or supplemental pendant jurisdiction, pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729 – 33, specifically 31 U.S.C. § 3732, and also 28 U.S.C. §§ 1331, 1345.

27.     The Court may exercise personal jurisdiction over the Defendants, and venue in the District of Massachusetts is proper under 31 U.S.C. § 3732(a), in that each of the Defendants transacted business in the District of Massachusetts and caused to be submitted, submitted or conspired to submit false claims in this District, and because acts prohibited by 31 U.S.C. § 3729 *et seq.* occurred in the District of Massachusetts.

28.     The Relators have standing to bring this action on behalf of the United States pursuant to 31 U.S.C. § 3730. This suit is not based upon prior public disclosure of allegations or transactions in a prior criminal, civil, or administrative hearing, lawsuit or investigation, in a Government Accountability Office or Auditor General's report, hearing, audit, or investigation, from the news media, or in any other location as the term "publically disclosed" is defined in 31 U.S.C. §3730(e)(4)(A). The Relators, however, have affirmatively disclosed the allegations herein to the United States, including prior to filing this action, in accordance with the provisions of 31 U.S.C. §3730(e)(4).

29.     To the extent that there has been a public disclosure of the information upon which the allegations of this complaint are based that is unknown to the Relators, each Relator is an original source of this information as defined in 31 U.S.C. § 3730(e)(4)(B), and possesses direct and independent knowledge of the information, which they acquired in the course of their employment by Defendant Coloplast Corp., and this information has materially added to any publically-disclosed allegations or transactions.

### Legal Overview

30.     The False Claims Act provides, in pertinent part, that any person who:

(a)(1)(A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . or

(a)(1)(C) conspires to commit a violation of subparagraph (A), (B) . . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, . . . plus 3 times the amount of damages which the

10

Government sustains because of the act of that person.

31 U.S.C. § 3729. For purposes of the False Claims Act,

> The terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and

require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

31. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes) and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

32. The federal anti-kickback statute, 42 U.S.C. § 1320A-7b(b), was promulgated by Congress to protect the integrity of federal health programs and to prevent decisions regarding the provision of medical goods and services from being influenced or corrupted by financial motivations. Accordingly, the statute flatly prohibits the payment of kickbacks in any form. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to further prevent kickbacks disguised as legitimate business transactions from occurring. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93. In 2010, Congress again amended the statute to provide that Medicare or Medicaid claims that include items and services that result in kickback violations are false claims under the Federal False Claims Act. *See* Patient Protection and Affordable Care Act ("PPACA"), Pub.

L. No. 111-148, 124 Stat. 119 (2010). PPACA also made clear that specific intent to violate

the law or actual knowledge of a kickback violation is not required. *See id.* at § 6402(f)(1).

33.    The anti-kickback statute makes it unlawful for any person or entity to

knowingly and willfully offering, making, soliciting or accepting remuneration, in cash or in

kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or

recommending or arranging for the purchasing or ordering medical goods and services

eligible for federal reimbursement. The statute reads in pertinent part:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any
> kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind
> to any person to induce such person—
>    (A) to refer an individual to a person for the furnishing or arranging for the
>    furnishing of any item or service for which payment be made in whole or in part
>    under a Federal health care program, or
>    (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or
>    ordering any good, facility, service, or item for which payment may be made in
>    whole or in part under a Federal health care program, shall be guilty of a felony
>    and upon conviction thereof, shall be fined not more than $25,000 or imprisoned
>    for more than five years, or both.

42 U.S.C. § 1320A-7b(b)(2). The statute provides certain statutory exceptions and certain

regulatory "safe harbors" to exclude certain types of conduct from its reach. None of those

exceptions or safe harbors applies to Defendants' conduct in this case. 42 U.S.C. § 1320A-

7(b)(3). Violations of the statute also can lead to the offender's exclusion from participation

in federal health care programs and, effective August 6, 1997, civil monetary penalties of

$50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-

7b(7) and 42 U.S.C. § 1320a-7a(a)(7).

## Defendants' Relationship with Federal Health Care Programs

34.    Defendants 180 Medical, A-Med, Byram, CCS, Liberty, Liberator, Shield, and

12

Uromed are large national DME suppliers that provide DME medical products to patients throughout the United States, and submit reimbursement claims on behalf of those patients to their insurers, including without limitation, federal health care programs such as Medicare, Medicaid, TRICARE/CHAMPUS, and the Federal Employees Health Benefits Program ("FEHB"). Defendant Manufacturers Coloplast, ConvaTec, and Hollister understood that the Defendant DME suppliers submitted approximately 85 to 90 percent of their reimbursement claims for DME Ostomy, Continence Care and Urology and Advanced Wound and Skin Care products to these federal health care programs.

35.     Medicare is a federal health insurance program that was established in 1965 to provide health care coverage for individuals age 65 and older, as well as to certain persons under the age of 65 with disabilities.

36.     The federal government finances Medicare primarily through payroll taxes on current workers and on taxes of social security benefits. The program's cost to the federal government is currently approximately $300 billion per year.

37.     In order to receive billing privileges from Medicare, a DME supplier must submit and renew every three (3) years an Enrollment Application and sign a Provider Agreement. The Application and Agreement requires DME suppliers, and an officer or director signatory on the entity's behalf, to certify that it will comply with applicable Medicare laws, regulations, and program instructions, including but not limited to the federal anti-kickback statute and the Stark law. The Application also requires the DME supplier to certify that it understands that payment of a claim by Medicare is conditioned upon both the claim and the underlying transactional conduct being in compliance with all relevant health

13

care laws, regulations, program instructions, and applicable conditions of participation, including the federal anti-kickback statute. At all times relevant to the civil action, these certification requirements were in full force and effect.

38.    Congress requires that compliance with the federal anti-kickback statute is a precondition of Medicare payment.

39.    The Medicaid program is a joint federal-state partnership that provides health care benefits for vulnerable patient populations, primarily the poor and disabled. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, FMAP is at least 50 percent and as high as 83 percent.

40.    Title XIX of the Social Security Act requires that in order to receive federal matching funds, certain basic services must be offered to the categorically needy population in any State program. Within broad federal rules, each State decides which persons are eligible for Medicaid, the services covered, and payment levels for services and administrative and operation procedures.

41.    The States directly reimburse health care services provided to Medicaid recipients, with each State obtaining the Federal share of the payment from accounts that draw on funds of the United States Treasury.

42.    The Medicaid programs of all states reimburse for DME medical products. Most states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Usually, after processing the claims, these private

14

companies then generate funding requests to the state Medicaid programs. Before the beginning of each calendar quarter, each state submits to the Centers for Medicare and Medicaid Services ("CMS") an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as needed, and determines the amount of federal funding each state will be permitted to draw down as it actually incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from DME suppliers seeking payment for medical products, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which outlines the basis for adjustment to the quarterly funding amount (to reconcile the estimated expenditures to actual expenditures). 42 U.S.C. § 430.30.

43.    To participate in the Medicaid program, a DME supplier or medical provider must execute a Provider Enrollment Application, certifying, among other things, its continuing compliance with all applicable federal and state laws and regulations. *See* 42 C.F.R. § 431.107 (2011); Cal. Welf. & Inst. Code § 14043.2; 130 CMR 409.404 (2010). Medicaid reimbursement is available only for eligible claims, and a provider may not bill Medicaid for services that either are performed solely to enhance the provider's profit or are fraudulent. *See* 42 C.F.R. §§ 1395y(a)(1)(A); Cal. Welf. & Inst. Code § 14043.1(2). Statutes criminalizing kickbacks have been central to preventing Medicaid fraud and abuse. In its current form, the federal anti-kickback statute clearly prohibits the submission of any claim to Medicaid tainted by an underlying kickback relationship, and several States have adopted similar statutes. *See, e.g.*, Cal. Welf. & Inst. Code § 14107.2; 130 CMR 450.261 (MA).

15

44.    The Defendant DME suppliers are parties to provider agreements with each of the state Medicaid programs to which they submit DME reimbursement claims.

45.    Other healthcare provider entities, including hospitals, surgical centers, rehabilitation centers and home health agencies, in order to receive reimbursement from Medicare and Medicaid for services rendered, must submit a Cost Report, HCFA-2552, in which they certify that all costs being submitted are true and accurate and that the provider has complied with all applicable laws and regulations regulating the provision of health care services.  These cost reports provide that "if services identified by this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, [than] criminal, civil and administrative action, fines, and/or imprisonment may result."  A signatory of the submitting entity also must certify: "to the best of my knowledge and belief, it [the Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

46.    Under federal law, hospitals and other health providers have the responsibility of providing "patient discharge services," which include identifying post-hospital discharge service needs, determining the Diagnosis Related Group ("DRG") for the specific case, and providing a list of eligible providers of those services without exclusion or limitation. *See* 42 U.S.C. § 1395x(e), (ee), SSA § 1861(e), (ee); 42 C.F.R. § 482.43(c)(7).  These requirements are designed to inform patients "of their freedom to choose among participating Medicare

16

providers of post-hospital services and must, when possible, respect patient and family preferences when they are expressed."   42 C.F.R. § 482.43(c)(7).   Hospitals and health providers are reimbursed for these patient discharge planning services by Medicare and Medicaid as part of the block-billing administrative component under a DRG or Outpatient Prospective Payment System ("OPPS") claim.

47.   Similar federal health care program regulations authorize home health agencies to receive reimbursement for the provision of DME products to Medicare and Medicaid patient beneficiaries.   Under the Balanced Budget Act of 1997 and other related regulations, eligible home health agencies may submit a consolidated bill to federal health programs for reimbursement pursuant to a physician-authorized home health plan of care.   Home health agencies then receive reimbursement for a single home health "HHRG" or "PPS" episode payment that includes a built-in fee component designed to reimburse them for the product supply acquisition costs of DME supplies during the 60-day plan of care.

48.   TRICARE is the health care system of the United States military, designated to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and military retirees and their dependents.   The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers.   TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations, and fee-for-service providers.   A variety of managed care contractors create networks of civilian health care providers that provide medical services

17

and products to TRICARE members.

49. FEHBP provides health insurance coverage for millions of federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association and Government Employees Health Association. The Office of Personnel Management administers FEHBP plans.

## Defendants' Unlawful Kickback Schemes

50. The U.S. Ostomy, Continence Care and Advanced Wound and Skin Care product sales markets are quite large and primarily involve federal health care program patient populations (approximately 85 to 90% of all sales are reimbursed by a federal program, predominantly Medicare). As a point of reference, in terms of total revenues, the current U.S. Ostomy Care market (*e.g.*, ostomy pouches and accessories) has annual sales of approximately $350 million dollars per year, the U.S. Continence Care market segment for the catheter products at issue (*i.e.*, intermittent urological catheters) has annual sales of approximately $171 million dollars per year, and the Advanced Wound and Skin Care market has annual sales of approximately $1.1 billion dollars.

51. Ostomy Care, Continence Care and Advanced Skin and Wound Care patients typically have a chronic medical condition that requires them continually to use "disposable" DME products such as catheters or ostomy bags for the duration of their remaining lives. For Ostomy patients, these chronic medical conditions result from undergoing major surgical procedures that remove portions of their intestinal tracts as part of the treatment of cancer or traumatic injury. Surgery types include ileostomy, colostomy, and urostomy. Urological and Continence Care products typically are used by patients being treated for multiple sclerosis,

18

spinal cord injuries, and bladder control issues. These medical products are sold by manufacturers, either through suppliers or directly to health care providers, for patient care in hospitals, home health settings, long-term care facilities, and in the community.

52. In part, because of the long-term, chronic treatment needs of these patient populations, the manufacture and supply of related DME medical products is quite remunerative. At present, annual sales for these three U.S. product markets conservatively exceeds $1.66 billion dollars a year. The three Defendant DME Manufacturers, Coloplast, ConvaTec, and Hollister, control virtually the entire Ostomy Care market (approximately 91%) and large portions of the Continence Care market for intermittent catheter products (approximately 65%), and the Advanced Wound and Skin Care national markets (approximately 61%).

53. Manufacturers vigorously compete for market share in these product categories and, in doing so, target large national and regional DME suppliers that service sizable patient populations. This competition results in a legal and ethical "race to the bottom" in which kickbacks and other financial inducements are given to DME suppliers in exchange for explicit agreements to "convert" patients to a manufacturer's specified product line. As a result of the various kickback schemes implemented by the Defendant DME Manufacturers, between 2007 and the present day, the annualized sales for these three product markets has increased from approximately $1.34 billion dollars to approximately $1.66 billion dollars.

*Defendant Manufacturers' "Patient Referral" Programs*

54. As part of their unlawful sales and marketing kickback schemes, the three Defendant DME Manufacturers have implemented "patient enrollment" and "nurse

19

enrollment" programs. These programs target major hospitals, surgical centers, rehabilitation centers, and home health agencies in order to "enroll" patients in need of ongoing Ostomy Care, Continence Care and Advanced Wound Care and Skin Care products in order to "convert" them to the Defendant DME Manufacturers' various product lines. These programs are designed to capture patients at their point of entry into the healthcare system and to control their future medical product choices by unlawfully steering them to select large Defendant DME suppliers who, in turn, have agreed to supply these referred patients (and some of their other pre-existing patient customers) with a Defendant DME Manufacturer's specified products.

55.     Defendant Hollister's "Secure Start" enrollment program is the industry leader and was put into effect as early as 2002. The "Secure Start" program was designed by Edmond Veome, a former senior executive at Hollister and Coloplast Corp.'s current Vice President of Marketing. Hollister's "Secure Start" program is extremely successful and results in the generation of more than 50,000 patient referrals per year to select national DME suppliers.     Defendants ConvaTec and Coloplast operate similar rival patient and nurse enrollment and referral programs.

56.     The Defendant DME Manufacturers provide patient referrals to DME suppliers, including all of the Defendant DME Suppliers, on the condition that they exclusively place patients on a Defendant DME Manufacturers' specified products. For example, in 2004, representatives of Defendant CCS told Coloplast representatives that it could not afford to put patients on Coloplast's ostomy products, despite their comparable quality and better pricing, because to do so would cost CCS valuable patient referrals from Hollister and

20

ConvaTec. During this scheme, representatives of Defendants Edgepark, Byram and Liberty have made similar claims to Coloplast representatives about Osotmy Care, Continence Care, and Advanced Wound and Skin Care referrals.

57.     In order to increase its ability to compete with ConvaTec and Hollister's patient referral capabilities, in 2010, Coloplast hired away Mr. Veome from Hollister to set up a copycat patient enrollment program, called the Coloplast "CARE" program. Through the first six months of 2011, Coloplast has enrolled more than 15,000 new patients and 1,700 nurses into the CARE program.

58.     The patient enrollment programs operated by the Defendant DME Manufacturers start with company sales representatives actively recruiting medical facility nurses and discharge planners with a programmatic offer of free value-added services in the form of a variety of "patient discharge" services. These services include: free discharge planning services to the hospital/referring nurse; free databases of patients referred and products ordered; free access to specialized Wound, Ostomy, and Continence Care Nurses for phone consultations for discharges nurses and/or patients; determination of the patient's insurance and coverage; selection of a DME supplier for the patient; patient status reports to clinicians; free telephone teaching/training for patients regarding use of the products; and free product supply kits for patients upon program enrollment.

59.     These services supposedly are provided at no cost to the medical facilities or their personnel; however, receipt of these services is contingent upon enrollment in the manufacturer program by facility nurses or discharge planning staff. Once enrolled, facility personnel are required to "enroll" patients in the program by having them fill out "sample

request forms" that ostensibly entitle patients to free samples of medical supplies needed for their post-op care. These forms collect patient medical, insurance and contact information as well as information about the medical products the patients currently are using. The nurse enrollment forms also ask the nurses to track and report to the manufacturer the number of patients the facility discharges on an annual basis that require Ostomy, Continence Care or Advanced Wound and Skin Care medical supplies. The patient "sample request" forms do not disclose the fact that facility personnel are enrolled in the manufacturer program or that the facility is the recipient of free patient discharge services from the manufacturer. Patient medical privacy information is provided through these programs and by medical provider personnel without regard to the privacy and security requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

60.    Once patients are enrolled in the manufacturer program, manufacturer sales representatives contact them directly by telephone in order to "warm transfer" the patients to a waiting Defendant DME Supplier for product conversion or re-supply. Sometimes, manufacturer reps simply provide patient "leads" or referrals directly to the suppliers.

61.    In return for these valuable referrals, the manufacturer requires the DME suppliers to exclusively place a certain volume of patients on the manufacturer's DME products to the exclusion of competitor products. All of these referrals are provided by the Defendant DME Manufacturers for the express purpose of inducing Defendant DME Suppliers to convert patients to their exclusive product lines. The ability to barter out high volumes of patient referrals give the Defendant DME Manufacturers increased financial leverage to arrange for exclusive volume commitments from national DME suppliers.

22

62.    As part of these enrollment programs, the Defendant DME Manufacturers establish "quotas" for new patient and nurse enrollments and pay "conversion" or "enrollment" bonuses to sales force staff for each new patient or nurse enrollment that occurs at a medical facility above a specified numerical target. This practice incentivizes sales representatives to "troll" for patients at medical facilities and to "assist" facility staff in enrolling patients by completing paperwork, faxing documents, or making phone calls.

63.    The Defendant DME Manufacturers keep running "share reports" that track the numbers of patient conversions or "leads" given to select DME suppliers by, among other things, region, month, and medical facility. They also track on a quarterly basis the numbers of new patient discharges (referred to internally as "NPDs") and nurse program enrollments (referred to internally as "NPEs"). Hospitals and other medical facilities are graded with letter grades ranging from "A" to "D" based on factors such as the number of surgeries performed per patient beds so that manufacturers can best focus program resources on the facilities they believe are most conducive for patient enrollment.

64.    The Defendant DME Manufacturers extend these enrollment programs to home health agencies ("HHAs") because large numbers of Ostomy, Continence Care and Advanced Wound and Skin Care patients receive home health care services after discharge from a hospital or surgical or rehabilitation center.

65.    As an inducement to gain the help of the HHAs in enrolling patients in these manufacturer programs, the Defendant DME Manufacturers provide the HHAs with large quantities of free product under the guise of "samples" or "emergency kits." This free product is not marked in any distinguishing way from regular medical supplies typically

23

purchased by HHAs to provide to patients during their episodes of care. By providing the HHAs with free bulk product inventory, HHAs, in turn, can significantly lower their supply acquisition costs by supplying patients with free product rather than purchased inventory. Patients enrolled by HHAs into the manufacturer's program also receive large quantities of free product "samples" at their homes, eliminating the need for HHAs to re-supply patients out of their own purchased inventory supplies.

66.    Existing federal health care program regulations require the HHAs to provide patients with requisite medical supplies from the first to last home visit. Under the Balanced Budget Act of 1997 and other related regulations, HHAs submit a consolidated bill to Medicare and Medicaid for reimbursement pursuant to a physician-authorized home health plan of care. HHAs then receive reimbursement for a single home health "HHRG" or "PPS" episode payment that includes a built-in fee component designed to reimburse HHAs for the product supply acquisition costs of supplies such as urology catheters or ostomy pouches during the 60-day plan of care. By acquiring large amounts of free product and receiving full government reimbursement, the HHAs are able to significantly increase their profitability.

67.    Once patients are enrolled in the programs, just as with patients enrolled at a hospital or other medical facility, manufacturer sales staff place outbound telemarketing calls to patients to ensure receipt of their "sample kits" products and to promote the products. These calls continue until the patient nears the end of the home health episode. At that time, a manufacturer representative will telephonically "warm transfer" the patient directly to a select DME supplier with which the manufacturer has an undisclosed referral and financial relationship.    Home health patients are never informed of the underlying relationships

24

between the manufacturer and the DME supplier.

*Defendant Manufacturers' "Patient Conversion" Campaigns*

68.    The Defendant DME Manufacturers also provide select national DME suppliers with an array of additional financial kickbacks to induce the suppliers to convert their existing patient customer bases to the manufacturers' DME products. These kickbacks include: cash or cash equivalents labeled as DME Supplier "marketing" or "advertising" costs; cash or cash equivalents to reimburse suppliers for waiving patient co-payments; cash or cash equivalent "patient conversion bonuses" paid directly to DME supplier sales staff based on the number of patient conversions; below-market discount pricing not regularly available; "incentive payments" and other forms of "rebates" tied to explicit volume commitments and not generally available; and free product inventory disguised as "samples" or "product kits".

69.    Coloplast's DME "patient conversion" campaigns are an instructive example of how the Defendant DME Manufacturers offer kickbacks and financial inducements to DME suppliers in exchange for patient conversion and product order referrals. Coloplast targets between approximately 10 and 30 of the largest national and regional DME suppliers based on a supplier's (a) willingness to commit to more than $1 million in Coloplast product purchases (Coloplast uses a proxy of $200,000 of existing business), (b) willingness to market to end users both in relation to conversion of competitive end-users and up selling opportunities, and (c) ability to have direct access to end-users to be able to influence product choice. Based on the DME suppliers' abilities to deliver on these three criteria, Coloplast then ranks suppliers in "Gold," "Platinum" and "Diamond" tiers, with "Diamond" being the

25

most exclusive and lucrative tier in terms of the scope of kickbacks and inducements offered by Coloplast. Coloplast markets its patient conversion campaigns as a "Win-Win" scenario that increases revenues and profits for both itself and its preferred suppliers.

70. As part of this scheme, Coloplast offers select DME suppliers cash or cash equivalents tied to explicit numbers of patient conversions. These monies are disguised or labeled as "marketing" or "advertising" costs. These payments also are used to hide repayment to DME suppliers who routinely waive patient co-payments as a method of inducing patients to switch from their existing products to Coloplast's specified product lines. Coloplast also pays "commissions" to DME supplier employees based on the number of patients converted to designated Coloplast products. In 2011 alone, Coloplast will spend approximately $600,000 on patient conversion "marketing" and "advertising" services directed at its DME supplier partners.

71. Coloplast provides select DME suppliers with undisclosed below-market discounts and quarterly rebate "incentive payments" in exchange for explicit volume commitments to convert patients to desired product lines. In addition, special "net pricing" is offered to preferred suppliers who agree to two conditions: First, they must accept Medicare assignment on specific products; and second, they must meet specific volume thresholds. These pricing incentives are below fair market, not equally available to all DME suppliers, and not disclosed on Coloplast's product invoices given to suppliers. Sometimes these pricing incentives are provided in "bundled" fashion, *i.e.*, in exchange for a supplier's agreement to convert patients to a second specified product line. Coloplast spends approximately three to five million dollars per year on below-market discounts and incentive

26

payments to preferred DME suppliers.

72.     As part of its conversion campaigns, Coloplast furnishes DME preferred suppliers with large quantities of free product inventory under the guise of "samples." However, these sample products are not labeled or marked "not for resale" or "sample", allowing suppliers to stock and provide samples to patient beneficiaries as if they were regular product sales with federal health program reimbursement available.     In many instances, DME suppliers substitute free Coloplast product for the patient's existing product as part of the patient conversion process.  Patients then are told that they will receive the substituted product going forward unless they call the DME supplier to complain. Sometimes, patients are falsely told by the supplier that their existing product choice is "unavailable" or "out of stock."   In reality, Coloplast's large-scale "sampling" program makes it quite easy for DME suppliers to provide samples in lieu of regular product to federal health care program beneficiaries.  For suppliers that participate in the program, Coloplast provides free product inventory up to one per cent of overall product purchases.

73.     During time periods relevant to these allegations, Coloplast's management understood that these patient conversion practices violated the anti-kickback statute and were contrary to the company's own "Policies & Procedures" (most recently issued in July 2011) with regard to the anti-kickback statute and discounts, rebates, and product samples. Likewise, Coloplast's management knew or should have known that it was a violation of the anti-kickback statute to offer or pay remuneration, by whatever means necessary, to induce DME suppliers to convert patient beneficiaries to Coloplast products.  In some cases, senior Coloplast management even directed sales personnel that certain inducements were to be

27

given to DME suppliers in exchange for patient conversions (*e.g.*, remuneration to compensate for a supplier's waiver of patient co-payments) but should not be reduced to writing for fear of creating "smoking gun" evidence of the kickback scheme.

74.    Coloplast knew that DME suppliers would not disclose their receipt of these kickbacks to the federal government because it understood that compliance with the anti-kickback statute is a prerequisite and requirement of federal health care program reimbursement.

75.    These conversion programs have been in operation at Coloplast, and the Defendant DME Manufacturers, in one form or another, since 2003 and continue to this day.

76.    Each of the Defendant DME Suppliers receives kickbacks and inducements from these programs.

77.    Defendant Byram and Coloplast have contractually "partnered" for more than five (5) years. On an annual basis, Byram purchases approximately $3.5 million dollars of Coloplast Ostomy Care products and $2.5 million dollars of Coloplast Continence Care products. To convert even more of Byram's patient population base (currently estimated at 300,000 patients per year), Coloplast recently has provided Byram with $30,000 in "marketing" and "advertising" monies as part of a designated Ostomy Care patient conversion program based on the expected conversion of three hundred (300) Ostomy Care patients. Byram also has been promised $100 for every additional conversion beyond the 300-patient target. These amounts also are intended to reimburse Byram for conversion program costs including a one-time waiver of patient co-payments (Coloplast managers have been advised only to communicate this inducement orally and never in writing), printing and

postage costs, and the re-stocking of returned product. As part of Byram's annual contract with Coloplast dating back to 2006, Byram receives $57,000 a year in "marketing support" supposedly to cover ordinary business expenses such as catalog fees, advertisements, and marketing materials. That figure has been increased to $70,000 a year in Byram's 2011 current contract. In addition to receiving significantly-discounted pricing on Coloplast products, Byram also receives "quarterly incentive payments" tied to explicit volume commitments. Since 2008, Byram has received approximately $550,000 in "incentive payments." Coloplast also has given below-market price discounts to Byram that allow it to make a 40% profit margin off whatever the Medicare Allowable is for select product lines.

78. Defendant CCS and Coloplast have contractually "partnered" for more than four (4) years. As part of its relationship, Coloplast has provided CCS with below-market discounts and incentive payments or rebates in exchange for accepting assignment on Medicare and Medicaid and agreeing to make minimum volume purchase commitments. In accord with this arrangement, CCS annually purchases approximately $4.5 million dollars of Coloplast products. CCS also receives from Coloplast up to $10,000 a month in free product (provided without proper invoicing) to be used for "inventory replenishment."

79. Defendant 180 Medical and Coloplast have contractually "partnered" for more than three (3) years. As part of Coloplast's patient conversion campaigns, 180 Medical receives below-market discounts and incentive payments or rebates in exchange for agreeing to make minimum volume purchase commitments exceeding $611,000 per quarter of Continence Care products. In accord with this arrangement, 180 Medical annually purchases more than $3 million dollars of Coloplast products.

80.    Defendant A-Med and Coloplast have contractually "partnered" for more than six (6) years. As part of Coloplast's patient conversion campaigns, A-Med receives below-market discounts and incentive payments or rebates in exchange for agreeing to make minimum volume purchase commitments. In accord with this arrangement, A-Med annually purchases around $3 million dollars of Coloplast products.

81.    Defendant Liberty and Coloplast have contractually "partnered" for more than six (6) years. As part of Coloplast's patient conversion campaigns, Liberty receives below-market discounts and incentive payments or rebates in exchange for agreeing to make minimum volume purchase commitments. Coloplast and Liberty also have agreed to an ostomy pouch conversion campaign targeting 2,500 patient conversions to Coloplast Assura and Sensura pouches. In accord with this arrangement, Liberty annually purchases around $2.5 million dollars of Coloplast products.

82.    Defendant Liberator and Coloplast have contractually "partnered" for more than three (3) years.    As part of Coloplast's patient conversion campaigns, Liberator's Coloplast product purchases have increased from $1.9 million dollars in 2008 to $6.4 million dollars in 2011 on an annualized basis. Coloplast and Liberator currently are focusing on converting patients to Coloplast's "Speedicath" Continence Care catheters and "Carecentrix" Ostomy Care products. As part of this conversion campaign, since June 2011, Liberator has received more than 11,500 Speedicath product kits (each consisting of 6 catheters) from Coloplast, at no cost and without invoices, in violation of Coloplast's own Policy on Samples.    As part of the Carecentrix campaign, Liberator receives below-market price discounts that guarantee it a 35% profit margin over Medicare allowables.

83.     Defendant Edgepark and Coloplast have contractually "partnered" for more than four (4) years. As part of Coloplast's patient conversion campaigns, Edgepark receives below-market discounts and incentive payments or rebates in exchange for agreeing to make minimum volume purchase commitments. In accord with this arrangement, Edgepark annually purchases around \$28 million dollars of Coloplast products.

84.     Defendant Edgepark is the single largest recipient of Hollister patient referrals.

85.     Defendant Edgepark also has been offered kickbacks in the form of "bundled discounts." For example, Edgepark was offered a four per cent price reduction by ConvaTec on its Ostomy Care line of products if it agreed to convert thirty per cent of patients using Coloplast catheter products to a new ConvaTec catheter product line.

86.     Defendant Shield and Coloplast have contractually "partnered" for more than five (5) years. As part of Coloplast's patient conversion campaigns, Shield receives below-market discounts and incentive payments or rebates in exchange for agreeing to make minimum volume purchase commitments. In accord with this arrangement, Shield annually purchases around \$3 million dollars of Coloplast products.

87.     Defendant Uromed and Coloplast have contractually "partnered" for more than three (3) years. As part of Coloplast's patient conversion campaigns, Uromed receives below-market discounts and incentive payments or rebates in exchange for agreeing to make minimum volume purchase commitments. In accord with this arrangement, Uromed annually purchases around \$3 million dollars of Coloplast products.

### Defendant DME Manufacturers' "Upselling" Schemes

88.     The Defendant DME Manufacturers "partner" with select DME suppliers to

31

create and promote new DME products that provide no additional medical benefit but can be reimbursed at a higher rate (*e.g.*, slightly changing the type of a catheter or the size of a wound dressing when the federal reimbursement is tied to the type or size of the item). Similarly, the manufacturers provide preferred DME suppliers with reimbursement guidance based on the DMEPOS Part B fee schedule or patient utilization patterns so that suppliers will switch patients to higher-revenue and higher-reimbursement products. The manufacturers internally refer to these practices as "upselling," and as part of their marketing approach, they actively advise select DME suppliers on how they can best "upsell" and take advantage of federal health reimbursement rates.

89. For example, Coloplast presently "promotes" to its preferred DME suppliers that they switch patients from open ostomy pouches (Product No. 15821 or ConvaTec Product No. 22771) that have an $888 reimbursement rate to a closed Coloplast ostomy pouch carrying a $2,645 reimbursement rate without any medical necessity justification. As part of its "upselling" marketing strategy, Coloplast provides preferred suppliers with cost and profit breakdowns based on anticipated patient conversions to higher-reimbursement items.

90. Coloplast also has implemented a major initiative promoting the conversion of patients using straight catheters to new "Speedicath" hydrophilic catheters. Both catheters are billed under the same A4351 HCPT code; however, the hydrophilic catheters are a single-use product and cannot be re-used multiple times by patients. Switching patients to the hydrophilic catheters leads to a dramatic increase in product utilization. Under existing federal regulations, patients can receive reimbursement for the use of up to 200 catheters per

month. The hydrophilic catheters also are more profitable for Coloplast to sell and the company currently has a two-to three-year growth plan in which it projects to grow product sales from $4.4 million dollars to $17.5 million dollars per year. In order to induce DME suppliers to make the "Speedicath" conversion, Coloplast has offered below-market discount pricing to suppliers who agree to accept Medicare assignment on the product.

91.    Coloplast also is conducting a major conversion program with its Moldable Ostomy Ring Product (A4385 HCPT code, $5.35 reimbursement) offering select DME suppliers $100,000 in "marketing and advertising costs" and samples to convert patients to the product. Coloplast packages the rings only in three-month quantities (boxes of 30) and is encouraging DME suppliers to encourage patients to use and re-use the rings regardless of medical necessity. The Ostomy Care ring market is estimated at $11 million dollars a year.

92.    Similarly, while most patients prefer "open" ostomy pouches to "closed-end" ostomy pouches, Coloplast actively is inducing select DME suppliers to convert patients to the closed-end pouches by marketing their significantly-higher reimbursement rates and the fact that patients are allowed to seek reimbursement for up to 60 closed pouches per month (as opposed to only 20 for the equivalent open pouch product).

93.    Likewise, ConvaTec has created a 4 x 4 ¾ Silver Alginate (A6197 HCPT Code) that it pushes to suppliers over the standard 4 x 4 Alginate (A6196 HCPT Code) because the reimbursement rate is twice as much. The new Alginate has no medical benefits above the standard 4 x 4 Alginate and was specifically created to maximize potential federal reimbursement dollars. Defendant DME Suppliers like Byram have told ConvaTec's competitors that unless they play the "size game" and design a similarly-oversized wound

33

dressing, Byram will stick with the more-lucrative ConvaTec products because of the higher Medicare reimbursement value.

*Defendants' Knowledge of False Claims*

94.    As a result of the kickbacks provided by the Defendant DME Manufacturers to the Defendant DME Suppliers, the Defendant DME Manufacturers caused and/or induced the Defendant DME Suppliers to submit false claims to federal health programs for Ostomy Care, Continence Care, and Advanced Wound and Skin Care DME products.

95.    As a result of the kickbacks provided by the Defendant DME Manufacturers to the Defendant DME Suppliers, the Defendant DME Manufacturers caused and/or induced the Defendant DME Suppliers to file false or fraudulent records or certifications to the United States regarding compliance with the federal anti-kickback statute and other federal and state laws, all in violation of the False Claims Act.

96.    Each of the Defendants knew and was well aware that strict compliance with the conditions of eligibility and participation in federal health care programs, including compliance with the federal anti-kickback statute, was a prerequisite to participation in the federal health care programs and a mandatory condition of receiving federal reimbursement on any subsequent submitted health care claims.

97.    Each of the Defendants knew that each reimbursement claim submitted by the Defendant DME Suppliers as part of the kickback scheme was a false claim in that the Defendants expressly, or alternatively impliedly, certified that they were compliant with the federal anti-kickback statute and all other applicable federal and state laws and regulations required for eligibility and participation in federal health care programs, including but not

limited to, Medicare and Medicaid.

98.     Each of the Defendants knew that each false statement, record, claim, or certification filed or submitted to a federal health care program was material to the Government's decision to pay on a claim in that the Government relied on the falsity of the representation, record, claim, or certification, or the falsity caused the Government to pay reimbursement monies which it otherwise would not have paid had it known of the underlying and undisclosed kickbacks and inducements.

99.     The Government would not have paid any of the reimbursement claims pertaining to the above-described kickback scheme had it known at the time that each claim was the product of an unlawful kickback or inducement in violation of the federal anti-kickback statute and the False Claims Act.

## COUNT I

## FALSE CLAIMS ACT –
## PRESENTING OR CAUSING A PRESENTATION
## OF FALSE OR FRAUDULENT CLAIMS
## 31 U.S.C. § 3729(a)(1)(A)
## (Against All Defendants)

100.    The Relators incorporate by reference paragraphs 1 through 99 in this Complaint as if fully set forth in this Count.

101.    This Count seeks relief pursuant to 31 U.S.C. § 3729(a)(1)(A). As a result of Defendant DME Manufacturers' kickbacks to the Defendant DME Suppliers to induce them to purchase, order, or recommend, or arrange for the purchasing or ordering of, DME products, in violation of the federal anti-kickback statute, 42 USC 1320a-7b(b), all of the

35

claims, from on or about January 1, 2003 through the present day, that the Defendant DME Manufacturers caused the Defendant DME Suppliers to submit to a federal health care program, including but not limited to Medicare and Medicaid, for related DME products are false and fraudulent. Accordingly, the Defendants knowingly caused to be presented or presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

102. By virtue of the false and fraudulent claims the Defendants knowingly presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## COUNT II

### FALSE CLAIMS ACT –
### CAUSING A FALSE RECORD OR
### STATEMENT TO BE MADE OR USED
### 31 U.S.C. § 3729(a)(1)(B)
### (Against All Defendants)

103. The Relators incorporate by reference paragraphs 1 through 99 in this Complaint as if fully set forth in this Count.

104. This Count seeks relief pursuant to 31 U.S.C. § 3729 (a)(1)(B). As a result of the Defendant DME Manufacturers' kickbacks to the Defendant DME Suppliers to induce them to purchase, order, or recommend, or arrange for the purchasing or ordering of, DME products, in violation of the federal anti-kickback statute, 42 USC 1320a-7b(b), the Defendant DME Manufacturers knowingly caused the Defendant DME Suppliers to make or use false records or statements material to false or fraudulent claims paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(1)(B). These false records or statements

36

included the Defendant DME suppliers' false certifications and representations to the Government regarding their compliance with the conditions of eligibility and participation in federal health care programs, including but not limited to their compliance with the federal anti-kickback statute, 42 USC 1320a-7b(b).

105. By virtue of the false records or statements that the Defendants knowingly caused to be made or used, or knowingly made or used, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## **Prayer for Relief for Counts I and Count II**

The Relators, on behalf of the United States, seek the following relief against Defendants:

A. That Defendants cease and desist from violating 31 U.S.C. § 3729 *et. seq.*

B. A judgment against Defendants, jointly and severally, for the damages sustained by the United States, trebled, pursuant to 31 U.S.C. § 3729.

C. Such civil penalties as provided by law.

D. For attorneys' fees and costs of this civil action as provided by law.

E. Such other and further relief as this Court deems just and equitable.

F. Additionally, Relators, on their behalf, request that they receive thirty percent (30%), or such other maximum amount as permitted by 31 U.S.C. § 3730(d), of the proceeds of this action or settlement of this action collected by the United States, plus an amount for the reasonable attorneys' fees and costs in this action.

37

## Demand for a Jury Trial

A jury trial is demanded in this case.

                Respectfully submitted,

                Jeffrey E. Marcus (Mass. Bar No. 656279)
                jmarcus@knpa.com
                William J. Blechman
                wblechman@knpa.com
                KENNY NACHWALTER, P.A.
                201 South Biscayne Boulevard
                1100 Miami Center
                Miami, Florida 33131-4327
                Telephone:    (305) 373-1000
                Facsimile:    (305) 372-1861

                *Attorneys for Relators*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this $\mathcal{2}$nd day of December 2011, I caused an original and a copy of this Complaint to be filed under seal and in camera for at least sixty (60) days and not to be served on the Defendants until further order of this Honorable Court.

I HEREBY CERTIFY that on this $\mathcal{2}$nd day of December 2011, I caused to be served on the United States, a written disclosure as required by the False Claims Act.

Respectfully submitted,

Jeffrey E. Marcus (Mass. Bar No. 656279)
jmarcus@knpa.com
KENNY NACHWALTER, P.A.
201 South Biscayne Boulevard
1100 Miami Center
Miami, Florida 33131-4327
Telephone:     (305) 373-1000
Facsimile:      (305) 372-1861