UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF CALIFORNIA, *ex rel*. KIMBERLY HERMAN, AMY LESTAGE, and KEVIN ROSEFF;<br><br>            Plaintiffs,<br><br>v.<br><br>COLOPLAST CORP., HOLLISTER INC., A-MED HEALTH CARE CENTER, CCS MEDICAL, INC., SHIELD HEALTHCARE, INC., BYRAM HEALTHCARE CENTERS, INC. and LIBERATOR MEDICAL SUPPLY, INC.<br><br>            Defendants. | Civil Action No.11-cv-12131-RWZ<br><br><br>**LEAVE TO FILE GRANTED ON MAY 18, 2016** |

**THIRD AMENDED COMPLAINT – Leave to File Granted on May 18, 2016**

1.      The United States of America ("United States") and the State of California, by and through Kimberly Herman, Amy Lestage and Kevin Roseff (collectively the "Relators"), hereby file their Third Amended Complaint against Defendants Coloplast Corp., and Hollister Inc. (collectively "Defendant Manufacturers"), as well as A-Med Health Care Center, CCS Medical, Inc., and Shield HealthCare, Inc. (collectively "Defendant Suppliers"), alleging violations of the False Claims Act and the California False Claims Act.  Relators continue their action against Coloplast for retaliation in violation of the False Claims Act and Minnesota Whistleblower Law.  Finally, the Relators also continue their action against Byram Healthcare Centers, Inc. ("Byram") and Liberator Medical Supply, Inc. ("Liberator") and all other defendants for the recovery of attorney's fees and costs pursuant to the False Claims Act.  In support of their Third Amended Complaint, Relators allege as follows:

## NATURE OF THE CASE

2.     This is an action brought by the Relators on behalf of the United States and the State of California, against the Defendants Hollister and CCS under the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), and against Defendants Shield and A-Med under both the FCA and California False Claims Act, Cal. Gov't Code § 12650 et seq. ("CA FCA"), to recover treble damages sustained by, and civil penalties and restitution owed to, the United States and the State of California as a result of illegal kickback schemes, illegal telephone solicitation campaigns, and deceptive sales campaigns designed to defraud Medicare and California's Medicaid program, as well as to recover attorneys' fees and costs as permitted by each statute. Relators also bring claims against Coloplast for retaliation in violation of the anti-retaliation provisions of the FCA, 31 U.S.C. § 3730(h), as well as the Minnesota Whistleblower Law, Minn. Stat. § 181.932.

3.     Under the kickback schemes, Defendant Coloplast, a manufacturer of ostomy and continence care products, provided illegal kickbacks to Defendant CCS, a supplier of ostomy and/or continence care products reimbursed by Federal health care programs, in exchange for the Defendant CCS switching patients to Coloplast's products, or continuing to recommend and sell Coloplast's products instead of other manufacturers' products.  As part of the schemes, the Defendant CCS knowingly submitted false claims to Federal health care programs.  These claims were tainted by kickbacks causing these programs to improperly pay millions of dollars of government money annually in reimbursements.

4.     The federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), expressly prohibits any entity from offering, paying, soliciting or receiving any "remuneration," which "include[s] any kickback, bribe, or rebate," to "any person to induce such person" to purchase or

recommend a product or service that is covered by Medicare or Medicaid. Although the Defendant CCS knew that the AKS prohibited it from accepting kickbacks in exchange for promoting Coloplast's products, CCS disregarded this prohibition, choosing instead to put profits before its duty to comply with Federal law.

5.      Hollister is engaged in illegal telephone solicitation campaigns, whereby various suppliers used Hollister as a telemarketing firm to make unsolicited phone calls to Medicare beneficiaries to market the products sold by the suppliers, including Defendant Byram.

6.      Pursuant to 42 U.S.C. § 1395m(a)(17) ("the DME Telemarketing Prohibition"), durable medical equipment, prosthetics, orthotics supplies ("DMEPOS") suppliers are prohibited from making unsolicited telephone calls to Medicare beneficiaries for the furnishing of covered items, except in certain situations. The DME Telemarketing Prohibition specifically prohibits payment to a supplier that knowingly submits a claim generated pursuant to a prohibited telephone solicitation. Accordingly, such claims for payment are false claims. Both the suppliers and Hollister knew that the DME Telemarketing Prohibition prohibited the suppliers from using Hollister to indirectly accomplish what the suppliers are prohibited from doing directly, but they disregarded this prohibition. As a result of the illegal telemarketing scheme, Hollister knowingly caused various suppliers, including Defendant Byram, to submit false claims for products to Medicare and Medicare Advantage Plans, as defined below, causing the Medicare program to improperly pay millions of dollars.

7.      Additionally, Defendants Shield and A-Med concealed refunds and failed to make refunds due to California's Medicaid program. Furthermore, at all relevant times, the Defendants Shield and A-Med falsely certified they were in compliance with all applicable

Medicare and/or Medicaid laws, regulations, and program instructions for payment including compliance with the Federal anti-kickback statute when they were not.

8.       The practices complained of herein are continuing.

## SOURCE OF RELATORS' ALLEGATIONS

9.       Relators state that all information and allegations in the original Complaint and this Amended Complaint are based on Relators' direct and independent knowledge as current and former employees of Coloplast.  The evidence referenced herein was obtained directly by Relators independently, and through their own labor and efforts.  This action is not based on any public disclosure.   The information and evidence that they have obtained or of which they have personal knowledge, and on which these allegations of violations of the FCA and the CA FCA are based, consist of documents, electronic data, conversations with authorized agents and employees of the Defendant Manufacturers and Defendant Suppliers, and knowledge of other actions taken pursuant to policy, practice, or instructions while employed by Coloplast.   In particular, Relators negotiated certain contracts and amendments on behalf of Coloplast with the Defendant Suppliers and/or were responsible for Defendant Suppliers' accounts.   Relators' independent knowledge of the FCA and CA FCA violations alleged herein was gained from their negotiation of these contracts with Defendant Suppliers and their knowledge of Coloplast's invoicing practices pursuant to those contracts.

10.       Relators voluntarily disclosed their information to the Government before filing this action and before any public disclosure.  Relators submitted their Initial Disclosures to the Government on November 19, 2011.  In addition, on or about January 31 through February 1, 2012, Relators met in Boston with representatives of the U.S. Attorney, the FBI, and the Department of Justice.  During that two-day meeting, Relators had individual interviews with the

Government wherein they disclosed all of the information upon which their allegations are based.

11.     Relators are therefore original sources of information within the meaning of the FCA, 31 U.S.C. § 3730(e)(4)(B).  The original and this Amended Complaint were properly served on the United States and the State of California.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3729-3733.

13.     This Court may exercise supplemental jurisdiction over the Minnesota state law retaliation claims, pursuant to 28 U.S.C. §§ 3732(b) and 1367(a), because all state created claims pled or that may be pled in this case arise out of a common nucleus of operative facts.

14.     This Court has personal jurisdiction over the defendants and venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c), because the defendants all do business in this District.

## THE PARTIES

**A.     The Plaintiffs**

15.     Plaintiff United States, acting through the Department of Health and Human Services ("HHS"), which includes the Centers for Medicare & Medicaid Services ("CMS"), administers the Medicare program.

16.     Plaintiff State of California, acting through the California Department of Health Care Services, administers the California Medicaid program, known as Medi-Cal.

**B.     The Relators**

17.     Relator Kimberly Herman ("Relator Herman") is a citizen of the United States and a resident of the State of Minnesota. Relator Herman is the former President of Coloplast Corporation.  Relator Herman began her career with Coloplast Corporation as a consultant on or about August 2009, and was hired as the Vice President of Marketing in or about January 2010. In or about April 2010, Relator Herman was promoted to President.

18.     Relator Amy Lestage ("Relator Lestage") is a citizen of the United States and a resident of the State of Massachusetts.  Relator Lestage has worked for Coloplast Corporation since March 2004.  Relator Lestage is currently employed by Coloplast Corporation as a Key Account Manager ("KAM").   Prior to her position as a KAM, Relator Lestage worked for Coloplast Corporation as a territory manager for six years.

19.     Relator Kevin Roseff ("Relator Roseff") is a citizen of the United States and a resident of the State of Florida.  Relator Roseff was hired by Coloplast Corporation as National Accounts Manager in or about June 2009, and was promoted to Director of Distribution in or about March 2010.

**C.     The Defendant Manufacturers**

20.     Defendant Coloplast Corp. ("Coloplast") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. Coloplast manufactures and sells ostomy and continence care products reimbursed by Federal health care programs.

21.     Defendant Hollister, Inc. ("Hollister") is an Illinois corporation with its principal place of business in Libertyville, Inc. Hollister manufactures and sells ostomy and continence care products reimbursed by Federal health care programs.

**D.     The Defendant Suppliers**

22.     Upon information and belief, A-Med Health Care Center ("A-Med") is a California corporation, with a principal place of business in Huntington Beach, California. A-Med is a DMEPOS supplier enrolled in Medicare and California Medicaid.  As part of its business, A-Med sells Products to Medicare and Med-Cal recipients.  A-Med submits claims to Medicare and Medi-Cal in Huntington Beach, California.

23.     Upon information and belief, CCS Medical, Inc. ("CCS") is a Delaware corporation with a principal place of business in Dallas, Texas.  CCS is a DMEPOS supplier enrolled in Medicare.  As part of its business, CCS sells Products to Medicare recipients.  CCS submits claims to Medicare in multiple locations, either as separately incorporated entities or simply as separate divisions within the same incorporated entity, including: (a) Clearwater, Florida; (b) Roanoke, Virginia; (c) Forest Hill, Texas; (d) Duluth, Georgia; (e) Farmers Branch, Texas; (f) Wexford, Pennsylvania; and (g) Anaheim, California.

24.     Upon information and belief, Shield HealthCare, Inc. ("Shield") is a California corporation, with a principal place of business in Valencia, California.  Shield is a DMEPOS supplier enrolled in Medicare and Med-Cal.  As part of its business, Shield sells Products to Medicare and Medi-Cal recipients.  Shield submits claims to Medicare and Medi-Cal in multiple locations, either as separately incorporated entities or simply as separate divisions within the same incorporated entity, including: (a) Ontario, California; (b) Valencia, California; (c) Santa Fe Springs, California; (d) Walnut Creek, California; (e) Fresno, California; and (f) Tukwila, Washington.

25.     Upon information and belief, Liberator Medical Supply, Inc. ("Liberator") is a Florida corporation, with a principal place of business in Stuart, Florida. Liberator is a DMEPOS

supplier enrolled in Medicare.   As part of its business, Liberator sells Products to Medicare recipients.

26.    Upon information and belief, Byram Healthcare Centers, Inc. ("Byram") is a New Jersey corporation, with a principal place of business in White Plains, New York. Byram is a DMEPOS supplier enrolled in Medicare.   As part of its business, Byram sells Products to Medicare recipients.   As part of its business, Byram sells Products to Medicare and Medi-Cal recipients.

## THE FEDERAL HEALTH CARE PROGRAMS

### A.    Medicare

27.    Medicare is a Federal program that provides federally subsidized health insurance for persons who are sixty-five (65) or older or are disabled. *See* 42 U.S.C. § 1395 *et. seq.* ("Medicare").  Part B of Medicare ("Medicare Part B") provides benefits to participants to cover, among other things, ostomy and continence care products.  *See generally id.* §§ 1395j-1395w-4.

28.    Ostomy and continence care products are considered DMEPOS and are covered by Medicare Part B.  *See* 42 U.S.C. § 1395m.

29.    To enroll in or maintain Medicare billing privileges, all the Defendant Suppliers must comply with Medicare's DMEPOS supplier standards set forth at 42 C.F.R § 424.57(c).

30.    During the relevant times, to enroll in Medicare and to be eligible for payment under Medicare Part B, DMEPOS suppliers must also submit a DMEPOS Medicare Enrollment Application, the CMS-855S Form, on which they must certify:

> I agree to abide by the Social Security Act and all applicable Medicare laws, regulations and program instructions that apply to this supplier.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including,

but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

31.     Additionally, the CMS-855S Form explains the penalties for certain conduct:

> 2.     Section 1128B(a)(1) of the Social Security Act authorizes criminal penalties against any individual who, "knowingly and willfully," makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program.

> 3.     The Civil False Claims Act, 31 U.S.C. § 3729, imposes civil liability, in part, on any person who: a) knowingly presents, or causes to be presented, to an officer or any employee of the United States Government a false or fraudulent claim for payment or approval; (b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or c) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

> 4.     Section 1128A(a)(1) of the Social Security Act imposes civil liability, in part, on any person (including an organization, agency or other entity) that knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency … a claim … that the Secretary determines is for a medical or other item or service that the person knows or should know: … b) the claim is false or fraudulent.

32.     By signing the "Certification Statement," the DMEPOS supplier certifies, *inter alia*, to the following:

> 1.     I have read the contents of this application, and the information contained herein is true, correct, and complete.  *If I become aware that any information in this application is not true, correct, or complete, I agree to notify [Medicare] immediately.* (Emphasis added.)
> . . .

> 3.     I have read and understand the Penalties for Falsifying Information ... I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application *or contained in any communication supplying information to Medicare* . . . may be punished by criminal, civil or administrative penalties, including but not limited to the denial or revocation of Medicare billing privileges, and/or imposition of fines, civil damages, and/or imprisonment.  (Emphasis added.)

> …

> 7.      I *will not knowingly present or cause to presented* a false or fraudulent claim for payment by Medicare, and *will not* submit claims with deliberate ignorance or reckless disregard to their truth or falsity. (Emphasis added.)

33.     During all relevant times, a DMEPOS supplier such as CCS submits a claim for payment to Medicare on a claim form entitled "CMS Form 1500," in which the supplier certifies that the items for which payment is sought were provided in accordance with federal law, to include without limitation the AKS:

> In submitting this claim for payment from federal funds, I certify that: . . . 4) this claim . . .  complies with all applicable Medicare and/or Medicaid laws, regulations and program instructions for payment including but not limited to the Federal anti-kickback statute. . . .

34.     Part C of the Medicare Program, commonly known as Medicare Advantage, ("Medicare Advantage") was enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. 97–248, which authorizes Medicare to contract with risk-based private health plans, or those plans that accept full responsibility (i.e., risk) for the costs of their enrollees' care in exchange for a prospective, monthly, per-enrollee payment ("Medicare Advantage Plans").  42 U.S.C. §§ 1395w-21 *et seq.*  The Medicare Advantage Plans themselves receive, directly from the Medicare Program, a predetermined, monthly, risk-adjusted payment to cover each beneficiary's care.  42 U.S.C. § 1395w-23.  Medicare Advantage Plans must include as part of their covered services those items and services covered by Medicare Part B, including, among other things, ostomy and continence care products ("Basic Benefits"). 42 C.F.R. § 422.101(a). The Basic Benefits covered by Medicare Advantage Plans are paid for by the Medicare Advantage Plans, in whole or in part, using the money received by the Medicare Program.  42 C.F.R. § 422.100(c).  Medicare Advantage Plans are regulated and subsidized by HHS pursuant to one-year annually renewable contracts.

B.     **California's Medicaid Program**

35.     Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled.  Medi-Cal is funded with a mix of Federal and State funds; more than 50% of Medi-Cal's budget is supplied by Federal dollars. Medi-Cal is administered by the California Department of Health Care Services ("DHCS"). Medi-Cal provides coverage for certain medical supplies for Medi-Cal eligible individuals, including ostomy and continence care products.

36.     There are two key regulatory mechanisms by which Medi-Cal limits the amounts it pays for medical supplies. First, Medi-Cal negotiates prices for certain medical supplies and limits its maximum reimbursements based on the negotiated prices ("Negotiated Price Limits"). Second, Medi-Cal sets limits on how much suppliers can bill to Medi-Cal for medical supplies in excess of the suppliers' own costs ("Upper Billing Limits").

37.     Under the Negotiated Price Limits, DHCS negotiates non-exclusive contracts for a maximum acquisition cost ("MAC") with interested distributors, manufacturers, and relabelers for certain medical supplies, including ostomy and continence care products.  *See*  Cal. Welf. & Inst. Code § 14105.3(b). The contractors must guarantee that Medi-Cal providers can purchase contracted product(s) at or below the MAC.  DHCS also establishes a list of maximum allowable product costs ("MAPCs") for certain other medical supplies (e.g. catheters), which is published in provider bulletins.  *See* Cal. Welf. & Inst. Code 14105.47(b)(1).  The maximum allowable reimbursement rate for incontinence medical supplies is the MAC, plus a 38% markup.  *See* Cal. Welf. & Inst. Code § 14125(a).

38.     Under the Upper Billing Limits, the amount that a supplier may charge Medi-Cal

for medical supplies is limited to the supplier's "net purchase price . . . plus no more than a 100

percent mark-up."  Cal. Code. Regs. tit. 22, § 51008.1.

39.     Specifically, the Upper Billing Limits regulation provides, in pertinent part,:

(a)     Bills submitted pursuant to Section 51008 for durable medical equipment as defined in Section 51160, medical supplies authorized pursuant to Section 51320, or incontinence medical supplies listed in Section 51526(c) shall not exceed an amount that is the lesser of:

(1)     The usual net charges made to the general public, or

(2)     The net purchase price of the item, which shall be documented in the provider's books and records, plus no more than a 100 percent mark-up.  Documentation shall include, but not be limited to, evidence of purchase such as invoices or receipts.

(A)     Net purchase price is defined as the actual cost to the provider to purchase the item from the seller, including any rebates, refunds, discounts or any other price reducing allowances, known by the provider at the time of billing the Medi-Cal program for the item, that reduce the item's invoice amount.

(B)     The net purchase price shall reflect price reductions guaranteed by any contract to be applied to the item(s) billed to the Medi-Cal program.

(C)     The net purchase price shall not include provider costs associated with late payment penalties, interest, inventory costs, taxes, or labor.

* * *

(b)     Providers shall not submit bills pursuant to this section for items obtained at no cost.

Cal. Code Regs. tit. 22, § 51008.1.

40.     As a practical matter, the Upper Billing Limits regulation limits the amount that a

supplier may bill Medi-Cal to the supplier's "net purchase price . . . plus no more than a 100

percent mark-up," *id.* at § 51008.1(a)(2), because this amount is generally the "lesser" amount compared to the "usual charges made to the general public," *id.* at § 51008.1(a)(1).

41.     Each Medi-Cal supplier is required to enter into a Provider Agreement with DHCS to be eligible to receive reimbursement from the Medi-Cal program.

42.     The Medi-Cal Provider Agreement prohibits suppliers from soliciting, requesting, accepting or receiving rebates, refunds and discounts, as well as requiring suppliers to refrain from conduct that would harm Medi-Cal or its beneficiaries.   Among other commitments, suppliers must agree to do all of the following:

**Compliance with Laws and Regulations**.  Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Section 14000 and 142000), and any applicable rules or regulations promulgated by DHCS pursuant to these chapters.  Provider further agrees that if it violates any of the provisions of Chapters 7 and 8 of the Welfare and Institutions Code, or any other regulations promulgated by DHCS pursuant to these Chapters, it may be subject to all sanctions or other remedies available to DHCS. Provider further agrees to comply with all federal laws and regulations governing any regulating Medicaid providers.

**\*\*\*Forbidden Conduct**. Provider agrees that it shall not engage in conduct inimical to the public health, morals, welfare and safety of any Medi-Cal beneficiary, or the fiscal integrity of the Medi-Cal program.

\*\*\*

**Provider Fraud and Abuse.** Provider agrees that is shall not engage in or commit fraud or abuse.  "Fraud" means an intentional deception or misrepresentation made by a person with knowledge that the deception could result in some unauthorized benefit to himself or some other person.  It includes any act that constitutes fraud under applicable federal or state law.  "Abuse" means either: (1) practices that are inconsistent with sound fiscal or business practices and result in unnecessary cost to the Medicare program, the Medi-Cal program, another state's Medicaid program, or other health care programs operated, or financed in whole or in part, by the Federal Government or any state or local agency in this state or any other state; (2) practices that are inconsistent with sound medical practices and result in reimbursement by the Medi-Cal program or other health care programs operated, or financed in whole or in part, by the Federal Government or any state or local agency in this state or any other state, for services that are unnecessary or for substandard items or services that fail to meet professionally recognized standards for health care.

\*\*\*

**Prohibition of Rebate, Refund or Discount.** Provider agrees that it shall not offer, give, furnish, or deliver any rebate, refund, commission preference, patronage dividend,

discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary.  Provider further agrees that it shall not solicit, request, accept, or receive, any rebate, refund, commission preference, patronage dividend, discount, or any other gratuitous consideration, in connection with the rendering of health care services to any Medi-Cal beneficiary.  Provider further agrees that it shall not take any other action or receive any other benefit prohibited by state or federal law.

43.     In other words, Medi-Cal suppliers must agree not to take rebates, refunds or discounts (as specifically stated in the Provider Agreement, as well as the federal and state laws and regulations referenced therein) and to conduct their business relationships with DHCS and the United States with a view to Medi-Cal's public purpose and the welfare of California's medically indigent citizens.

44.     The Provider Agreement expressly states: "Provider agrees that compliance with the provisions of this agreement is a condition precedent to payment to provider."

45.     Medi-Cal suppliers are required to submit claims for DMEPOS, including ostomy and continence care products, on a form known as the CMS-1500.  The CMS-1500 form includes the following certification with respect to claims to Medicaid:

"NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of any material fact, may be prosecuted under applicable Federal or State laws."

Compliance with the CMS-1500 certification is a condition precedent to payment to the supplier for claims to Medi-Cal for DMEPOS.

46.     Under certain circumstances, Medi-Cal requires a supplier of DMEPOS to submit an invoice supporting its claim for payment.  For example, an invoice is required where a particular incontinence supply product is "unlisted," i.e. does not have an established MAC or MAPC.  Where submission of an invoice is required, a supplier must also submit an Invoice Certification.  Medi-Cal Provider Manual, Medical Supplies: An Overview at p. 8 (March 2009). The Invoice Certification requires a supplier to certify that it has disclosed any discounts or

rebates as required by the AKS and that the claim complies with California's Upper Billing Limits regulation.   *Id.*   Where an Invoice Certification is required, compliance with the Invoice Certification is a condition precedent to payment to the supplier for claims to Medi-Cal for medical supplies.

## STATUTES AND REGULATIONS

A.     **The False Claims Act**

47.     The FCA provides, in pertinent part, that any person who:

(i)      knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(ii)     knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(iii)    conspires to commit a violation of the FCA.

is liable to the United States for civil penalties, plus three (3) times the amount of damages which the United States sustains because of the act of that individual or entity. 31 U.S.C. § 3729(a).

48.     The FCA, 31 U.S.C. § 3729(b)(1), provides that "(1) the terms 'knowing' and 'knowingly'–(A) mean that a person, with respect to information–(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in deliberate disregard of the truth or falsity of the information, and (B) require no proof of specific intent to defraud."

49.     Furthermore, the FCA, 31 U.S.C. § 3730(h), provides relief to employees who have been retaliated against in their employment because of lawful acts done by the employee in furtherance of efforts to stop one or more violations of the FCA.   Such retaliation may include discharge, demotion, suspension, threats, harassment or any other type of discrimination in the

terms and conditions of employment.  The employee is entitled to all relief necessary to make that employee whole, including reinstatement, two times back pay, interest on back pay, and compensation for any special damages, including litigation costs and reasonable attorneys' fees.

**B.      The Federal Anti-Kickback Statute**

50.      The AKS, 42 U.S.C. § 1320a-7b(b), makes it illegal for any entity to knowingly and willfully solicit, offer, pay or receive any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to induce or reward the referral of an individual to an entity for the furnishing of any item reimbursable by a Federal health care program, or the purchasing, leasing, ordering or recommending, or arranging for the purchasing, leasing, ordering or recommending of any good or item reimbursable under a Federal health care program.

51.      As early as 1994, the Federal government made it clear  through a "Special Fraud Alert" that the AKS prohibits manufacturers from offering financial incentives to those selling their product to effectuate "product conversion" programs where even one purpose is to induce the increase use of such products covered by Federal health care programs. Such "conversion programs involve offering financial benefits to sellers of their products in exchange for recommending that patients switch from one brand of product to the manufacturer's products." 59 Fed. Reg. 65,371, 65,372, 65,376 (Dec. 19, 1994).  One of the examples provided in the Special Fraud Alert was of a "product conversion" program in which a drug manufacturer provided supplier pharmacies with cash awards for changing from a competitor's product to the drug manufacturer's product.

52.      In 2006, the Federal government further clarified the types of marketing arrangements between DMEPOS manufacturers and DMEPOS suppliers that violate the AKS

through an Advisory Opinion issued by the Office of Inspector General within the Department of Health and Human Services ("the OIG").  The Advisory Opinion cautioned that DMEPOS manufacturers who subsidize a DMEPOS supplier's advertising expenses and maintain and staff call centers to field inquiries generated by such advertisements, constitutes remuneration under the AKS because such activities on the part of the DMEPOS manufacturer provides valuable services to selected DMEPOS suppliers, sparing them costs they would otherwise incur to promote and operate their business. OIG Advisory Opinion No. 06-16 (Oct. 10, 2006).  Such marketing activities were found to constitute unlawful remuneration from the DMEPOS manufacturers to the DMEPOS suppliers in exchange for DMEPOS suppliers' orders of the manufacturers' products.  *Id.*  The Advisory Opinion further noted that such activities could additionally constitute unlawful remuneration from the DMEPOS suppliers to the DMEPOS manufacturers because of the DMEPOS suppliers' agreement to generate business for the DMEPOS manufacturers in exchange for the free advertising and call center services.  *Id.*

**C.    The Medicare Prohibition Against Unsolicited Telephone Contact by DMEPOS Suppliers**

53.    42 U.S.C. § 1395m(a)(17)(A) prohibits unsolicited telephone contacts by DMEPOS suppliers and provides that:

> A supplier of a covered item under this subsection may not contact an individual enrolled under this part by telephone regarding the furnishing of a covered item to the individual unless [one] 1 of the following applies:
>
> (i)    The individual has given written permission to the supplier to make contact by telephone regarding the furnishing of a covered item.
>
> (ii)    The supplier has furnished a covered item to the individual and the supplier is contacting the individual only regarding the furnishing of such covered item.
>
> (iii)    If the contact is regarding the furnishing of a covered item other than a covered item already furnished to the individual, the supplier has furnished at least [one] 1 covered item to the individual during the 15-month period preceding the date on which the supplier makes such contact.

54.     42 U.S.C. § 1395m(a)(17)(B) prohibits payment for items furnished subsequent to unsolicited contacts and provides that, "[i]f a supplier knowingly contacts an individual in violation of subparagraph (A), no payment may be made under this part for any item subsequently furnished to the individual by the supplier."   Accordingly, the requirement that DMEPOS suppliers not make unsolicited telephone calls is a condition of payment to DMEPOS suppliers for DMEPOS, including ostomy and continence products.   Thus, any claim for payment in violation of this section is a false claim.

55.     As early as 2003, the Federal government made it clear through an OIG "Special Fraud Alert," entitled "*Telemarketing by Durable Medical Equipment Suppliers*," the types of marketing activities that are impermissible under 42 U.S.C. § 1395m(a)(17).   In January 2010, the OIG issued an Updated Special Fraud Alert on the topic.   OIG Updated Special Fraud Alert (January 2010).

56.     Both the initial Special Fraud Alert and the Updated Special Fraud Alert were directed at arrangements where DMEPOS suppliers use third parties to make unsolicited telephone calls to Medicare beneficiaries to market DMEPOS.   *Id.* The Updated Alert reminded DMEPOS suppliers that unless the arrangement meets one of three exceptions found in Section 1395m(a)(17)(A), unsolicited telemarketing by DMEPOS suppliers to Medicare beneficiaries is prohibited, "whether contact with a beneficiary is made by the supplier directly or by another party on the supplier's behalf." *Id.*  "Moreover, a DMEPOS supplier is responsible for verifying that marketing activities performed by third parties with which the supplier contracts or otherwise does business do not involve prohibited activity and that information purchased from such third parties was neither obtained, nor derived, from prohibited activity." *Id.*   The Government cautioned that, "[i]f a claim for payment is submitted for items or services

-18-

generated by a prohibited solicitation, both the DMEPOS supplier and the telemarketer are potentially liable for criminal, civil, and administrative penalties for causing the filing of a false claim, as well as criminal and civil penalties for using interstate telephone calls in furtherance of a scheme to defraud." *Id.*

## THE OSTOMY AND CONTINENCE CARE MARKET

57.     Ostomy products are typically used by patients who have had their intestine redirected to an opening in the abdominal wall.  Patients using ostomy products may suffer from, among other ailments, colorectal cancer, bladder cancer, diverticulitis, and inflammatory bowel disease. These patients rely on various collection devices to eliminate waste from the body. Collection bags and pouches make up the majority of the ostomy market and remain the fastest-growing segment.

58.     Continence care products are typically used by patients in need of bladder or bowel management.  Such patients may suffer from, among other ailments, spinal cord injuries, spina bifida, multiple sclerosis, benign prostatic hyperplasia and prostatectomies.  Continence products include urinary catheters.

59.     Patients in need of ostomy or continence care products are generally aged 65 or older and the majority of patients must use such products for either an extended time period, or for the rest of their lives based on the underlying condition triggering the need for such products.

60.     At all relevant times, the Defendants Hollister and Coloplast knew that ostomy and continence care patients generally required continuous, long-term, disposable medical equipment and that controlling a patient's product choice equated to considerable, recurring revenue to their financial bottom lines.  In fact, internal Coloplast documents describe ostomy

and continence consumer care as an "annuity business."  *See Marketing Operations* PowerPoint, dated Feb. 7, 2012, at p. 3, attached hereto as **Exhibit 1**.

61.     On information and belief, during the relevant times, Hollister negotiated rebate, sales, and discount contracts with DMEPOS suppliers, promoted Hollister's products, and created marketing materials and campaigns for Hollister's ostomy and continence care products. Since at least 2006, these products have been the most important product lines in Hollister's portfolio of products.

62.     DMEPOS suppliers, including the Defendant CCS, purchased ostomy and/or continence care products directly or indirectly from manufacturers, including the Defendant Coloplast.  After DMEPOS suppliers such as Defendant CCS furnish the products to patients, they submit claims for reimbursement on behalf of those patients to their payors, including Medicare, Medicare Advantage Plans, and the various state Medicaid programs.

63.     Medicare, Medicare Advantage Plan, and Medicaid reimbursements are the major source of funding for ostomy and continence products.  According to an analysis by Coloplast, Medicare, not including Medicare Advantage, reimburses approximately 70% of ostomy product sales in the United States, while Medicaid, private payors and self pay accounts for the balance. See Coloplast Presentation "*How Healthcare is Paid in the US*" by Russ Miller, Director of Reimbursement, dated Sept. 29, 2009, at p. 6, attached hereto as **Exhibit 2**.  That same analysis shows that Medicare reimburses 63% of continence care product sales in the United States, with Medicaid, private pay and self pay accounting for the balance.  *Id.*

64.     Coloplast and Hollister are among the market leaders for ostomy and continence products in the United States and each company represents a significant part of the United States market share for these products.

## THE DEFENDANT SUPPLIERS' KNOWLEDGE OF THEIR DUTIES TO COMPLY WITH THE UPPER BILLING LIMIT AND THE AKS

**A.     Shield and A-Med Knew They Had a Duty to Comply with the Upper Billing Limit**

65.     At all relevant times, Shield and A-Med were well aware that Medi-Cal covered a substantial percentage of the continence care sales they made.

66.     At all relevant times, Shield and A-Med were enrolled in Medi-Cal and submitted claims for reimbursement to Medi-Cal for continence care products.

67.     At all relevant times, Shield and A-Med were parties to effective Medi-Cal Provider Agreements.

68.     At all relevant times, Shield and A-Med submitted claims to Medi-Cal for Products on CMS 1500 Forms and were required to submit Invoice Certifications as called for by applicable Medi-Cal rules.

**B.     CCS Knew It Had A Duty to Comply with the AKS**

69.     At all relevant times, CCS was well aware that Medicare and Medicare Advantage Plans covered a substantial percentage of the ostomy and/or continence care sales they made.

70.     CCS knew that it was required to comply with the AKS in furnishing DMEPOS and medical supplies to Medicare beneficiaries.

71.     As detailed above, as part of the Medicare enrollment process, CCS was required to complete and submit a DMEPOS Medicare Enrollment Application, CMS Form 855S.

72.     The CMS Form 855S includes a certification that the DMEPOS supplier will comply with the Social Security Act and all applicable Medicare laws, regulations and program instructions, including the AKS.

73.     CCS certified that it understood that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with the AKS and all conditions of participation in Medicare.

74.     Additionally, at all relevant times, CCS was engaged in business with Coloplast and/or Hollister.

75.     Accordingly, upon information and belief, CCS was made aware that its conduct was not in compliance with the AKS by Coloplast and Hollister based on Coloplast's and Hollister's adoption of the AdvaMed Code, and Hollister's submission of certifications of compliance to the AdvaMed Code, which requires adopting companies to communicate the principles of the Code to their dealers and distributors with the expectation that they will adhere to the Code.

76.     At all relevant times, CCS knew that it was required to comply with the AKS in furnishing continence care to Medicare recipients.

## THE KICKBACK SCHEME BETWEEN COLOPLAST AND CCS

**A.      The Background on the Kickback Scheme**

77.     At its core, the kickback schemes consisted of unlawful *quid pro quo* between Coloplast and CCS.  CCS and Coloplast substituted what was in the best interest of patients for the purpose of maximizing their revenues, profits, and market share.

78.     The kickback scheme is the brainchild of Edmond Veome ("Veome"), Coloplast's current President, who previously worked at Hollister in marketing from 2003 to 2009.

79.     During Veome's tenure at Hollister, the scheme led to substantial sales increases for Hollister's Products in the United States.  Meanwhile, Coloplast struggled to meet the ambitious ostomy product sales and revenue goals for the United States market.  Coloplast's

goals included growing ostomy product sales revenues in the United States in amounts that were higher than overall industry-wide market growth, doubling Coloplast's profits at least every five years, achieving double digit market share in the United States and increasing profit margins to at least 18% by 2012.

80.     Impressed by Veome's success in substantially increasing Hollister's market share while simultaneously creating solid brand loyalty among DMEPOS suppliers with his "win-win" marketing campaigns, Coloplast hired Veome away from Hollister.  Veome began working at Coloplast in the Fall of 2009 and has continued with Coloplast to date.  Veome currently serves as Coloplast's President.  Veome was hired with the express purpose of developing for Coloplast an identical marketing program using identical or substantially similar campaigns and strategies that he developed and orchestrated for Hollister.

81.     To achieve this goal, Coloplast, under Veome's guidance, deconstructed and analyzed every element of Hollister's marketing program.  Bjorn Christ, Coloplast's Senior Vice President ("Christ"), created a project team for this purpose led by Kendall Kapitan, Coloplast's Associate Product Manager for Ostomy.  In or about February 2010, Relator Herman attended a one and half day workshop where a detailed presentation was made regarding how Coloplast would go about replicating Hollister's marketing program in the United States and during which Veome was first introduced to the team.  This workshop was attended by Relator Roseff via telephone, Veome, Christ, Kristian Villumsen, Coloplast's Senior Vice President of Global Marketing and Craig Palmer, Coloplast's Vice President of Sales.  During the workshop, PowerPoint slides and other Hollister documents were circulated to educate the Coloplast team on the coming initiatives for the ostomy product line.

82.     At that meeting, Relator Roseff voiced his concerns about replicating such a program, stating that he did not think Veome's growth model could be implemented for legal and ethical reasons.   Veome responded to this concern by stating: "We do all of this at Hollister." Relator Herman was also adamant during the workshop that Coloplast could not implement a program similar to Hollister's Secure Start program and be in compliance with United States healthcare laws.

83.     Coloplast began its kickback scheme in or about 2010, and is continuing to date.

84.     The kickback relationship between CCS and Coloplast involved a series of initial steps.  Before offering CCS the opportunity to participate in the kickback schemes, Coloplast had ascertained that CCS had sufficient influence over whether patients received Coloplast's products or a competitor's ostomy and/or continence care products.

85.     Coloplast, based on Hollister's marketing model, used three criteria to target DMEPOS suppliers with which to partner.  The supplier had to: (a) have a minimum of $1 million in potential business across business areas to ensure significant upside, (b) have direct access to patients they could influence on product choices, and (c) be willing to partner with Coloplast to pressure patients to convert from competitor products and pursue upselling opportunities.  *See Establishing our Master Dealer Sales Team* PowerPoint, dated Aug. 9, 2011 and *Coloplast CARE* PowerPoint, dated Aug. 8, 2012, attached hereto as **Exhibits 3 and 4**, respectively.

86.     Coloplast uses a grading system to "rank" suppliers into loyalty programs, which in turn determine the types of kickbacks offered.  For example, Coloplast's preferred DMEPOS suppliers, sometimes referred to as Master Dealer Partners, receive patient referrals and access to free samples for up to 2% of sales, among other things. Such Master Dealer Partners, including

CCS, receive preferred patient referrals, marketing support, a dedicated 1-800 phone number for the supplier's employees and customers, in-person training on how to maximize reimbursements, and access to Coloplast's sales force, among other things, as well as special pricing and rebates. *See id.*

87.     CCS and Coloplast engaged in ongoing discussions to identify which campaign initiatives to pursue. *See id.*

88.     The lynchpin of Coloplast's marketing strategies are campaigns whereby Coloplast uses kickbacks, as alleged in detail below, to induce a supplier such as the Defendant CCS to initiate their patient customers on a Coloplast Product or convert their patient customers from a competitor's brand of ostomy and/or continence care products to Coloplast brand products.

89.     Coloplast utilizes both "hard" campaigns and "soft" campaigns.  Hard campaigns involve either the partner DMEPOS supplier (such as CCS) or Coloplast initiating the supplier's patients, including Medicare and Medi-Cal beneficiaries, on Coloplast's product or converting such patients from their chosen product to Coloplast's product without giving such patients a choice.  Sometimes patients are falsely told that their DMEPOS supplier no longer carries the patient's chosen brand or that such brand is on back order.  Patients may even be sent Coloplast's product instead of their usual brand without prior notice.  Soft campaigns involve either a DMEPOS supplier or Coloplast contacting patients, including Medicare and Medi-Cal beneficiaries, and persuading them to begin on or convert to Coloplast's product.

90.     Defendant CCS began its illegal kickback relationship with Coloplast in or about 2011.

**B.     CCS Accepted Illegal Price Reductions from Coloplast in Exchange for Driving Sales of Ostomy and Continence Care Products**

91.     Since at least 2011, CCS has accepted hundreds of thousands of dollars in price reductions and discounts from Coloplast in exchange for conducting conversion and marketing campaigns to induce patients to try Coloplast Products or to switch from a competitor's ostomy and/or continence care products to Coloplast-brand Products.  These payments constituted illegal remuneration in violation of the AKS.

92.     For example, in 2011 Coloplast agreed to give CCS a price reduction on Coloplast's SpeediCath urological catheter product in return for CCS undertaking a promotional campaign to convert CCS customers to the Coloplast product.  In an email dated June 29, 2011, from Ulrik Berthelsen to Relator Lestage and Veome (cc'ing Relator Roseff) Coloplast agreed to discount sales of its SpeediCath product to CCS to $1.10 per unit.  *See* **Exhibit 5.**  In exchange for this price discount, CCS agreed to undertake a promotional campaign that would immediately convert CCS customers to the Coloplast product.  *Id.*  Coloplast estimated this would result in approximately 220,000 patient conversions.  *Id.*  As a result of these activities, CCS submitted false claims to Medicare from June 1, 2011 through January 19, 2015.  Attached hereto is a spreadsheet provided to Relators by the Government containing sample claims data submitted by CCS, which the Government obtained from CMS.  *See* **Exhibit 6.**

93.     Similarly, in late 2012, Coloplast agreed to reduce its prices for ostomy products in return for CCS engaging in "hard conversion" campaigns of patients (*i.e.* patients were told that they could no longer order the competitor products through CCS).  On October 26, 2012, Coloplast and CCS met in Atlanta, Georgia to discuss a conversion campaign that would switch CCS patients from Hollister and Convatek products to Coloplast ostomy products.  This meeting is reflected in an email from Ulrik Berthelson to David Tucker of CCS that copied Relator

Lestage and Veome.  *See* **Exhibit 7.**  As a result of this campaign, CCS submitted false claims to Medicare during the period December 1, 2012 through January 19, 2015.  *See* **Exhibit 6.**

94.     In late 2012 and early 2013, Coloplast agreed to reduce its price for its Elastic Barrier Strip product in exchange for CCS's agreement to conduct a promotional campaign targeting at least 4,000 ostomy patients for referral to the Coloplast product.  As a result of this agreement, CCS submitted false claims to the government from March 3, 2013 through January 19, 2105.  *See* **Exhibit 6**.

95.     The scope of the kickback schemes involving illegal discounts was not limited to the specific examples above, but extended to numerous other products for which CCS negotiated price discounts from Coloplast.

## THE UNSOLICITED TELEPHONE CONTACT WITH MEDICARE BENEFICIARIES TO MARKET HOLLISTER OSTOMY AND/OR CONTINENCE CARE PRODUCTS

96.     Hollister developed referral programs which it used to keep track of and steer new ostomy and/or continence care patient leads to Defendant Byram and other DMEPOS suppliers in exchange for the suppliers initiating new customers on Hollister's products or converting the suppliers' existing customers from a competitor product to the Hollister product.  Hollister markets its referral program under the name "Secure Start."

97.     Relators' knowledge of the details of Hollister's Secure Start program was gained through Ed Veome.  As described above, in the Fall of 2009 Veome left Hollister and was hired by Coloplast to implement the same marketing schemes that he had orchestrated at Hollister. During meetings beginning in 2009, Veome shared the details of Hollister's Secure Start program with Relators and others at Coloplast responsible for implementing Coloplast's identical CARE program.

98.     Hollister harvests ostomy and continence patients from medical facilities, including hospitals, spinal cord injury rehabilitation centers, and urology clinics throughout the United States to generate leads for Defendant Byram and other suppliers.  Hollister targets these facilities based on factors such as the number of surgeries performed on patients who will need ostomy or continence care products.

99.     Hollister sales representatives go to these medical facilities to sell the Secure Start program to clinicians, including nurses and therapists, as well as discharge planners ("Health Professionals").  Hollister's representatives target Health Professionals because they have direct contact with patients and access to patient medical, insurance and contact information.

100.     Hollister's representatives pitched the Secure Start program by misleading Health Professionals into thinking that if they enrolled patients into the program, patients would be provided only with free product samples and informational resources to help adjust to their new lives using ostomy and continence care products after discharge, as well as to navigate complicated insurance, Medicare and Medicaid coverage rules to better ensure patients could afford the products.  As such, Hollister duped Health Professionals into becoming an unwitting and uncompensated sales force, enrolling patients into the Secure Start program by exploiting the trust these patients had in their caretakers.

101.     Hollister trains Health Professionals on how to complete and submit enrollment applications for each of their patients needing ostomy and/or continence care products upon discharge.  These enrollment forms include patient contact, diagnosis, insurance and medical information ("Patient Information").

102.     The Health Professionals send Patient Information to Hollister on behalf of patients, including Medicare beneficiaries, on forms created by and supplied by Hollister.

103.    Individual patients, including Medicare beneficiaries, also submitted their Patient Information, which was later used for Lead Lists, on forms created and supplied by Hollister.

104.    Upon information and belief, none of the Hollister patient enrollment forms disclosed that third-party DMEPOS suppliers such as Defendant Byram would make telephone contact with customers for the purposes of taking orders for or selling Hollister products.

105.    Medicare beneficiaries signing the aforementioned forms did not give written permission for Defendant Byram or other suppliers to make contact by telephone for the purpose of furnishing of Hollister products.

106.    Upon receiving a patient enrollment form, Hollister automatically sent free sample kits of Hollister products directly to the patient within twenty-four hours.  Hollister personnel entered the patient's information into a database from the form and assigned the patient to Defendant Byram or another supplier.  These were so-called "Lead Lists."  In fact, internal Hollister documents show that one of the Secure Start Program Coordinator's express roles was to "[s]elect supplier for ongoing patient orders."  *See Secure Start Discharge Program* PowerPoint, attached hereto as **Exhibit 8**.

107.    Hollister provided weekly patient lead reports to Defendant Byram and other suppliers listing the leads assigned to them ("Lead List").  The Hollister Lead Lists contained patient contact information.  A sample weekly report attached to an email sent by Hollister to Defendant Byram is attached hereto as **Exhibit 9.**

108.    Hollister also provided patient referrals to Defendant Byram and other suppliers through what is known as a "Warm Transfer" done over the telephone.  *See* Hollister Secure Start Associate Coordinator Job Description, attached hereto as **Exhibit 10**.  The Warm Transfer process begins upon a patient's receipt of the sample ostomy and/or continence care products

sent when the patient enrolled in the Secure Start program.  These patients were relatively new users of ostomy and/continence care products.

109.     Using the Lead Lists, Hollister telemarketers would contact patients, including Medicare beneficiaries, after they received free Hollister product samples.  The purpose of the telemarketing call was to convince the patient to continue to use Hollister brand products and to live-transfer (i.e. Warm Transfer) the patient to a supplier who could fulfill their order.

110.     If the patient is ready to purchase the Hollister product, the Hollister telemarketer transfers the patient to a pre-assigned 1-800 number established for the Warm Transfer of patients to suppliers, so the supplier (including the Defendant Byram) can fill the order and submit claims for reimbursement to Medicare, and Medicare Advantage, among other payors.

111.     The Warm Transfers to Defendant Byram and other suppliers occurred without the Medicare beneficiaries providing written consent to allow the suppliers to make contact with them to sell or furnish Hollister products to such beneficiary.

112.     The patients receiving Telemarketing Calls had not previously purchased or received the Hollister products discussed on these calls from Defendant Byram or other supplier to which they were being Warm Transferred.

113.     Most of the patients receiving Telemarketing Calls were not existing customers of the Defendant Byram or other supplier to which they were Warm Transferred.

114.     Upon information and belief, other Medicare beneficiaries who initiated telephone calls to Hollister for various reasons concerning Hollister product issues ("Initiated Calls"), as opposed to receiving Telemarketing Calls, were also Warm Transferred by Hollister to Defendant Byram and other suppliers so that the suppliers could sell or furnish Hollister products to such beneficiaries.

115.    Upon information and belief, patients making Initiated Calls did not provide written permission for Defendant Byram or another supplier to make contact by telephone regarding the furnishing of Hollister products.

116.    Upon information and belief, many of the patients making Initiated Calls being Warm Transferred had not previously purchased or received the Hollister-specific products discussed on these calls from the Defendant Byram or other supplier to which they were being transferred.

117.    Upon information and belief, many of the patients making Initiated Calls were not existing customers of the Defendant Byram or other supplier to which they were Warm Transferred.

118.    Defendant Byram and the other suppliers greatly value the Lead Lists and Warm Transfers provided by Hollister.

119.    As an example of how suppliers value these referrals, in or about the Fall of 2009, Relator Herman, Relator Roseff, Bjorn Christ (Coloplast Senior Vice President), and Craig Palmer (Coloplast Senior Vice President of Sales) ("Coloplast Team") met with Vice Presidents David Crane and Jeff Kekic from supplier RGH Enterprises, Inc., doing business as Edgepark Medical Supplies, at the JW Marriott Hotel in Orlando, Florida.   During the meeting, the Coloplast Team offered to work with the RGH/Edgepark sales representatives on joint field sales calls to home health agencies to grow Coloplast's and RGH/Edgepark's respective ostomy product market share.   David Crane told the Coloplast Team that RGH/Edgepark could not engage in such joint sales calls with Coloplast because RGH/Edgepark was afraid it would hurt RGH/Edgepark's relationship with Hollister and did not want to risk decreasing the high number of patient referrals RGH/Edgepark received from Hollister.

120. Additionally, on or about February 2011, Relator Herman had a telephone conversation with Renee Picard Walsh, Senior Vice President at Defendant Byram, during which Relator Herman asked Walsh if Byram would purchase more Coloplast ostomy pouches. Walsh replied it was unlikely that Defendant Byram would do this because Byram was afraid it would jeopardize Byram's patient referrals from Hollister.

## HOLLISTER KNEW IT HAD A DUTY TO COMPLY WITH THE FCA AND AKS

121. At all relevant times, Hollister knew that it was required to comply with the FCA and AKS in promoting their respective Products to DMEPOS suppliers and other health care professionals.

122. Upon information and belief, Hollister adopted the AdvaMed Code of Ethics on Interactions with Health Care Professionals ("AdvaMed Code").

123. The AdvaMed Code is a set of compliance guidelines that were adopted by the Advanced Medical Technology Association ("AdvaMed") to promote industry compliance with the AKS. AdvaMed advocates on a global basis for the highest ethical standards, timely patient access to safe and effective products, and economic policies that reward value creation. AdvaMed offers a Code Certification Program where companies adopting the AdvaMed Code can certify compliance.

124. A company submitting an AdvaMed certification attests that: (a) the Company's officers, employees, and agents are required to abide by the AdvaMed Code for all interactions involving U.S. Health Care Professionals; (b) the Company has communicated the provisions of the AdvaMed Code to its dealers and distributors with the expectation that they will adhere to them; (c) the Company has made the AdvaMed Code available on its public website; and (d) the

Company has adopted the AdvaMed Code and implemented an appropriately tailored effective compliance program related to interactions with Health Care Professionals.

125.    Hollister submitted valid certifications of compliance to the AdvaMed Code.  This certification must be signed by Hollister's Chief Executive Officer and Chief Compliance Officer or individuals with equivalent responsibilities within Hollister.  *See* AdvaMed Code, Section II, p. 2.  Further, Hollister employee, Mark Kalifa, Vice President of Global Compliance, Clinical and Regulatory Affairs, wrote an article entitled "*AdvaMed Code: An Overview*," describing the merits and how specific provisions of AdvaMed Code are directed to compliance with the AKS, which was published in WOC News, a Wound, Ostomy and Continence Nurses Society publication.  *See* Mark Kalifa, *AdvaMed Code: An Overview* (Issue 2, 2010), attached hereto as **Exhibit 11.**

126.    Pursuant to the AdvaMed Code, "[c]ompanies adopting this Code shall communicate the principles of this Code to their employees, agents, dealers and distributors with the expectation that they will adhere to this Code."  AdvaMed Code, Section II, p. 4.

127.    The AdvaMed Code, adopted by Hollister, expressly states "a Company should not provide free services that eliminate an overhead or other expense that a Health Care Professional would otherwise of business prudence or necessity have incurred as part of its business operations if so doing would amount to an unlawful inducement.  Further, a Company should not suggest mechanisms for billing for services that are not medically necessary, or for engaging in fraudulent practices to achieve inappropriate payment." AdvaMed Code, Section X, p. 10.  The AdvaMed Code also states that "[t]he number of single use products provided at no charge should not exceed the amount reasonably necessary for the adequate evaluation of the products under the circumstances."  AdvaMed Code, at Section XII, p. 11.

## SHIELD AND A-MED SUBMITTED FALSE CLAIMS TO MEDI-CAL USING SHAM GROWTH REBATE AND DISCOUNT SCHEMES

(i)    Background to the Sham Rebate Agreements

128.    At all relevant times, Shield and A-Med were well aware that Medi-Cal covered a substantial percentage of the Products they sold, were enrolled in Medi-Cal and submitted claims for reimbursement to Medi-Cal for Products.

129.    At all relevant times, Shield and A-Med entered into Medi-Cal Provider Agreements, which were in effect.

130.    At all relevant times, Shield and A-Med submitted claims for Products on CMS 1500 Forms and were required to submit Invoice Certifications as called for by applicable Med-Cal rules.

131.    From 2010 through the present, Shield and A-Med entered into various supplier agreements and amendments with Coloplast.  Collectively, these various agreements between Shield and A-Med and Coloplast are referred to as the "Rebate Agreements."

132.    The Rebate Agreements worked as follows: Shield and A-Med and Coloplast agreed on the "true" price of an item to be purchased by Shield and A-Med.  However, rather than invoicing Shield and A-Med at this "true" price, Shield and A-Med and Coloplast would artificially set the invoice price at or above the amount necessary to allow Shield and A-Med to bill Medi-Cal at the maximum reimbursement amount, consistent with the Upper Billing Limits regulation.  Shield and A-Med and Coloplast would then set up a "rebate" or "chargeback" (collectively referred to as "rebate") which reduced the amount paid by Shield and A-Med from the artificial and inflated invoice price, down to the true, agreed-upon price.  Rather than billing Medi-Cal based on its true net purchase price (with the rebate subtracted) as it should have, Shield and A-Med instead billed Medi-Cal based on the full fictitious invoice price, and failed to

reflect the rebate in its claims to Medi-Cal.  In this way, Shield and A-Med would be reimbursed the maximum reimbursement amount, even though such reimbursement exceeded its net purchase price plus a 100% markup, in violation of the Upper Billing Limit regulation.

133.   The rebates agreed to between Shield and A-Med and Coloplast were ostensibly based on the volume of products purchased by Shield and A-Med, and provided for increased rebate percentages and chargeback prices, corresponding to several "tiers" of product volume, measured in dollars.  In reality, however, the rebates were guaranteed, because Shield and A-Med and Coloplast deliberately set the volume "tiers" that triggered the rebates near, or even below, the volumes Shield and A-Med were already purchasing from Coloplast, and also set the corresponding rebate percentages and chargeback prices such that Shield and A-Med's inflated invoice price would always be rebated down to the true, bargained-for price.

134.   Shield and A-Med, like other DMEPOS suppliers selling Products, typically have a relatively static list of beneficiaries to whom they provide the same "package" of Products every month, month after month for years in a row.  Thus, Shield and A-Med's volume of purchases from Coloplast did not normally vary significantly or change suddenly.  Shield and A-Med also had a long "track record" of purchases by which to predict their future purchase volumes.  Thus, when Shield and A-Med set the volume "tiers" in their rebate agreements at levels they were already attaining, Shield and A-Med knew they would earn the corresponding rebates in every quarter.  This was the intent of the agreements and the bargained-for result.

135.   Upon information and belief, Shield and A-Med and Coloplast also had an understanding that, even if Shield and A-Med did not make the minimum volumes that triggered the rebates, Coloplast would still give Shield and A-Med the rebate.

136.    In short, Shield and A-Med knew they would always get Coloplast's Products at the rebated or chargeback prices, and those were the true prices upon which Shield and A-Med and Coloplast negotiated and agreed.

137.    Shield and A-Med, not Coloplast, dictated the key terms of the Rebate Agreements, such as the volumes Shield and A-Med would be purchasing and the net price to be obtained after rebate.

138.    Although a legitimate rebate agreement would normally be proposed by a DMEPOS manufacturer like Coloplast in the hope of inducing a greater volume of purchases, here the purpose of these volume rebates to Shield and A-Med was not to encourage greater volumes of purchases before such volumes were known.  The volumes were already established. The purpose was simply to evade Medi-Cal's Upper Billing Limit regulation, by creating falsely inflated invoices which Shield and A-Med could use as support for their claims to Medi-Cal at the maximum reimbursement amount, and then giving guaranteed rebates on the back end. Shield and A-Med conditioned continued business with Coloplast on Coloplast's agreement to enter into the Rebate Agreements.

139.    Thus, instead of being motivated by a bona fide attempt to induce or reward higher purchase volumes, like a legitimate volume rebate contract, the rebate and chargeback agreements between Shield and A-Med and Coloplast were a sham.  Likewise, the invoice prices and rebate percentages/chargeback prices in the contracts between Shield and A-Med and Coloplast were not arrived at through an arms-length transaction, but were the product of collusion between Shield and A-Med and Coloplast which was specifically designed to set invoice prices at a false or artificial level determined by the Medi-Cal reimbursement amount

and then to "back out" the rebate amount so as to reach the price actually agreed on between the parties, all with the purpose of evading Medi-Cal Upper Billing Limit regulation.

140.    The Rebate Agreements all contained provisions for prompt payment discounts in certain circumstances, which provided that, if the respective Shield and A-Med made payment, in a certain manner, within a certain number of days after receiving a Coloplast's invoice, Shield and A-Med were permitted to withhold the amounts of the prompt payment discount from their payments.

141.    The purpose of the rebate and prompt payment discounts were to induce Shield and A-Med to purchase or to continue purchasing Products which Coloplast knew would be billed to Medi-Cal, and which were in fact billed to Medi-Cal.

142.    In furtherance of the overbilling scheme, Coloplast agreed with Shield and A-Med to issue invoices which reflected only the agreed-upon prices and did not reflect the rebate amounts, even though Coloplast and Shield and A-Med each knew that the Products on the invoices would be subject to a fixed price reduction due to the guaranteed rebates.

(ii)    Shield and A-Med Knew that Submitting Inflated Invoices to Medi-Cal Was Illegal

143.    A-Med and Shield knew that submitting such artificially-inflated invoices to Medi-Cal was illegal because they were both previously defendants in an action alleging FCA and CA FCA violations stemming from the very same conduct.  *See United States ex rel. Donath v. Whitestone Corporation, et al.*, Civil Action No. 07-cv-0995 (C.D. Cal.), **Exhibit 12.**  In fact, as a result of that action, Shield entered into a settlement agreement with the United States and California with respect to the time period from March 1, 2003 through June 30, 2009.  *See* **Exhibit 13**.  However, Shield has continued to defraud Medi-Cal after the effective date of such settlement agreement.  A-Med entered into a settlement agreement with the relator in that action

covering the time period 2003 through 2011.  ***See* Exhibit 14**.  A-Med also continued to defraud Medi-Cal after the effective date of its settlement with relator Donath.

144.     Shield and A-Med were aware of Medi-Cal's Upper Billing Limit regulation but agreed to and created false, fraudulent and misleading documents that concealed the rebates and discounts.  Indeed, as referenced below, in or around late 2010, Relators Herman and Roseff sought to include a disclaimer on Coloplast invoices for A-Med and Shield stating that the amounts reflected in the invoices may not reflect additional earned discounts, rebates, or chargebacks received by the suppliers.  However, Coloplast senior management refused to do so.

145.     By their conduct, the Shield and A-Med maintained the false and misleading invoices as proof of its "net purchase price" as required by the Upper Billing Limit regulation's documentation requirements, even though Shield and A-Med knew that their invoices did not reflect the rebates guaranteed by Coloplast.

146.     Shield and A-Med also generally paid Coloplast the full invoice amounts, and then Coloplast would calculate the rebate on a monthly or quarterly basis and issue a separate rebate credit back to Shield and A-Med. This way, Shield and A-Med were able to maintain a false "paper trail" that showed Shield and A-Med paying Coloplast amounts which matched with the full invoice amounts.  Shield and A-Med would then collect their rebates "on the back end."

147.     Pursuant to these sham volume rebate agreements, A-Med and Shield received rebates from Coloplast in every financial quarter, or other applicable period.

148.     Upon information and belief, Shield and A-Med did not disclose to the State of California in its claims for payment or supporting documentation the rebates or prompt payment discounts they received from Coloplast.  Instead, Shield and A-Med billed the Medi-Cal program

for Products purchased by Coloplast based on Coloplast's invoice prices, which did not reflect the rebate amounts or the prompt payment discounts.

149.    The invoice prices upon which Shield and A-Med based their claims to Medi-Cal never reflected Shield and A-Med's true "net purchase price," because once Shield and A-Med entered into volume rebate agreements with Coloplast, they always received rebates and/or prompt payment discounts off the invoice price, in every financial quarter or other applicable period.  The "tiers" in the rebate agreement were pre-determined such that Shield and A-Med would always qualify for a rebate.  Thus, the rebates were known to Shield and A-Med at all times and were guaranteed by contract.  In every financial quarter, or other applicable period, the invoice prices would be rebated down to the "true" net purchase price as previously agreed.

150.    Despite the fact that the rebate tiers were set such that Shield and A-Med would always qualify for the guaranteed rebates, Shield and A-Med actually received rebates off of their invoice prices in every financial quarter, totaling millions dollars, Shield and A-Med always billed Medi-Cal based on its full invoice price plus 100%; in other words without reflecting the rebates in any way.

151.    Likewise, even when Shield and A-Med had already purchased sufficient volume in a given quarter to qualify for a rebate of a specific percentage under one or more of the "tiers" in their volume rebate contract, and the receipt of rebates were therefore known by Shield and A-Med and unambiguously guaranteed by contract, Shield and A-Med still did not reflect the rebates in their claims to Medi-Cal.

152.    Although Shield and A-Med have received, and continue to receive, millions of dollars in "rebates," Shield and A-Med's claims to Medi-Cal have never reflected any rebates.

-39-

153.     Similarly, although Shield and A-Med have received, and continue to receive, prompt payment discounts, Shield and A-Med have never reflected any prompt payment discounts in their claims to Medi-Cal.

154.     Shield and A-Med's claims to Medi-Cal for Products purchased from Coloplast pursuant to "growth rebate" agreements exceeded the Shield and A-Med's "net purchase price . . . plus a 100 percent markup," in violation of the Upper Billing Limits regulation.

155.     Through their sham growth rebate agreements with Coloplast (which also included prompt payment discounts) Shield and A-Med have improperly evaded the Upper Billing Limits regulations and have been overpaid millions of dollars by Medi-Cal.  Shield and A-Med have failed to return these known overpayments.

156.     Shield and A-Med agreed to and made, used and caused to be made and used false records and statements, including but not limited to, falsely-inflated invoices, CMS Form 1500s, Invoice Certifications, and Provider Agreements, which Shield and A-Med knew, agreed, and intended would be used, and which were used, to get the Shield and A-Med's false Medi-Cal claims paid by the State of California and the United States, via Medi-Cal.

(iii)     Shield Submitted False Claims to Medi-Cal as a Result of the Sham Rebate Agreement with Coloplast

157.     Shield entered into three sham rebate agreements with Coloplast that resulted in Shield submitting false claims to Medi-Cal.

158.     The first, Contract No. PACA0225 was signed by Shield on June 18, 2008 and was effective June 1, 2008 through September 30, 2010.  Exhibit A to the contract set forth roughly 40 products, divided into four categories (Categories A through D).  Exhibit A stated prices for each category of product.  Paragraph (2)(D) of the contract provided that Shield's

rebate would be determined by Exhibit B.  Exhibit B set forth a rebate chart for each category of product.

**CATEGORY A**

| (A) TIER | (B) QUARTERLY PURCHASES EQUAL OR EXCEED (IN $) | (C) QUARTERLY PURCHASES ARE LESS THAN (IN $) | (D) REBATE % |
|---|---|---|---|
| 1 | 370,000.00 | 420,000.00 | 30% |
| 2 | 420,000.00 | 470,000.00 | 38% |
| 3 | 470,000.00 | 600,000.00 | 42% |
| 4 | 600,000.00 | | 45% |

**CATEGORY B**

| (A) TIER | (B) QUARTERLY PURCHASES EQUAL OR EXCEED (IN $) | (C) QUARTERLY PURCHASES ARE LESS THAN (IN $) | (D) REBATE % |
|---|---|---|---|
| 1 | 370,000.00 | 420,000.00 | 30% |
| 2 | 420,000.00 | 470,000.00 | 40% |
| 3 | 470,000.00 | 600,000.00 | 46% |
| 4 | 600,000.00 | | 50% |

159.    Contract No. PACA0225 was amended effective February 1, 2010 to include additional products and rebate categories.  On August 9, 2010, the contract was amended again to extend the term of the original contract to September 30, 2010.

160.    For the quarter ending May 2009 through September 30, 2010, Shield always achieved either the Tier 3 or Tier 4 quarterly purchase threshold and received a rebate from Coloplast.  For instance, in the quarter ending May 2009, Shield achieved Tier 3 threshold and qualified for a rebate of 42% for Category A products, 46% for Category B products, 11% for Category C products, and 35% for Category D products.  Coloplast issued a check to Shield for these rebates in the amount of $117,796.88.

161.    Shield continued to meet either Tier 3 or Tier 4 during the remainder of the contract:

a.  For the quarter ending August 2009, Shield met the Tier 3 threshold again and Coloplast again paid a rebate;

b.  For the quarter ending November 2009, Shield met the Tier 4 threshold and received a check from Coloplast in the amount of $215,112.25;

c.  For the quarter ending May 2010, Shield achieved the Tier 4 threshold and Coloplast paid a rebate in the amount of $148,151.75;

d.  For the last month of the contract, September 2010, Shield achieved the Tier 4 threshold and Coloplast paid a rebate of $59,665.03.

162.    These rebates resulted in the submission of false claims by Shield.  Specifically, the attached spreadsheet, which was provided to Relators by the Government, contains data regarding sample claims submitted by Shield to Medi-Cal under Contract No. PACA0225.  *See* **Exhibit 15.**  These claims did not reflect the rebates Shield later received from Coloplast pursuant to the rebate agreement.

163.    In July and August 2010, Relators Roseff and Herman negotiated a new rebate agreement with Shield.  *See, e.g.*, **Exhibit 16**.  Those negotiations resulted in Contract No. DACA1117, effective October 1, 2010 through February 15, 2014, which is signed by Relator Herman as President of Coloplast.  *See* **Exhibit 17.**  Like the previous contract, Exhibit A to Contract No. DACA1117 set forth categories of products (Categories A through Q) and Exhibit B set forth corresponding rebate Tiers.  *See id.*  For example, Shield would receive a 51% discount on certain Category A products (Freedom T-Tap Leg Bag Kit [A4358] and Cath Ext Urosan Plus STD Latex [A4349]) if it reached the Tier 1 threshold.  Shield received a 43% discount for reaching the Tier 2 threshold on certain Category B products (Self Cath Plus Funnel End FEM [4212] and Self Cath Plus Funnel End FEM [4214]).

164.    Coloplast invoices to Shield gave the contract price list without disclosing the existence or amounts of the rebates.  For example, Coloplast invoice number 12048161 dated 12/19/2012 for Order No. 1424796 includes a line for Item No. 4412 (12 units) and corresponding prices.  Nothing in the invoice indicates the existence or amount of any rebate. *See* **Exhibit 18.**

165.    Shield easily achieved the Tier 3 or Tier 4 threshold during the term of the contract:

| Quarter Ended | Threshold Met by Shield | Rebate Paid by Coloplast |
|---|---|---|
| Dec. 2010 | Tier 3 | $242,727.21 |
| March 2011 | Tier 3 | $256,869.37 |
| June 2011 | Tier 3 | $313.428.82 |
| Sept. 2011 | Tier 4 | $336,706.90 |
| Dec. 2011 | Tier 4 | $330,024.66 |
| March 2012 | Tier 4 | $320,948.76 |
| June 2012 | Tier 4 | $320,130.87 |
| Sept. 2012 | Tier 4 | $345,825.82 |
| Dec. 2012 | Tier 4 | $325,251.31 |
| March 2013 | Tier 4 | $320,137.57 |
| June 2013 | Tier 4 | $335,044.08 |
| Sept. 2013 | Tier 4 | $391,849.01 |
| Dec. 2013 | Tier 4 | $389,746.51 |
| Feb. 2014 | Tier 4 | $174,724.83 |

166.    These rebates resulted in the submission of false claims by Shield.  Specifically, the attached spreadsheet, which was provided to Relators by the Government, contains data regarding sample claims submitted by Shield under Contract No. DACA1117.  *See* **Exhibit 19.** The claims submitted by Shield failed to reflect the amount of any rebates Shield knew it would receive from Coloplast.

167.    Shield and Coloplast entered into the final rebate agreement, Contract No. DACA5926, effective February 16, 2014 through February 29, 2016.  An amendment to the contract was made effective April 1, 2014, to include certain pricing incentives.

168.    Contract DACA5926 includes a prices list (as Exhibit A to the contract) organized by business areas (Continence, ostomy, skin, and wound), as well as quarterly rebate thresholds (Exhibit B to the contract):

| Exhibit B | | Quarterly Rebate Thresholds | | 12/20/2013 |
|---|---|---|---|---|

Purchases eligible for rebate are Gross purchases that have not been subject to chargebacks. Such sales will not be included in rebate eligible purchases. Quarterly Thresholds determine the amount of eligible purchases required to achieve Tier rebates. Tier determines the rate used to calculate rebate percentage due as listed on Exhibit A.

CHART A

| All Brands | Year 1 Quarterly Thresholds | | | |
|---|---|---|---|---|
| | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
| Tier 1 | $1,325,000-$1,349,999 | $1,325,000-$1,349,999 | $1,325,000-$1,349,999 | $1,325,000-$1,349,999 |
| Tier 2 | $1,350,000-$1,374,999 | $1,350,000-$1,399,999 | $1,350,000-$1,424,999 | $1,350,000-$1,449,999 |
| Tier 3 | $1,375,000-$1,399,999 | $1,400,000-$1,499,999 | $1,425,000-$1,599,999 | $1,450,000-$1,699,999 |
| Tier 4 | $1,400,000 + | $1,500,000 + | $1,600,000 + | $1,700,000+ |

Year 2 Quarterly Base Revenue ("Q8R") will be equal to 1/4 the amount of Minimum Purchases required for year 2.

| All Brands | Year 2 Quarterly Thresholds | | | |
|---|---|---|---|---|
| | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 |
| Tier 1 | $1,350,000-$1,399,999 | $1,350,000-$1,399,999 | $1,350,000-$1,399,999 | $1,350,000-$1,399,999 |
| Tier 2 | $1,400,000-$1,474,999 | $1,400,000-$1,499,999 | $1,400,000-$1,524,999 | $1,400,000-$1,549,999 |
| Tier 3 | $1,475,000-$1,799,999 | $1,500,000-$1,899,999 | $1,525,000-$1,999,999 | $1,550,000-$2,099,999 |
| Tier 4 | $1,800,000 + | $1,900,000 + | $2,000,000 + | $2,100,000 + |

169.    Paragraph 2.D of the contract provides, in part, "[t]he percentage of the applicable Rebate shall be the [sic] determined by the Tier achieved by Quarterly Purchases within the applicable contract Quarter"; that "Buyer's Rebate shall be determined from Exhibit B"; "The amount of the Rebate shall be the product of the Quarterly Purchases multiplied by the Rebate percentage."

170.    Under the contract Tiered rebates are available "if Quarterly Rebate Thresholds achieved" for all "Business Area[s]," except for those in the "Skin" category.  The rebates range from 0% at Tier 1 to 72% at Tier 4.  The highest rebates are available for ostomy products.

| Catalog Number | Product Name/Description | Size | HCPCS | Tiered Rebates Available if Quarterly Thresholds achieved | | | |
|---|---|---|---|---|---|---|---|
| | | | | Tier 1 Rebate % | Tier 2 Rebate % | Tier 3 Rebate % | Tier 4 Rebate % |
| 2501 | Assura Stoma Cap, Non-Convex, Cut-to-Fit | 13/16 - 2 1/8" (20-55 mm) | A5055 | 38% | 44% | 47% | 50% |
| 28007S | SureCath Set | 12 FR, 14" (36 cm), 700 mL | A4353 | 37% | 43% | 44% | 46% |
| 210 | Self-Cath Female, Funnel End | 10 FR, 6" (15 cm) | A4351 | 32% | 39% | 41% | 43% |
| 214 | Self-Cath Female, Funnel End | 14 FR, 6" (15 cm) | A4351 | 32% | 39% | 41% | 43% |
| 412 | Self-Cath Straight Tip | 12 FR, 16" (41 cm) | A4351 | 28% | 35% | 39% | 43% |
| 410 | Self-Cath Straight Tip | 10 FR, 16" (41 cm) | A4351 | 28% | 35% | 39% | 43% |

The following pricing is the contract price to Shield Healthcare from Coloplast Corp. All additional costs for distribution services are determined between Shield Healthcare and the authorized distributor and are in addition to the price offered by Coloplast Corp. The authorized distributor is required to provide accurate and timely sales tracings to

171.    The amendment to Contract No. DACA5926 clarified the duration of the calendar quarters and prorated the first quarter payment thresholds to reflect the shorter period of the first quarter:

The purpose of this Amendment is to confirm that the payment incentive on the Contract between Coloplast Corp. and Shield Healthcare will be paid on calendar quarters. The calendar quarters for the first year are as follows:

| Year 1 Quarter 1 | 02.16.2014 – 03.31.2014 |
|---|---|
| Year 1 Quarter 2 | 04.01.2014 – 06.30.2014 |
| Year 1 Quarter 3 | 07.01.2014 – 09.30.2014 |
| Year 1 Quarter 4 | 10.01.2014 – 12.30.2014 |

The first quarter payment thresholds listed on the original Exhibit B will be prorated as shown below:

| All Brands | Quarter 1 |
|---|---|
| Tier 1 | $662,500 - $674,999.50 |
| Tier 2 | $675,000 - $687,499.50 |
| Tier 3 | $687,500 - $699,999.50 |
| Tier 4 | $700,000 + |

Subsequent contract years will follow the same calendar quarter logic.

172.    Shield and Coloplast knew and intended that Shield would meet at least the Tier 3 threshold when they negotiated Contract No. DACA5926.  In an email dated November 26, 2013, Tim Townson (Coloplast Key Account Manager for Shield) told Paul Collins at Shield "I

want to make sure it is clear our intention is for you to qualify for Tier 3 in the first quarter of the contract.  If you decide to do a Convatec conversion, then you should easily qualify for Tier 4."  Later, in a December 12, 2013 email to Collins, Townson proposed a minimum commitment tier schedule for the new contract that "will allow for [Shield] to qualify for Tier 4 today as well as give you time to run some of the campaigns we discussed while still getting our best pricing."

173.    Upon information and belief, Coloplast sent a check to Shield in the amount of $246,452.15, which constituted rebates for the first quarter under Contract No. DACA5926.

174.    These anticipated rebates resulted in the submission of false claims to Medi-Cal by Shield.  Specifically, the attached spreadsheet, which was provided to the Relators by the Government, contains data regarding sample claims submitted by Shield to Medi-Cal under Contract No. DACA5926.  *See* **Exhibit 20.**   The claims submitted by Shield failed to reflect the amount of any rebates Shield knew it would receive from Coloplast.  The second page of the worksheet contains pricing and rebate information from Contract No. DACA5926.

   (iv)   A-Med Submitted False Claims to Medi-Cal as a Result of the Sham Rebate Agreement with Coloplast

175.    On or about September 29, 2011, A-Med and Coloplast entered into Contract DACA5115, effective October 1, 2011 through September 30, 2013.  *See* **Exhibit 21.**  The Tier thresholds and rebate percentages were set out in Incentive Pages attached to the Contract.  *See id.* **at AMED00297800-AMED00297801.**

176.    In the fall of 2012, Defendant Byram acquired A-Med, effective December 1, 2012.  Byram assumed the A-Med-Coloplast contract for approximately the last four months.  Coloplast and Byram then negotiated amendments to the effective Byram-Coloplast agreement (Contract No. DACT5482), adding A-Med as a "Purchaser Party" and adopting the same pricing structure from the A-Med-Coloplast contract, except that the rebates were characterized as

-46-

"chargebacks" made for "sales to end users."  Effective April 1, 2013, A-Med sales were covered by the amended Byram-Coloplast Contract No. DACT5482.

177.    During the effective period of the A-Med-Coloplast Contract No. DACA5115 (October 1, 2011 through March 31, 2013), A-Med consistently achieved the Tier 1 rebate thresholds:

Tier 1 Threshold: $575,000

|                      | Contract YR1 Q1 | Contract YR1 Q2 | Contract YR1 Q3 | Contract YR1 Q4 |
|----------------------|-----------------|-----------------|-----------------|-----------------|
| Total Sales          | $582,572.67     | $601,676.02     | $583,931.10     | $587,544.17     |
| Tier Achieved        | Tier 1          | Tier 1          | Tier 1          | Tier1           |
| Total Rebate Payment | $78,317.35      | $84,555.68      | $82,952.02      | $60,635.93      |

|                      | Contract YR2 Q1 | Contract YR2 Q2 |
|----------------------|-----------------|-----------------|
| Total Sales          | $648,142.31     | $631,424.01     |
| Tier Achieved        | Tier 1          | Tier 1          |
| Total Rebate Payment | $79,268.20      | $86,969.33      |

178.    These rebates resulted in the submission of false claims to Medi-Cal by A-Med. Specifically, the attached spreadsheet, which was provided to Relators by the Government, contains data regarding claims submitted by A-Med to Medi-Cal under Contract No. DACA5115 during the period January 1, 2012 through December 1, 2012.  *See* **Exhibit 22.**  The claims submitted by A-Med failed to reflect the amount of any rebates A-Med knew it would receive from Coloplast.  Also attached are certain exemplar invoices from Coloplast to A-Med, which were also provided to Relators by the Government.  *See* **Exhibits 23.**   These invoices failed to reflect the rebate amounts A-Med knew it would receive from Coloplast under Contract No. DACA5115.

## RETALIATION ALLEGATIONS

**A.      Relators Herman and Roseff**

179.      Relator Herman is a well-regarded healthcare executive with over twenty-five years of healthcare management experience.  Her former positions within the industry include Chief Marketing Officer/SVP of Gentiva, Chief Operations Officer/EVP of Senior Home Care, and Vice President of Apria Healthcare.

180.      Beginning in August 2009, Relator Herman served as a consultant to Coloplast as interim Vice President of Marketing.  In January 2010, Relator Herman was hired as a full-time employee by Coloplast as Vice President of Marketing.  Within a few months, in April 2010, Relator Herman was promoted to President of Coloplast.

181.      Relator Roseff has over thirty years of healthcare experience, including as an entrepreneur of DME products.  In June 2009, Relator Roseff joined Coloplast as National Accounts Manager.  In or about March 2010, Relator Roseff was promoted to Director of Distribution for U.S. Coloplast.  Relator Roseff visited Coloplast's headquarters in Minnesota on a weekly basis to perform work and attend meetings.

182.      Relators Roseff and Herman's job duties provided them with direct and personal knowledge of Coloplast's domestic sales and marketing initiatives as well as direct contact with the company's worldwide leadership.   Relators Roseff and Herman received positive performance evaluations and were both promoted to leadership positions within Coloplast in recognition of their value to the company.

183.      In or about October 2009, Relator Herman learned in conversation with Bjorn Christ, Senior Vice President of Global, that Coloplast was hiring Veome to become Vice President of Marketing at Coloplast as of February 2010.  Given her knowledge of Veome's

illegal sales and marketing activities at Hollister, Relator Herman was uncomfortable with this development and voiced her concerns to Christ.

184.    In or about February 2010, a workshop was held at Coloplast wherein the following participants attended: Relator Herman, Relator Roseff, Veome, Christ, Craig Palmer, Vice President of Sales, and Kristian Villumsen, Senior Vice President of Global Marketing. The purpose of the workshop was to discuss replicating Hollister's Secure Start program at Coloplast.  At that meeting, Relator Roseff voiced his concerns about replicating such a program, stating that he did not think Veome's growth model could be implemented for legal and ethical reasons.   Veome responded to this concern by stating: "We do all of this at Hollister."  Relator Herman was also adamant during the workshop that Coloplast could not implement a program similar to Secure Start and be in compliance with U.S. healthcare laws.

185.    Immediately after the conclusion of the workshop, Relators Herman and Roseff convened and conducted Internet research concerning the legality of Veome's work and the Secure Start program.  Thereafter, Relators forwarded the information they found to Christ and repeated their objection to the implementation of the CARE program on the grounds that it violated the AKS, FCA and other federal regulatory laws.  At that time, Relators Herman and Roseff suggested engaging outside counsel to evaluate the legality of the program.

186.    Within approximately one week after the workshop, Relators Herman and Roseff along with Christ had an introductory call with outside counsel.  During that call, Christ authorized outside counsel to review the proposed CARE program.

187.    In or about March 2010, a conference call was held with Relators, Christ and outside counsel to discuss outside counsel's advice concerning the CARE program.  The

following day, Christ decided to redeploy Veome to a global position based outside the United States.

188.   Veome continued to direct Coloplast's U.S. sales and marketing activities and to implement the CARE program from his redeployed post.  Marketing planning meetings also continued to take place at Coloplast's offices in Minnesota, however Relator Herman was excluded from those meetings.

189.   During the months that followed, Relator Herman raised her concerns about the legality of Veome's work and her exclusion from marketing meetings on multiple occasions with Christ, both by email and in person.  In response to her concerns, Christ told Relator Herman in words and substance: "Kim, shut up and get on board."

190.   In or around late 2010, Relators Herman and Roseff sought to include a disclaimer on Coloplast invoices for A-Med and Shield stating that the amounts reflected in the invoices may not reflect additional earned discounts, rebates, or chargebacks received by the suppliers.  Peter Fusager, Coloplast's VP of Finance who reported to Coloplast Denmark, told Relator Herman that "it would be very difficult to add this information to select invoices." Relator Herman instructed the finance department to add the language to all Coloplast invoices. However, at the direction of Fusager and Coloplast Denmark, the disclaimer was never added.

191.   In April 2011, at a Global Leadership Group meeting in Denmark, Relator Herman was repeatedly ridiculed by executive management at Coloplast Global for "needing to get on board with a growth plan" for the ostomy and continence care business in the U.S.  At the same meeting, Veome told Herman that he would "very shortly be spending a significant amount of time in the U.S."

192.    One week later, Coloplast's CEO Lars Rasmussen terminated Relator Herman in retaliation for her investigation of and refusal to participate in Coloplast's fraudulent and unlawful marketing activities.

193.    On or about the same day that Relator Herman was terminated, Veome was relocated back to the United States to become Vice President of Marketing at Coloplast.

194.    In or around May 2011, Relator Roseff went to Coloplast's Human Resources department and expressed concern for his continued employment at Coloplast given his vocal disagreement with Coloplast's illegal marketing efforts.

195.    In or about June 2011, Ulrik Berthelsen asked Relator Roseff to add certain language to Coloplast's contract with a supplier concerning the waiver of patient co-pays. Relator Roseff forwarded this request to Coloplast's in-house legal department stating: "I am not comfortable with this from a compliance perspective as it relates to Medicare."

196.    On or about July 20, 2011 (after Relator Roseff returned to the office from vacation), Coloplast terminated Relator Roseff for his investigation of and refusal to participate in Coloplast's fraudulent and unlawful marketing activities.

**B.    Relator Lestage**

197.    Relator Lestage is an experienced health care professional with eleven years of experience in the healthcare industry.

198.    In March 2004, Relator Lestage joined Coloplast as a Sales and Service Representative.  Through the years, she was promoted to various positions having account responsibility over several of the defendant suppliers.  In 2010, she was promoted to Key Accounts Manager.  As part of her duties in that role, Relator Lestage was responsible for managing defendant Byram's account.

199.    Relator Lestage's duties provided her with direct and personal knowledge of Coloplast's domestic sales and marketing initiatives as well as direct contact with the company's worldwide leadership.   Relator Lestage received positive performance evaluations and was recognized as a valuable member of the sales and marketing team.

200.    In December 2011, Relators filed the original *qui tam* Complaint in this Court under seal.   Thereafter, Relator Lestage provided material support to the government in its investigation of Relators' False Claims Act allegations.

201.    In or about November 2014, the original *qui tam* Complaint was unsealed by this Court and became available on the public docket for the first time.

202.    In or about December 2014, Coloplast removed the Byram account from Relator Lestage's responsibility in retaliation for her participation in the *qui tam* action.

203.    On December 23, 2014, Coloplast placed Relator Lestage on indefinite administrative leave for her participation in the *qui tam* action and investigation of False Claims Act violations.

204.    Since being place on administrative leave, Relator Lestage has been paid significantly less than what she had been earning prior to the retaliatory conduct by Coloplast.

205.    During her administrative leave, Coloplast has engaged in further acts of retaliation in an attempt to dissuade Relator Lestage from returning to work.

## CLAIMS FOR RELIEF

## COUNT I
## <u>FALSE CLAIMS ACT</u>
### CCS

**CCS Knowingly Presented or Caused to be Presented False and/or Fraudulent Claims in Violation of 31 U.S.C. § 3729(a)(1)(A), as amended, by Accepting Illegal Kickbacks in Exchange for Converting Patients to**

**Defendant Manufacturers' Products in Violation of the Anti-Kickback Statute**

206.    Plaintiff/Relators repeat and reallege the allegations contained in paragraphs 1 through 205 as if fully set forth herein.

207.    This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

208.    From least 2011 to the present, CCS knowingly accepted illegal kickbacks from Coloplast in the form of price reductions in exchange for which CCS would convert patients to the Coloplast's products.

209.    Through the acts described herein, from at least 2011 to the present, Defendant CCS presented for payment and approval false and/or fraudulent claims to officers of the United States government.

210.    As described herein, such claims were false and/or fraudulent because CCS certified that the claims submitted complied with the Federal Anti-Kickback Statute ("AKS"), but as alleged herein the claims were in fact the result of illegal kickbacks.

211.    The submission of false and/or fraudulent claims to which CCS was not entitled and that the Government paid by mistake constitutes a violation of the FCA.

212.    Violation of the AKS renders related claims per se false or fraudulent because compliance with the AKS is a condition of payment under the Medicare program.  Violation of the AKS rendered CCS ineligible to receive Medicare reimbursement for the submitted claims.

213.    CCS failed to disclose the material violations of the AKS and other laws.  As a result of this illegal activity, these claims were improper pursuant to 31 U.S.C. § 3729(a)(1)(A).

214.     CCS deliberately and intentionally concealed material information from government officials, their contractors, carriers, intermediaries and agents, in order to induce payment of the false and fraudulent claims.

215.     Government health care program officials and their contractors, carriers, intermediaries and agents, would not have paid the claims submitted by CCS had they known the truth.

216.     By reason of the illegal kickback schemes described herein, the United States has suffered significant losses in an amount to be determined at trial.

**COUNT II**
**FALSE CLAIMS ACT**
**CCS**

**CCS Knowingly Made, Used or Caused to be Made or Used a False and/or Fraudulent Statement Material to a False Claim in Violation of 31 U.S.C. § 3729(a)(1)(B), as amended**

217.     Plaintiff/Relators repeat and reallege the allegations contained in paragraphs 1 through 216 as if fully set forth herein.

218.     This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. 31 U.S.C. §§ 3729-3733, as amended.

219.     From at least 2011 to the present, CCS knowingly made or used false records or statements material to payment or approval of a claim, including without limitation claims submitted to Medicare and/or Medi-Cal on CMS Form 1500 claims forms.

220.     As described herein, such false records or statements include without limitation:

(a)     False statements on the CMS 1500 claim form as to compliance with the Federal anti-kickback statute;

(b)     False statements on the CMS 1500 claim form as to the truthfulness, accuracy and completeness of the form; and

(c)     False statements on the supplier enrollment agreement, including but not limited to CMS Form 855S, as to the CCS's compliance with the AKS at a time when CSS was receiving kickbacks from Coloplast.

221.     CCS knowingly made or used or caused to be made or used false records or statements, and knew that such records or statements were material to getting CCS claims paid or approved by Medicare or Medi-Cal.   CCS knew that the claims were not eligible for reimbursement because of the illegal kickback scheme and it was a natural and foreseeable consequence that CCS would make or use such records or statements.

222.     CCS made or used such records or statements as a natural and foreseeable result of the illegal kickback activities described in this Complaint.

223.     Government health care program officials, their contractors, carriers, intermediaries and agents paid and approved claims for payment to CCS that should not have been paid or approved.

224.     CCS deliberately and intentionally concealed the false and fraudulent nature of the claims from the government officials, their contractors, carriers, intermediaries and agents, in order to induce payment of the false and fraudulent claims.

225.     Government officials, their contractors, carriers, intermediaries and agents would not have paid CCS's claims if they had known the truth.

226.     By reason of the above-described actions the United States has suffered significant losses in an amount to be determined at trial.

## COUNT III
## FALSE CLAIMS ACT, CONSPIRACY
### CCS

**CCS Conspired to Violate the False Claims Act by Getting False or Fraudulent Claims Allowed or Paid by the United States in Violation of 31 U.S.C. § 3729(a)(1)(C), as amended**

227.    Plaintiff/Relators repeat and reallege the allegations contained in paragraphs 1 through 226 as if fully set forth herein.

228.    This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

229.    From at least 2011 to the present, CCS conspired with Coloplast to defraud the United States by knowingly accepting kickbacks in the form of illegal price discounts in exchange for which CCS would convert patients to Coloplast's products.

230.    From at least 2011 to the present, CCS knowingly conspired with Coloplast to violate the FCA by acting together to present or cause to be presented false or fraudulent claims to the government, thereby causing the government, including Medicare and Medi-Cal to reimburse ineligible claims.  Said claims were improper and should not have been made but for the illegal remunerations which caused the claims to be made.  Said claims were also illegally excessive in cost due to the illegal kickbacks and actions of CCS.

231.    From at least 2011 to the present, CCS knowingly conspired with Coloplast to defraud the United States by knowingly submitting false certifications to government health care programs, including but not limited to Medicare and Medi-Cal, that the Supplier was in compliance with state and federal laws, including the AKS.

232.    By virtue of their conspiratorial conduct, CCS presented false or fraudulent claims with the intent to defraud the government.  Such false or fraudulent claims were paid by

Government officials, their contractors, carriers, intermediaries and agents, causing significant damages to the United States.

233.    The United States is therefore entitled to recover from CCS treble damages under the FCA in an amount to be proved a trial, plus a civil penalty of at least $5,500 per violation.

**COUNT IV**
**FALSE CLAIMS ACT**
**Shield and A-Med**

**Shield and A-Med Knowingly Presented or Caused to be Presented False and/or Fraudulent Claims in Violation of 31 U.S.C. § 3729(a)(1)(A), as amended**

234.    Plaintiff/Relators repeat and reallege the allegations contained in paragraphs 1 through 233 as if fully set forth herein.

235.    This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

236.     Since 2009 and 2011, respectively, Defendants Shield and A-Med knowingly presented, or caused to be presented, false and/or fraudulent claims for payment and approval the United States government.

237.    The United States, in reliance on the accuracy of the claims and unaware of any rebates Shield and A-Med would receive from defendant manufacturers, paid Defendants Shield and A-Med more than would have been paid if they claims had not been false.

238.    By reason of these payments, the United States has suffered damages in an amount to be determined at trial.

## COUNT V
## FALSE CLAIMS ACT
### Shield and A-Med

**Shield and A-Med Knowingly Made, Used or Caused to be Made or Used a False and/or Fraudulent Statement Material to a False Claim in Violation of 31 U.S.C. § 3729(a)(1)(B), as amended**

239.     Plaintiff/Relators repeat and reallege the allegations contained in paragraphs 1 through 238 as if fully set forth herein.

240.     This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. 31 U.S.C. §§ 3729-3733, as amended.

241.     Since 2009 and 2011, respectively, Defendants Shield and A-Med knowingly made, used or caused to be made or used false records or statements material to obtain government payment for false or fraudulent claims.

242.     The United States, in reliance on the accuracy of the claims and unaware of any rebates Shield and A-Med would receive from defendant manufacturers, paid Defendants Shield and A-Med more than would have been paid if they claims had not been false.

243.     By reason of these payments, the United States has suffered damages in an amount to be determined at trial.

## COUNT VI
## FALSE CLAIMS ACT, CONSPIRACY
### Shield and A-Med

**Shield and A-Med Conspired to Violate the False Claims Act by Getting False or Fraudulent Claims Allowed or Paid by the United States in Violation of 31 U.S.C. § 3729(a)(1)(C), as amended**

244.     Plaintiff/Relators repeat and reallege the allegations contained in paragraphs 1 through 243 as if fully set forth herein.

245.     This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

246.     From at least 2009 and 2011, respectively, Defendants Shield and A-Med conspired with defendant manufacturers to defraud the United States by knowingly submitting or causing to be submitted false and fraudulent claims to Medi-Cal and the United States government.

247.     By virtue of their conspiratorial conduct, Shield and A-Med presented false or fraudulent claims with the intent to defraud the government.  Such false or fraudulent claims were paid by Government officials, their contractors, carriers, intermediaries and agents, causing significant damages to the United States.

248.     The United States is therefore entitled to recover from Shield and A-Med treble damages under the FCA in an amount to be proved a trial, plus a civil penalty of at least $5,500 per violation.

## COUNT VII
## CALIFORNIA FALSE CLAIMS ACT
### Shield and A-Med

**Shield and A-Med Knowingly Presented or Caused to be Presented False and/or Fraudulent Claims in Violation of Cal. Gov't Code §§ 12650 *et seq.* by Submitting Claims for Reimbursement from Medicare Without Disclosing Illegal Rebates and/or Discounts**

249.     Plaintiff/Relators repeat and reallege the allegations contained in paragraphs 1 through 248 as if fully set forth herein.

250.     This is a claim for treble damages and monetary penalties pursuant to the California False Claims Act, Cal. Gov't Code §§ 12650 et seq., as amended.

251.     From at least 2009 to the present, Shield and A-Med have orchestrated a scheme wherein they submitted claims for reimbursement to Medi-Cal attaching an invoice purportedly

reflecting the true cost of the Product, with knowledge that they were entitled to certain guaranteed rebates, chargebacks and other discounts from Defendant Coloplast that would discount the cost of the Product as reflected in the invoice.

252.    As alleged herein, Shield and A-Med entered into rebate agreements with Coloplast that entitled them to certain discounts based on product volume.  In furtherance of the overbilling scheme, Coloplast agreed to issue invoices which reflected only the agreed-upon prices before the rebate amounts, even though Shield and A-Med knew that the prices reflected on the invoices would be subject to a fixed price reduction due to the guaranteed rebate and/or chargeback.  Shield and A-Med knew that they were entitled to the discounts regardless of the volume purchased.  Shield and A-Med submitted claims for reimbursement to Medi-Cal with invoices that failed to reflect the rebate, chargeback or other discount guaranteed by Coloplast, and failed to correct or report the true cost of the product after receiving the discount.

253.    Shield and A-Med knew that these rebate agreements violated Medi-Cal's Upper Billing Limit regulation.

254.    Shield and A-Med knowingly presented or caused to be presented false or fraudulent claims resulting from the overbilling scheme to Medi-Cal, thereby causing Medi-Cal to reimburse ineligible claims.

255.    Medi-Cal would not have paid Shield and A-Med's claims had they known the truth.

256.    By reason of Shield and A-Med's conduct, the State of California has suffered significant losses in an amount to be determined at trial.

**COUNT VIII**
**FALSE CLAIMS ACT, CONSPIRACY**
**Hollister**

**Hollister Conspired to Violate the False Claims Act by Submitting False or Fraudulent Claims Made in Violation of the Telephone Solicitation Prohibition in Violation of 31 U.S.C. § 3729(a)(1)(C), as amended**

257.    Plaintiff/Relators repeat and reallege the allegations contained in paragraphs 1 through 256 as if fully set forth herein.

258.    This is a claim for treble damages and monetary penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

259.    From at least 2010 to the present, Hollister knowingly conspired with Defendant Byram and other suppliers to violate the FCA by acting together to present or cause to be presented false or fraudulent claims to the government, thereby causing the government to reimburse ineligible claims.   Said claims were false, fraudulent and improper and should not have been made because they were the result of unsolicited telephone contacts made in violation of 42 U.S.C. § 1395m(a)(17)(A) ("Telephone Solicitation Prohibition").

260.    As detailed above, beginning on or before June 2010 and continuing through the present, through Hollister's "Secure Start Discharge Program," Defendant Byram and other suppliers utilized Hollister to make unsolicited telemarketing calls to Medicare beneficiaries on their behalf.   The purpose of these telemarketing calls was to direct Medicare beneficiaries who were not yet customers of the Defendant Byram or another supplier to a specific supplier by transferring beneficiaries in real time via telephone to a particular supplier.

261.    Medicare beneficiaries were unaware that Hollister was contacting them on behalf of the Defendant Byram or other supplier to arrange for the supplier to furnish Hollister products for which the supplier would submit claims to Medicare and Medicare Advantage Organizations.

262.    If the beneficiary verbally consented to be transferred, the beneficiary would be live-transferred by Hollister over the phone to Defendant Byram or another supplier.   This

transfer process was referred to by Hollister as a "Warm Transfer."  The Warm Transfers were made by Hollister pursuant to an agreement with the Defendant Byram and other suppliers in which Hollister agreed to make contact with the patients on the suppliers' behalf in order to furnish Hollister products to the Medicare beneficiaries.

263.   As a result thereof, Hollister and the Defendant Byram and other suppliers conspired and acted in concert to make telemarketing calls to Medicare beneficiaries, who were not yet customers of the suppliers and who had not given the suppliers written permission to be contacted, regarding the furnishing of DMEPOS in violation of the Medicare prohibition on unsolicited telephone contact by DMEPOS suppliers, 42 U.S.C. § 1395m(a)(17)(A).

264.   The success of this conspiracy is reflected in **Exhibits 9 and 10**, which is a weekly report that Hollister sent to defendant Byram for the "warm transfers" made by Hollister for the week of July 7, 2013 through July 13, 2013.

265.   Pursuant to 42 U.S.C. § 1395m(a)(17)(B), suppliers are prohibited from being paid for items furnished subsequent to unsolicited contacts.  As a result, compliance with the Telephone Solicitation Prohibition is a condition of payment.  Accordingly, a violation of the Telephone Solicitation Prohibition is a violation of the FCA.

266.   By virtue of Hollister and Defendant Byram and other suppliers' conspiratorial conduct, on information and belief, the Defendant Byram and other suppliers presented and/or caused to be presented false or fraudulent claims with the intent to defraud the government.  On information and belief, such false or fraudulent claims were paid by Government officials, their contractors, carriers, intermediaries and agents, causing significant damages to the United States.

267.    The United States is therefore entitled to recover from Hollister treble damages under the FCA in an amount to be proved at trial, plus a civil penalty of at least $5,500 per violation.

## COUNT IX
## FALSE CLAIMS ACT, RETALIATORY DISCHARGE
### Defendant Coloplast

**Defendant Coloplast Discharged Relator Herman in Retaliation for her Refusal to Participate in Defendant's Unlawful Marketing Activities in Violation of 31 U.S.C. § 3730(h)**

268.    Relators repeat and reallege the allegations contained in paragraphs 1 through 267 as if fully set forth herein.

269.    This is a claim for damages arising from the retaliatory discharge of Relator Herman by Defendant Coloplast.

270.    As alleged in this Amended Complaint, Relator Herman engaged in activities to investigate whether the CARE and Secure Start programs caused false claims to be submitted for payment to the government.  On multiple occasions, Relator Herman notified her supervisor, Bjorn Christ, of her belief that the CARE program violated the AKS, FCA and other federal regulatory laws.  Relator Herman also refused to participate in implementing the CARE program and other illegal marketing activities.

271.    On or about April 2011, Coloplast discharged Relator Herman from her employment and damaged Herman's career as a direct and intended result of Herman's investigation of the false claims violations and refusal to knowingly participate in the fraudulent activities alleged in this Amended Complaint.

272.     Relator Herman is entitled to reinstatement as President of Coloplast or in lieu thereof front pay, two times the amount of back pay, interest on back pay, and compensation for special damages including litigation costs and attorney's fees.

## COUNT X
## FALSE CLAIMS ACT, RETALIATORY DISCHARGE
### Defendant Coloplast

**Defendant Coloplast Discharged Relator Roseff in Retaliation for his Refusal to Participate in Defendant's Unlawful Marketing Activities in Violation of 31 U.S.C. § 3730(h)**

273.     Relators repeat and reallege the allegations contained in paragraphs 1 through 272 as if fully set forth herein.

274.     This is a claim for damages arising from the retaliatory discharge of Relator Roseff by Defendant Coloplast.

275.     As alleged in this Amended Complaint, Relator Roseff engaged in activities to investigate whether the CARE and Secure Start programs caused false claims to be submitted for payment to the government.  On multiple occasions, Relator Roseff notified Bjorn Christ of his belief that the CARE program violated the AKS, FCA and other federal regulatory laws.  Relator Roseff also refused to participate in implementing the CARE program and other illegal marketing activities.

276.     On or about July 2011, Coloplast discharged Relator Roseff from his employment and damaged Roseff's career as a direct and intended result of Roseff's investigation of the false claims violations and refusal to knowingly participate in the fraudulent activities alleged in this Complaint.

277. Relator Roseff is entitled to reinstatement as Director of Distribution for U.S. Coloplast or in lieu thereof front pay, two times the amount of back pay, interest on back pay, and compensation for special damages including litigation costs and attorney's fees.

## COUNT XI
## FALSE CLAIMS ACT, RETALIATORY DISCHARGE
### Defendant Coloplast

**Defendant Coloplast Removed Relator Lestage's Largest Account from her Responsibility and Placed her on Administrative Leave in Retaliation for her Participation in the *qui tam* Litigation and Investigation of False Claims in Violation of 31 U.S.C. § 3730(h)**

278. Relators repeat and reallege the allegations contained in paragraphs 1 through 277 as if fully set forth herein.

279. This is a claim for damages arising from the retaliatory actions taken against Relator Lestage by Defendant Coloplast.

280. As alleged in this Amended Complaint, Relator Lestage engaged in activities to investigate whether the CARE and Secure Start programs caused false claims to be submitted for payment to the government. Relator Lestage also engaged in activities to investigate whether the various marketing campaigns by which Coloplast paid remuneration in the form of price reductions, rebates and marketing funds to Byram and CCS to participate in conversion campaigns and promotional campaigns in violation of the AKS, resulted in the submission of false claims to various federal health care programs. Relator Lestage also reported False Claims Act and AKS violations to the government by filing the *qui tam* action.

281. In or about November 2014, the *qui tam* Complaint was unsealed and became available on the public docket for the first time.

282.     In or about December 2014, Coloplast removed Relator Lestage's largest account, Byram, from her responsibility as a direct result of her participation in the *qui tam* action and investigation of False Claims Act violations.

283.     On or about December 23, 2014, Coloplast placed Relator Lestage on indefinite administrative leave and damaged Lestage's career as a direct result of her participation in the *qui tam* action and investigation of False Claims Act and AKS violations.

284.     Relator Lestage is entitled to reinstatement or in lieu thereof front pay, two times the amount of back pay, interest on back pay, and compensation for special damages including litigation costs and attorney's fees.

## COUNT XII
## <u>MINNESOTA WHISTLEBLOWER LAW, MINN. STAT. § 181.932</u>
### Defendant Coloplast

**Defendant Coloplast Discharged Relator Herman in Retaliation for her Refusal to Participate in Defendant's Unlawful Marketing Activities in Violation of Minn. Stat. § 181.932**

285.     Relators repeat and reallege the allegations contained in paragraphs 1 through 284 as if fully set forth herein.

286.     This is a claim for damages arising from the retaliatory actions taken against Relator Herman by Defendant Coloplast.

287.     At all relevant times, Herman was a resident of Minnesota.

288.     As alleged in this Complaint, Relator Herman engaged in activities to investigate whether the CARE and Secure Start programs caused false claims to be submitted for payment to the government.  On multiple occasions, Relator Herman notified her supervisor, Bjorn Christ, of her belief that the CARE program violated the AKS, FCA and other federal regulatory laws.

-66-

Relator Herman also refused to participate in implementing the CARE program and other illegal marketing activities.

289.    In or about April 2011, Coloplast discharged Relator Herman from her employment and damaged Herman's career as a direct and intended result of Herman's reporting of the false claims violations and refusal to knowingly participate in the fraudulent activities alleged in this Complaint.

290.    Pursuant to Minn. Stat. § 181.935, Relator Herman is entitled to any and all damages recoverable at law, including reinstatement as President of Coloplast or in lieu thereof front pay, compensatory damages and punitive damages, together with costs and reasonable attorney's fees.

## COUNT XIII
## MINNESOTA WHISTLEBLOWER LAW, MINN. STAT. § 181.932
### Defendant Coloplast

**Defendant Coloplast Discharged Relator Roseff in Retaliation for his Refusal to Participate in Defendant's Unlawful Marketing Activities in Violation of Minn. Stat. § 181.932**

291.    Relators repeat and reallege the allegations contained in paragraphs 1 through 290 as if fully set forth herein.

292.    This is a claim for damages arising from the retaliatory actions taken against Relator Roseff by Defendant Coloplast.

293.    During his employment, Relator Roseff visited Coloplast's Headquarters in Minnesota, where he had an office, on a weekly basis to perform work for Coloplast. Additionally, for a period of time Coloplast maintained an apartment for Roseff in Minneapolis, Minnesota while he was employed by Coloplast.

294.   As alleged in this Complaint, Relator Roseff engaged in activities to investigate whether the CARE and Secure Start programs caused false claims to be submitted for payment to the government.  On multiple occasions, Relator Roseff notified Bjorn Christ of his belief that the CARE program violated the AKS, FCA and other federal regulatory laws.  Relator Roseff also refused to participate in implementing the CARE program and other illegal marketing activities.

295.   In or about July 2011, Coloplast discharged Relator Roseff from his employment and damaged Roseff's career as a direct and intended result of Roseff's reporting of the false claims violations and refusal to knowingly participate in the fraudulent activities alleged in this Complaint.

296.   Pursuant to § 181.935, Relator Roseff is entitled any and all damages recoverable at law, including reinstatement as Director of Distribution for U.S. Coloplast or in lieu thereof front pay, compensatory damages and punitive damages, together with costs and reasonable attorney's fees.

## COUNT XIV
## FALSE CLAIMS ACT, ATTORNEY'S FEES
### Defendants Coloplast, Hollister, Byram and Liberator

**Defendants Coloplast, Hollister, Byram and Liberator for attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d) up to the date of the lifting of the stay against Byram and Hollister**

297.   Relators repeat and reallege the allegations contained in paragraph 1 through 296 above as if fully set forth herein.

298.   Relators filed this *qui tam* action on December 2, 2011 against a number of defendants including Coloplast, Hollister, Byram and Liberator.

299.    On November 20, 2014, Relators filed an Amended Complaint, which included claims against Coloplast, Hollister, Byram and Liberator.

300.    On June 1, 2015, Relators filed a Second Amended Complaint, which included claims against Coloplast, Hollister, Byram and Liberator.

301.    Each of the complaints were brought by the Relators on behalf of the United States and the State of California against Coloplast, Hollister, Byram, Liberator and other Suppliers under the False Claims Act, 31 U.S.C. §§ 3729-3733, and against Coloplast, Byram and several other Suppliers under the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*, to recover treble damages sustained by, and civil penalties and restitution owed to, the United States and the State of California as a result of illegal kickback schemes and deceptive marketing campaigns by which Coloplast and Hollister paid illegal remuneration to Byram and Liberator, resulting in the submission of false claims to federal health care programs and California's Medicaid program, as well as to recover attorneys' fees, expenses and costs as permitted by each statute.

302.    The United States and State of California conducted an extensive investigation into the allegations made by the Relators from November 2011 through to and including March 2016.  Throughout, the Relators provided material assistance to the investigation.

303.    On December 22, 2015, the Government filed a notice of its intention to partially intervene as to Defendant Coloplast for the purposes of settlement.  (ECF No. 56.)

304.    In December 2015, Coloplast executed a settlement with the Government and Relators, which specifically reserved Relators' claims for attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d), as well as Relators' claims alleging retaliation.  (ECF No. 81 at ¶ 4.)

305.   On December 22, 2015, the Government filed a notice of its intention to partially intervene as to Defendant Liberator for the purposes of settlement.  (ECF No. 56.)

306.   In December 2015, Liberator executed a settlement with the Government and Relators, which specifically reserved Relators' claims for attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d).  (ECF No. 81 at ¶ 5.)

307.   Defendant Byram is in the process of finalizing a settlement with the Government and Relators.  (ECF No. 81 at ¶ 9.)   The settlement agreement with Byram will similarly reserve Relators' claims for attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d).  (*Id.*)

308.   Defendant Hollister is in the process of finalizing a settlement with the Government and Relators.  (ECF No. 81 at ¶ 10.)   The settlement agreement with Hollister will similarly reserve Relators' claims for attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d), as well as Relators' claim alleging a violation of the Telephone Solicitation Prohibition.  (*Id.*).

309.   Pursuant to 31 U.S.C. § 3730(d), Relators are entitled to recover their attorneys' fees, expenses and costs incurred in connection with the settled claims through the date the Court lifts the stay on the underlying litigation, as well as their subsequent attorneys' fees, expenses and costs in connection with pursuing the remaining claims specified above in Counts I through XIII of this Amended Complaint.

310.   The Defendants Coloplast, Hollister, Byram and Liberator are jointly and severally liable for Relators' attorney's fees and costs pursuant to 31 U.S.C. § 3730(d).

## **PRAYERS FOR RELIEF**

WHEREFORE, the Relators, acting on behalf of and in the name of the United States, the State of California, and their own name, demand and pray that judgment be entered as follows:

a.    In favor of the United Stated against the Defendant Suppliers, jointly and severally, for treble the amount of damages to the Federal health care programs from the illegal practices alleged herein, plus maximum civil penalties for each false claim;

b.    In favor of the State of California against the Defendant Suppliers, jointly and severally, for treble the amount of damages to the California Medicaid program from the illegal practices alleged herein, plus maximum civil penalties for each false claim;

c.    In favor of the United States and the State of California against the Defendant Suppliers for disgorgement of the profits earned as a result of their illegal schemes;

d.    In favor of the Relators for the maximum amount allowed as a Realtors' share pursuant to 31 U.S.C. § 3730(d) and in favor of the Relators against all of the Defendants for reasonable expenses, attorneys' fees and costs incurred by the Relators;

e.    In favor of the Relators for the maximum amount allowed as a Realtors' share pursuant to the California FCA, Cal. Gov't Code § 12652(g).

f.    In favor of the Relators against Shield, A-Med and Byram for reasonable expenses, attorney's fees and costs incurred by the Relators in relation to the Medi-Cal claims;

g.    In favor of the Relators against the Defendants Coloplast, Hollister, Byram and Liberator for the reasonable attorneys' fees, expenses and costs incurred by the

Relators from the time they engaged counsel to pursue this *qui tam* action through the date the Court lifts the above-referenced stay;

h.    In favor of the Relators against the Defendants A-Med, Shield and CCS for the reasonable attorneys' fees, expenses and costs incurred by the Relators from the time they engaged counsel to pursue this *qui tam* action through the conclusion of this litigation;

i.     In favor of the Relators, the United States and the State of California and against the Defendants for all costs of this action;

j.     In favor of the Relators against Defendant Coloplast for all available damages and relief under 31 U.S.C. § 3730(h), including, without limitation, two times back pay plus interest (and prejudgment interest), reinstatement or in lieu thereof front pay, and compensation for any special damages and/or exemplary or punitive damages, and litigation costs, and attorney's fees;

k.    In favor of Relators Herman and Roseff for all available damages and relief under Minn. Stat. § 181.935; and

l.     For such other and further relief the Court deems just and proper.


**PLAINTIFFS/RELATORS DEMAND A TRIAL BY JURY ON ALL COUNTS**

May 20, 2016                                    Respectfully submitted,

                                               KIMBERLY HERMAN, AMY LESTAGE,
                                               and KEVIN ROSEFF

                                               By their attorneys,

                                               */s/ Paul W. Shaw*
                                               Paul W. Shaw (BBO No. 455500)
                                               Taylor R. Neff (BBO No. 675255)
                                               VERRILL DANA, LLP
                                               One Boston Place, Suite 1600
                                               Boston, MA 02108-4407
                                               (617) 309-2600
                                               (617) 309-2601 (fax)
                                               pshaw@verrilldana.com
                                               tneff@verrilldana.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2016 I caused a true and accurate copy of the foregoing document to be filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.  I also caused the foregoing document to be sent by e-mail (by agreement), to the following parties' counsel:

Coloplast, Corp.
Thomas W. Beimers
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Thomas.Beimers@FaegreBD.com

Liberator Medical Supply, Inc.
Maureen A. Ruane
LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, NJ 07068
MRuane@lowenstein.com

Byram Health Care Centers, Inc.
Jonathan N. Rosen
POLSINELLI
1401 Eye Street, N.W., Suite 800
Washington, DC 20005
jnrosen@polsinelli.com

A-Med Health Care Center
Dennis Warren
827 Commons Drive
Sacramento, California 95825
dwwotp@gmail.com

And by mail to:

Hollister, Inc.
Michael K. Loucks
Alexandra M. Gorman
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
500 Boylston Street
Boston, MA 02116
michael.loucks@skadden.com

State of California
Nicholas Paul
David Zlotnick
California Department of Justice
1455 Frazee Road, Suite 315
San Diego, CA 92108
nicholas.paul@doj.ca.gov

*/s/ Paul W. Shaw*
Paul W. Shaw

9162941_1