# EXHIBIT 1



Coloplast

# Marketing Operations
## Making life easier for people with intimate healthcare needs

Morten Hansen

Ostomy Care
Urology & Continence Care
Wound & Skin Care

7 February 2012
Marketing Operations
Page 1

**Coloplast**

# Consumer Care & Coloplast Care update

- Why Consumer Care?

- Organizational structure

- Quick process overview

- Questions

Ostomy Care
Urology & Continence Care
Wound & Skin Care

## Why Consumer Care?

- Establishing clinician and end user preference – create pull

- Enrolling and interacting increases likelihood of retention, conversion

- Drive/support onboarding with key dealer partners

- Annuity business

- Future cross-sell/up-sell opportunities

**Coloplast**

Ostomy Care
Urology & Continence Care
Wound & Skin Care

7 February 2012
Marketing Operations
Page 3

**Coloplast**

# A few facts about Consumer Care in 10/11

- Interacted with 25,000+ new end users

- 175,000+ activities

- Handled 35,000+ sample orders

- Team has ongoing interaction with 3,500 clinicians and dealers

Ostomy Care
Urology & Continence Care
Wound & Skin Care

7 February 2012
Marketing Operations
Page 4

# Marketing Operations organization



**Coloplast**

Ostomy Care
Urology & Continence Care
Wound & Skin Care

7 February 2012
Marketing Operations
Page 5





Consumer Care process summary

| Lead intake & sampling | Educate | Retain | DTC programs |
| --- | --- | --- | --- |
| Day 0-3 | Day 4-6 through 90 | Day 90-365 | Day 365+ |

**Administrator**
•Lead intake / pre-assignment
•Data handling, manual entry

**Advisor**
•Coloplast Care initiation
•Nurse relations

**Coordinator**
•Inbound / existing users
•Validation / retention

**Representative**
•DTC campaigns
•Database exploration

Initial data transfer to dealers

7 February 2012
Marketing Operations
Page 7

Ostomy Care
Urology & Continence Care
Wound & Skin Care

Coloplast

# A little more on the dealer transfer process



**End user submitted to Coloplast**
- End user submitted to Coloplast

**Lead submitted**

**Process Lead**
- Entry into CRM system
- Assign lead to Supplier

**Generate sample order for end user**

**Sample end user**

**End user receives samples**
- Care kit

**Within 72 hours of sample delivery**
- Continous Care process

**Consumer Care Calls**

First 24 hours     48-72 hours     72 hours+

- Weekly report generated and sent to Supplier based on assignment in step two
- Coloplast aims to warm transfer end user to Supplier as early as possible
- Supplier can contact end user 7+ days after end user enrollment (where applicable)
- Supplier expected to provide immediate feedback on individual end users if unable to service – information can be sent to samples@coloplast.com or called in
- Supplier sends monthly updates to Coloplast on status

Ostomy Care
Urology & Continence Care
Wound & Skin Care

 **Coloplast**

# Data supplied by Coloplast in weekly report

| Field | Description |
| --- | --- |
| Contact ID | Coloplast End user unique ID |
| Created Date | Date that lead was received by Coloplast |
| Supplier | End user tied to |
| Supplier status | Status of setting up end user's relation with supplier |
| Primary Business Area | CC = Continence Care / OC = Ostomy Care |
| Lead Source | Method of lead submission |
| CC Lead Origin From | Lead submission channel, Continence Care |
| OC Lead Origin From | Lead submission channel, Ostomy Care |
| Full Name | End user / lead name |
| Date of Birth | End user date of birth (where available) |
| Contact through other | Y = Contact caregiver, N = Contact end user |
| Name of person | Name of caregiver |
| Home Phone # | Home phone # |
| Preferred language | Preferred language of communication (where available) |
| Consent | Permission to contact received via (Written/Verbal/(blank=none)) |
| Address 1 | End user address line 1 |
| Address 2 | End user address line 2 |
| Address 3 | End user address line 3 |
| PO Box/Sorting Code | Additional USPS Instructions |
| City | End user city |
| Zip/Post Code | End user zip code |
| State | End user state |
| Account ID | System check value (please disregard) |

*Subject to ongoing changes for improvement*


Coloplast

Ostomy Care
Urology & Continence Care
Wound & Skin Care

# Ongoing review/reporting and collaboration

| Monthly YTD Update |
|---|

- Unique Coloplast ID to Supplier ID
- Contacted
  - Yes
  - No
- Ordered
  - Yes
  - No
- Initial order value
- Products ordered
- Addtl. comments/status

| Ongoing Review/collaboration |
|---|

- Pinging of CP referrals
- Response from Supplier in 72 hrs

**Coloplast**

Ostomy Care
Urology & Continence Care
Wound & Skin Care

7 February 2012
Marketing Operations
Page 10



# Key challenges in dealer transfer process

- Privacy statement challenges remaining

  - Missing signatures, version of form used, inbound calls, language needed when HCPs signing forms (+ web enroll)

- Lead timing: home health episode, warm transfers

- Information availability at time of transfer: ex. insurance, sampling

- Transferable vs. non-transferable lead

- Reporting back from dealers / data exchange methods



Ostomy Care
Urology & Continence Care
Wound & Skin Care

7 February 2012
Marketing Operations
Page 11

## Ongoing improvements

- Dealer collaboration

- Nurse relations

- Care program enhancements across Bas – incl. new contact protocols

- DTC programs

- Data clean-up

- Systems – web, CRM, phone

7 February 2012
Marketing Operations
Page 12

Ostomy Care
Urology & Continence Care
Wound & Skin Care

**Coloplast**

**Coloplast**

Our mission

Making life easier for people
with intimate healthcare needs

Our values

Closeness... to better understand

Passion... to make a difference

Respect and responsibility... to guide us

Our vision

Setting the global standard
for listening and responding

Ostomy Care
Urology & Continence Care
Wound & Skin Care

7 February 2012
Marketing Operations
Page 13

# Transfer status CY to date

| Sum of Net leads | Week ending | | | | | |
|---|---|---|---|---|---|---|
| Dealer | 1/8/2012 | 1/15/2012 | 1/22/2012 | 1/29/2012 | 2/5/2012 | Grand Total |
| ⊟CCS | 30 | 33 | 40 | 37 | 54 | 194 |
| CC | 1 | 4 | 4 | 4 | 5 | 18 |
| OC | 29 | 29 | 36 | 33 | 49 | 176 |
| ⊟RGH | 55 | 86 | 91 | 86 | 113 | 431 |
| CC | 0 | 3 | 0 | 3 | 9 | 15 |
| OC | 55 | 83 | 91 | 83 | 104 | 416 |
| ⊟Liberator | 48 | 70 | 62 | 63 | 85 | 328 |
| CC | 4 | 4 | 2 | 1 | 5 | 16 |
| OC | 44 | 66 | 60 | 62 | 80 | 312 |
| ⊟Liberty | 29 | 29 | 37 | 37 | 43 | 175 |
| CC | 0 | 0 | 1 | 0 | 0 | 2 |
| OC | 29 | 29 | 36 | 36 | 43 | 173 |
| ⊟Byram | 35 | 42 | 53 | 43 | 2 | 175 |
| CC | 0 | 0 | 4 | 0 | 0 | 4 |
| OC | 35 | 42 | 49 | 43 | 2 | 171 |
| ⊟J&B | 3 | 1 | 7 | 3 | 5 | 19 |
| CC | 3 | 1 | 7 | 3 | 5 | 19 |
| OC | 0 | 0 | 0 | 0 | 0 | 0 |
| ⊟National Rehab | 30 | 31 | 35 | 29 | 32 | 157 |
| CC | 7 | 2 | 1 | 0 | 1 | 11 |
| OC | 23 | 29 | 34 | 29 | 31 | 146 |
| ⊟Non-Care dealers | 13 | 18 | 33 | 28 | 24 | 116 |
| CC | 4 | 7 | 19 | 11 | 12 | 53 |
| OC | 9 | 11 | 14 | 17 | 12 | 63 |
| Grand Total | 243 | 310 | 358 | 326 | 358 | 1,595 |

| Sum of Net leads | Week ending | | | | | |
|---|---|---|---|---|---|---|
| Dealer | 1/8/2012 | 1/15/2012 | 1/22/2012 | 1/29/2012 | 2/5/2012 | Grand Total |
| ⊟CC | 19 | 21 | 38 | 23 | 37 | 138 |
| CCS | 1 | 4 | 4 | 4 | 5 | 18 |
| RGH | 0 | 3 | 0 | 3 | 9 | 15 |
| Liberator | 4 | 4 | 2 | 1 | 5 | 16 |
| Liberty | 0 | 0 | 1 | 1 | 0 | 2 |
| Byram | 0 | 0 | 4 | 0 | 0 | 4 |
| J&B | 3 | 1 | 7 | 3 | 5 | 19 |
| National Rehab | 7 | 2 | 1 | 0 | 1 | 11 |
| Non-Care dealers | 4 | 7 | 19 | 11 | 12 | 53 |
| ⊟OC | 224 | 289 | 320 | 303 | 321 | 1,457 |
| CCS | 29 | 29 | 36 | 33 | 49 | 176 |
| RGH | 55 | 83 | 91 | 83 | 104 | 416 |
| Liberator | 44 | 66 | 60 | 62 | 80 | 312 |
| Liberty | 29 | 29 | 36 | 36 | 43 | 173 |
| Byram | 35 | 42 | 49 | 43 | 2 | 171 |
| J&B | 0 | 0 | 0 | 0 | 0 | 0 |
| National Rehab | 23 | 29 | 34 | 29 | 31 | 146 |
| Non-Care dealers | 9 | 11 | 14 | 17 | 12 | 63 |
| Grand Total | 243 | 310 | 358 | 326 | 358 | 1,595 |

Ostomy Care
Urology & Continence Care
Wound & Skin Care

7 February 2012
Marketing Operations
Page 14

*Numbers exclude leads received from dealers*




Coloplast

# EXHIBIT 2

**Coloplast**

Coloplast Capital Market Day 2009

# How Healthcare is Paid in the US
## Coloplast Capital Market Day 2009

Russ Miller, Director of Reimbursement

29 September 2009
How Healthcare is Paid in the US
Page 1

Ostomy Care
Urology & Continence Care
Wound & Skin Care

Coloplast Capital Market Day 2009

# The U.S. Health Insurance Environment and its Applicability to Coloplast Products



Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 2

**Coloplast**



Coloplast Capital Market Day 2009



**Coloplast**

# Agenda

- Payers
- Providers and Suppliers
- Insurance Transactions (Coverage, Coding and Payment)
- Insurance Reimbursement for the Surgical Urology Patient
- Reimbursement for the Ostomy, Wound or Continence Patient
- Reimbursement for Med Tech Innovation

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 4

Coloplast Capital Market Day 2009

# Health Insurance by Payer Segment

| | Lives (millions) |
|---|---|
| Medicare | 40.2 |
| Employment-based insurance (Private Payers) | 174.8 |
| Directly purchased/Individual market (Private Payers) | 26.8 |
| Medicaid | 38.1 |
| Military healthcare coverage | 11.2 |
| Uninsured | 46.6 |
| **Total Coverage Arrangements** | **337.7** |

*2008 US Population: 304,000,000*

Source: United States Census Bureau, Current Population Reports, August 2006,
Table C-1; Income Poverty and Health Insurance Coverage in the U.S.: 2005, p.60.



**Coloplast**



Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 5

Coloplast Capital Market Day 2009

# Payer Mix for Product Categories

| | Medicare | Medicaid | Private Payers | Self Pay |
|---|---|---|---|---|
| Surgical Urology | | | | |
| • Men | 68% | | 30% | 2% |
| • Women | 40% | | 60% | |
| Continence Care | 63% | ———— | 37% | ———— |
| Ostomy Care | 70% | ———— | 30% | ———— |
| Wound Care | 40% | 25% | 25% | 10% |

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 6

**Coloplast**

Coloplast Capital Market Day 2009





**CMS** Centers for **Medicare** & **Medicaid** Services

## The Medicare Program:

*For people age 65+ or with certain disabilities.*

## Types of Medicare Insurance:

*Part A* – Inpatient Hospital Care, Skilled Nursing Facilities, Home Health Care

*Part B* – Physician Services, Outpatient Hospital, Medical Supplies, Ambulatory Surgery Centers

*Part C* – Medicare Advantage Plans (HMOs and PPOs)

Primary Sites-of-Service (SOS) for Coloplast Corp.

22% of Medicare beneficiaries.

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 7

Coloplast Capital Market Day 2009

# The World of **Private Payers**

Private sector companies who administer health plans that utilize governmental or private sector dollars

➢ Approximately 1500 – 1700 private health insurance companies















Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 8



Coloplast

Coloplast Capital Market Day 2009

# Private Payers in the U.S.

Private health insurance companies operate as:

➢ Health Insurance Companies (for individuals or groups)
➢ Third Party Administrators (for employers or unions)

➢ Government Contractors (for the Medicare program)

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 9

Coloplast Capital Market Day 2009

## Medicaid

A state-administered insurance program for low-income persons:

⋏ Who are aged, blind, disabled or low-income families with dependent children

⋏ Who receive public assistance

⋏ ⋏ Other low income disabled groups with high medical expenses.

Eligibility is determined by federal and state law.

Medicaid programs are jointly funded by federal & state government.



Ostomy Care
Urology & Continence Care
Wound & Skin Care

28 September 2009
How Healthcare is Paid in the US
Page 10

Coloplast Capital Market Day 2009





## Agenda

- Payers
- **Providers and Suppliers**
- Insurance Transactions (Coverage, Coding and Payment)
- Insurance Reimbursement for the Surgical Urology Patient
- Reimbursement for the Ostomy, Wound or Continence Patient
- Reimbursement for Med Tech Innovation

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 11



Product Categories by Provider/Supplier Type

Coloplast Capital Market Day 2009

Coloplast Capital Market Day 2009

# Providers and Suppliers

 Integrated Delivery Network

A healthcare system of multidisciplinary providers owned or affiliated under common management. May include several hospitals, physician groups, rehabilitation centers, home health agencies, long-term care facilities and providers of Durable Medical Equipment and Supplies. There are approximately 300 IDNs in the US. Examples include: UCLA, Baylor and Mayo System.

 Hospital

An acute care facility that may or may not be part of an Integrated Delivery Network.

 Local Dealers

Regional and local providers of medical equipment and supplies to local healthcare facilities and patients. There are approximately 64,000 dealers in the US.

 GPO

For profit companies, usually corporations, that engage in contract negotiations on behalf of their member IDNs. The GPO retains an "admin fee" paid by the supplier, in exchange for the GPOs services. There are 6 national GPOs. Examples include MedAssets, Premier and Novation.

National Distributors

Distribute large volumes of products to multiple healthcare entities, including hospitals, Durable Medical Equipment companies, and home healthcare organizations. Examples include: McKesson, Cardinal Health, Invacare Supply Group, Owens & Minor, Gulf South.

 **Coloplast**

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 13





Coloplast Capital Market Day 2009

## Agenda

- Payers

- Providers and Suppliers

- Insurance Transactions (Coverage, Coding and Payment)

- Insurance Reimbursement for the Surgical Urology Patient

- Reimbursement for the Ostomy, Wound or Continence Patient

- Reimbursement for Med Tech Innovation

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 14

Coloplast Capital Market Day 2009

# The Building Blocks of Reimbursement

- **Coverage:** Defines the clinical conditions of a service or technology.

- **Coding:** The nomenclature used to classify medical services, supplies and diagnostic categories. Required for filing insurance claims with payers.

- **Payment:** Payments are made via defined payment systems and contracts. Payment assignment is driven by the coding on the insurance claim.

- **Compliance:** Providers, suppliers and manufacturers are subject to government oversight and audits. Applicable statutes include:

  - False Claims Act,
  - Anti-Kickback statutes
  - FDA prohibitions on off-label promotion.



Coloplast

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 15

Coloplast Capital Market Day 2009

# The Building Blocks of Reimbursement

| | Medicare | Private Payers |
|---|---|---|
| Coverage Policies | National / Local | Made by each entity |
| Coding Systems | Universal | |
| Payment Systems | Defined system for each site-of-service | Often adopt Medicare site-of-service structure / pay rates set by contracts |

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 16

Coloplast

Coloplast Capital Market Day 2009

# Coding – The Language of Reimbursement

**CPT ® Coding** (Current Procedural Terminology) – used for reporting procedures and services performed by physicians.

**HCPCS Coding (Level II)** – identification of devices, drugs, and supplies.

ICD-9-CM Procedure Coding – identification of inpatient hospital services.
ICD-9-CM Diagnostic Coding – identification of the reason for the encounter.

® CPT is a registered trademark of the American Medical Association.

**Coloplast**

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 17

Coloplast Capital Market Day 2009

# Coding drives Payment

**XX** = payment 'driver'    **x** = required, but not a payment driver

| Coding | | | | | Payment |
|---|---|---|---|---|---|
| Site-of-Service | CPT | ICD-9 ** Diagnosis | HCPCS | ICD-9 Procedure | **Fee Schedule** |
| Medical Supplies | | x | XX | | |

** Critical for meeting payer coverage requirements



Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 18

**Coloplast**

Coloplast Capital Market Day 2009

# Coding drives Payment

**XX** = payment 'driver'    **x** = required, but not a payment driver

| Site-of-Service | Coding | | | | Payment |
|---|---|---|---|---|---|
| | CPT | ICD-9 ** Diagnosis | HCPCS | ICD-9 Procedure | |
| Hospital Outpatient | XX | x | x | | APC Group (PPS) |
| Hospital Inpatient | | XX | | XX | MS-DRG (PPS) |
| Physician Practice | XX | x | x | | Fee Schedule |
| Amb Surg Center | XX | x | x | | Fee Schedule |
| Medical Supplies | | x | XX | | Fee Schedule |

** Critical for meeting payer coverage requirements.
PPS – Prospective Payment System.



Coloplast

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 19

Coloplast Capital Market Day 2009




Coloplast

## Agenda

- Payers
- Providers and Suppliers
- Insurance Transactions (Coverage, Coding and Payment)
- Insurance Reimbursement for the Surgical Urology Patient
- Reimbursement for the Ostomy, Wound or Continence Patient
- Reimbursement for Med Tech Innovation

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 20

Coloplast Capital Market Day 2009

# Medicare Prospective Payment Systems

➤ Hospital Inpatient and Outpatient

## Example: Virtue Male Sling System

### Inpatient (choose 1)

| MS-DRG 662 | $15,690 |
| MS-DRG 663 | $7,752 |
| MS-DRG 664 | $5,762 |

### Outpatient

APC 385   $6,447

*Benchmark*

- > 24 hour stay (patient in bed).
- Based on diagnosis and procedure.
- Subdivided by Severity.
- Data-driven Payment (Claims data).
- Geographic adjustment.

- < 24 hour stay (observation room).
- Based on procedures only.
- Data-driven Payment (Claims data).
- Geographic adjustment.


Coloplast

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 21

# Private Payer Reimbursement is critical for Hospital Profitability



**Community Hospital Payment-to-Cost Ratios by Source, 1980-2006**

132% in 2007

- ■ Private Payers
- - - Medicare
- ● Medicaid

Source: American Hospital Association.

Ostomy Care
Urology & Continence Care
Wound & Skin Care

28 September 2009
How Healthcare is Paid in the US
Page 22

**Coloplast**

Coloplast Capital Market Day 2009

# Medicare Fee Schedules

➤ Physician and Ambulatory Surgery Center

## Example: Virtue Male Sling System

| Physician Fee | Ambulatory Surgery Center |
|---|---|
| CPT 53440 | CPT 53440 |
| $905 | $4,811 |

- Formula-driven Payment
  - Relative Value Units (RVUs)
  - Sustainable Growth Rate (SGR)
- Geographic adjustments

- Factored from the Hospital Outpatient Payment
- Geographic adjustments

**Private Payers ≈ Medicare + 25%**



Coloplast

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 23

Coloplast Capital Market Day 2009



# Agenda

- Payers

- Providers and Suppliers

- Insurance Transactions (Coverage, Coding and Payment)

- Insurance Reimbursement for the Surgical Urology Patient

- **Reimbursement for the Ostomy, Wound or Continence Patient**

- Reimbursement for Med Tech Innovation

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 24

Coloplast Capital Market Day 2009

# Insurance Reimbursement

Two Important Variables

➤ A Reimbursement Rate that allows for Supplier Margin

➤ A Utilization Rate that reflects Accepted Clinical Practice

▪ Defined by Coverage Policies

| Product | Medicare | |
| --- | --- | --- |
| | Rate | Utilization |
| One-Piece Ostomy Pouch (drainable, with filter) | $4.99 | Max. 20 / month |
| Intermittent Urinary Catheter | $1.62 - $1.90 | Max. 200 / month |
| Foam Dressing, ≤ 4" x 4" | $7.85 | 3 changes / week |


Coloplast

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 25

Coloplast Capital Market Day 2009




Coloplast

## Agenda

- Payers
- Providers and Suppliers
- Insurance Transactions (Coverage, Coding and Payment)
- Insurance Reimbursement for the Surgical Urology Patient
- Reimbursement for the Ostomy, Wound or Continence Patient
- **Reimbursement for Med Tech Innovation**

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 26

Coloplast Capital Market Day 2009

**re·im·burse'ment** *n. – a.) repayment for expenses incurred, b.) payments given to healthcare providers for services rendered or supplies provided, base on benefits covered under an insurance plan.*

*…but more importantly…*

*It's a critical factor for:*

➤ *Determining the speed of market acceptance for new technology,*

➤ *Providing the appropriate margin for product pricing,*

➤ *Creating the space for volume growth of existing technologies.*

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 27

 **Coloplast**

Coloplast Capital Market Day 2009

# From a Foundation of Clinical Effectiveness

Patient Access and Utilization

Customer Acceptance

Coverage Coding Payment

Clinical Effectiveness

Health Economic Outcomes

Evolving in Importance

**Coloplast**

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 28

Coloplast Capital Market Day 2009

## How Medicare determines coverage



**CMS** Centers for **Medicare** & **Medicaid** Services

"No payment may be made under [Medicare] for any expenses incurred for items or services [that] **are not reasonable and necessary** for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."
Section 1862(a)(1)(A) of the SSA*

➤ The absence of formal criteria gives CMS discretion and results in a "quasi-case law" approach to establishing coverage policies.

➤ Generally, a technology is considered "reasonable and necessary" when it:
1. Produces a **demonstrable clinical benefit** for the Medicare population, and
2. Is supported by **methodologically sound evidence.**



Coloplast

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 29

Coloplast Capital Market Day 2009

# How Private Payers determine coverage

➢ Few payers have published clinical criteria.

## Technology Evaluation Center Criteria



**BlueCross BlueShield Association**

1. The technology must have final approval from the appropriate governmental regulatory bodies

2. The scientific evidence must permit conclusions concerning the effect of the technology on health outcomes

3. The technology must improve the net health outcome

4. The technology must be as beneficial as any established alternatives

5. The improvement must be attainable outside the investigational settings



Coloplast

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 30



Coloplast Capital Market Day 2009

# New Coding requires Clinical Evidence

## Requirements

AMA Website – Requirement for New CPT Coding:
➢ *"…the clinical evidence of the service/procedure is well-established and documented in U.S. peer-reviewed literature."*

CMS Requirements - HCPCS Request Process:
➢ Requires evidence for claims of *"significant therapeutic distinction."*
➢ CMS Denial Letters often state – **"Clinical information…does not demonstrate superior clinical outcomes."**

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 31



Coloplast Capital Market Day 2009

Successful Execution of Concurrent Pathways

Execute Payer Coverage Tactics

Secure Coding

Secure Payment Class

12 mos.    24 mos.    36 mos.

U.S. Food and Drug Administration
Clearance

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 32

Coloplast

Coloplast Capital Market Day 2009

## Reimbursement / Health Economic Assessment Model



**Coloplast**

Ostomy Care
Urology & Continence Care
Wound & Skin Care

29 September 2009
How Healthcare is Paid in the US
Page 33



Coloplast Capital Market Day 2009

29 September 2009
How Healthcare is Paid in the US
Page 34

Ostomy Care
Urology & Continence Care
Wound & Skin Care

Coloplast

# EXHIBIT 3



Establishing our Master Dealer sales team

August 9, 2011

CONFIDENTIAL

Ostomy Care
Urology & Continence Care
Wound & Skin Care
8/9/2011 11:22 AM



Page 1

# Agenda

1) **Kick-off**

2) Objectives and expectations

3) Q4 / Q1 sales initiatives

4) Working together as a team

5) Partnering with the rest of the organization

6) Determine target accounts

7) Coloplast CARE

8) Wrap up

Ostomy Care
Urology & Continence Care
Wound & Skin Care
8/9/2011 11:22 AM



Page 2

## Agenda

1) Kick-off

**2) Objectives and expectations**

3) Q4 / Q1 sales initiatives

4) Working together as a team

5) Partnering with the rest of the organization

6) Determine target accounts

7) Coloplast CARE

8) Wrap up



## Objectives for new Master Dealer Sales team

1. Segment Master Dealers according to potential and ability & willingness to grow with Coloplast

2. Establish strong partnerships with key dealers across all levels of the organization

3. Develop differentiated service offering for key partners to build value around our products

4. Develop catalogue of "win-win" campaigns with dealers to increase revenue from end-user cross-selling and conversions

5. Execute on marketing campaigns and measure ROI to continuously refine campaign catalogue



# ~30 targeted Master Dealers will be selected based on three criteria

| Criteria | Description |
|---|---|
| **Business potential of min. $1 million** | • Minimum $1 million in potential Coloplast business across business areas to ensure significant upside from partnership<br>• Existing business not required, but used as proxy for potential (min. $200 k in current Coloplast sales) |
| **Ability to market to end-users** | • Account must have direct access to end-users to be able to influence product choice<br>• End-user information needs to be available in structured format to allow for outbound calling / mailings |
| **Willingness to market to end-users** | • Account must be willing to partner with Coloplast to market to end-users both in relation to conversion of competitive end-users and up selling opportunities |

Ostomy Care
Urology & Continence Care
Wound & Skin Care



**Coloplast**
Page 5

*qualefy?: current — growth Volume, potential to work wit us —*

# We need to build services around our products to differentiate ourselves from competition

| Gold Partners | Platinum Partners | Diamond Partners |
|---|---|---|
| • Up to two joint marketing campaigns per year<br>• Access to samples for up to 1% of sales<br>• Access to all Coloplast marketing materials<br>• Access to on-line training on Ostomy and Continence Care patient characteristics, needs, product types etc.<br>• Option to buy directly from Coloplast<br>• Free freight on all orders above $500<br>• Dedicated account manager | **Same as Gold partners plus:**<br>• Access to patient referrals from Coloplast CARE and other DTC activities<br>• Up to four joint marketing campaigns per year<br>• Access to samples for up to 2% of sales<br>• Co-branding of Coloplast marketing materials<br>• Help with development of product formularies for bids (e.g. managed care)<br>• Free annual newsletter on latest reimbursement trends<br>• Access to in-person training on OC and CC once per year<br>• Free expedited freight once per month<br>• Overview of Coloplast sales force in targeted regions | **Same as Platinum partners plus:**<br>• Preferred supplier for new patient referrals from Coloplast CARE and other DTC activities<br>• Up to six joint marketing campaigns per year<br>• Exclusive early access to new Coloplast products<br>• Access to market intelligence about primary referral sources<br>• Prioritized product supply in case of back-orders<br>• Customizing of marketing materials (for campaigns)<br>• Dedicated 1-800 phone number for patients and employees<br>• Access to in-person training on reimbursement once per year<br>• Access to in-person training on OC and CC twice per year<br>• Access to Coloplast sales force at national sales meetings |

*Sharing referral data w/ them?*

*• access to samples up to 20% of sales*

## An initial catalogue of possible joint marketing campaigns with our Master dealers has been defined

**Overview of "Win-Win" campaigns**

DTC campaigns will be divided in to two groups:

**"Win-Win" campaigns**
• Increasing the revenue and/or profit for the Master Dealer while increasing Coloplast revenue
• Example: Selling OC accessories to existing patients

**"Zero-sum" campaigns**
• Increasing Coloplast's share of the reimbursement on behalf of the Master Dealer
• Example: Selling SpeediCath to users of uncoated catheters

**Only "Win-Win" campaigns will be launched together with dealers**

**Revenue increasing campaigns**
1. Sell OC accessories to existing Ostomy patients
2. Sell MECs to existing IC users
3. Sell InterDry Ag to bariatric (+diabetic?) patients
4. Sell AttracTain (+Sween 24?) to diabetic patients
5. Sell MECs to existing diaper users?
6. Convert 1-piece OC users to 2-piece
7. Covert OC users from drainable to closed pouches
8. Convert IC users from A4351 to A4352/A4353

**Margin increasing campaigns**
1. Convert LoFric (or other hydrophilic) users to SpeediCath
2. Convert Hollister / ConvaTec OC users to SenSura
3. Convert Aquacel Ag business to SeaSorb Ag (primarily Home Health)

## Ground rules for funding of campaign activity with Master Dealers

1. We will only pay for costs that are incremental and directly attributable to the marketing campaign

2. Since the campaign is a "win-win" scenario, costs the DTC dealer should carry a substantial part of the costs (min. 25% of the incremental costs)

3. As a starting point, we will pay for all samples and Coloplast marketing material

4. We will not pay for the following: 1) waiving of co-pay fee or other financial inducements, 2) Sales force / customer service time

5. Funding of marketing campaigns requires that we receive information on campaign effect and ROI

**What role does Consumer Care play in campaigns?**


Spiff's


How much WL specify "in writing"

Ostomy Care
Urology & Continence Care
Wound & Skin Care
8/9/2011 11:22 AM

 Coloplast
Page 8

While we will partner with many Master Dealers, we need to determine ~5 strategic partners for our sales force





## CCS Medical

?

?



---

Agenda

1) Kick-off

2) Objectives and expectations

3) **Q4 / Q1 sales initiatives**

4) Working together as a team

5) Partnering with the rest of the organization

6) Determine target accounts

7) Coloplast CARE

8) Wrap up



## Q4/Q1 Sales Initiatives

OC:
- *Accelerate ostomy ring conversion campaigns . (Some impact Q4, majority Q1, ULRIK)*
- Ostomy IHN Program (Q1 timing, KEITH)
- Byram OC conversion program (Q1 timing, ULRIK)
- CARE program push (push # of overall leads) (Elevate CARE program in day-to-day activities) (Q1 impact, ED)
- Reduce Acute Care Ostomy Pricing (Q1 timing, KEITH)
- Improving Care Performance (Q1 timing, ED)

CC:
- *Accelerate SpeediCath conversion campaigns . Q4, ULRIK)*
- Sign up ISG and RGH with lower SpeediCath pricing .  (Target closure in 2 weeks, ULRIK)
- MEC Initiative: "whatever it takes" approach (Q1, MARK)

WC:
- Drive wound care sales with "Part B" billers.  (ULRIK, Q1 Impact)

SC:
- "Full Court Press" on Year End Skin Care Opportunities (Q4, KEITH)
- Target dealers with existing skin barrier business related to their diaper business.  (ULRIK, Q1 impact)

Overall:
- Major dealer / distributor purchase follow-up (ULRIK Q4 activity)



- timing.
- size of opportunity
- status

## Accelerate ostomy ring conversion campaigns – Ulrik Berthelsen

| What is it? | What customers will be targeted? | What activities will be pursued in Q4/Q1? | Status, Next Steps & Impact |
|---|---|---|---|
| • Campaign to convert ends-users currently using ConvaTec Eakin seal or Hollister Adapt rings to Coloplast's new moldable rings<br><br>• Higher margins on Coloplast product and preference for Coloplast drives interest from Master Dealers<br><br>• Conversion will either be conducted as "hard conversion" (mandatory switch) or "soft conversion" (optional switch) | Liberty Medical<br>• Estimated +1 million units (split of units unknown)<br><br>CCS Medical<br>• 500k units of Eakin rings<br><br>Binson's Home Health<br>• 23k units of Eakin rings and 18k units of Adapt | Development of marketing package for Master Dealers including:<br>• Postcard size box-stuffer with attached sample and dealer logo<br>• Script for customer service with FAQ outlining key benefits<br>• Retail stand with brochure<br><br>Liberty Medical<br>• Soft conversion (start not confirmed)<br><br>CCS Medical<br>• Soft conversion (start not confirmed)<br><br>Binson's Home Health<br>• Hard conversion planned in Sep. | • Marketing package developed and ready to go<br><br>Liberty Medical<br>• Conversion to be discussed during August 12 meeting<br>• Accessories will be included in new contract (by Aug12)<br><br>CCS Medical<br>• Marketing package will be shown to CCS on August 8th<br>• Timing for conversion TBD<br><br>Binson's Home Health<br>• Conversion of Eakin rings on hold, as they are now buying from suspected grey market trader at very low pricing<br>• Hard conversion of Hollister targeted for September |



*Aug. 9th*

## Byram OC conversion program – Ulrik Berthelsen

*Ulrik: "we are unofficially paying the waiver of the co-pay"*

| What is it? | What customers will be targeted? | What activities will be pursued in Q4/Q1? | Status, Next Steps & Impact |
|---|---|---|---|
| • Soft conversion of 1,000 end-users under managed care to Coloplast pouching system<br><br>• 90% of targeted end-users currently use ConvaTec products<br><br>• End-users will be offered to try Coloplast product instead of their current pouching system "risk-free" | Byram Healthcare<br>• Pilot for 1,000 end-users with potential to expand if successful<br><br>No other customers currently in pipeline | Campaign is expected to launch on September 1st. Target is conversion of 300 patients (annual value of $150-230k)<br><br>Activities to be finalized:<br>• Cross-reference for ConvaTec to Coloplast products<br>• Training of Byram inside sales team<br>• Finalization of script including link to Coloplast website for product details | Activities on track for September 1st launch. Weekly telco's with Byram's marketing team |

Ostomy Care
Urology & Continence Care
Wound & Skin Care

 **Coloplast**

Page 13

## Accelerate SpeediCath conversion campaigns – Ulrik Berthelsen

| What is it? | What customers will be targeted? | What activities will be pursued in Q4/Q1? | Status, Next Steps & Impact |
|---|---|---|---|
| • Campaign to convert ends-users currently using AstraTech LoFric (or other hydrophilic) to SpeediCath<br><br>• AstraTech starting to sell direct to patients drives desire for Master Dealers to convert patients<br><br>• Conversion will either be conducted as "hard conversion" (mandatory switch) or "soft conversion" (optional switch) | CCS Medical<br>• 268k units of LoFric<br>• 800k units of LoFric Primo<br><br>Edgepark<br>• Up to 2 million units of LoFric and LoFric Primo<br><br>Shield Healthcare<br>• Volume not quantified"<br><br>Binson's Home Health<br>• 9,225 units of LoFric | CCS Medical<br>• Hard conversion of end-users using LoFric (early August)<br>• Hard conversion of end-users using LoFric Primo (September) giving them choice between SpeediCath and Rochester<br>• Marketing materials being developed<br><br>Edgepark<br>• Conversion activities pending contract amendment for RGH<br><br>Shield<br>• Activities not defined yet<br><br>Binson's<br>• Hard conversion | CCS Medical<br>• Initial conversion started<br>• LoFric Primo conversion pending samples and marketing materials<br><br>Edgepark<br>• Conversion activities pending contract amendment for RGH (see next page)<br><br>Shield<br>• Departure of Dir. of Purchsing causing delay<br>• Visit to be planned to accellerate timing<br><br>Binson's<br>• Ordering stock on Aug 15 and starting to convert |

Ostomy Care
Urology & Continence Care
Wound & Skin Care

 **Coloplast**

Page 14

*RGH — quarterly incentive back to dollar one if they hit 20% growth Roughly $1M Rebate/quarter*

# Sign up ISG and RGH with lower SpeediCath pricing – Ulrik Berthelsen

| What is it? | What customers will be targeted? | What activities will be pursued in Q4/Q1? | Status, Next Steps & Impact |
|---|---|---|---|
| • Offer ISG and RGH lower SpeediCath pricing in return for commitments for increased business<br><br>• Both ISG and RGH will likely be offered $1.10 for SpeediCath Compact Female and Male RTU (Min. ASP is $1.07 for the US) | • ISG<br><br><br><br><br><br>• RGH | ISG<br>• Target date for amendment is before August 12th<br>• Limited volumes of AstraTech<br>• Commitment to be defined<br>• Once amendment is signed, support activities will be defined<br>•<br>RGH<br>• Target date: August 5th<br>• Meeting first week of August to agree on commitment<br>• App. 2 million units of AstraTech<br>• Conversion campaign to be developed with Edgepark | ISG<br>• Discussion with Greg Bosco at ISG customer summit in coming week to clarify commitment<br>• Still targeting resolution by end of week<br><br>RGH<br>• Reluctant to make commitment in return for lower pricing<br>• Expected to be finalized in coming week with commitment of $1-1.5 million in total business |

Ostomy Care
Urology & Continence Care
Wound & Skin Care



# Drive wound care sales with "Part B" billers – Ulrik Berthelsen

| What is it? | What customers will be targeted? | What activities will be pursued in Q4/Q1? | Status, Next Steps & Impact |
|---|---|---|---|
| • Explore opportunities to drive Wound Care sales through Part B biller that already have existing Wound Care business<br><br>• Higher margins on Coloplast product and preference for Coloplast drives interest from Master Dealers<br><br>• Conversion will either be conducted as "hard conversion" (mandatory switch) or "soft conversion" (optional switch) | CCS Medical<br>• Existing Wound Care business of $50 million with 93 WC clinics<br><br>Byram Healthcare<br>• Helping HHA with billing for Wound Care products<br>• CP WC sales of ~$500k<br><br>Binson's Home Health Care<br>• +$100k in ConvaTec wound care business | CCS Medical<br>• Presentation of portfolio and pricing to CCS on August 8th<br>• Likely no impact in Q4<br><br>Byram Healthcare<br>• Wound Care included as part of new partnership proposal to be discussed in early August<br><br>Binson's<br>• Getting information on competitive usage and pricing and will provide proposed formulary and pricing during August | CCS Medical<br>• Presentation of portfolio and pricing to CCS on August 8th<br><br>Byram Healthcare<br>• Wound Care included as part of new partnership proposal sent to Byram. Discussion expected for coming week.<br><br>Binson's<br>• Getting information on competitive usage and pricing and will provide proposed formulary and pricing during August<br>• Binson's received much lower pricing for all ConvaTec products recently |

Ostomy Care
Urology & Continence Care
Wound & Skin Care



## Target dealers with existing skin barrier business related to their diaper business – Ulrik Berthelsen

| What is it? | What customers will be targeted? | What activities will be pursued in Q4/Q1? | Status, Next Steps & Impact |
|---|---|---|---|
| • Target dealers with existing skin barrier business and try to convert them to using Baza Clear<br><br>• Preference for Coloplast and superior product quality drives interest from Master Dealers | **J&B Medical**<br><br>• 20,000 units monthly of 3.5 oz DermaRite PeriGuard at $1.25<br><br>• Opportunity of ~$300k annually<br><br>No other customers currently in pipeline | **J&B Medical**<br><br>• Identify how Michigan Medicaid is reimbursing for these items (by the ounce, any max size?)<br><br>• Offer either 1.75 oz or 5 oz Baza Clear as alternative at comparable price<br><br>• Margin is expected to be low, but above MC | • Reimbursement determined to be by the tube for max. 2 tubes per month<br><br>• Currently 50% of patients use 2 tubes<br><br>• Aimee O to meet with J&B Medical in coming week to determine if they are willing to switch to 1.75 Oz Baza Clear instead of current product<br><br>• Would be $300,000 opportunity at 65% GP1 with Baza Clear at $1.25 |



## Major dealer / distributor purchase follow-up – Ulrik Berthelsen

| What is it? | What customers will be targeted? | What activities will be pursued in Q4/Q1? | Status, Next Steps & Impact |
|---|---|---|---|
| • Ensure continuous follow-up on purchases for major dealers and distributors to ensure good finish of the year<br><br>• Continuous follow-up will give deeper understanding of the customer's business and help them achieving growth targets and incentives | **RGH**<br><br>• Needs to deliver ~$8 million in sales in Aug+Sep to qualify for incentive<br><br>• This represents ~$1.5 million in growth (25%)<br><br>All other Master Dealers with +$1 million in revenue | **RGH**<br><br>• Assess RGH's intentions in terms of achieving their "Q2" bonus<br><br>• Develop weekly report to send to Jeff Keckic, McCay (supply chain) and David Willschek ( rebate analyst)<br><br>• Inform RGH about latest order point to qualify for rebates<br><br>**Other Master Dealers**<br><br>• Set up weekly calls with the KAMs to review sales. This will drive accountability and customer follow-up | **RGH**<br><br>• Weekly report developed to provide RGH with overview of sales required to achieve target<br><br>• Aimee O to assess intentions for achieving Q2 bonus and inform about latest order time<br><br>**Other Master Dealers**<br><br>• To be discussed with KAMs on August 9th<br><br>• Spiff to be developed to motivate KAMs to finish year strongly |



## MEC Sales Initiative – Mark Lindsey

| What is it? | What customers will be targeted? | What activities will be pursued in Q4/Q1? | Status, Next Steps & Impact |
|---|---|---|---|
| • Bard has decided to discontinue their full line of MEC's on September 1, 2011. Bard is thought to have greater than 2% of the MEC Market. | • Customers Targeted include Acute Care, Rehabs and Dealers | Identify the top Acute facilities, Rehabs, Dealers for immediate conversion MECs<br><br>Contact the Materials Managers explaining the situation and providing the Bard letter<br><br>Obtain items and usage for creating a cross reference and proposal on MEC items<br><br>Tools-Bard Exit letter, Product Conversion Charts and Product Brochures sent to Field<br><br>National Dealer Team-Contact with all National Dealers seeking conversions<br><br>Target Potential Sales Increase Master Dealer Sales Team-$200K Continence Field Sales Team-$300K<br><br>Metrics-Monthly National Sales Growth on MECs for Aug., Sept. and Oct. and Conversion Grid | June/July FY'10 vs FY'11 $1,819,617 vs $ 1,744,635<br><br>MEC Status Grid from Field/KAMs<br><br>Recent Conversions-$110,400 Pending Conversions-$377,400<br><br>CC RMs/KAMs will take over Pending Conversion Status<br><br>MEC Market is Flat to Declining |

Ostomy Care
Urology & Continence Care
Wound & Skin Care



Page 19

## Agenda

1) Kick-off

2) Objectives and expectations

3) Q4 / Q1 sales initiatives

**4) Working together as a team**

5) Partnering with the rest of the organization

6) Determine target accounts

7) Coloplast CARE

8) Wrap up

Ostomy Care
Urology & Continence Care
Wound & Skin Care
8/9/2011 11:22 AM



Page 20

## New pricing guidelines will make it a lot easier to determine relevant pricing for OC and CC products

| Catalog # | Product description | Size | Access | Tier I TM Floor | Tier I RM/DA M Floor | Tier II TM Floor | Tier II RM/DA M Floor | Tier III RM/DA M Floor | Tier III Dir Floor | Tier IV Dir Floor | Tier IV Pres Floor | Tier V Dir Floor | Tier V Pres Floor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12010 | Ostomy Care Adhesive Remover Spray | 1.7 fl oz (50 mL) | $ 12.76 | $ 11.71 | $ 10.64 | $ 10.28 | $ 9.92 | $ 9.56 | $ 9.20 | $ 8.84 | $ 8.48 | $ 8.14 | $ 7.78 |
| 12011 | Ostomy Care Adhesive Remover Wipe | 1 wipe | $ 0.59 | $ 0.52 | $ 0.44 | $ 0.43 | $ 0.41 | $ 0.39 | $ 0.38 | $ 0.37 | $ 0.35 | $ 0.34 | $ 0.32 |
| 12030 | Ostomy Care Moldable Ring | 1 1/8" (30 mm) | $ 4.82 | $ 4.42 | $ 4.01 | $ 3.79 | $ 3.56 | $ 3.43 | $ 3.30 | $ 3.27 | $ 3.23 | $ 3.19 | $ 3.15 |
| 12042 | Ostomy Care Moldable Ring | 1 5/8" (42 mm) | $ 4.82 | $ 4.42 | $ 4.01 | $ 3.79 | $ 3.56 | $ 3.43 | $ 3.30 | $ 3.27 | $ 3.23 | $ 3.19 | $ 3.15 |
| 2650 | Ostomy Care Paste, Non-Pectin | 2 oz (57 g) | $ 6.43 | $ 5.90 | $ 5.36 | $ 5.18 | $ 5.00 | $ 4.82 | $ 4.64 | $ 4.46 | $ 4.28 | $ 4.11 | $ 3.93 |
| 2651 | Ostomy Care Paste, Pectin | 2 oz (57 g) | $ 10.84 | $ 9.94 | $ 9.03 | $ 8.73 | $ 8.43 | $ 8.13 | $ 7.83 | $ 7.53 | $ 7.22 | $ 6.92 | $ 6.62 |
| 3210 | Ostomy Care Protective Sheet | 4 x 4" (10 x 10 cm) | $ 3.96 | $ 3.63 | $ 3.30 | $ 3.19 | $ 3.08 | $ 2.97 | $ 2.86 | $ 2.75 | $ 2.64 | $ 2.53 | $ 2.42 |
| 3215 | Ostomy Care Protective Sheet | 6 x 6" (15 x 15 cm) | $ 8.48 | $ 7.78 | $ 7.07 | $ 6.84 | $ 6.60 | $ 6.36 | $ 6.12 | $ 5.89 | $ 5.65 | $ 5.42 | $ 5.18 |
| 3220 | Ostomy Care Protective Sheet | 8 x 8" (20 x 20 cm) | $ 14.67 | $ 13.45 | $ 12.22 | $ 11.82 | $ 11.41 | $ 11.00 | $ 10.59 | $ 10.19 | $ 9.78 | $ 9.37 | $ 8.96 |
| 12000 | Ostomy Care Skin Barrier Cream | 2 oz (57 g) | $ 3.66 | $ 3.03 | $ 2.75 | $ 2.66 | $ 2.57 | $ 2.48 | $ 2.39 | $ 2.30 | $ 2.21 | $ 2.12 | $ 2.03 |
| 12020 | Ostomy Care Skin Barrier Spray | 1.7 fl oz (50 mL) | $ 15.18 | $ 13.93 | $ 12.66 | $ 12.23 | $ 11.80 | $ 11.37 | $ 10.94 | $ 10.51 | $ 10.09 | $ 9.68 | $ 9.25 |
| 12021 | Ostomy Care Skin Barrier Wipe | 1 wipe | $ 0.55 | $ 0.51 | $ 0.46 | $ 0.45 | $ 0.43 | $ 0.41 | $ 0.40 | $ 0.39 | $ 0.37 | $ 0.36 | $ 0.34 |

   

Ostomy Care
Urology & Continence Care
Wound & Skin Care

Coloplast
Page 21

Agenda

1) Kick-off

2) Objectives and expectations

3) Q4 / Q1 sales initiatives

4) Working together as a team

5) **Partnering with the rest of the organization**

6) Determine target accounts

7) Coloplast CARE

8) Wrap up

Ostomy Care
Urology & Continence Care
Wound & Skin Care
8/9/2011 11:22 AM

Coloplast
Page 22

## The Key Account Manager will act as the quarterback and expected to be aware and involved in all activities

**KAM responsibilities**

- Set strategic direction and conduct structured quarterly business reviews
- Responsibility for contracting and pricing
- Develop and execute marketing campaigns and other initiatives to drive the business
- Have continuous dialogue with the customer to optimize operations e.g. purchasing patterns
- Ensure execution of sales force partnership, incl. co-visiting with Master Dealer reps
- Ensure that all requests from the customer is met, e.g. samples, literature
- Ensure monthly communication to the sales force on activities with Strategic Partners
- Ensure regular communication to the sales force "as needed' for other Master Dealers

**Field sales force responsibilities**

- Support initiatives developed by KAMs
- Share information / market intelligence with KAMs
- Conduct joint sales calls with reps from Strategic Partners
- Support with in-service needs at HQ and regional branches as requested
- Provide emergency sample/literature support as requested
- RMs and TMs available for participating in corporate meetings as requested

Ostomy Care
Urology & Continence Care
Wound & Skin Care

**Coloplast**
Page 23



UIRIK:   Ostomy pricing

example pricing to a customer

medicare
→ 30 %
→ -50 %
sku  sku  sku sku sku

## The question of double-paying commissions – who drives the business?

Ulrik: "Broadlane + Amerinet GPO presence (ostomy). will drive NPD's to suppliers

## CC regions




## CC territories





## OWSC regions




## OWSC territories





## Agenda

1) Kick-off

2) Objectives and expectations

3) Q4 / Q1 sales initiatives

4) Working together as a team

5) Partnering with the rest of the organization

6) **Determine target accounts**

7) Coloplast CARE

8) Wrap up



## Targeted accounts will be selected based on three criteria

| Criteria | Description |
|---|---|
| Business potential of min. $1 million | • Minimum $1 million in potential Coloplast business across business areas to ensure significant upside from partnership<br>• Existing business not required, but used as proxy for potential (min. $200 k in current Coloplast sales) |
| Ability to market to end-users | • Account must have direct access to end-users to be able to influence product choice<br>• End-user information needs to be available in structured format to allow for outbound calling / mailings |
| Willingness to market to end-users | • Account must be willing to partner with Coloplast to market to end-users both in relation to conversion of competitive end-users and up selling opportunities |



## Who should the ~30 targeted Master Dealers be?

*Handwritten: Care $215 · 32701 $108 $120 Colonial*

| Account | State | City |
|---|---|---|
| Symbius | AZ | Phoenix |
| Allegro Medical | AZ | Mesa |
| Shield Healthcare | CA | Valencia |
| A-Med Health Care | CA | Huntington Beach |
| Byram Healthcare | CT | Milford |
| Liberator Medical Supply | FL | Stuart |
| Liberty Medical Supply | FL | Port Saint Lucie |
| All-Med Services of Florida | FL | Miami Lakes |
| Colonial Medical Supplies | FL | Altamonte Springs |
| CCS Medical | GA | Lawrenceville |
| UroMed / At Home Medical | GA | Suwanee |
| Medline | IL | Chicago |
| Walgreen's | IL | Chicago? |
| J&B Medical Supply | MI | Wixom |
| Binson's Home Health Care Centers | MI | Center Line |
| Airway Oxygen | MI | Wyoming |
| Wright & Filippis | MI | Rochester Hills |
| ActivStyle / Advocate / Home Wellness | MN | Minneapolis |
| Handi Medical Supply | MN | Saint Paul |
| Express Medical Supply | MO | Fenton |
| HDIS | MO | Olivette |
| Saint Louis Medical Supply | MO | Saint Louis |
| Wilmington Medical Supply | NC | Wilmington |
| Sterling Medical Services | NJ | Moorestown |
| Edgepark Medical Supplies (RGH) | OH | Twinsburg |
| 180 Medical | OK | Oklahoma City |
| Care Medical Equipment | OR | Portland |
| Mercy Surgical Dressing Group | PA | Pittsburgh |
| National Rehab Equipment / All South Services of Florida | PA | Coraopolis |
| Blackburns Physician's Pharmacy | PA | Tarentum |
| Har-Kel | PA | Bridgeville |
| Puerto Rico | PR | N/A |
| ABC Home Medical | TX | Dallas |
| Kreisers??? | | |

Page 31

*Handwritten: Landeacm metro NY*

## Agenda

1) Kick-off

2) Objectives and expectations

3) Q4 / Q1 sales initiatives

4) Working together as a team

5) Partnering with the rest of the organization

6) Determine target accounts

**7) Coloplast CARE**

8) Wrap up

Coloplast

Page 32

## Improving Care Performance – Ed Veome

| What is it? | What customers will be targeted? | What activities will be pursued in Q4/Q1? | Status, Next Steps & Impact |
|---|---|---|---|
| • Increasing Care leads improves NPD rates and increases retention of end users. | • Prioritize current referral sources to expand the number of enrollments per nurse. | Expand CC leads to include end users in rehab facilities and other community based lead sources<br><br>Expand OC education to improve ability to expand Care program leads<br><br>Improve Consumer Care process with dealer partners to ensure warm transfer and follow-up with new end users<br><br>Implement a series of bi-monthly communications to the field to demonstrate best practices and promote sales SPIFFs in Q4/Q1 | • Modified Care leads to include urology clinic leads.<br><br>• .<br><br>• Reinforced SpeediCath box communications<br><br>• In process of setting up regional calls for OC Care dialogue . Participated on OWSC call last week with all of the TMs and RMs and and reinforced the need to drive leads through the end of the year. |

Ostomy Care
Urology & Continence Care
Wound & Skin Care



Page 33

## Agenda

1) Kick-off

2) Objectives and expectations

3) Q4 / Q1 sales initiatives

4) Working together as a team

5) Partnering with the rest of the organization

6) Determine target accounts

7) Coloplast CARE

8) **Wrap up**

Ostomy Care
Urology & Continence Care
Wound & Skin Care
8/9/2011 11:22 AM



Page 34

# EXHIBIT 4

# Coloplast CARE
## August 8, 2012

Ostomy Care
Urology & Continence Care
Wound & Skin Care

**Coloplast**

# Coloplast has increased focus on retention of new end users through CARE and our Master Dealer partners



We have identified 8 key accounts we have partnered with in the CARE Program

Byram Healthcare

N⋅R

J&B MEDICAL SUPPLY ....SETTING THE STANDARD

CCS MEDICAL

LIBERATOR MEDICAL SUPPLY, INC.

edgepark
Medical Supplies
Since 1928
What you need, when you need it.®

Liberty

Shield HealthCare

Ostomy Care
Urology & Continence Care
Wound & Skin Care

Page 2

 Coloplast

# Over the last 10 months we have increased the number of leads we send to our CARE partners...



Oct 11'
704 leads

Feb 12' 1326 leads

July 12'
1799 leads

Total leads sent to CARE Partners

Ostomy Care
Urology & Continence Care
Wound & Skin Care

Page 3



Coloplast

# Although, we have had little transparency to the retention of these leads or the success of the program with our partners

| Sum of Net leads | | |
|---|---|---|
| Dealer | | Grand Total |
| Byram | CC | 2,327 |
| | OC | 77 |
| | OC | 2,250 |
| CCS | CC | 1,146 |
| | OC | 225 |
| J&B | OC | 921 |
| | CC | 105 |
| | OC | 85 |
| Liberator | OC | 20 |
| | CC | 2,037 |
| | OC | 100 |
| Liberty | CC | 1,937 |
| | OC | 1,630 |
| | OC | 65 |
| National Rehab | CC | 1,565 |
| | CC | 1,455 |
| | OC | 65 |
| RGH | OC | 3,720 |
| | CC | 1,390 |
| | OC | 154 |
| Shield | OC | 3,566 |
| | CC | 700 |
| | OC | 21 |
| Grand Total | OC | 679 |
| | | 13,120 |

Fiscal Year running totals to July 30th

Ostomy Care
Urology & Continence Care
Wound & Skin Care

Page 4

 Coloplast

Therefore we need to establish a more stringent process of measuring our success in the program

## How do we gain and measure success?

Establishing specific qualifications to becoming a partner in CARE which will ensure we have the most qualified partners

Setting expectations of activities we expect from our CARE partners to measure and track success of the program

Ostomy Care
Urology & Continence Care
Wound & Skin Care

Page 5


Coloplast

# But first.... How does Hollister do it?

## Secure Start

• Hollister provides report to dealer with number of leads sent as well as the customers who have signed on, then applying a score to said dealer

• This grading system is then used to 'rank' dealers against each other and to the overall success of the program

• Highlight average value of patient to the dealer which implies Hollister's value add to the dealer as a partner

• Hollister bases the number of leads provided to each dealer upon how successful they are in the program (ranking/grade)

*Is this a best practice for us to improve upon/replicate?*

 Coloplast

We learn from Hollister that they successfully 'control' their Secure Start program...

...... so, how do we then dictate criteria to 'qualify' dealers for 'membership' in Coloplast CARE and increase the value of being a partner to Coloplast?

• Require new language in contract to standardize communications and expectations
• Require Insurance listing to assess where we send patients
• Require shared CARE/Dealer enrollment form
• Agreement to send any Coloplast leads they can't provide for to us
• Require sales tracings for all sales
• Require support of Coloplast products via marketing campaigns/programs
• No participation in conversion activity of Coloplast products to competitor allowed
• Require sales force partnership if applicable
• Dedicated 800 number
• Agreement to provide follow up on tracking information on a monthly basis
• Participation in quarterly review of program results
• Contact leads must be made by partner via phone, email or physical mailer
• Commitment to carry all "Bigger, Better, Bolder" launch products and accept assignment



Coloplast

# Setting possible tier levels created for CARE program



- CARE partners
- Master dealers
- Low touch list/regional dealer
- Remainder of dealers



Coloplast

# Expectations for reporting and measuring success

## What information do we need from our CARE partners to measure success?

CARE partner required to report back to Coloplast on a monthly basis the following information

• Coloplast customer ID number
• Name, phone and zip code
• On service with dealer - Yes/No
• First date of shipment
• Last date of shipment
• Active or Inactive
• Reason if not on service (no insurance, use competitive product, use competitive dealer, insurance not accepted, Home Health episode, etc.)
• Products ordered and quantity
• Initial order and quantity last ordered
• Contact status – pending, etc.

Ostomy Care
Urology & Continence Care
Wound & Skin Care

Page 9

 Coloplast

# Master Dealer presentation, NSM
## December 7th, 2011

Ostomy Care
Urology & Continence Care
Wound & Skin Care

Page 1


Coloplast

CONFIDENTIAL

# The goals for the Master Dealer team is to grow sales with +20% for 11/12

A strong value proposition....

- Attract new end-users
- Increase revenue from existing end-users
- Improve gross profit
- Reduce cost-to-serve

...drives commercial activities and programs...

1. "House brand" status for ostomy
2. Conversion of competitive end-users
3. Upgrade campaigns for existing end-users
4. Continuous dialogue on retention

...leading to strong impact

- Revenue growth for existing end-users
- Increased retention for new end-users
- More end-users aware of Coloplast

Ostomy Care
Urology & Continence Care
Wound & Skin Care

Coloplast

CONFIDENTIAL

# We now have a strong team in place focused on our Master Dealers

**Aimee Ostrowski**
(North Central)

RGH
J&B Medical
Binson's
Wright & Filippis
Aiway Oxygen

**Eric Sward**
(Central)

180 Medical
Handi Medical
Allegro Medical
Express Medical
ActivStyle
HDIS
Walgreen's

**Amy Lestage**
(North East)

Byram
Sterling
Medline
CCS Medical

**Yvonne Battistini**
(South East)

Liberator Medical
Liberty Medical
All-Med Services of FL
PMSI
Puerto Rico

**Eric Hymes**
(East)

UroMed
National Rehab
Mercy Surgical
Wilmington Medical
Har-Kel
Blackburn's

**Vacant**
(West)

Shield
A-Med
Symbius Medical
ABC Home Medical
Southlake Medical

Ostomy Care
Urology & Continence Care
Wound & Skin Care


Coloplast

# What do all these companies have in common?



We are actively working with them to:
1) Convert business
2) Upgrade patients
3) Do cross-selling

Ostomy Care
Urology & Continence Care
Wound & Skin Care

Coloplast

CONFIDENTIAL

CONFIDENTIAL

# Early results are very promising and should boost our ostomy revenues



Medical Supplies
Since 1928



LIBERATOR
MEDICAL
SUPPLY, INC. ™

*Liberty*®
We Deliver Better Health™

- Upgrade campaign to ~5,000 end-users exposing them to better products
- Ostomy ring campaign to ~2,000 end-users currently not using rings

- Conversion campaign for managed care end-users
  - +70% conversion rate
  - +160 end-users converted so far

- Commitment to buy +$300,000 in ostomy rings
- Campaing to be kicked off shortly targeting thousands of current ostomy end-users

Ostomy Care
Urology & Continence Care
Wound & Skin Care



Coloplast

# EXHIBIT 5

| From: | Ulrik Berthelsen |
|---|---|
| Sent: | Wednesday, June 29, 2011 10:56 AM |
| To: | Amy Lestage; Edmond Veome |
| Cc: | Kevin Roseff |
| Subject: | RE: New proposal |

| Follow Up Flag: | Follow up |
|---|---|
| Flag Status: | Completed |

| Categories: | Red Category |
|---|---|

Hi Amy,

Thank you for your e-mail. Here is my perspective on Eric's counteroffer:

- I think that it is very positive that we are now looking eye to eye on this and that he is willing to discuss the entire business
- Most of what he requires is in my opinion doable, but I think we need to do a few tweaks

Here is where I think we can meet in the middle (I had a chance to chat with Claus and he agreed with the approach):

1. We offer a 6% rebate on all sales paid monthly (as long as monthly sales exceed $340k, i.e. they maintain their current volume. They can catch up later if they miss a month)
2. We offer an additional rebate of 2% on all sales as long as sales are min. 15% above previous year (a total of 6% on all sales if they grow min. 15%)
3. We can offer to pay from June 1st 2011
4. We will offer $1.10 for SpeediCath Compact and Male RTU. It is not possible for us to offer a lower price than this, and with their 6-8% discount on all sales, they are already below $1.10 (BTW the difference between the $1.10 and $1.05 is $12,500 on 250k units so fairly minimal in other words).
5. We want all future conversion activities to be ceased. We understand that they have sent out communication on the 414's, but want them not to do any additional conversion activities (this is almost 10% of existing business)
6. We want immediate conversion of 220k units of AstraTech to SpeediCath and that CCS will work together with us to convert all AstraTech business over the next 6 months
7. We are willing to talk about Ostomy, but we need to see success with AstraTech conversion first and get back on track with CC (This is highly sensitive and can throw our relationship with RGH off, so we need to tread very, very carefully).

The financials of this would be the following:

- Write down of approximately $250k in profit from the 6% rebate
- Upside would be approximately $250k in revenue (conversion of 250k LoFric units minus 8% discount) and $190k in GP1
- Net, net – a loss of approximately $60k before the conversion of remaining LoFric units

*Best regards*
*Ulrik*

Ulrik Berthelsen
Director of Commercial Excellence

Coloplast US
Direct (+1) 612-302-4933
Cell phone (+1) 612-876-2706

Email: dkubn@coloplast.com
This e-mail (including any attachments) is intended for the addressee(s) stated above only and may contain confidential information protected by law. You are hereby notified that any unauthorised reading, disclosure, copying or distribution of this e-mail or use of information contained herein is strictly prohibited and may violate rights to proprietary information. If you are not an intended recipient, please return this e-mail to the sender and delete it immediately hereafter. Thank you.

-----Original Message-----
From: Amy Lestage
Sent: Tuesday, June 28, 2011 9:21 PM
To: Ulrik Berthelsen; Edmond Veome
Cc: Kevin Roseff
Subject: Fw: New proposal

Ulrik/Ed,

Eric called me to explain his below counter offer. He explained that he would need something similar to the following in order to maintain our partnership. He said that even with these requests accepted his COGS would still be lower than if they were to convert to the competition.
He did express his desire to continue working with Coloplast and is hoping we can come to a conclusion very soon. He is also looking forward to our possible meeting next month. Let me know when/if you'd like to schedule a call to discuss further.

Thanks again for your participation today.

Amy
Best Regards,

Amy Lestage
Distribution Manager
Coloplast Corp.
Mob. 617.947.1739
usjal@coloplast.com

----- Original Message -----
From: Eric.Hymes@ccsmed.com <Eric.Hymes@ccsmed.com>
To: Amy Lestage
Sent: Tue Jun 28 13:34:09 2011
Subject: Re: New proposal

Amy,

Thanks for meeting with me today.  Here is what I can do:

1. 6% rebate (monthly) starting in June 2011(back to June 1) on all purchases.
2. Rebate increased to 8% for year 2 if we grew business (all categories together) 15%
3. Rebate for year 3 at 8% for year 3 if we grew business another 15% (year 3 over 2).
4. $1.05 for Speedicath and compact
5. Immediate conversion of 250K Astra units to SC.
6. Proper and better Ostomy direct pricing.

As for the 414's what's done is done, I cannot break my commitment to the other manufacturer.  If we get this going ASAP, we can grow way past that.

Thank you,

Eric E. Hymes
Vice President/General Manager
Chronic Care Division - Urological/Ostomy/Incontinence
CCS Medical
2105 Newpoint Place, Suite 600
Lawrenceville, GA 30043
770-407-4444  direct
540-798-8408  mobile
770-407-4445  fax
56315            internal
eric.hymes@ccsmed.com

Description: logo9
Empowering people to lead healthier lives

From:   Amy Lestage <USJAL@coloplast.com>
To:      "eric.hymes@ccsmed.com" <eric.hymes@ccsmed.com>
Date:   06/28/2011 03:45 PM
Subject:        New proposal

Eric,

As discussed today, here is our new proposal:

1.      4% discount on all sales requiring minimum $4.1 million in sales
(i.e. maintaining current volumes)

2.      Additional 2% discount on all sales for Year 2 and Year 3 as long
as sales grow by minimum 15%

3.      $1.10 price for SpeediCath Compact and Male RTU (previously
proposed but not yet implemented)

The above requires that CCS abstain from conversion activity and convert
220k units of LoFric that they have stated that they can convert
immediately. The discount would be a minimum of $164,000 and $283,000 if
they grow 15%.

Please let me know your thoughts.

Amy
Best Regards,

Amy Lestage
Distribution Manager
Coloplast Corp.
Mob. 617.947.1739
usjal@coloplast.com

# EXHIBIT 6
# (Filed Under Seal)

# EXHIBIT 7

| | |
|---|---|
| **From:** | Ulrik Berthelsen |
| **Sent:** | Thursday, October 27, 2011 4:42 PM |
| **To:** | Sonia McDonough; Maja Ingeman |
| **Cc:** | Angie Sommers; Amy Lestage |
| **Subject:** | FW: CCS and Coloplast partnership |
| **Attachments:** | Copy of Purchases-Hol-Con-Ostomy Only-Sept-1 to Sept-30-11 (2).xlsx |
| | |
| **Importance:** | High |

Dear all,

Please see the high moving Hollister and ConvaTec items. Let's start crossing! Please give me a call to discuss if you have any questions. We need to have a file ready to CCS Medical tomorrow.


*Best regards*

*Ulrik*


Ulrik Berthelsen

Director, Master Dealer Sales


Coloplast US

Direct (+1) 612-302-4933

Cell phone (+1) 612-876-2706

Email: dkubn@coloplast.com

This e-mail (including any attachments) is intended for the addressee(s) stated above only and may contain confidential information protected by law. You are hereby notified that any unauthorised reading, disclosure, copying or distribution of this e-mail or use of information contained herein is strictly prohibited and may violate rights to proprietary information. If you are not an intended recipient, please return this e-mail to the sender and delete it immediately hereafter. Thank you.


**From:** Wesley Phelps [mailto:wesley.phelps@ccsmed.com]

**Sent:** Thursday, October 27, 2011 3:37 PM
**To:** Ulrik Berthelsen; David Tucker; Steve.strobl@ccsmed.com; Helen Young; Herchell Evans
**Cc:** Amy Lestage; Edmond Veome
**Subject:** RE: CCS and Coloplast partnership


Coloplast Team,


Hope you all had safe travels back.  Thanks again for taking the time coming to Atlanta yesterday.  Attached are our top skus ranked by COGS for both Hollister and Covatec.  This should help you cross reference your products.   Please let us know if you need anything else.  We look forward to seeing your proposed pricing matched up to these skus.


Thank you,


**Wesley Phelps**
National Sales Director
Chronic Care Division - Urological/Ostomy/Incontinence

CCS Medical

2105 Newpoint Place, Suite 600

Lawrenceville, GA 30043

770-407-4387  direct
678-878-6944  mobile
866-804-7071  fax
56313         internal
wesley.phelps@ccsmed.com


**Empowering people to lead healthier lives**


**From:** Ulrik Berthelsen [mailto:DKUBN@coloplast.com]
**Sent:** Wednesday, October 26, 2011 10:41 PM
**To:** David Tucker; Steve.strobl@ccsmed.com; Wesley Phelps; Helen Young; Herchell Evans
**Cc:** Amy Lestage; Edmond Veome
**Subject:** CCS and Coloplast partnership


Dear all,

Thank you for a very productive meeting today. We are excited about the opportunity to further strengthen the

partnership between CCS Medical and Coloplast. As discussed, we will be sending you an overview of the current pricing and utilization as well as the future pricing that we are proposing and a cross to the top SKUs for Hollister and ConvaTec. You will receive that later this week as promised, once we have received an overview of the top SKUs for Hollister and ConvaTec.

Attached you find the wound care pricing that was presented to the CCS team in Denver in August. As discussed, we see partnering in wound care as an opportunity to further improve the profitability of CCS overall as well as having increased wound care sales count towards the growth commitment. Please let us know if you have any questions or comments to this file.

As Amy will be out on PTO the rest of this week, please include me on any communication to make sure that we have a quick turn-around time. We look forward to moving this opportunity forward and being able to make a decision within the next couple of weeks.

*Best regards*

*Ulrik*

Ulrik Berthelsen

Director, Master Dealer Sales

Coloplast US

Direct (+1) 612-302-4933

Cell phone (+1) 612-876-2706

Email: dkubn@coloplast.com

This e-mail (including any attachments) is intended for the addressee(s) stated above only and may contain confidential information protected by law. You are hereby notified that any unauthorised reading, disclosure, copying or distribution of this e-mail or use of information contained herein is strictly prohibited and may violate rights to proprietary information. If you are not an intended recipient, please return this e-mail to the sender and delete it immediately hereafter. Thank you.

**The documents accompanying this transmission contain confidential health and business information that is legally privileged. This information is intended only for the use of the individual or entity named above. The authorized recipient of this information is prohibited from disclosing this information to any other party unless required to do so by law or regulation and is required to destroy the information after its stated need has been fulfilled. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance on the contents of these documents is strictly prohibited. If you have received this information in error, please notify the sender immediately for the return or destruction of these**

documents.

# EXHIBIT 8

# Secure Start
# Discharge Program



Hollister

# Current Reality

Hollister receives 5,000 calls on a monthly basis

**Findings:**

## Patient

- Uncertain about insurance benefits
- Complains about timely delivery of supplies
- Local supplier doesn't carry the products needed
- Overwhelmed with condition

## Clinician

- Uncertain about insurance coverage for the patient
- Expresses concern about "What happened to the Patient?"
- Expresses concern about patient staying in nurse recommended product
- Limited resources for patient samples

 Hollister

# *What is the goal of the Secure Start Discharge Program?*

Hollister partners with clinicians to effectively support patients through the transition from hospital discharge to the home.

**Program Benefits:**

## Patient

- Provide patient timely access to samples and education
- Limit confusion upon hospital discharge to home/home health
- Effectively manage supply of product to patient via select dealers
- Improve quality of life through difficult transition after surgery

## Clinician

- Reduces time spent on discharge process
- Provides patient follow-up data regarding product and supplier selection and patient needs
- Appropriate supplier selected based upon patient needs
- Provides resource for patient supply/education upon discharge


Hollister

# The Secure Start Discharge Program will Enhance Patient Experience Upon Transition from Hospital to Home



## Team Members

### Role

**1.) Sales Representative**
(OWC Sales Specialist)



- Introduce Secure Start Discharge Program to Clinician
- Introduce Secure Start Program Coordinator via phone
- Enroll clinician in the program
- Meet monthly with clinician to review new patient start status

**2.) Clinician**
(WOC/Discharge Planner)



- Discuss discharge program with Sales Specialist
- Enroll in Secure Start Discharge Program
- Meet Secure Start Program Coordinator via teleconference
- Send new patient sample requests to Hollister

**3.) Secure Start Program Coordinator**



- Coordinate teleconference with sales specialist to introduce discharge program to clinician
- Initiate phone calls to patients to assist in selection of appropriate product and supplier
- Provide education materials as requested by patients
- Provide monthly program status to clinicians



# Secure Start Discharge Program Process

## *Clinician's Role*

## Three Simple Steps:

- Complete program enrollment form which identifies you and allows us to establish your profile in our system.

- Meet Program Coordinator, they will support you and your patients based upon your requested needs.

- Send your personalized Patient Sample Request Forms to Program Coordinator.

 Hollister

# Secure Start Discharge Program Process
## *Program Coordinator's Role*

- Establish Clinician record and provide personalized Patient Sample Request Forms

- Receive Patient Sample Request Forms from Clinician and create patient record

- Order customized sample kit and mail to patient to arrive within 48 hours

- Email FedEx tracking information to Clinician

- Select supplier for ongoing patient orders

- Contact patient for follow-up via prescribed timeline

- Provide monthly patient status reports to Clinician

**Hollister**

# Managing Patient through Home Health

- Patient will have access to samples throughout Home Health Episode

- Medicare Patients will have access to recommended products throughout episode of care

- Managed Care Patients will be aligned with a Supplier upon discharge from hospital

- Home Health Nurses will be communicated with regularly

**❌❌ Hollister**

# Secure Start Discharge Program

## Patient Flow



Clinician signs enrollment form & meets Program Coordinator

Clinician sends sample request via phone, fax, or e-mail upon patient discharge

Hollister establishes patient profile & sends custom sample kit to arrive in 48 hours

No HH – Assign patient to supplier & call supplier to set-up warm transfer date

HH – Understand provider contract and establish parameters, communication & sampling

Hollister to call patient on day of sample arrival to explain sample kit and discuss provider

Upon patient's approval, patient is connected to supplier to place an order to obtain supplies

At 7 days Hollister conducts sample follow-up and if applicable confirms supply delivery

Clinicians to receive Patient Status Reports monthly

Hollister conducts on-going follow-up with patients at 90 days & 6 month intervals

Hollister

# Secure Start Discharge Program Forms

*Enrollment Form*

## Enrollment Form

- Utilized to develop clinician profile:
  - □ Demographic information
  - □ Clinical preferences
  - □ Product preferences
  - □ Supply preferences
- Enables program coordinator to manage process per clinician specifications
- Eliminates repeated gathering of information



**Secure|Start**

*Discharge Program Enrollment Application*

Clinician Name
Date
Hospital
City/State/Zip
Alternative Address (if applicable)
% of Patients Referred to Home Health

**What ostomy products do you currently use?  Please check all that apply.**

□ ConvaTec   □ Coloplast   □ Hollister   □ Other

**How many ostomy patients do you discharge each month?**

**Communication Preference:** □ Telephone   □ Fax   □ Email
Daytime Phone
Evening Phone
Best Time To Call   □ a.m.   □ p.m.
Other
Fax
Email

**Special Instructions (Example: Supplier Preference, Patient Education Materials, etc.)**

*I agree to enroll in the Secure Start Discharge Program with Hollister Incorporated.*
*I have also read and acknowledge the Privacy Statement.*

Clinician Signature _____ Phone # _____

**Privacy Statement**
Your privacy is important to Hollister Incorporated ("Hollister"). Hollister will not sell or rent personal information to others. Personal information collected by Hollister is used to contact customers about Hollister and its products and services and is only shared with other outside organizations (service providers) to help them contact customers on behalf of Hollister. If you no longer wish to receive such communications, you may "opt out" at any time by calling Hollister at 1.800.323.4060, Monday through Friday, 7:00 a.m. to 5:00 p.m. CST.

**Internal Use Only**
Sales Specialist
CRM BP Number

For questions regarding Secure Start Discharge Program, please contact:
Hollister Program Coordinator: 888-808-7456
Fax: 800-359-2341; Email: securestartdischarge@hollister.com

# Secure Start Discharge Program Forms

*Patient Sample Request Form*

## Sample Request Form

- Enables Clinician to select from a large variety of state of the art, reimbursement-friendly products

- Provides key information on patient's selection of an appropriate supplier

- Obtains patient's acknowledgement of privacy statement

Hollister

# Secure Start Discharge Program Forms

## *Patient Status Reports*

❊ Hollister

**Secure|Start™**

Status Update Report

| Referring Nurse | Patient Name | Samples Sent | | | Supplier Chosen | Comments |
|---|---|---|---|---|---|---|
| | | Product # | Quantity | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

## Patient Status Reports

- Optional reports that provide status of all patients assisted by the program

- Reports order placed by patient

- Provides supplier selected for patient

- Provides verification of samples sent

❊ Hollister

# Secure Start Discharge Program
## Contact Information

- Phone — 1-888-808-7456

- Fax — 1-800-398-2341

- E-mail — securestartdischarge@hollister.com



Hollister

Hollister

Questions?

# EXHIBIT 9

| From: | Murray, Monty [mmurray@byramhealthcare.com] |
|---|---|
| Sent: | Wednesday, July 17, 2013 4:31 PM |
| To: | Amy Lestage; Nicole Cavalluzzi |
| Cc: | Dahl, Andrew |
| Subject: | FW: Hollister Secure Start Weekly Reports for 07/07/2013 thru 07/13/2013 |
| Attachments: | Byram Weekly 13-07-16.xls |

Can we add Andrew please. You can remove Len Romanello too.

Thank you

**Monty Murray**
**Vice President, Marketing**
**Byram Healthcare**
mobile: 813.857.4442
office: 914.286.2065
email: mmurray@byramhealthcare.com
website: www.byramhealthcare.com

**From:** Hollister Data Corp [mailto:admin@hollisterdatacorp.com]
**Sent:** Wednesday, July 17, 2013 11:29 AM
**To:** Lukasek, Angela; Romanello, Len; Hughes, Susan; Rosefort, Allison; Guttman, David; Rekar, Kristy; Murray, Monty
**Subject:** Fwd: Hollister Secure Start Weekly Reports for 07/07/2013 thru 07/13/2013

**Please see your attached weekly reports representing results 7/07/2013 thru 07/13/2013 accordingly.**

This report includes only those patients with Secure Start Discharge Program enrollment dates of 1/1/2011 or later.
Of these patients, this report:

- *Includes* patients that were warm transferred to your business via a Secure Start Associate Coordinator
- *Includes* patients that have indicated that they are purchasing from your business (but were not warm transferred by Hollister)

**Hollister Data Corp**

**Secure Start**

*prepared by*

| REPORT WEEK (Tuesday) | 7/16/2013 |
|---|---|

| Count of Hollister BP | | | |
|---|---|---|---|
| NAME CHECK | Hollister BP | First Name | Last Name |
| BYRAM HEALTHCARE | 8754241 | | |
| | 8778811 | | |
| | 8681427 | | |
| | 8781853 | | |
| | 8790219 | | |
| | 8794444 | | |
| | 8797549 | | |
| | 8680408 | | |
| | 8794652 | | |
| | 8799260 | | |
| | 8798899 | | |
| | 8766902 | | |
| | 8797479 | | |
| | 8799325 | | |
| | 8793957 | | |
| | 8797625 | | |
| | 8783739 | | |
| | 8795428 | | |
| | 8789650 | | |
| | 8775014 | | |
| | 8799114 | | |
| | 8796854 | | |
| | 8796262 | | |
| | 8798148 | | |
| | 8779828 | | |
| | 8762497 | | |
| | 8797500 | | |
| | 8798503 | | |
| | 8776507 | | |
| | 8798643 | | |
| | 8780688 | | |
| | 8794736 | | |
| | 8778866 | | |
| | 8793665 | | |
| | 8773526 | | |
| | 8794073 | | |
| | 8789980 | | |
| | 8766493 | | |
| | 8795495 | | |
| | 8772816 | | |
| | 8791349 | | |
| | 8792291 | | |















| Referring Org | City2 | State | Program Enrollment Date |
|---|---|---|---|
| BRANDON REGIONAL | Brandon | FL | 1/18/2013 |
| Baptist Medical | San Antonio | TX | 5/2/2013 |
| BAYLOR UNIVERSITY | DALLAS | TX | 3/7/2012 |
| St James Hospital | Chicago Heights | IL | 5/15/2013 |
| COLUMBIA JOHN | Hopewell | VA | 5/28/2013 |
| Sherman Hospital | Elgin | IL | 6/13/2013 |
| Morton Plant | Clearwater | FL | 6/25/2013 |
| ST FRANCIS HOSPITAL | Tulsa | OK | 3/2/2012 |
| Middlesex Memorial | Middletown | CT | 6/13/2013 |
| Peace River Reg | PORT CHARLOTTE | FL | 7/2/2013 |
| ROOSEVELT HOSPITAL | New York | NY | 7/1/2013 |
| SUTTER GENERAL | Sacramento | CA | 3/14/2013 |
| St Josephs Medical | Tacoma | WA | 6/25/2013 |
| The Christ Hospital | Cincinnati | OH | 7/2/2013 |
| UNIVERSITY OF | Ann Arbor | MI | 6/11/2013 |
| UNIVERSITY OF | Charlottesville | VA | 6/26/2013 |
| Rose Medical Center | Denver | CO | 5/22/2013 |
| ELMBROOK MEMORIAL | Brookfield | WI | 6/17/2013 |
| Mercy Medical | Des Moines | IA | 5/24/2013 |
| UNIVERSITY OF | Chicago | IL | 4/17/2013 |
| Univ Of Rochester | Rochester | NY | 7/2/2013 |
| Univ Of Rochester | Rochester | NY | 6/21/2013 |
| Triumph Hospital - | Amarillo | TX | 6/20/2013 |
| Methodist Hospital | Indianapolis | IN | 6/27/2013 |
| Long Island Jewish | New Hyde Park | NY | 5/7/2013 |
| Fletcher Allen | Burlington | VT | 2/25/2013 |
| Centerpoint | Independence | MO | 6/25/2013 |
| IMMEDIATE HOME | BENSALEM | PA | 6/28/2013 |
| St Joseph Hospital | Bellingham | WA | 4/23/2013 |
| MIDLAND MEMORIAL | Midland | TX | 7/1/2013 |
| VNA OF ST LUKE'S | Bethlehem | PA | 5/10/2013 |
| SPOKANE VISITING | Spokane | WA | 6/17/2013 |
| St Lukes Regional | Boise | ID | 5/2/2013 |
| SELF ENROLLMENT | Libertyville | IL | 6/11/2013 |
| PORTER ADVENTIST | Denver | CO | 4/11/2013 |
| JOHN C LINCOLN | Phoenix | AZ | 6/11/2013 |
| Lenox Hill Hospital | New York | NY | 5/25/2013 |
| Sacred Heart | Spokane | WA | 3/12/2013 |
| SELF ENROLLMENT | Libertyville | IL | 6/18/2013 |
| UNIVERSITY OF | Ann Arbor | MI | 4/8/2013 |
| SOUTHERN HILLS | Nashville | TN | 5/31/2013 |
| FROEDTERT MEMORIAL | Milwaukee | WI | 6/5/2013 |

| HUNTINGTON HOSPITAL | Huntington | NY | 6/28/2013 |
| PORTLAND ADVENTIST | PORTLAND | OR | 12/13/2012 |
| Hoag Memorial | Newport Beach | CA | 6/11/2013 |
| FAIRFAX HOSPITAL | Falls Church | VA | 6/6/2013 |
| WASHINGTON | Fayetteville | AR | 5/20/2013 |
| LOMA LINDA UNIV | Loma Linda | CA | 6/5/2013 |
| MAIMONIDES MEDICAL | Brooklyn | NY | 6/20/2013 |
| DESERT HOSPITAL | Palm Springs | CA | 6/28/2013 |
| VNA OF NO CARROLL | NORTH CONWAY | NH | 5/23/2013 |
| SAINT LUKES EAST | Lees Summit | MO | 4/25/2013 |
| WASHINGTON | Washington | DC | 6/26/2013 |
| St Joseph Hospital | Bellingham | WA | 9/13/2012 |
| SUMMIT MEDICAL | HERMITAGE | TN | 4/23/2013 |
| Lower Keys Medical | Key West | FL | 5/29/2013 |
| THE COMMUNITY | Munster | IN | 6/12/2013 |
| Swedish Medical | Englewood | CO | 6/17/2013 |
| HENRICO DOCTORS | Henrico | VA | 4/26/2013 |
| PORTLAND ADVENTIST | PORTLAND | OR | 6/14/2013 |
| ADVANCED HOME CARE | Kingsport | TN | 6/25/2013 |
| Hoag Memorial | Newport Beach | CA | 6/27/2013 |
| North Central | San Antonio | TX | 7/8/2013 |
| Univ Of Rochester | Rochester | NY | 6/4/2013 |
| ST LUKES CORNWALL | Newburgh | NY | 7/3/2013 |
| EISENHOWER MEDICAL | Rancho Mirage | CA | 6/14/2013 |
| St Peter Hospital | Olympia | WA | 5/20/2013 |
| COOKEVILLE | Cookeville | TN | 3/22/2013 |
| Ellis Hospital | Schenectady | NY | 7/8/2013 |
| WAUKESHA MEMORIAL | Waukesha | WI | 7/9/2013 |
| Reg Med Ctr | Hudson | FL | 3/20/2013 |
| RHS Materials | Meridian | MS | 6/13/2013 |
| NEW YORK | New York | NY | 5/22/2013 |
| ST. LOUIS | Saint Louis | MO | 6/26/2013 |
| SPECIALTY WOUND | HOUSTON | TX | 5/31/2013 |
| Sumner Regional | Gallatin | TN | 7/8/2013 |
| NEW HANOVER | Wilmington | NC | 6/19/2013 |
| Baptist Hospital Inc | Nashville | TN | 7/12/2013 |
| Rose Medical Center | Denver | CO | 6/28/2013 |
| St. Anthony | Lakewood | CO | 5/31/2013 |
| NEIGHBORHOOD | West Chester | PA | 7/2/2013 |
| SOUTHWESTERN | Tulsa | OK | 6/4/2013 |
| Seattle Childrens | Seattle | WA | 7/8/2013 |
| SELF ENROLLMENT | Libertyville | IL | 7/15/2013 |
| SELF ENROLLMENT | Libertyville | IL | 6/25/2013 |
| St Elizabeth | Belleville | IL | 6/28/2013 |
| CONNECTICUT | Hartford | CT | 7/5/2013 |
| Arrowhead | Glendale | AZ | 6/19/2013 |
| SELF ENROLLMENT | Libertyville | IL | 10/5/2012 |
| LAWRENCE & | NEW LONDON | CT | 4/12/2013 |
| Community Health | HOLLISTON | MA | 7/5/2013 |
| Emory University | Atlanta | GA | 6/18/2013 |
| ELITE HOME HEALTH | Peoria | AZ | 7/2/2013 |
| North Shore Univ | Manhasset | NY | 7/1/2013 |

| | | | |
|---|---|---|---|
| Univ of Iowa Hosp | Iowa City | IA | 4/15/2013 |
| PORTER ADVENTIST | Denver | CO | 12/19/2012 |
| North Shore Univ | Manhasset | NY | 1/24/2013 |
| Harris Methodist | Fort Worth | TX | 2/22/2013 |
| SELF ENROLLMENT | Libertyville | IL | 7/9/2013 |
| MARIN HOME CARE | San Rafael | CA | 3/29/2012 |
| SELF ENROLLMENT | Libertyville | IL | 7/10/2013 |
| Sts. Mary and | Louisville | KY | 5/2/2013 |
| PROVIDENCE HOME | PORTLAND | OR | 4/24/2012 |
| SELF ENROLLMENT | Libertyville | IL | 4/29/2013 |
| UNIVERSITY OF | Seattle | WA | 6/24/2013 |
| SELF ENROLLMENT | Libertyville | IL | 7/1/2013 |
| REDMOND-ST CHARLES | Redmond | OR | 12/9/2011 |
| EXEMPLA GOOD | Lafayette | CO | 7/9/2013 |
| PORTER ADVENTIST | Denver | CO | 7/8/2013 |
| ALACARE OF | Scottsboro | AL | 9/6/2011 |
| SELF ENROLLMENT | Libertyville | IL | 7/15/2013 |

| Confirmed Dealer Date | Date of Discharge Warm Transfer | DURATION | Total |
|---|---|---|---|
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/8/2013 | 7/8/2013 | Permanent Stoma | 1 |
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/8/2013 | 7/8/2013 | (blank) | 1 |
| 7/8/2013 | 7/8/2013 | (blank) | 1 |
| 7/8/2013 | 7/8/2013 | (blank) | 1 |
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/8/2013 | 7/8/2013 | (blank) | 1 |
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/8/2013 | 7/8/2013 | (blank) | 1 |
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/8/2013 | 7/8/2013 | Permanent Stoma | 1 |
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/8/2013 | 7/8/2013 | (blank) | 1 |
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/8/2013 | 7/8/2013 | (blank) | 1 |
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/8/2013 | 7/8/2013 | (blank) | 1 |
| 7/8/2013 | 7/8/2013 | (blank) | 1 |
| 7/8/2013 | 7/8/2013 | (blank) | 1 |
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/8/2013 | 7/8/2013 | (blank) | 1 |
| 7/8/2013 | 7/8/2013 | Temporary Stoma | 1 |
| 7/9/2013 | 7/9/2013 | Temporary Stoma | 1 |
| 7/9/2013 | 7/9/2013 | (blank) | 1 |
| 7/9/2013 | 7/9/2013 | Temporary Stoma | 1 |
| 7/9/2013 | 7/9/2013 | Temporary Stoma | 1 |
| 7/9/2013 | 7/9/2013 | Temporary Stoma | 1 |
| 7/9/2013 | 7/9/2013 | (blank) | 1 |
| 7/9/2013 | 7/9/2013 | Permanent Stoma | 1 |
| 7/9/2013 | 7/9/2013 | (blank) | 1 |
| 7/9/2013 | 7/9/2013 | Temporary Stoma | 1 |
| 7/9/2013 | 7/9/2013 | Temporary Stoma | 1 |
| 7/9/2013 | 7/9/2013 | Temporary Stoma | 1 |
| 7/9/2013 | 7/9/2013 | Temporary Stoma | 1 |
| 7/9/2013 | 7/9/2013 | Temporary Stoma | 1 |
| 7/9/2013 | 7/9/2013 | Temporary Stoma | 1 |
| 7/9/2013 | 7/9/2013 | Temporary Stoma | 1 |
| 7/9/2013 | 7/9/2013 | (blank) | 1 |

| | | | |
|---|---|---|---|
| 7/9/2013 | 7/9/2013 | (blank) | 1 |
| 7/10/2013 | 7/10/2013 | Permanent Stoma | 1 |
| 7/10/2013 | 7/10/2013 | Temporary Stoma | 1 |
| 7/10/2013 | 7/10/2013 | Permanent Stoma | 1 |
| 7/10/2013 | 7/10/2013 | Temporary Stoma | 1 |
| 7/10/2013 | 7/10/2013 | Permanent Stoma | 1 |
| 7/10/2013 | 7/10/2013 | Temporary Stoma | 1 |
| 7/10/2013 | 7/10/2013 | (blank) | 1 |
| 7/10/2013 | 7/10/2013 | (blank) | 1 |
| 7/10/2013 | 7/10/2013 | Temporary Stoma | 1 |
| 7/10/2013 | 7/10/2013 | Permanent Stoma | 1 |
| 7/10/2013 | 7/10/2013 | Permanent Stoma | 1 |
| 7/10/2013 | 7/10/2013 | Permanent Stoma | 1 |
| 7/10/2013 | 7/10/2013 | Temporary Stoma | 1 |
| 7/10/2013 | 7/10/2013 | Permanent Stoma | 1 |
| 7/10/2013 | 7/10/2013 | (blank) | 1 |
| 7/10/2013 | 7/10/2013 | Temporary Stoma | 1 |
| 7/11/2013 | 7/11/2013 | Temporary Stoma | 1 |
| 7/11/2013 | 7/11/2013 | Permanent Stoma | 1 |
| 7/11/2013 | 7/11/2013 | Permanent Stoma | 1 |
| 7/11/2013 | 7/11/2013 | Temporary Stoma | 1 |
| 7/11/2013 | 7/11/2013 | Permanent Stoma | 1 |
| 7/11/2013 | 7/11/2013 | Temporary Stoma | 1 |
| 7/11/2013 | 7/11/2013 | (blank) | 1 |
| 7/11/2013 | 7/11/2013 | Temporary Stoma | 1 |
| 7/11/2013 | 7/11/2013 | (blank) | 1 |
| 7/11/2013 | 7/11/2013 | Permanent Stoma | 1 |
| 7/11/2013 | 7/11/2013 | (blank) | 1 |
| 7/11/2013 | 7/11/2013 | Temporary Stoma | 1 |
| 7/12/2013 | 7/12/2013 | Temporary Stoma | 1 |
| 7/12/2013 | 7/12/2013 | Temporary Stoma | 1 |
| 7/12/2013 | 7/12/2013 | Temporary Stoma | 1 |
| 7/12/2013 | 7/12/2013 | Temporary Stoma | 1 |
| 7/12/2013 | 7/12/2013 | Temporary Stoma | 1 |
| 7/12/2013 | 7/12/2013 | (blank) | 1 |
| 7/12/2013 | 7/12/2013 | Temporary Stoma | 1 |
| 7/12/2013 | 7/12/2013 | Permanent Stoma | 1 |
| 7/12/2013 | 7/12/2013 | Temporary Stoma | 1 |
| 7/12/2013 | 7/12/2013 | (blank) | 1 |
| 7/12/2013 | 7/12/2013 | (blank) | 1 |
| 7/12/2013 | 7/12/2013 | (blank) | 1 |
| 7/12/2013 | 7/12/2013 | (blank) | 1 |
| 7/12/2013 | 7/12/2013 | (blank) | 1 |
| 7/12/2013 | 7/12/2013 | (blank) | 1 |
| 7/12/2013 | 7/12/2013 | Temporary Stoma | 1 |
| 7/8/2013 | (blank) | Temporary Stoma | 1 |
| 7/8/2013 | (blank) | Permanent Stoma | 1 |
| 7/8/2013 | (blank) | Temporary Stoma | 1 |
| 7/9/2013 | (blank) | Permanent Stoma | 1 |
| 7/9/2013 | (blank) | (blank) | 1 |
| 7/9/2013 | (blank) | Temporary Stoma | 1 |
| 7/9/2013 | (blank) | Temporary Stoma | 1 |

| 7/9/2013 | (blank) | (blank) | 1 |
| 7/9/2013 | (blank) | Temporary Stoma | 1 |
| 7/9/2013 | (blank) | (blank) | 1 |
| 7/9/2013 | (blank) | Temporary Stoma | 1 |
| 7/9/2013 | (blank) | Permanent Stoma | 1 |
| 7/10/2013 | (blank) | Temporary Stoma | 1 |
| 7/10/2013 | (blank) | Temporary Stoma | 1 |
| 7/10/2013 | (blank) | Permanent Stoma | 1 |
| 7/10/2013 | (blank) | Permanent Stoma | 1 |
| 7/10/2013 | (blank) | Permanent Stoma | 1 |
| 7/11/2013 | (blank) | Temporary Stoma | 1 |
| 7/11/2013 | (blank) | Permanent Stoma | 1 |
| 7/12/2013 | (blank) | Temporary Stoma | 1 |
| 7/12/2013 | (blank) | (blank) | 1 |
| 7/12/2013 | (blank) | Temporary Stoma | 1 |
| 7/12/2013 | (blank) | Permanent Stoma | 1 |
| 7/12/2013 | (blank) | Temporary Stoma | 1 |
| | | | 111 |

# EXHIBIT 10

**Job Title**
**Secure Start Associate Coordinator**

**Job Profile**
Libertyville, IL - Corporate
For over 85 years, Hollister Incorporated has built a strong foundation of quality medical products, quality services, and quality employees - making a difference in the lives of those we serve. Hollister Incorporated stands strong: We are an independent and employee-owned company. Committed to our customers. Dedicated to our employees. Working towards the future with a long-term vision.

Our challenge at Hollister Incorporated is to find those who share this dedication of helping others. Those searching for a way to make a difference. To leave a legacy of achievement. Knowing it takes talent, teamwork, and sheer determination.

Hollister Incorporated is a company where dedicated professionals can channel their efforts in a worthwhile cause. A company where good work is rewarded. Where contributing selflessly is highly regarded. This growing global medical device company will make the journey...with you. So join us, and make a difference.

The purpose of this position is to support the start of new ostomy patients (up to 6 months post hospital discharge) in order to gain the use of Hollister products for new users to improve patient outcomes. The role is the single point of contact for the consumer, handling product education, insurance coordination, and supplier partnership, in addition to providing emotional support and resource referrals for other condition-related concerns, until the consumer is self-managing their product selection and order placement.

RESPONSIBILITIES:

End-User Relationship Management

â¢ Initiate call to Secure Start patients post-discharge from the hospital.

â¢ Identify current product usage and needs.

â¢ Based on nurse/clinician protocols and preferences, promote Hollister products and sample to secure Hollister product use or affect conversion from competitive products to maximize patient outcomes.

â¢ Process sample orders as indicated.

• Initiate sample follow-up calls to consumers to ensure successful patient outcomes with product sampled.

• Identify best supplier match for consumer and initate warm transfer of consumer to supplier.

• Maintain ongoing relationship with consumer for all product-related concerns for program duration.

• Provide feedback/updates to referring clinicians as indicated

Supplier Coordination

• Based on verification of consumer's insurance coverage, identify most appropriate supplier.

• Conduct initial introduction of consumer to supplier.

• Follow-up with supplier and consumer as indicated to ensure positive patient outcome.

• Monitor supplier metrics to ensure performance expectations are being met.

Other Support Activities

• Maintain knowledge of, and relationships with, product distribution (DTC) partners in order to identify the most appropriate consumer solution.

• Maintain ongoing communication/coordination with Consumer Program Specialists and Hollister Field Sales Representatives on patient status/outcomes in order to support the continued growth efforts of the Secure Start Program.

• Partner with Marketing function as needed for targeted campaigns and provide feedback as indicated.

• Maintain ongoing competitive product knowledge.

Academic/Credentials/Certifications:

Bachelor's degree highly desired

Length of Experience:

0-2 years experience with Bachelor degree or 4 years of sales, marketing or customer service experience in lieu of degree

Specialized Skills/Technical Knowledge:

Computer knowledge including Microsoft Word, Excel, Outlook, Web-based applications and Windows-based navigation

Excellent communication skills both over the phone and in person

Independent problem solving

Previous experience in vendor relations

Inside/outside sales experience within the healthcare industry preferably ostomy

Work related experience in an end-user market

SAP Experience/CRM Experience desirable but not required

Possess the ability to work under pressure and exhibit multi-tasking capabilities

Demonstrated application of consultative skills and techniques

Manages time effectively and adapts quickly to changing priorities

Effective listening and negotiation skills
For consideration, click on the 'Add to Job Cart' button below.

**Job URL**
http://sh.webhire.com/servlet/av/jd?ai=318&ji=2490725&sn=I

# EXHIBIT 11



Inside WOCNews • President's Letter • Regional News • Director's Corner

# WOCNews

Issue 2 • 2010

Wound, Ostomy and Continence Nurses Society

## WOCN-WCET Joint Conference Issue

WOC Nurses
Special Recognition

Members Provide
Relief in Haiti

Wound
Ostomy and
Continence
Nurses
Society

www.wocn.org

• A highlighted showcasing of the educational experience in the exhibit hall.

As we face this changing market together, your society and our exhibitors are planning innovative and comprehensive experiences—so don't miss out on the opportunity to meet exhibitors in June. To strengthen your overall knowledge and maximize your limited time in Phoenix, we will be introducing a revolutionary way to learn more about our exhibitors through an online mapping resource, "You Are Here." Information will become available shortly.

As always, we welcome your feedback to enhance your experience with the 2010 WOCN WCET Joint Conference's exhibit program.

# AdvaMed Code: An Overview
*Information Provided by Mark Kalifa, Hollister Incorporated*

The Advanced Medical Technology Association ("AdvaMed") "Code of Ethics for Interactions with Health Care Professionals" became effective in January, 2004. A substantially revised version of the code was approved by AdvaMed in December, 2009 (the "AdvaMed Code".) The AdvaMed Code contains important guidance that applies to how medical device companies interact with healthcare professionals. Healthcare professionals include nurses, physicians and other people employed by customers of medical device companies. AdvaMed and its respective members adopted the AdvaMed Code in response to the rapidly changing healthcare fraud enforcement environment. Medical device companies are concerned about healthcare fraud enforcement because it presents risks in the form of criminal and civil liability to the companies and health care professionals.

## Why Is the Code Necessary?
The AdvaMed Code is intended to provide guidance to aid medical device companies in compliance with the federal Anti-Kickback Statute and help facilitate ethical interactions between medical device companies and healthcare professionals.

> "The AdvaMed Code contains important guidance that applies to how medical device companies interact with healthcare professionals."

The Anti-Kickback Statute forbids payment or remuneration of any sort intended to induce the referral of items or services reimbursable by Medicare, Medicaid or other federal funds. The statute ascribes liability to parties on both sides of an impermissible "kickback" transaction. Violation of the Anti-Kickback Statute is a felony and may result in a fine of up to $25,000, imprisonment for up to five years or both. In addition, the Office of Inspector General of the United States Department of Health and Human Services (the "OIG") may suspend or exclude a provider or other entity, including a medical device company, from participation in the Medicare or Medicaid programs if such provider or entity is convicted of violating the Anti-Kickback Statute. Compliance with the AdvaMed Code and its restrictions on actions which may be considered "unlawful inducement" promotes compliance with the Anti-Kickback Statute.

OIG Guidance released in 2003 states adherence to the Pharmaceutical Research and Manufacturers of America Code or PhRMA Code, and presumably, by extension, the AdvaMed Code, should substantially reduce the risk of a manufacturer being found to have violated the Anti-Kickback statute and other healthcare fraud and abuse laws.

The AdvaMed Code provides guidance to assist medical device companies with making sure interactions with health care professionals are ethical and any conflict of interest is avoided. Health care providers have a duty to act in the best interest of patients, and companies should not take any

*Continued on page 23*

# Changing Exhibit Program • Continued from page 17

action to encourage health care providers to violate this duty. Further, interactions with health care providers should always be conducted with appropriate transparency.

## Compliance with the AdvaMed Code

Many companies have developed compliance programs to help comply with the AdvaMed Code. Compliance programs place certain restrictions on the types and manner of interactions between companies and healthcare professionals. These restrictions include limitations on hospitality (including meals and refreshments), restrictions on the types of travel and other expenses a company can pay on behalf of a healthcare professional and limitations on consulting arrangements with healthcare professionals. The AdvaMed Code specifically prohibits companies from providing or paying for any entertainment or recreational event or activity such as sporting events, golf or other leisure or vacation trips. Payment for meals served in conjunction with presentations of scientific, education or business information must be modest and done in conjunction with such presentation. The AdvaMed Code dictates meals cannot be provided where a healthcare professional is not present (such as a "dine and dash" program) and companies may not pay for meals for guests of healthcare professionals (including spouses.)

Examples of scenarios addressed in the AdvaMed Code:

Q. May companies provide Starbucks gift cards, fruit baskets or movie tickets to nurses in connection with an educational meeting or to be used as door prizes for a skills fair or other event?

A. No, companies may only provide items to healthcare professionals that benefit patients or serve a genuine educational function. Door prizes or other raffle gifts that do not meet these requirements are not appropriate under the AdvaMed Code.

Q. Are companies permitted to provide lunch for nurses meeting that serves a bona fide educational purpose?

A. Yes, companies may provide funding for lunch or meals or may directly provide meals and refreshments as long as the meal is modest in nature and is provided to all attendees. Meals and refreshments should not be provided to spouses or other guests of conference attendees.

Q. Are companies permitted to provide lunch or meals for a recreational gathering such as a holiday party or going away party?

A. No, providing meals or funding for meals or refreshments for recreational gatherings are not consistent with the AdvaMed Code principals.

Q. May companies provide a gift to a nurse who is moving or retiring?

A. No, gifts of any type that are not educational or beneficial to patients may not be provided to nurses.

Q. Can companies provide samples, starter kits and educational brochures to nurses or healthcare facilities?

A. Yes, it is appropriate for companies to provide samples, starter kits and educational brochures beneficial to patients or educational in nature to healthcare professionals or healthcare facilities.

Q. Can a company take a nurse to dinner at a restaurant?

A. Yes, but only if the meal provided is modest and occasional in nature and the meal is part of bona fide business, educational or scientific discussions. Meals serving as mere entertainment or are not in locations conducive to such discussions are not appropriate.

Q. Can a lunch be dropped off at a healthcare professional's office?

A. No, meals should only be provided to nurses or to other healthcare professionals if they are provided in conjunction with an educational or other business presentation. ◆

# EXHIBIT 12

Cathy Ostiller - AUSA
(213) 894·6159

1   PAUL D. SCOTT, ESQ.
    pdscott@lopds.com
2   California Bar Number 145975
    LANI ANNE REMICK, ESQ.
3   laremick@lopds.com
    California Bar Number 189889
4   LAW OFFICES OF PAUL D. SCOTT
    201 Filbert Street, Suite 401
5   San Francisco, CA 94133
    Phone: (415)981-1212
6   Fax:   (415)981-1215

7   Attorneys for Qui Tam Plaintiff

8

9              IN THE UNITED STATES DISTRICT COURT

10         FOR THE CENTRAL DISTRICT OF CALIFORNIA

11                                    SACV 07 - 0 0 9 9 5 - Doc (JTLx)

12  THE UNITED STATES OF AMERICA ex rel.  )   NO.
    [UNDER SEAL] AND STATE OF CALIFORNIA  )
13  ex rel. [UNDER SEAL],                 )   COMPLAINT FOR VIOLATION OF
                                          )   FEDERAL FALSE CLAIMS ACT
14                                        )   AND CALIFORNIA FALSE
                  Plaintiffs,             )   CLAIMS ACT
15                                        )
          v.                              )
16                                        )   FILED UNDER SEAL
    [UNDER SEAL],                         )   (31 U.S.C. 3729 et seq.)
17                                        )
                                          )
18                Defendants.             )   JURY TRIAL DEMANDED
                                          )
19  ─────────────────────────────────────

20

21

22

23

24

25

26

27

28

FILED
CLERK, U.S. DISTRICT COURT
AUG 23 2007
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

Copy

PAUL D. SCOTT, ESQ.
pdscott@lopds.com
California Bar Number 145975
LANI ANNE REMICK, ESQ.
laremick@lopds.com
California Bar Number 189889
LAW OFFICES OF PAUL D. SCOTT
201 Filbert Street, Suite 401
San Francisco, CA 94133
Phone: (415)981-1212
Fax:   (415)981-1215

Attorneys for Terry Donath

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA ex rel. TERRY DONATH AND STATE OF CALIFORNIA ex rel. TERRY DONATH,<br><br>Plaintiffs,<br><br>v.<br><br>WHITESTONE CORPORATION, CAPRICORN HOLDINGS, INC., SHIELD HEALTHCARE, KOBAYASHI PHARMACEUTICAL CO., LTD., AND A-MED HEALTHCARE CENTER,<br><br>Defendants. | NO.<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT AND CALIFORNIA FALSE CLAIMS ACT**<br><br>**FILED UNDER SEAL**<br>(31 U.S.C. 3729 et seq.)<br><br>**JURY TRIAL DEMANDED** |

## JURISDICTION, VENUE & PRELIMINARY MATTERS

1. This is an action to recover damages and penalties on behalf of the United States and the State of California arising from false claims, false statements, and other conduct by the defendants in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, et seq. and the California False Claims Act, Cal. Gov't Code §§ 12650, et seq. This court has jurisdiction over the federal False Claims Act claims pursuant to 28 U.S.C. §§ 1331 &

1

1  1345 and 31 U.S.C. § 3732 and has jurisdiction over the California

2  False Claims Act claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C.

3  § 3732(b).

4      2.  Defendants' false claims, false statements and other

5  conduct involve over-billing Medi-Cal, California's Medicaid

6  program, for medical supplies, including incontinence supplies.

7  Specifically, defendants falsely billed, and conspired to falsely

8  bill, Medi-Cal for incontinence and other medical supplies at

9  prices which were false and inflated because they failed to

10  disclose "off-invoice" rebates and other discounts which lowered

11  the true cost of the supplies.  Medi-Cal is jointly funded by the

12  United States and the State of California.

13      3.  Venue is proper in the Central District of California

14  under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because a

15  defendant can be found in and transacts business in this district

16  and because this district is a place where the claims arose and

17  where the acts complained of occurred.

18      4.  This action is not based upon any public disclosure.

19  Relator is an original source of the information upon which this

20  action is based.  Relator has direct and independent knowledge of

21  the information on which the allegations are based and has

22  voluntarily provided the information to the United States and the

23  State of California before filing this action.

24      5.  As required by 31 U.S.C. § 3730(b)(2) and Cal. Gov't Code

25  § 12652(c)(3), Relator has provided to the Attorney Generals of the

26  United States and the State of California and to the United States

27  Attorney for the Central District of California, along with the

28

2

1  filing of this complaint, a copy of the complaint and a written

2  disclosure of substantially all material evidence and information

3  related to the complaint.  The disclosure statement supports the

4  existence of false claims by the defendants.

5     6.  As required under the federal False Claims Act, this

6  complaint has been filed in camera and under seal and shall not be

7  served on the defendants until the court so orders.

8                              PARTIES

9     7.  Plaintiff TERRY DONATH ("Donath" or "Relator") is a

10  citizen of the United States and an individual residing in San

11  Diego County, California.  Donath brings this action for violations

12  of the federal False Claims Act and the California False Claims Act

13  on behalf of himself and on behalf of the United States Government

14  and the State of California, pursuant to 31 U.S.C. § 3730(b)(1) and

15  Cal. Gov't Code § 12652(c).

16     8.  Defendant WHITESTONE CORPORATION (aka Whitestone

17  Acquisition Corporation) ("Whitestone") is a company that

18  manufactures and sells medical supplies and products, including

19  incontinence supplies.  Whitestone was founded in 1949 and is based

20  in Bloomington, Indiana.

21     9.  Whitestone is a wholly-owned subsidiary of defendant

22  CAPRICORN HOLDINGS, INC. (aka Capricorn Investors, II, L.P.)

23  ("Capricorn"), a Connecticut-based private investment group.  Upon

24  information and belief, Capricorn is run and managed by three

25  individuals, Capricorn's general partners.  One of Capricorn's

26  general partners, James M. Better, is also defendant Whitestone's

27  President and CEO.  Relator is informed and believes that at all

28

3

1   times relevant herein, Capricorn dominated, directed, managed, and
2   controlled the operations of Whitestone.  Relator is further
3   informed and believes that Capricorn authorized and approved the
4   conduct of Whitestone set forth herein.

5       10.  Defendant SHIELD HEALTHCARE (aka Shield Healthcare
6   Centers, Inc.) ("Shield") is a company in the business of selling a
7   broad range of disposable medical products for the use and/or
8   treatment of patients in their homes, including incontinence
9   medical supplies.  Shield was founded in 1957 and is based in Santa
10  Clarita, California.

11      11.  Shield is owned by defendant KOBAYASHI PHARMACEUTICAL
12  CO., LTD. (aka Kobayashi Enterprises International, Inc.)
13  ("Kobayashi"), a Japanese company.  Upon information and belief,
14  Shield and Kobayashi have one or more concurrent officers.  Relator
15  is informed and believes that at all times relevant herein,
16  Kobayashi dominated, directed, managed, and controlled the
17  operations of Shield.  Relator is further informed and believes
18  that Kobayashi authorized and approved the conduct of Shield set
19  forth herein.

20      12.  Defendant A-MED HEALTHCARE CENTER ("A-Med") is a company
21  in the business of selling medical supplies, including incontinence
22  medical supplies.  A-Med is based in Huntington Beach, California.

23                  GOVERNING STATUTES AND REGULATIONS

24      13.  Title XIX of the Social Security Act of July 30, 1965
25  (Title 42, United States Code, Section 1396, *et seq.*) established a
26  medical assistance program known as the Medicaid Program.  Medicaid
27  is a health insurance program designed to assist participating

28

                                4

1    states in providing medical services and durable medical equipment

2    and supplies to families with dependent children, to the aged, the

3    mentally infirm, the blind, and the totally disabled, whose income

4    and resources are insufficient to meet the costs of necessary

5    medical services and supplies.  The Medicaid program is

6    administered by the respective states and jointly paid for by each

7    state and the United States Government.

8        14.   California's Medicaid Program is known as Medi-Cal, and

9    is administered by the California Department of Health Services

10   (DHS).  The Medi-Cal program is funded with 50% federal funds and

11   50% state funds.

12       15.   The Medi-Cal program provides for coverage of certain

13   medical supplies for Medi-Cal eligible individuals, including

14   incontinence medical supplies.

15       16.   In the case of incontinence medical supplies, Medi-Cal

16   providers provide such supplies directly to Medi-Cal beneficiaries.

17   The providers then submit claims to Medi-Cal for reimbursement.

18       17.   Medi-Cal providers are required to submit claims for

19   incontinence medical supplies on a form known as the HCFA-1500.

20   The HCFA-1500 form includes the following certification with

21   respect to claims to Medicaid: "NOTICE: This is to certify that the

22   foregoing information is true, accurate and complete.  I understand

23   that payment and satisfaction of this claim will be from Federal

24   and State funds, and that any false claims, statements, or

25   documents, or concealment of a material fact, may be prosecuted

26   under applicable Federal or State laws."

27       18.   The Medi-Cal program imposes dollar limits on how much a

28

5

provider may be reimbursed for each different type of incontinence medical supply item.  California Welfare and Institutions Code ("W&I Code") section 14125 establishes a statutory maximum reimbursement rate for incontinence medical supplies, commonly referred to as the "Maximum Allowable Cost" or "MAC."

19.   Specifically, the statute states that "[r]eimbursement for incontinence medical supplies shall consist of the weighted average of the negotiated contract prices within each product category, plus a markup fee equal to 38% of the resulting adjusted contract price."

20.   Pursuant to W&I Code § 14125, DHS issues a list of negotiated "per item" prices for various types of incontinence medical supplies which are approved for payment by Medi-Cal.  This price list is known as "the Medi-Cal formulary" and is published in Medi-Cal's Pharmacy Provider Manual.  The Medi-Cal formulary price plus 38 percent equals the Maximum Allowable Cost permitted by statute.

21.   Prior to March 1, 2003, although the Medi-Cal program's Maximum Allowable Cost provision limited the dollar amount that a provider could be <u>reimbursed</u> for each item of incontinence medical supplies, there was no formula in place limiting how much a provider could <u>bill</u> for such supplies.  Thus, theoretically, a provider could bill Medi-Cal two or three times what the provider paid for an item, and the provider would be reimbursed that amount, as long as the amount billed did not exceed the Maximum Allowable Cost.

22.   In 2003, however, an upper billing limit was put into

1  effect.   The upper billing limit regulation, 22 California Code of
2  Regulations § 51008.1, first became operative on March 1, 2003 as
3  an emergency regulation, and remains in effect.   The purpose of the
4  regulation is to prevent providers from charging Medi-Cal excessive
5  mark-ups for incontinence and other medical supplies.

6      23.   Specifically, the upper billing limit regulation provides
7  that "the amount billed shall not exceed an amount that is the
8  lesser of: (1) the usual charges made to the general public; or (2)
9  The net purchase price of the item . . . plus no more than a 100
10 percent markup."   22 Cal. Code Reg. § 51008.1(a).   As a practical
11 matter, this regulation limits the amount that providers may bill
12 Medi-Cal to the provider's "net purchase price" plus a 100% markup
13 (because this amount is virtually always the "lesser" amount
14 compared to the "usual charges made to the general public").

15     24.   The upper billing limit regulation explicitly requires
16 that where a provider bills Medi-Cal based on the provider's "net
17 purchase price" plus 100% markup, the "net purchase price" must
18 reflect any price reductions received by the provider due to
19 rebates or similar discounts.

20     25.   Specifically, the regulation states:   "Net purchase price
21 is defined as the actual cost to the provider to purchase the item
22 from the seller, including any rebates, refunds, discounts or any
23 other price reducing allowances, known by the provider at the time
24 of billing the Medi-Cal program for the item, that reduce the
25 item's invoice amount."   22 Cal. Code Reg. § 51008.1(a)(2)(A)
26 (emphasis added).

27     26.   The regulation also prohibits providers from billing
28

1  Medi-Cal for items received for free, 22 Cal. Code Reg.

2  § 51008.1(b), because receiving items for free in effect lowers the

3  price of other items purchased at full price and is therefore the

4  same as receiving a rebate or discount.

5      27.  In addition to setting limits on amounts billed, the

6  upper billing limit regulation also requires providers of

7  incontinence supplies to maintain documentation to support the

8  amounts they bill.

9      28.  Specifically, the regulation mandates that the net

10 purchase price upon which a provider bases its billing "shall be

11 documented in the provider's books and records" and that

12 "[d]ocumentation shall include, but not be limited to, evidence of

13 purchase such as invoices or receipts."  22 Cal. Code Reg.

14 § 51008.1(a).

15                    DEFENDANTS' SCHEME

16     29.  Defendant Whitestone is a manufacturer of medical

17 supplies, including incontinence medical supplies.  Whitestone's

18 incontinence medical supplies are listed on the Medi-Cal formulary

19 and approved for sale to Medi-Cal beneficiaries.  Whitestone sells

20 such products to wholesalers and providers, including defendants

21 Shield and A-Med.  Shield and A-Med are both providers of

22 incontinence medical supplies directly to Medi-Cal beneficiaries.

23     30.  Plaintiff Donath was employed by defendant Whitestone as

24 a manufacturer's representative, for a geographic area including

25 California, between December 1994 and February 2007.

26                    Whitestone and Shield

27     31.  Shield is one of the largest medical equipment suppliers

28

                              8

1 in the United States.  Shield is the largest supplier of

2 incontinence supplies to the Medi-Cal formulary and is one of

3 Whitestone's largest customers.

4   32.  As manufacturer's representative for Whitestone, Donath

5 handled the Shield account between December 1994 and December 2000,

6 at which time the account was taken from him and instead was

7 personally handled by Whitestone Vice President of Sales and

8 Marketing Brian Tripi (hereinafter "Tripi").  Donath continued to

9 receive commissions on the Shield account until January of 2004.

10   33.  When they were first enacted, the upper billing limits

11 set forth in 22 Cal. Code Reg. § 51008.1 had a big effect on

12 pricing and "the bottom line" for businesses in the Medi-Cal chain

13 of supply for incontinence medical supplies.  The regulation was

14 therefore a subject of intense interest to large players such as

15 Whitestone and Shield.

16   34.  On March 13, 2003, shortly after it was adopted, Donath

17 sent Whitestone Vice President Brian Tripi a copy of the new

18 regulation.  Donath's cover memo explained that "WHAT THIS MEANS TO

19 OUR PROVIDER NETWORK (SHIELDS AND THE LIKE), IS THAT THEY CAN ONLY

20 CLAIM COST + 100%."  This statement was followed by a numerical

21 example illustrating how, at current pricing levels, a provider

22 such as Shield would experience a loss of profits due to the

23 billing limits established by the new regulation.

24   35.  Donath again sent Tripi a copy of the new regulation on

25 April 4, 2003.  Relator's cover memo specifically noted in bold

26 that "THIS 'UPPER LIMIT REGULATION' STATES, THAT THE PROVIDER CAN

27 ONLY BE REIMBURSED THE NET PURCHASE PRICE OF THE ITEM, WHICH MUST

28

1   BE DOCUMENTED IN THE PROVIDER'S BOOKS AND RECORDS, PLUS NO MORE
2   THAN A 100 PERCENT MARKUP." A "Medi-Cal Update" attached to the
3   memo summarized the new regulation and noted that it "prevents
4   excessive billings when . . . supplies . . . are obtained
5   significantly below market rates."

6       36.  Before the imposition of the upper billing limits,
7   providers had an incentive to try to pay the lowest possible prices
8   for incontinence supplies, because they could bill the Maximum
9   Allowable Cost and keep the difference between that amount and the
10  price they had paid.  After the imposition of the upper billing
11  limits, providers could no longer simply bill the Maximum Allowable
12  Cost, but were instead limited to billing their cost plus a 100%
13  markup.  As a result, it became a _dis_advantage for a Medi-Cal
14  provider to be paying a low price for incontinence supplies.  A
15  number of providers of incontinence supplies actually asked their
16  suppliers to _increase_ the prices they were charging the provider,
17  so that the provider could bill more to Medi-Cal based on the
18  higher cost.

19      37.   Defendants Shield and Whitestone, however, employed a
20  scheme to circumvent the upper billing limits set forth in the
21  regulation, while simultaneously _decreasing_ the prices Whitestone
22  was charging Shield.

23      38. Notwithstanding the upper billing limits, Whitestone
24  lowered its prices to Shield by giving Shield "rebates" off of
25  Whitestone's invoice prices.

26      39.  These rebates were ostensibly based on the volume of
27  incontinence products purchased by Shield from Whitestone.  In
28

10

reality, however, the rebates were essentially guaranteed because the volumes that triggered the rebates were set at or near the volumes Shield was already purchasing.

40.   Further, Relator is informed and believes that Whitestone and Shield had an understanding that, even if Shield did not make the minimum volumes that triggered the rebates, Whitestone would still give Shield the rebate.   Thus, Shield knew that it would always get Whitestone's products at the rebated prices, and those were the true prices upon which Shield and Whitestone negotiated and agreed.

41.   Upon information and belief, Whitestone also gave Shield rebates for prompt payment.

42.   To Relator's knowledge, Shield did not disclose to the State of California the rebates it received from Whitestone. Instead, Shield billed the Medi-Cal program for incontinence medical supplies purchased from Whitestone based on Whitestone's invoice prices, which did not reflect the rebate amounts.

43.   Shield's claims to Medi-Cal based on the invoice prices were false because they violated the upper billing limit regulation.

44.   Specifically, as noted above, the regulation prohibits a provider from billing more than its "net purchase price" plus a 100% markup.   The regulation requires that the "net purchase price" must "includ[e] any rebates . . . that reduce the item's invoice amount."

45.   Accordingly, the maximum amount that Shield could properly have billed Medi-Cal was the Whitestone invoice price,

1  <u>minus any applicable rebates</u>, plus a 100% markup.  Shield knew
2  that, under its agreement with Whitestone, Shield would always
3  receive the agreed-upon rebates.  Accordingly, Shield should have
4  billed Medi-Cal based on the true, rebated prices.

5      46.  Shield, however, did not reduce its "net purchase price"
6  to reflect the rebates it received from Whitestone.  Instead it
7  submitted claims to Medi-Cal which were excessive and inflated
8  because they were based on the full invoice price (plus the
9  permitted 100% markup), rather than the actual, lower, rebated
10  prices.  These claims were false claims to the Medi-Cal program.

11      47.  Upon information and belief, Shield also submitted claims
12  to Medi-Cal which were even higher than the full invoice price plus
13  the permitted 100% markup.  Instead, Shield simply submitted claims
14  in amounts that would result in it receiving reimbursement at the
15  Maximum Allowable Cost.  These claims were excessive and inflated
16  because they did not reflect the actual prices Shield was paying.
17  These claims were false claims to the Medi-Cal program.

18      48.  Shield's excessive and inflated claims were also false in
19  that Shield falsely certified on the HCFA-1500 form that the
20  information provided on the form was "true, accurate and complete."
21  In fact, the amounts claimed by Shield were not "true, accurate and
22  complete" because they were falsely inflated, did not reflect
23  Shield's true net purchase price including the rebates, and were in
24  violation of the upper billing limits regulation.

25      49.  In furtherance of the overbilling scheme, Whitestone
26  issued Shield invoices which reflected only the base prices and did
27  not reflect the rebate amounts, even though Whitestone and Shield
28

12

1  both knew that the items on the invoices would be subject to a
2  fixed price reduction due to the guaranteed rebates.

3     50.  Shield maintained the false and misleading invoices as
4  proof of its "net purchase price" as required by the upper billing
5  limit regulation's documentation requirements, even though Shield
6  knew that the invoices did not reflect the true net purchase price
7  since they did not reflect the rebates provided by Whitestone.

8     51.  Relator is informed and believes that, in furtherance of
9  the scheme, Shield also paid Whitestone the full invoice amounts,
10 and then Whitestone would calculate the rebate on a monthly or
11 quarterly basis and issue a separate rebate credit back to Shield.
12 In this way, Shield was able to maintain a false "paper trail" that
13 showed Shield paying Whitestone amounts which matched with the full
14 invoice amounts.  Shield would then collect its rebates "on the
15 back end."

16    52.  Starting in approximately December 2004, Whitestone and
17 Shield further agreed that Whitestone would increase the prices on
18 its invoices sent to Shield, while keeping the actual prices at
19 approximately the same level by increasing the rebates provided to
20 Shield.  This change allowed Shield to falsely bill Medi-Cal in an
21 even greater amount, up to the Maximum Allowable Cost, based on the
22 higher falsely-inflated invoice prices.

23    53.  This "off-invoice," ostensibly volume-based rebate
24 program was created by Whitestone Vice President Brian Tripi.  Upon
25 information and belief, the program was specifically pitched to
26 Shield as a way that Shield could successfully bill Medi-Cal at
27 amounts higher than permitted by the upper billing limits.

28

54.  Although a volume rebate ostensibly would encourage a customer to purchase more, that was not the case with Shield, because the rebates were generally set at or below the volumes that Shield was already purchasing, and there was also an understanding that the rebates were guaranteed even if Shield did not reach those volumes.

55.  As noted above, when the upper billing limits first went into effect, providers had an incentive to request their suppliers or wholesalers to charge them _higher_ prices, so that the providers could maximize their billing based on the new "net purchase price plus 100% markup" upper billing limits.  Shield, however, pressured Whitestone to _lower_ its net prices.  This only made sense because Shield was not planning to bill Medi-Cal based on its true net purchase price (as it should have).  Rather, Shield was planning to bill Medi-Cal based on the inflated and false invoice prices (or even higher amounts), without revealing to Medi-Cal the off-invoice rebates provided by Whitestone.

56.  Whitestone knew that Shield would bill the products sold to it by Whitestone to the Medi-Cal program.  Whitestone used the rebate program for the purpose of allowing Shield to make more money by billing Medi-Cal based on the full invoice prices without revealing the back-end, off-invoice rebates, while reducing Shield's chances of "getting caught" since Shield had the invoices showing the full prices as false "records" to support the prices at which Shield was billing.  The off-invoice rebate scheme provided a way for Whitestone to secure Shield's business by offering Shield lower prices without adversely affecting Shield's Medi-Cal

14

1  reimbursement.  Whitestone and Shield agreed to structure their
2  dealings as an off-invoice rebate program so that Shield could bill
3  Medi-Cal based on the invoice prices, which did not reflect the
4  rebates and therefore did not reflect the actual prices that Shield
5  was paying.  In this way, Whitestone and Shield agreed and intended
6  to, and did, get false claims paid and approved by the Medi-Cal
7  program.

8      57.  Prior to December 2004, Whitestone was charging Shield an
9  invoice price of $22.50 for a case of medium or large adult briefs,
10  two of the products Shield purchased in highest volume.  After
11  December 2004, Whitestone's invoice price was $26.33 per case for
12  these products.

13      58.  Upon information and belief, during this same period,
14  after the rebates, Shield was actually paying a price in the range
15  of $18.50 to $19.10 for a case of medium or large adult briefs.

16      59.  An actual price in the range of $18.50 to $19.10
17  represents a rebate of about 15% to 18% off the pre-December 2004
18  invoice price of $22.50, and a rebate of about 28% to 30% off the
19  post-December 2004 invoice price of $26.33.

20      60.  In 2005, Shield submitted 19,023 claims to Medi-Cal for
21  just one of the products it purchased from Whitestone, a medium-
22  size Ultrashield brief, and was reimbursed $1,646,943 for these
23  claims.  Assuming an unreported rebate of between 15% to 30%, these
24  claims represent damages to the Medi-Cal program of as much as
25  $247,000 to $494,000 (15% to 30% of $1,646,943) for just one
26  product for the year 2005.  The corresponding numbers for 2006,
27  again for just one year for one product, the medium-size
28

15

1   Ultrashield brief, were 29,825 claims and reimbursement of

2   $2,436,956.  Assuming an unreported rebate amount of between 15% to

3   30%, these claims represent damages to the Medi-Cal program of as

4   much as $365,000 to $731,000 (15% to 30% of $2,436,956).

5      61.  Accordingly, the estimated damages resulting from false

6   claims to Medi-Cal for just this one example product for a period

7   of two years (2005 & 2006) are in the range of $600,000 to

8   $1,200,000.  The false claims alleged cover up to four years

9   (starting in or around March 2003 to the present) and involve many

10   other Whitestone products in addition to the medium-sized

11   Ultrashield brief, such as other sizes and types of disposable

12   briefs, adult mesh pant and pad systems, disposable adult

13   shields/liners/pads, disposable adult undergarments, and disposable

14   underpads (economy and premium).  These same rebate practices may

15   have impacted other products as well.

16      62.  In early 2007, when Donath was inquiring about another

17   Whitestone account, a Whitestone office employee mentioned to

18   Donath that she had just calculated a rebate for Shield of more

19   than $300,000.  An unreported $300,000 rebate reflects a loss to

20   the Medi-Cal program of $600,000, since purchase prices are marked

21   up 100%.  Upon information and belief, this was the amount of

22   Shield's rebate for just one month or one quarter.  The same

23   Whitestone office employee also stated to Donath that Shield's

24   average per month rebate was at least $161,000, which would

25   represent a monthly loss to the Medi-Cal program of $322,000.  Upon

26   information and belief, the overbilling has been occurring for more

27   than four years, starting in or around March 2003, and continues to

28

1   the present.

2       63.   As a result of Whitestone's and Shield's scheme and
3   conspiracy to overbill Medi-Cal, and Shield's submission of
4   thousands of false claims to Medi-Cal, the United States and the
5   State of California have been damaged in an amount in the millions
6   of dollars since the overbilling began in or around March of 2003.
7   Defendants' conduct continues to the present and the United States
8   and the State of California continue to be damaged.

9                         Whitestone and A-Med

10      64.   Donath also handled the account of defendant A-Med
11  Healthcare Center.

12      65.   Donath first learned certain facts regarding the off-
13  invoice rebate scheme in approximately February 2006.  At that
14  time, he was told by Whitestone Vice President Brian Tripi that
15  Shield was paying $19.10 for a case of medium or large adult
16  briefs, two products which represented a large volume of Shield's
17  purchases from Whitestone.  (On another occasion, Tripi had
18  suggested that Shield might be paying as low as $18.50 per case for
19  these products).

20      66.   As stated above, Donath had handled the Shield account
21  until December 2000, when it was taken over by Tripi.  After
22  December 2000, even though he was no longer handling the Shield
23  account, Donath still received copies of Shield's order
24  confirmations, which showed the Whitestone products ordered by
25  Shield and the invoice prices Whitestone was charging Shield.
26  Donath continued to receive the order confirmations until
27  Whitestone went "paperless" in 2005.

28

                                   17

1     67.   According to the order confirmations received by Relator,

2  prior to December 2004, Whitestone was charging Shield an invoice

3  price of $22.50 for a case of medium or large adult briefs.  After

4  December 2004, the order confirmations reflect an invoice price of

5  $26.33 per case for these two products.

6     68.   Donath had previously wondered why, according to the

7  order confirmations he received, Shield, Whitestone's largest

8  account, seemed to be paying higher prices than some of the other,

9  smaller customers whose accounts Donath handled.  These higher

10  invoice prices also seemed to contradict the prices Tripi had

11  mentioned to Relator.

12     69.   The significance of the contradiction between the prices

13  told to Donath by Tripi and the higher prices Donath saw in the

14  Shield order confirmations was clarified a short while later when

15  Tripi stated in Donath's presence that Whitesone was giving

16  "rebates" to Shield.  These comments were made prior to and during

17  a March 2006 meeting Donath attended with Tripi at A-Med.

18     70.   During the March 2006 meeting with A-Med, the question

19  came up of how A-Med could get the maximum reimbursement for

20  Whitestone products from the Medi-Cal formulary.  Tripi stated that

21  he would give A-Med an off-invoice rebate tied to volume that would

22  meet all their needs, just like Whitestone does for Shield.

23     71.   When asked how Whitestone would determine the volume

24  needed to qualify for a rebate, Tripi stated to A-Med that the

25  volumes they were currently doing would be the same volumes that

26  Whitestone would establish as a baseline for rebate qualification.

27     72.   He further stated that A-Med would always qualify for the

28

1  maximum rebate and would automatically get the rebate needed to
2  bring the net prices down to the pricing levels Whitestone was
3  promising in order to get A-Med's business.

4    73.  This arrangement in effect guaranteed that A-Med would
5  receive the agreed-upon rebate, no matter what volume of purchases
6  it had.

7    74.  After the meeting, Tripi also stated to Donath that if A-
8  Med's sales should happen to drop off, all Whitestone would do was
9  drop the minimum volumes, so that A-Med would still qualify for the
10  rebates and still pay the same prices.

11    75.  A written agreement was subsequently consummated,
12  pursuant to which A-Med was given the promised rebates.  The
13  agreement also provides for a prompt payment rebate or discount of
14  1%.

15    76.  Although the agreement purports to create "tiers" in
16  which different purchase volumes are tied to different rebate
17  percentages, in fact Whitestone always gives A-Med the highest
18  rebate of 12.5%.

19    77.  To Relator's knowledge, A-Med did not disclose to the
20  State of California the rebates it received from Whitestone.
21  Instead, A-Med billed the Medi-Cal program for incontinence medical
22  supplies purchased from Whitestone based on Whitestone's invoice
23  prices, which did not reflect the rebate amounts.

24    78.  A-Med's claims to Medi-Cal based on the invoice prices
25  were false because they violated the upper billing limit
26  regulation.

27    79.  Specifically, as noted above, the regulation prohibits a
28

19

provider from billing more than its "net purchase price" plus a
100% markup.  The regulation requires that the "net purchase price"
must "includ[e] any rebates . . . that reduce the item's invoice
amount."

80.  Accordingly, the maximum amount that A-Med could properly
have billed Medi-Cal was the Whitestone invoice price, <u>minus any
applicable rebates</u>, plus a 100% markup.  A-Med knew that, under its
agreement with Whitestone, A-Med would always receive the agreed-
upon rebates.  Accordingly, A-Med should have billed Medi-Cal based
on the true, rebated prices.

81.  A-Med, however, did not reduce its "net purchase price"
to reflect the rebates it received from Whitestone.  Instead it
submitted claims to Medi-Cal which were excessive and inflated
because they were based on the full invoice price (plus the
permitted 100% markup), rather than the actual, lower, rebated
prices.  These claims were false claims to the Medi-Cal program.

82.  A-Med's excessive and inflated claims were also false in
that A-Med falsely certified on the HCFA-1500 form that the
information provided on the form was "true, accurate and complete."
In fact, the amounts claimed by A-Med were not "true, accurate and
complete" because they were falsely inflated, did not reflect A-
Med's true net purchase price including the rebates, and were in
violation of the upper billing limits regulation.

83.  In furtherance of the overbilling scheme, Whitestone
issued A-Med invoices which reflected only the base prices and did
not reflect the rebate amounts, even though Whitestone and A-Med
both knew that the items on the invoices would be subject to a

20

1  fixed price reduction due to the guaranteed rebates.

2      84.  A-Med maintained the false and misleading invoices as
3  proof of its "net purchase price" as required by the upper billing
4  limit regulation's documentation requirements, even though A-Med
5  knew that the invoices did not reflect the true net purchase price
6  since they did not reflect the rebates provided by Whitestone.

7      85.  Relator is informed and believes that, in furtherance of
8  the scheme, A-Med also paid Whitestone the full invoice amounts,
9  and then Whitestone would calculate the rebate on a monthly or
10  quarterly basis and issue a separate rebate credit back to A-Med.
11  In this way, A-Med was able to maintain a false "paper trail" that
12  showed A-Med paying Whitestone amounts which matched with the full
13  invoice amounts.  A-Med would then collect its rebates "on the back
14  end."

15      86.  This "off-invoice," ostensibly volume-based rebate
16  program was created by Whitestone Vice President Brian Tripi.  The
17  program was specifically pitched to A-Med as a way that A-Med could
18  maximize Medi-Cal reimbursement.

19      87.  Although a volume rebate ostensibly would encourage a
20  customer to purchase more, that was not the case with A-Med,
21  because the rebates were generally set at or near the volumes that
22  A-Med was already purchasing, and there was also an understanding
23  that the rebates were guaranteed even if A-Med did not reach those
24  volumes.

25      88.  Whitestone knew that A-Med would bill the products sold
26  to it by Whitestone to the Medi-Cal program.  The rebate program
27  allowed A-Med to make more money by billing Medi-Cal based on the
28

full invoice prices without revealing the back-end, off-invoice rebates, while reducing A-Med's chances of "getting caught" since A-Med had the invoices showing the full prices as false "records" to support the prices at which A-Med was billing.  The off-invoice rebate scheme provided a way for Whitestone to secure A-Med's business by offering A-Med lower prices without adversely affecting A-Med's Medi-Cal reimbursement.  Whitestone and A-Med agreed to structure their dealings as an off-invoice rebate program so that A-Med could bill Medi-Cal based on the invoice prices, which did not reflect the rebates and therefore did not reflect the actual prices that A-Med was paying.  In this way, Whitestone and A-Med agreed and intended to, and did, get false claims paid and approved by the Medi-Cal program.

89.  As a result of Whitestone's and A-Med's scheme to overbill Medi-Cal, and A-Med's submission of false claims to Medi-Cal, the United States and the State of California have been damaged.  Defendants' conduct continues to the present day and the United States and the State of California continue to be damaged.

MEDI-CAL AUDITS OF DOCUMENTS SUPPORTING "NET PURCHASE PRICE"

90.  As noted above, the upper billing limits regulation requires a provider to maintain documentation to support the "net purchase price" which forms the basis of its billing to Medi-Cal.

91.  In order to deter and discover fraud and abuse, Medi-Cal periodically audits provider and supplier records to confirm that the provider has not exceeded the upper billing limits.

92.  Specifically, the Medi-Cal Fraud Prevention Bureau periodically sends audit requests to suppliers of medical supplies.

The audit request form attaches an invoice obtained from a provider (such as Shield or A-Med), and requests that the supplier (such as Whitestone) state whether the invoice is consistent or inconsistent with the supplier's records. The audit request form specifically asks the supplier: "Was the above transaction subject to a refund, rebate or other buyback credit?  If yes, what was the credit amount?"

93.   In early 2007, during a conversation between Relator, Whitestone Vice President Brian Tripi and a third person, the third person asked Tripi whether he had ever received such an audit request from Medi-Cal.  In response, Tripi covered his eyes and said words to the effect of:  I don't want to see that letter.  I don't want to get that letter.  I don't even want to know that that letter exists.

COUNT ONE

False Claims Act, 31 U.S.C. § 3729(a)(1)<br>All Defendants

94.   Plaintiff realleges and incorporates paragraphs 1 to 93 above as if fully set forth herein.

95.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

96.   By virtue of the acts described above, defendants knowingly submitted, or caused to be submitted, false or fraudulent claims for payment for medical supplies to the United States government.

97.   The United States, unaware of the falsity of defendants' claims, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the

23

claims not been false.

98.  By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

COUNT TWO

False Claims Act, 31 U.S.C. § 3729(a)(2)<br>All Defendants

99.  Plaintiff realleges and incorporates paragraphs 1 to 93 above as if fully set forth herein.

100.  This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended.

101.  By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records or statements to obtain government payment for false or fraudulent claims.

102.  The United States, unaware of the falsity of defendants' records and statements, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the records and statements not been false.

103.  By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

COUNT THREE

False Claims Act, 31 U.S.C. § 3729(a)(3)<br>Whitestone/Shield Conspiracy<br>Defendants Whitestone, Capricorn, Shield, and Kobayashi

104.  Plaintiff realleges and incorporates paragraphs 1 to 93 above as if fully set forth herein.

105.  This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended.

106.  By virtue of the acts described above, defendants

24

1  conspired to defraud the United States by getting false or

2  fraudulent claims allowed or paid.

3     107.  The United States, unaware of the falsity of the claims

4  made by defendants and in reliance on the accuracy thereof, paid

5  and continues to pay claims in amounts in excess of what would have

6  been paid had the claims not been false.

7     108.  By reason of these payments, the United States has been

8  damaged, and continues to be damaged, in substantial amount.

9                          COUNT FOUR

10         False Claims Act, 31 U.S.C. § 3729(a)(3)
                   Whitestone/A-Med Conspiracy
11         Defendants Whitestone, Capricorn, and A-Med

12    109.  Plaintiff realleges and incorporates paragraphs 1 to 93

13  above as if fully set forth herein.

14    110.  This is a claim for treble damages and penalties under

15  the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended.

16    111.  By virtue of the acts described above, defendants

17  conspired to defraud the United States by getting false or

18  fraudulent claims allowed or paid.

19    112.  The United States, unaware of the falsity of the claims

20  made by defendants and in reliance on the accuracy thereof, paid

21  and continues to pay claims in amounts in excess of what would have

22  been paid had the claims not been false.

23    113.  By reason of these payments, the United States has been

24  damaged, and continues to be damaged, in substantial amount.

25                          COUNT FIVE

26    California False Claims Act, Cal. Gov't Code § 12651(a)(1)
                         All Defendants
27

28    114.  Plaintiff realleges and incorporates paragraphs 1 to 93

                              25

above as if fully set forth herein.

115.   This is a claim for treble damages and penalties under the California False Claims Act, Cal. Gov't Code §§ 12651 *et seq.*, as amended.

116.   By virtue of the acts described above, defendants knowingly submitted, or caused to be submitted, false or fraudulent claims for payment for medical supplies to the State of California.

117.   The State of California, unaware of the falsity of defendants' claims, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have been paid had the claims not been false.

118.   By reason of these payments, the State of California has been damaged, and continues to be damaged, in substantial amount.

COUNT SIX

California False Claims Act, Cal. Gov't Code § 12651(a)(2)
All Defendants

119.   Plaintiff realleges and incorporates paragraphs 1 to 93 above as if fully set forth herein.

120.   This is a claim for treble damages and penalties under the California False Claims Act, Cal. Gov't Code §§ 12651 *et seq.*, as amended.

121.   By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records or statements to get a false claim paid or approved by the State of California.

122.   The State of California, unaware of the falsity of defendants' records and statements, and in reliance on the accuracy thereof, paid the defendants amounts in excess of what would have

26

1  been paid had the records and statements not been false.

2      123.  By reason of these payments, the State of California has
3  been damaged, and continues to be damaged, in substantial amount.

4                        COUNT SEVEN

5      California False Claims Act, Cal. Gov't Code § 12651(a)(3)
6                  Whitestone/Shield Conspiracy
       Defendants Whitestone, Capricorn, Shield, and Kobayashi
7      124.  Plaintiff realleges and incorporates paragraphs 1 to 93
8  above as if fully set forth herein.

9      125.  This is a claim for treble damages and penalties under
10  the California False Claims Act, Cal. Gov't Code §§ 12651 et seq.,
11  as amended.

12      126.  By virtue of the acts described above, defendants
13  conspired to defraud the State of California by getting false or
14  fraudulent claims allowed or paid.

15      127.  The State of California, unaware of the falsity of the
16  claims made by defendants and in reliance on the accuracy thereof,
17  paid and continues to pay claims in amounts in excess of what would
18  have been paid had the claims not been false.

19      128.  By reason of these payments, the State of California has
20  been damaged, and continues to be damaged, in substantial amount.

21                        COUNT EIGHT

22      California False Claims Act, Cal. Gov't Code § 12651(a)(3)
23                  Whitestone/A-Med Conspiracy
           Defendants Whitestone, Capricorn, and A-Med
24      129.  Plaintiff realleges and incorporates paragraphs 1 to 93
25  above as if fully set forth herein.

26      130.  This is a claim for treble damages and penalties under
27  the California False Claims Act, Cal. Gov't Code §§ 12651 et seq.,

28

1  as amended.

2      131.  By virtue of the acts described above, defendants
3  conspired to defraud the State of California by getting false or
4  fraudulent claims allowed or paid.

5      132.  The State of California, unaware of the falsity of the
6  claims made by defendants and in reliance on the accuracy thereof,
7  paid and continues to pay claims in amounts in excess of what would
8  have been paid had the claims not been false.

9      133.  By reason of these payments, the State of California has
10  been damaged, and continues to be damaged, in substantial amount.

11      WHEREFORE, Relator, on behalf of himself and the United States
12  and the State of California, prays for judgment in plaintiffs'
13  favor and against defendants, as follows:

14      a.   Ordering defendants to pay an amount equal to three times
15  the amount of damages the United States and the State of California
16  have sustained because of defendants' actions, plus a civil penalty
17  of not less than $5,500 and not more than $11,000 for each action
18  in violation of 31 U.S.C. § 3729, and a civil penalty of up to
19  $10,000 for each action in violation of Cal. Gov't Code § 12651,
20  and the costs and expenses of this action, with interest, including
21  the costs and expenses to the United States and the State of
22  California;

23      b.   Awarding Relator the maximum amounts allowed pursuant to
24  31 U.S.C. § 3730(d) and Cal. Gov't Code § 12652(g);

25      c.   Awarding Relator all fees, costs, and expenses incurred
26  in initiating and sustaining this action, including reasonable
27  attorneys' fees;

28

1    d.   Awarding Relator pre-judgment interest; and

2    e.   Granting Relator, the United States, and the State of

3 California all other such relief as the Court deems just and

4 proper.

5                  <u>REQUEST FOR TRIAL BY JURY</u>

6    Pursuant to Rule 38 of the Federal Rules of Civil Procedure,

7 plaintiffs hereby demand trial by jury.

8 Dated: August _22_, 2007

9                        Respectfully submitted,

10                      LAW OFFICES OF PAUL D. SCOTT
                      Paul D. Scott, Esq.

11                      Lani Anne Remick, Esq.

12

13                  By: _Lani Anne Remick_
                      Lani Anne Remick, Esq.

14                      Attorneys for <u>Qui Tam</u> Plaintiff
                      Terry Donath

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 13

## SETTLEMENT AGREEMENT

This Settlement Agreement (Agreement) is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General (OIG-HHS) of the Department of Health and Human Services (HHS) (collectively the "United States"), the State of California, acting through the California Department of Justice, Office of the Attorney General, Bureau of Medi-Cal Fraud and Elder Abuse, and the California Department of Health Care Services (formerly known as the California Department of Health Services prior to July 1, 2007) (collectively "the State"), Shield Healthcare and Dharma Ventures Group, Inc. (collectively "Shield"), and Terry Donath ("Relator") (hereafter collectively referred to as "the Parties"), through their authorized representatives.   The United States and the State will hereafter collectively be referred to as the "Governments."

## I.   RECITALS

A.     Shield Healthcare is a distributor of medical supplies, including incontinence supplies, located in Santa Clarita, California, formerly owned by Kobayashi Pharmaceutical Co., Ltd. and currently owned by Dharma Ventures Group, Inc.

B.     On August 23, 2007, Relator filed a *qui tam* action in the United States District Court for the Central District of California captioned *United States ex rel. Donath v. Whitestone Corporation, et al.*, No. SACV 07-0995 DOC (JTLx), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) and the California False Claims Act, Cal. Gov't Code §§ 12650, *et seq*, alleging that Shield and others overbilled the Medi-Cal program for medical supplies, including incontinence supplies.   On April 19, 2010, Relator filed a First Amended Complaint in the action.   The original Complaint and the First Amended Complaint are hereafter

referred to collectively as the "Civil Action."

    C.    The Governments contend that Shield submitted or caused to be submitted claims for payment to the Medicaid Program (Medicaid), 42 U.S.C. §§ 1396-1396w-5.

    D.    The Governments contend, as alleged in the Civil Action, that they have certain civil claims against Shield arising from Shield's overbilling the Medi-Cal program by charging Medi-Cal more than twice the net purchase price of incontinence and other medical supplies and items in violation of 22 Cal. Code Reg. § 51008.1(a) during the period from March 1, 2003 through June 30, 2009. That conduct is referred to below as the Covered Conduct.

    E.    This Settlement Agreement is neither an admission of liability by Shield nor a concession by the Governments or Relator that their claims are not well founded.

    F.    Relator claims entitlement under 31 U.S.C. § 3730(d) and Cal. Gov't Code § 12652(g) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees and costs.

    To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

## II.  TERMS AND CONDITIONS

    1.    Payment.  Shield shall pay to the Governments $5 million ("the Settlement Amount") on the Effective Date of this Agreement as follows: $2 million to the United States by electronic funds transfer pursuant to written instructions to be provided by the United States Attorney for the Central District of California; and $3 million to the State pursuant to written instructions to be provided by the California Attorney General's Office.

Settlement Agreement - United States,
State of California & Shield Healthcare

2.   Release of Shield by the Governments.

2a.   Release of Shield by the United States.   Subject to the exceptions in Paragraph 4 (concerning excluded claims) below, and conditioned upon Shield's full payment of the Settlement Amount, and subject to Paragraph 16, below (concerning bankruptcy proceedings commenced within 91 days of the Effective Date of this Agreement or any payment made under this Agreement), the United States releases Shield, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former owners; officers, directors, employees and affiliates; and the successors and assigns of any of them, from any civil or administrative claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733, both pre-amendment and as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, 123 Stat. 1617 (2009), the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

2b.   Release of Shield by the State of California.   Subject to the exceptions in Paragraph 4 (concerning excluded claims) below, and conditioned upon Shield's full payment of the Settlement Amount, and subject to Paragraph 16, below (concerning bankruptcy proceedings commenced within 91 days of the Effective Date of this Agreement or any payment made under this Agreement), the State releases Shield, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former owners; officers, directors, employees and affiliates; and the successors and assigns of any of them, from any civil or administrative claim the State has for the Covered Conduct under the

California False Claims Act, Cal. Gov't Code §§ 12650, *et seq,* or the common law theories of payment by mistake, unjust enrichment, and fraud.

3.    OIG-HHS Reservation of Rights.  OIG-HHS expressly reserves all rights to institute, direct, or to maintain any administrative action seeking exclusion against Shield, and/or its officers, directors, and employees from Medicare, Medicaid, or other Federal health care programs as defined in 42 U.S.C. § 1320a-7b(f) under 42 U.S.C. § 1320a-7(a) (mandatory exclusion), or 42 U.S.C. § 1320a-7(b) (permissive exclusion) or 42 U.S.C. § 1320a-7a (permissive exclusion).

4.    Exceptions to Releases.  Notwithstanding the releases given in paragraphs 2 and 6 of this Agreement, or any other term of this Agreement, the following claims of the Governments are specifically reserved and are not released:

      a.    Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

      b.    Any criminal liability;

      c.    Except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs;

      d.    Any liability to the Governments (or its agencies) for any conduct other than the Covered Conduct;

      e.    Any liability based upon obligations created by this Agreement;

      f.    Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

      g.    Any liability for failure to deliver goods or services due;

      h.    Any liability for personal injury or property damage or for other

consequential damages arising from the Covered Conduct; and

        i.    ·Any liability of individuals (including current or former directors, officers, employees, agents, or shareholders of Shield) who receive written notification that they are the target of a criminal investigation (as defined in the United States Attorneys' Manual), are indicted or charged, or who enter into a plea agreement, related to the Covered Conduct.

     5.    <u>Agreement is Fair, Adequate and Reasonable.</u>  Relator and his heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B) and that the Settlement Amount for each individual claim are also fair, adequate, and reasonable under all the circumstances.  In connection with this Agreement and this Civil Action, Relator and his heirs, successors, attorneys, agents, and assigns agree that neither this Agreement, any intervention by the Governments in the Civil Action in order to dismiss the Civil Action, nor any dismissal of the Civil Action, shall waive or otherwise affect the ability of the Governments to contend that provisions in the False Claims Act, including 31 U.S.C. §§ 3730(d)(3) and 3730(e), or the California False Claims Act, bar Relator from sharing in the proceeds of this Agreement.  Moreover, the Governments and Relator and his heirs, successors, attorneys, agents, and assigns agree that they each retain all of their rights pursuant to the False Claims Act and the California False Claims Act on the issue of the share percentage, if any, that Relator should receive of any proceeds of the settlement of his claim(s).

     6.    <u>Relator's Release of Shield.</u>  Upon Shield's payment in full of the Settlement Amounts described in Paragraph 1, with the exception of the resolution of any outstanding issue relating to Relator's claim for reasonable expenses, attorney's fees, and costs in this litigation, and

subject to Paragraph 16, below (concerning bankruptcy proceedings commenced within 91 days of the Effective Date of this Agreement or any payment made under this Agreement), Relator will fully and finally release and be deemed to have released Shield, including its current and former parents and owners, from any and all causes of action, in law or in equity, suits, debts, liens, contracts, agreements, covenants, promises, liability, obligations, claims, demands, rights of subrogation, contribution and indemnity, damages, loss, cost or expense, direct or indirect, of any kind or nature whatsoever (including without limitation any claims under the False Claims Act, 31 U.S.C. §§ 3729 et seq. or California False Claims Act, Cal. Gov't Code §§ 12650, *et seq*), known or unknown, fixed or contingent, state or federal, under common law, statute or regulation, liquidated or unliquidated, claimed or concealed, and without regard to the date of occurrence, which Relator ever had, now has, or may assert in the future against Shield by reason of any act, cause, matter or thing whatsoever from the beginning of time to the date hereof. Notwithstanding any of the foregoing, Relator retains and does not release any and all claims he has or may have against Shield to recover his reasonable expenses, attorney's fees and costs under 31 U.S.C. § 3730(d) or Cal. Gov't Code § 12652(g).

Section 1542 of the California Civil Code provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Relator hereby expressly waives all rights against Shield that he may have by virtue of Section 1542, except as provided above with regard to his right to seek expenses, fees and costs

under 31 U.S.C. §3730(d) or Cal. Gov't Code §12652(g).

7.     Double Jeopardy and Excessive Fines Clauses.   Shield waives and shall not assert any defenses Shield may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.   Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the Governments concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

8.     Shield's Release of the Governments.   Shield fully and finally releases the Governments, their agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Shield has asserted, could have asserted, or may assert in the future against the Governments, their agencies, officers, agents, employees, and servants, related to the Covered Conduct and the Governments' investigation and prosecution thereof.

9.     Shield's Release of Relator

Upon the filing of an executed copy of the Stipulation for Dismissal attached as Exhibit 1 hereto with the United States District Court, Shield, on behalf of itself and its current and former parents and owners, will fully and finally release and be deemed to have released Relator, his agents, assigns and counsel from any and all causes of action, in law or in equity, suits, debts, liens, contracts, agreements, covenants, promises, liability, obligations, claims, demands, rights of

subrogation, contribution and indemnity, damages, loss, cost or expense, direct or indirect, of any kind or nature whatsoever (including without limitation any claims under the False Claims Act, 31 U.S.C. §§ 3729 et seq. or California False Claims Act, Cal. Gov't Code §§ 12650, *et seq*), known or unknown, fixed or contingent, state or federal, under common law, statute or regulation, liquidated or unliquidated, claimed or concealed, and without regard to the date of occurrence, which Shield ever had, now has, may assert in the future against Relator, his agents, assigns or counsel by reason of any act, cause, matter or thing whatsoever from the beginning of time to the date hereof, including, but not limited to, claims arising out of, based upon, or relating to the Civil Action or the prosecution thereof.

Section 1542 of the California Civil Code provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Shield hereby expressly waives all rights they may have against relator by virtue of Section 1542.

10. <u>Denial of Claims</u>. The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare carrier or intermediary or any state payer, related to the Covered Conduct; and Shield agrees not to resubmit to any Medicare carrier or intermediary or any state payer any previously denied claims related to the Covered Conduct, and agrees not to appeal any such denials of claims.

11. <u>Unallowable Costs</u>. Shield agrees to the following:

a.       Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Shield, its present or former officers, directors, employees, shareholders, and agents in connection with:

(1)       the matters covered by this Agreement;

(2)       the Governments' audit(s) and civil investigation(s) of the matters covered by this Agreement;

(3)       Shield's investigation, defense, and corrective actions undertaken in response to the Governments' audit(s) and civil investigation(s) in

connection with the matters covered by this Agreement (including attorney's fees);

(4)       the negotiation and performance of this Agreement and

(5)       the payments Shield makes to the Governments pursuant to this

Agreement and any payments that Shield may make to Relator, including

costs and attorneys fees,

are unallowable costs for government contracting purposes and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program (FEHBP) (hereinafter referred to as Unallowable Costs).

b.       Future Treatment of Unallowable Costs: Unallowable Costs shall be separately determined and accounted for in nonreimbursable cost centers by Shield, and Shield shall not charge such Unallowable Costs directly or indirectly to any contracts with the Governments or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report,

cost statement, information statement, or payment request submitted by Shield or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

c.    Treatment of Unallowable Costs Previously Submitted for Payment: Shield further agrees that within 90 days of the Effective Date of this Agreement it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the Governments, or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Shield or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. Shield agrees that the Governments, at a minimum, shall be entitled to recoup from Shield any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the Governments pursuant to the direction of the Department of Justice and/or the affected agencies.   The Governments reserve their rights to disagree with any calculations submitted by Shield or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on Shield or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

d.    Nothing in this Agreement shall constitute a waiver of the rights of the

Governments to audit, examine, or re-examine Shield's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

12. Cooperation. Shield agrees to cooperate fully and truthfully with the Governments' investigation of individuals and entities not released in this Agreement. Upon reasonable notice, Shield shall encourage, and agrees not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. Shield further agrees to furnish to the Governments, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by another on its behalf.

13. Benefit of the Parties. This Agreement is intended to be for the benefit of the Parties, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former owners; and officers, directors, and affiliates; and the successors and assigns of any of them only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 14 (waiver for beneficiaries paragraph), below.

14. Waiver for Beneficiaries. Shield agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

Settlement Agreement - United States,
State of California & Shield Healthcare                        11

15.     Financial Condition.   Shield warrants that it has reviewed its financial situation and that it currently is solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and shall remain solvent following payment to the United States of the Settlement Amount.   Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth constitute a contemporaneous exchange for new value given to Shield, within the meaning of 11 U.S.C. § 547(c)(1), and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange.   Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which Shield was or became indebted to on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

16.     Bankruptcy.   If within 91 days of the Effective Date of this Agreement or of any payment made under this Agreement, Shield commences, or a third party commences, any case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors (a) seeking to have any order for relief of Shield's debts, or seeking to adjudicate Shield as bankrupt or insolvent; or (b) seeking appointment of a receiver, trustee, custodian, or other similar official for Shield or for all or any substantial part of Shield's assets, Shield agrees as follows:

a.     Shield's obligations under this Agreement may not be avoided pursuant to 11 U.S.C. § 547, and Shield shall not argue or otherwise take the position in any such case, proceeding, or action that: (i) Shield's obligations under this Agreement may be avoided under 11 U.S.C. §

547; (ii) Shield was insolvent at the time this Agreement was entered into, or became insolvent as a result of the payment made to the Governments; or (iii) the mutual promises, covenants, and obligations set forth in this Agreement do not constitute a contemporaneous exchange for new value given to Shield.

   b.   If Shield's obligations under this Agreement are avoided for any reason, including, but not limited to, through the exercise of a trustee's avoidance powers under the Bankruptcy Code, the Governments, at their sole option, may rescind the releases in this Agreement and bring any civil and/or administrative claim, action, or proceeding against Shield for the claims that would otherwise be covered by the releases provided in Paragraphs 2 and 3, above.   Shield agrees that (i) any such claims, actions, or proceedings brought by the Governments are not subject to an "automatic stay" pursuant to 11 U.S.C. § 362(a) as a result of the action, case, or proceedings described in the first clause of this Paragraph, and Shield shall not argue or otherwise contend that the Governments' claims, actions, or proceedings are subject to an automatic stay; (ii) Shield shall not plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any such civil or administrative claims, actions, or proceeding that are brought by the United States within 60 calendar days of written notification to Shield that the releases have been rescinded pursuant to this Paragraph, except to the extent such defenses were available on the Effective Date of the Agreement; and (iii) the Governments have a valid claim against Shield in the amount of $4,197,445,989 and the Government may pursue their claims in the case, action, or proceeding referenced in the first clause of this Paragraph, as well as in any other case, action, or proceeding.

   c.   Shield acknowledges that its agreements in this Paragraph are

provided in exchange for valuable consideration provided in this Agreement.

17.     Intervention and Dismissal.   Upon receipt of the payment described in Paragraph II.1 above, the Governments shall promptly file a Partial Notice of Intervention in the Civil Action with respect to the claims against Shield encompassed by the Covered Conduct, and the United States and Relator shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal pursuant to the terms of the Agreement in the form attached hereto as Exhibit 1.

18.     Costs.   Except as expressly provided to the contrary in this Agreement, each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement, except that Relator reserves his claim to expenses, attorney's fees and costs against Shield.

19.     Voluntary Agreement.   Each party and signatory to this Agreement represents that it freely and voluntarily enters in to this Agreement without any degree of duress or compulsion.

20.     Governing Law.   This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Central District of California.   For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

21.     Complete Agreement.   This Agreement constitutes the complete agreement between the Parties.   This Agreement may not be amended except by written consent of the Parties.

22.     Capacity to Execute.   The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

23.   Counterparts.   This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

24.   Successors.   This Agreement is binding on Shield's successors, transferees, heirs, and assigns, and on Relator's successors, transferees, heirs, and assigns.

25.   Disclosure of Agreement.   All parties consent to the Governments' disclosure of this Agreement, and information about this Agreement, to the public.

26.   Effective Date.   This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).   Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

THE UNITED STATES OF AMERICA

DATED: 11/7/11          BY: _____
                            WENDY L. WEISS
                            Assistant United States Attorney
                            Central District of California

DATED: _____          BY: _____
                            GREGORY E. DEMSKE
                            Assistant Inspector General for Legal Affairs
                            Office of Counsel to the
                            Inspector General
                            Office of Inspector General
                            United States Department of
                            Health and Human Services

THE STATE OF CALIFORNIA

DATED: _____          BY: _____
                            SIOBHAN FRANKLIN
                            Deputy Attorney General
                            State of California

DATED: _____          BY: _____
                            KAREN T. JOHNSON
                            Chief Deputy Director, Medi-Cal Program
                            California Department of Health Care Services

THE UNITED STATES OF AMERICA


DATED:_____        BY:_____
                             WENDY L. WEISS
                             Assistant United States Attorney
                             Central District of California


DATED: 11/2/11           BY:_____
                             GREGORY E. DEMSKE
                             Assistant Inspector General for Legal Affairs
                             Office of Counsel to the
                             Inspector General
                             Office of Inspector General
                             United States Department of
                             Health and Human Services


THE STATE OF CALIFORNIA


DATED: _____        BY:_____
                             SIOBHAN FRANKLIN
                             Deputy Attorney General
                             State of California


DATED: _____        BY:_____
                             KAREN T. JOHNSON
                             Chief Deputy Director, Medi-Cal Program
                             California Department of Health Care Services


Settlement Agreement - United States,
State of California & Shield Healthcare          16

THE UNITED STATES OF AMERICA

DATED:_____        BY: _____
                             WENDY L. WEISS
                             Assistant United States Attorney
                             Central District of California

DATED:_____        BY: _____
                             GREGORY E. DEMSKE
                             Assistant Inspector General for Legal Affairs
                             Office of Counsel to the
                             Inspector General
                             Office of Inspector General
                             United States Department of
                             Health and Human Services

THE STATE OF CALIFORNIA

DATED: 11/15/11          BY: _____
                             SIOBHAN FRANKLIN
                             Deputy Attorney General
                             State of California

DATED: _____         BY: _____
                             KAREN T. JOHNSON
                             Chief Deputy Director, Medi-Cal Program
                             California Department of Health Care Services

THE UNITED STATES OF AMERICA

DATED: _____     BY: _____
                                WENDY L. WEISS
                                Assistant United States Attorney
                                Central District of California

DATED: _____     BY: _____
                                GREGORY E. DEMSKE
                                Assistant Inspector General for Legal Affairs
                                Office of Counsel to the
                                Inspector General
                                Office of Inspector General
                                United States Department of
                                Health and Human Services

THE STATE OF CALIFORNIA

DATED: _____     BY: _____
                                SIOBHAN FRANKLIN
                                Deputy Attorney General
                                State of California

DATED: 11/15/11            BY: _____
                                KAREN T. JOHNSON
                                Chief Deputy Director, Medi-Cal Program
                                California Department of Health Care Services

Settlement Agreement – United States,
State of California & Shield Healthcare          16

SHIELD HEALTHCARE - DEFENDANT

DATED: 10/28/11

BY: _____
LAURA M GILVAINE
VP Government Affairs

DATED: 10/28/11

BY: _____
PATRIC HOOPER
Hooper, Lundy & Bookman, Inc.
Counsel for Shield

TERRY DONATH - RELATOR

DATED: 11-16-11

BY: _____
TERRY DONATH

DATED: 11/16/11

BY: _____
PAUL D. SCOTT
Law Offices of Paul D. Scott, P.C.
Counsel for Terry Donath

Settlement Agreement - United States,
State of California & Shield Healthcare

17

EXHIBIT 14

## I. PARTIES

This Civil Settlement Agreement ("Agreement") is entered into among:

1.     A-Med Health Care, a California Corporation, (referred to herein as "A-Med" or "Defendant"), through its authorized representative.

2.     Terrance Donath (referred to herein as "Relator").

3.     The Law Offices of Paul D. Scott, P.C. (referred to herein as "Counsel for Relator"), through its authorized representative.

Hereafter the Defendant, Relator, and Counsel for Relator are collectively referred to herein as the "Parties," and each is a "Party."

## II. PREAMBLE

As a preamble to this Agreement, the Parties agree to the following:

A..     A-Med is a distributor of medical supplies, including incontinence supplies, located in Huntington Beach, California. Whitestone Acquisition Corporation (now Hartmann USA, Inc) (hereinafter "Whitestone Corporation") was a supplier of incontinence products, and Mentor Corporation (now Coloplast Corporation) was a supplier of urological products, during the Covered Conduct defined at paragraph IID of this Agreement.

B.     On August 23, 2007, Relator filed a *qui tam* action in the United States District Court for the Central District of California, captioned *United States ex rel. Donath v. Whitestone Corporation, et al.*, No. SACV 07-0995 DOC (JTLx), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) and the California False Claims Act, Cal. Gov't Code §12650, *et seq*, alleging that A-Med and others overbilled the Medi-Cal program for medical supplies, including incontinence supplies.  On April 19, 2010, Relator filed a First Amended

Complaint in the action. The original Complaint and the First Amended Complaint are hereafter referred to collectively as the "Civil Action."

   C.    The Civil Action contends that A-Med submitted or caused to be submitted claims for payment to the Medicaid Program (Medicaid), 42 U.S.C. § 1396-1396w-5.

   D.   The Civil Action contends that the United States and the State of California (collectively "the Governments") and Relator have certain civil claims against A-Med arising from its overbilling the Medi-Cal program, by failing to account for rebates in determining the net purchase price of incontinence and urological supplies, in violation of the Upper Billing Limits set forth at 22 Cal. Code Reg. § 51008.1(a), during the period from 2003 through 2011, when billing Medi-Cal for incontinence supplies A-Med acquired from Whitestone Corporation and catheters and related urological supplies A-Med acquired from Mentor Corporation. That conduct is referred to below as "the Covered Conduct."

   E.    The Civil Action includes claims against Defendant by the United States under the Federal False Claims Act and the State of California under the California False Claims Act and also includes claims against Defendant by Relator, on behalf of Counsel for Relator, for attorneys' fees and expenses under the Federal False Claims Act and the California False Claims Act.

   F.    As part of settlement discussions, Defendant, in good faith and without admission of liability or wrongdoing, exercised due diligence to determine the amount of rebates paid to Defendant by Whitestone and Mentor for incontinence and/or urological products Defendant supplied to Medi-Cal that were subject to 22 Cal. Code Reg. § 51008.1(a) and the resulting billings to Medi-Cal that exceeded two times the net purchase price. That information was provided to the Governments and Relator.



G.     Relator claims entitlement under 31 U.S.C. § 3730(d) and Cal. Gov't Code § 12652(g) to a share of the proceeds of this Agreement, but this Agreement does not resolve his entitlement to or the amount of that share.

H.     This Settlement Agreement is neither an admission of liability by A-Med nor a concession by Relator that the claims in the Civil Action are not well founded.

I.     To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the claims against the Defendant set forth in the Civil Action, the Parties reach a full and final settlement, which they agree is fair and reasonable, in consideration of the sums to be paid as set forth in this Agreement.

### III. TERMS AND CONDITIONS

1.     Defendant agrees to pay a settlement amount of $220,000 (Two Hundred and Twenty Thousand Dollars) ("the Settlement Amount") as follows: $132,000 (One Hundred and Thirty-Two Thousand Dollars) to the State of California and $88,000 (Eighty-Eight Thousand Dollars) to the United States.

2.     Defendant agrees to pay $50,000 (Fifty Thousand Dollars) to the Law Offices of Paul D. Scott, P.C.

3.     The payments provided for in Paragraphs III(1) and III(2) will be paid by Defendant within thirty (30) days after the following have occurred: 1) The signatories to this Agreement have all executed this Agreement; and 2) either the United States and the State of California have given their written consent to this Agreement, or the United States District Court for the Central District of California has entered an order dismissing the Civil Action against A-Med with prejudice as to the Relator and with prejudice as to the United States and the State of California with regard to the Covered Conduct, and any appeals have been concluded or the deadline for appeal (*i.e.*, 60 days from the date the dismissal was entered) has passed. Payment

3

will be made to the United States and the State of California by electronic funds transfer pursuant to instructions provided by the United States Attorney's Office for the Central District of California and by the State of California Department of Justice (or by check if wiring instructions are not provided). Payment will be made to Counsel for Relator by electronic funds transfer to the Law Offices of Paul D. Scott, P.C, pursuant to wiring instructions to be provided by Counsel for Relator.

4.    In consideration of the obligations of Defendant in this Agreement, and conditioned upon Defendant's full payment of the amounts described in Paragraphs III(1) and III(2) above, Relator agrees for himself, and for his heirs, successors, attorneys, agents, and assigns, to dismiss the Civil Action with prejudice against Defendant and to release Defendant, including its current and former parents, subsidiaries, and affiliates, and their respective directors, officers, employees, agents, and attorneys, and the successors and assigns of each of the foregoing (but specifically excluding the other defendants in the Civil Action and their affiliated owners or entities) from any and all causes of action, in law or in equity, suits, debts, liens, liability, obligations, claims, demands, rights of subrogation, contribution and indemnity, damages, loss, cost or expenses, direct or indirect, of any kind or nature whatsoever, known or unknown, fixed or contingent, state or federal, under common law, statute or regulation, liquidated or unliquidated, claimed or concealed, which arose prior to the Effective Date of this Agreement, including, but not limited to, any claims arising in whole or in part from the Civil Action, the matters alleged in the Civil Action, the settlement of the Civil Action, or the investigation and defense of the Civil Action. Notwithstanding the foregoing, by this Agreement, Relator and Counsel for Relator specifically do not release any claims whatsoever

4

against the other defendants in the Civil Action. Any such releases have been or will be only given through separate agreements with those other defendants.

5.     In consideration of the obligations of Relator and Counsel for Relator in this Agreement, Defendant fully and finally releases the Relator, Counsel for Relator, and their successors, attorneys, agents, affiliates, and assigns, from any and all causes of action, in law or in equity, suits, debts, liens, liability, obligations, claims, demands, rights of subrogation, contribution and indemnity, damages, loss, cost or expenses, direct or indirect, of any kind or nature whatsoever, known or unknown, fixed or contingent, state or federal, under common law, statute or regulation, liquidated or unliquidated, claimed or concealed, which arose prior to the Effective Date of this Agreement, including, but not limited to, any claims arising in whole or in part from the Civil Action, the matters alleged in the Civil Action, the settlement of the Civil Action, or the investigation and defense of the Civil Action.

6.     Section 1542 of the California Civil Code provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM
> OR HER MUST HAVE MATERIALLY AFFECTED HIS OR
> HER SETTLEMENT WITH THE DEBTOR.

Defendant, Relator, and Counsel for Relator hereby expressly waive all rights they may have by virtue of Section 1542 with respect to the other parties to this Agreement. The releases herein shall be effective whether or not they release claims that are currently known, unknown, foreseen or unforeseen.

7.     The Parties will notify the United States Department of Justice and the State of California Department of Justice of this Agreement within three business days of the Effective Date of this Agreement. The Relator and Defendant will jointly request Court approval of this



Agreement by March 2, 2012. The Parties' request for approval by the Court will be in the form of the proposed stipulation of dismissal with prejudice attached hereto as Exhibit A.

8.    Relator and Defendant agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).

9.    Nothing in this Agreement is intended to settle or release the Relator's rights under 31 U.S.C. § 3730(d) and Cal. Gov't Code § 12652(g) to claim a share of the Settlement Amount from the Governments. Relator retains those rights and will address those claims to the United States and the State of California subsequent to the execution of this Agreement.

10.    Notwithstanding the releases given in Paragraphs 4, 5 and 6 of this Agreement, or any other term of this Agreement, the following claims of the United States and the State of California are specifically reserved and are not released:

        a.    Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

        b.    Any criminal liability;

        c.    Except as explicitly stated in this Agreement, any administrative liability, including the suspension and debarment rights of any federal agency;

        d.    Any liability to the United States or the State of California (or their agencies) for any conduct other than matters arising from the Civil Action;

        e.    Any liability based upon obligations created by this Agreement;

        f.    Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

        g.    Any liability for failure to deliver goods or services due, unless based on the allegations in the Civil Action; and



h.    Any liability for personal injury or property damage or any liability for other consequential damages unrelated to the allegations in the Civil Action.

11.    Defendant waives and shall not assert any defenses Defendant may have to any criminal prosecution or administrative action relating to the conduct described in the Civil Action that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Furthermore, nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

12.    Defendant agrees to pay the full Settlement Amount, and Defendant shall not attempt to reduce its payment obligation by asserting a right to set off amounts that may or may not be due to Defendant for related or unrelated pending claims; and Defendant agrees not to submit or resubmit to the United States, or to cause any other person or entity to submit or resubmit to the United States, any previously denied claims related to the conduct described in the Civil Action and agree not to appeal any such denials of claims related to the conduct described in the Civil Action.

13.    a.    <u>Unallowable Costs Defined</u>: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of one or more of the Defendant, and/or any of their present or former officers, directors, employees, shareholders, and agents in connection with:

(1)    the matters covered by this Agreement;

7



(2)     the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

(3)     any investigation, defense, and corrective action undertaken by Defendant in response to the United States' audit(s) and civil investigation(s) in connection with the matters covered by this Agreement (including attorney's fees);

(4)     the negotiation and performance of this Agreement;

(5)     any payment Defendant makes to the United States pursuant to this Agreement and any payment that Defendant may make to Relator, including costs and attorneys' fees, are unallowable costs for government contracting purposes (hereinafter referred to as "Unallowable Costs").

b.     Future Treatment of Unallowable Costs:  Unallowable Costs will be separately determined and accounted for by Defendant, and Defendant shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

c.     Treatment of Unallowable Costs Previously Submitted for Payment: Within 90 days of the Effective Date of this Agreement, Defendant shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought from the United States by Defendant or any of its subsidiaries or affiliates. Defendant agrees that the United States, at a minimum, shall be entitled to recoup from Defendant any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment. The United States, including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine Defendant's books and

8

records and to disagree with any calculations submitted by Defendant or any of its subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by Defendant, or the effect of any such Unallowable Costs on the amount of such payments.

14.     Nothing in this Agreement is intended to make allowable costs that are otherwise unallowable by operation of law.

15.     This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent specifically provided for in this Agreement.

16.     Except as otherwise provided herein, each Party shall bear his or its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

17.     Relator, Defendant, and Counsel for Relator represent that this Agreement is freely and voluntarily entered into without duress or compulsion.

18.     This Agreement is governed by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising under this Agreement is the United States District Court for the Central District of California, which has jurisdiction over any disputes relating to this Agreement.

19.     For purposes of construction, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

20.     This Agreement is binding on the Parties, their parents, subsidiaries, affiliates, employees, agents, and servants as well as their successors, transferees, heirs, and assigns.

9

21.     Defendant agrees to use its reasonable best efforts to cooperate with requests for information by the United States, the State of California or the Relator relating to the Civil Action.

22.     This Agreement constitutes the complete agreement between the Parties as to the subject matter thereof.  This Agreement may not be amended or modified except by written consent of the Parties.

23.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

24.     This Agreement is effective on the date of signature of the last signatory to the Agreement (the "Effective Date" of this Agreement).  Facsimiles of signatures or pdf copies of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

25.     The signatories signing on behalf of the legal entities listed below represent that they are authorized to execute this Agreement on behalf of the respective entities.

AGREED TO BY:

2-29-12

Dated:

**DEFENDANT**

By: _____

Larry N. Thacker, Jr.
Chief Executive Officer
A-Med Health Care

10

03/01/2012  01:17   17607201508                    PC                         PAGE  01/01

**RELATOR**

Dated: 3/1/2012                    By: _____
                                       Terrance Donath

**COUNSEL FOR RELATOR**

Dated: 3/1/12                      By: _____
                                       Paul D. Scott on behalf of
                                       Law Offices of Paul D. Scott, P.C.

11

# EXHIBIT 15

# (Filed Under Seal)

EXHIBIT 16

| From: | Kyle Dunham </O=SHC/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=KDUNHAM> |
|---|---|
| Sent: | Monday, August 2, 2010 12:24 PM |
| To: | 'uskro@coloplast.com' |
| Cc: | 'usdgett@coloplast.com'; Jeff Lichtenstein <jlichtenstein@shieldhealthcare.com> |
| Subject: | Shield / Coloplast Contracts |
| Attach: | Coloplast Contract Renewal Analysis from D Gettman 07.31.10 modified by Kyle.xlsx; Coloplast 2010 CPA - Draft 4 07 31 10 redlined by SHC.docx; Coloplast 2010 CPA - Draft 2 06 28 10 _v3 redlined from Jess Smith.docx |

Kevin,

As a follow-up to our earlier conversation, I have included several attachments to this e-mail which I would like to discuss in further detail with you (and with Dave on the analytical piece if he is available). Attachment 1 is built upon the analytical tool that Dave originally sent me and shows the new projected gross sales, net sales, and cost liability (cost liability is Dave's term, this is identified as "additional savings" in my analysis). As you suggested, I re-ran the totals to look at net sales vs. gross sales at a growth rate of 24%. The bottom line is that 24% growth in gross sales (reflected in the new contract [Attachment 2] under Exhibit B, in which Tier 4 is set at $950K as compared with $800K in the previous drafts), equates to 24% growth in net sales as well.

So here is a summation of where we stand and where to go from here:

- I have redlined the CPA contract (Attachment 2) to conform to Jess's suggested revisions from his 7/19 e-mail. For reference purposes, Attachment 3 is the redlined contract that Jess sent me on 7/19, and this can be cross-checked to the updated CPA contract in Attachment 2. I have incorporated the changes Jess suggested with the only caveat that I am asking for a three-year contract since we wanted to align the CPA and PVP expiration dates. As such, there should be no objections to the boiler plate language on the updated, redlined contract (Attachment 2) other than potentially the further discussion regarding the three-year lifespan of the contract. This isn't necessarily a deal-breaker (it has to be a minimum of two years), but a strong preference on my part.
- I am projecting an annual savings (i.e., cost liability) of approximately $108K (which you will find in Attachment 1), but, again, this is based upon a 24% growth rate to realize the savings. We only achieve the savings if we purchase $3.8M gross annually, which equates to $500K in net growth. From my perspective, this is a reasonable step toward middle ground, which Jess asked me to do.
- If the changes are agreed to, the last step is to finalize the PVP agreement, which Jess and I have already agreed to in principle. While this agreement is also an important piece, the CPA contract takes highest priority and must be finalized ASAP, as this is the contract upon which all purchases are based.

As I said, I would like to discuss further by phone. If Coloplast can agree to what I have suggested in the preceding, we can sign off on the contract today as is. I look forward to hearing from you.

Best regards,
Kyle Dunham
Purchasing Manager
Shield HealthCare
27911 Franklin Pkwy
Valencia, CA 91355
Office: 661.294.4225
Email: kdunham@shieldhealthcare.com

SHC00019036

# EXHIBIT 17
# (Filed Under Seal)

# EXHIBIT 18

# (Filed Under Seal)

# EXHIBIT 19

# (Filed Under Seal)

# EXHIBIT 20

# (Filed Under Seal)

# EXHIBIT 21

# (Filed Under Seal)

# EXHIBIT 22

# (Filed Under Seal)

# EXHIBIT 23

# (Filed Under Seal)