UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-12131-RWZ

UNITED STATES OF AMERICA
and THE STATE OF CALIFORNIA,
*ex rel.* KIMBERLY HERMAN, *et al.*

v.

COLOPLAST CORP., *et al.*

MEMORANDUM OF DECISION

February 26, 2018

ZOBEL, S.D.J.

Defendant Coloplast Corp. moves for summary judgment on plaintiff-relator Amy Lestage's claim that Coloplast violated the anti-retaliation provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h).

I.  **Factual Background**

I summarize the facts in the light most favorable to the non-moving party. See Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 172 (1st Cir. 2015).

In 2011, Lestage became a Key Account Manager ("KAM") at Coloplast. KAMs sell medical product devices to distributors and dealers and manage those contractual relationships. They are paid commissions based on the percentage of growth of each account in their portfolio, and these "[c]ommissions are a key component of a KAM's compensation package, [and] in some cases amount to half (or more) of a KAM's annual compensation." Docket # 285 ¶ 52. "If a KAM hits 100% of the quota for his or

her portfolio, he or she will earn the 'target incentive' in commissions for that fiscal year ...." Docket # 282 ¶ 9. If a KAM exceeds 100% of the quota, she will receive a larger percentage of the target incentive. Lestage exceeded 100% of the quota in both FY 12/13 and FY 13/14, mainly due to her principal account, Byram Healthcare, Inc., one of the named defendants in the underlying qui tam action.

In August 2014, the docket in this case was unsealed and on November 20, 2014, the Amended Complaint publicly filed. At that time plaintiff's identity as a relator was revealed. In the Amended Complaint, relators alleged that defendants, including Coloplast and Byram, engaged in an illegal kickback scheme regarding the sale of ostomy and/or continence care products reimbursed by Medicare and Medicaid, and defrauded the federal government.

On December 18, 2014, Byram's CEO sent a letter to Edmond Veome, Coloplast's president, requesting that Coloplast "provide Byram Healthcare with a different account representative" and stating that it "no longer wish[ed] to work with Amy Lestage regarding [their] business together." Docket # 274–10 at 2. Byram directed Coloplast to its legal counsel regarding any questions it may have on the matter.

On December 23, 2014, Coloplast informed Lestage by letter that it was placing her "on an indefinite, paid administrative leave . . . while [it] investigated [Byram's demand to remove her from its account]." Docket # 283–10 at 2. The parties dispute whether Coloplast knew at that point that Lestage was a relator in the qui tam action. They also disagree whether to characterize this event as a "suspension" or a "paid

2

administrative leave."[1]  Whether termed a "suspension" or "paid administrative leave," it is undisputed that plaintiff was required to "immediately cease performing any services on behalf of Coloplast." Docket # 283–10 at 2.

Coloplast told plaintiff that "while on leave, [her] salary will be paid on the regular, biweekly process and [her] commission will be paid out according to the monthly process.  For any month where [she is] on paid administrative leave, Coloplast will guarantee a minimum commission payment of 100% of the eligible [target incentive] for that month ($6,666.67). [She] also remain[s] fully eligible for any benefits [she had] enrolled in." Docket # 283–11 at 2.  Indeed, "[f]or FY14/15 and FY15/16, Coloplast paid Plaintiff $80,000 in commission while on leave whereas the average KAM commission was less than $68,000 during this same period."  Docket # 282 ¶ 43.  She also continued to use the company-issued vehicle and fuel card, accrue paid time off, receive contributions to her 401(k), maintain health, disability, and life insurance benefits, and she received a raise.  She was, however, prohibited from "performing any services on behalf of Coloplast" or "hav[ing] any contact with Coloplast customers or employees relating to [her] accounts . . . or any Coloplast business."  Docket # 283–11 at 2. On May 6, 2015, relators moved to file a Second Amended Complaint, in part to add Lestage's retaliation claim against Coloplast.

---

[1]  Courts have referred to such a situation interchangeably as a "suspension" and "paid administrative leave." See e.g., Richardson v. Petasis, 160 F. Supp. 3d 88, 106 (D.D.C. 2015) (evaluating discrimination claim under Title VII framework and explaining that plaintiff was placed "on 'paid administrative leave' (which can also be appropriately referred to as a suspension)"); Scott v. Metropolitan Health Corp., 234 Fed. Appx. 341, 348 (6th Cir. 2007) (referring to a paid leave as "a suspension with pay and full benefits").  For the purposes of this Memorandum of Decision, I use the word "leave" for convenience while nevertheless drawing all reasonable inferences about the situation in Lestage's favor.

Although Coloplast allowed Lestage to return to work on January 25, 2016, she had delivered a baby in November 2015 and elected to take twelve weeks of maternity leave under the Family Medical Leave Act ("FMLA") beginning in January 2016. On April 12, 2016, following the end of her FMLA leave, she resumed working and was allowed to accrue immediately four days of paid time off to take a vacation.

Prior to her leave, plaintiff's portfolio of accounts included Byram, ABC Home Medical, Home Care Delivered, Buffalo Hospital Supply, Inc., and Claflin Medical Equipment Co. Upon her return in April 2016, she was taken off the Byram and ABC accounts. She did maintain the Home Care Delivered, Buffalo Hospital Supply, and Claflin accounts, and was also assigned four new accounts: AmeriSource Bergen, Blackburns Physician's Pharmacy, Concordance Healthcare Solutions, and Geriatric Medical. The parties dispute the growth potential of these four new accounts. It is undisputed, however, that plaintiff, through her counsel, wrote to Coloplast on December 28, 2015 that "given her status as a relator against her key accounts, it would be impossible for Ms. Lestage to return to an account position where she would be handling clients, like Byram and Liberator, that she had handled prior to the qui tam action." Docket # 282 ¶ 30.

On June 20, 2016, Coloplast answered the Amended Complaint and asserted counterclaims against Lestage for breach of contract and breach of duty of loyalty. The counterclaims allege that, between 2010 and 2013, Lestage sent eleven emails outside the company; that the emails contained confidential Coloplast information; that her "Employment Agreement prohibited Lestage from disclosing confidential information other than for the sole purpose of performing her employment duties" and required her

4

to "take all reasonable precautions to prevent the inadvertent disclosure" of confidential information; and that, "on information and belief, Lestage has shared the information forwarded to non-Coloplast email addresses with individuals outside of Coloplast." Docket # 144 at 56. Coloplast says it discovered the alleged violations inadvertently while conducting "its investigation and responding to inquiries from the government in this lawsuit." Docket # 284 at 5.

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue is 'genuine' for purposes of summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law." Poulis-Minott v. Smith, 388 F.3d 354, 363 (1st Cir. 2004) (citations and internal quotations omitted). In considering whether a genuine issue of material fact exists, the court "must view the evidence in the light most favorable to the opposing party." Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014). "In order to defeat a motion for summary judgment, the nonmovant may not rest upon some combination of conclusory allegations, improbable inferences, and unsupported speculation, but must instead present definite, competent evidence to rebut the motion." Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH, 781 F.3d 510, 516 (1st Cir. 2015).

### B. Retaliation Prohibited by the FCA

The anti-retaliation provision of the FCA shields employees who engage in protected FCA conduct from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment." 31 U.S.C. § 3730(h)(2). The burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), governs FCA retaliation claims in the First Circuit. Harrington v. Aggregate Indust. Ne. Region, Inc., 668 F.3d 25, 31 (1st Cir. 2012). Under that scheme, a plaintiff must first make out a prima facie case of retaliation by showing that: "(i) [s]he was engaged in conduct protected under the FCA; (ii) [her] employer had knowledge of this conduct; and (iii) [her] employer retaliated against [her] because of this conduct." Id. If a plaintiff meets this "low bar," the burden then shifts to the defendant who must "articulate a legitimate, non-retaliatory reason for the adverse employment action." Id. at 31-32. This burden is only one of production. Id. When it is met, the ultimate burden of persuasion returns to plaintiff to show "the proffered reason is a pretext calculated to mask retaliation." Id.

### III. Discussion

Plaintiff claims that Coloplast retaliated against her by placing her on leave, by removing key accounts and reassigning her inferior ones upon her return to work, and by filing counterclaims against her in this case. Coloplast contends that summary judgment should enter because plaintiff has failed to make out a prima facie case of retaliation and because, even if she has met that burden, she has failed to proffer evidence permitting a jury to find that Coloplast's explanations for its actions are mere pretext to mask retaliatory motivation.

The court begins by testing the sufficiency of plaintiff's prima facie case.

A.     Plaintiff's Prima Facie Case

The first two prongs of Lestage's prima facie case are straightforward. Prong one is satisfied because there is no dispute that Lestage engaged in protected activity when she filed as a relator in the underlying qui tam action. Prong two is also satisfied because this case was unsealed on August 21, 2014, making Lestage's identity as a relator publicly accessible knowledge more than four months before Coloplast placed her on leave. It strains credulity to think Coloplast did not learn of plaintiff's role around that time, and a reasonable jury could conclude it did have knowledge well before the leave. Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000) ("general corporate knowledge that the plaintiff has engaged in a protected activity" suffices for prima facie case). Moreover, though knowledge by particular decisionmakers is not required for this part of the analysis, there are material disputes of fact as to whether the relevant Coloplast employees did know Lestage had sued the company when it decided to place her on leave. See e.g. Docket # 285 ¶¶ 72-74. In any event, Coloplast does not dispute that it knew of her protected conduct shortly thereafter, including during the majority of her leave and when it reassigned her accounts and filed its counterclaims.

Prong three, by contrast, is hotly contested. The key dispute is whether the complained-of actions are "materially adverse," i.e. whether they are harmful enough to constitute retaliation under the FCA. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 557 (2006) (analyzing Title VII anti-retaliation provision). Materially adverse

7

actions are those that "might have dissuaded a reasonable worker from [engaging in protected activity]." Id. at 67–68; see Booker v. Mass. Dept. of Public Health, 612 F.3d 34, 43 (1st Cir. 2010).[2]  "[W]hether an action is materially adverse is judged by an objective rather than a subjective standard." Booker, 612 F.3d at 43.

I address the material adversity of each complained-of action in turn.[3]

### i. Placing Lestage on Leave

Coloplast contends that "[a] fully paid administrative leave is factually and legally distinct from a suspension [under section 3730(h)(1)]." Docket # 284 at 2. It argues that Lestage "was not fired or demoted, or denied a promotion, or reassigned with significantly different responsibilities or experience any change in benefits. Thus, [her] leave does not constitute actionable adverse employment action as a matter of law." Docket # 272 at 6-7. Lestage calls the leave a suspension and argues that the forced absence, even if paid, was a materially adverse action because it prohibited her from working and thereby prevented her from "opportunities to gain job experience," "to continue growing her accounts, potentially earning her commissions above the 100 percent to target pay-out," and left her feeling "stigmatized." Docket # 281 at 9, 11.

---

[2] Though the First Circuit does not appear to have considered whether Burlington Northern (a Title VII decision) sets the standard for retaliation claims under the FCA, other circuits have concluded that it plainly does. See U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd., 816 F.3d 315, 326 (5th Cir. 2016); Smith v. Clark/Smoot/Russell, 796 F.3d 424, 434 (4th Cir. 2015); Vander Boegh v. EnergySolutions, Inc., 536 F. App'x 522, 529 (6th Cir. 2013). The court will apply the standard here, noting the First Circuit's history of utilizing Title VII case law in FCA retaliation cases. See, e.g., Harrington, 668 F.3d at 31.

[3] In addition to showing that the complained-of actions are adverse, plaintiff's prima facie burden requires her to make a showing that Coloplast took the actions because of her protected conduct. Harrington, 668 F.3d at 31. At this stage, the close temporal proximity between the protected conduct and the leave, account reassignment, and counterclaims is sufficient. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004). Moreover, as discussed in section III.B. below, plaintiff has advanced additional evidence of causation to rebut Coloplast's proffered nonretaliatory justifications.

8

While some circuits have held that paid administrative leave pending a disciplinary investigation can never constitute an adverse employment action, see Joseph v. Leavitt, 465 F.3d 87, 90–91 (2d Cir. 2006) (collecting opinions of the Fourth, Fifth, Sixth, and Eighth Circuits and agreeing with their holding that "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action"), others have taken a more flexible view. See Dahlia v. Rodriguez, 735 F.3d 1060, 1078 (9th Cir. 2013) (en banc) (holding that placement on administrative leave can constitute an adverse employment action for purposes of a First Amendment retaliation claim); see also Lakeside-Scott v. Multnomah Cty., 556 F.3d 797, 804 n.7 (9th Cir. 2009) (noting in dicta that "being placed on administrative leave might qualify as an adverse employment action"). This circuit has not decided the issue. Following Burlington Northern, the First Circuit has, however, held that "employment actions are less susceptible to categorical treatment when it comes to the question of whether they are or are not materially adverse." Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 472 (1st Cir. 2010). Instead, whether a challenged action is materially adverse is "an objective test and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" Id. (quoting Burlington Northern, 548 U.S. at 71).

Here, although plaintiff continued to receive full benefits, salary, and commissions as if she had reached 100% of her quota during her leave, plus a raise, she points to other non-monetary effects of being involuntarily placed on leave. Specifically, she was prohibited from working for about a year, and thus, could not grow

9

herself professionally. She further claims that she lost the opportunity to attend a "President's Circle trip" and the opportunity to earn commissions above the 100% quota.[4] Under these circumstances, a jury could conclude that the leave was materially adverse. The summary judgment record permits a finding that a reasonable employee in plaintiff's position might well be dissuaded from providing information of wrongdoing in the face of such a leave. See Burlington Northern, 548 U.S. at 68; see also Dilettoso v. Potter, No. CV 04-0566-PHX-NVW, 2006 WL 197146, at *8 (D. Ariz. Jan. 25, 2006) ("Although administrative leave with pay may be welcomed by some, the threat of forced leave could reasonably deter employees who prefer working from engaging in protected activity").

### ii. Removal and Reassignment of Accounts

Coloplast argues that removing plaintiff from the Byram and ABC accounts and assigning her four new, smaller accounts upon her return is not a materially adverse action because the new accounts do not affect her ability to earn commissions. It emphasizes that a KAM's commissions are tied to account growth, not size, and it points to evidence that the new accounts have in fact shown growth for the 2016-17 year while part of her portfolio. It also argues that Byram and ABC were not returned to Lestage because those companies did not want to work with her. Lestage contends that there are material disputes of fact regarding whether or not Byram wanted to work

---

[4] With respect to the trip, Coloplast contends that it "did not inform Plaintiff she could not attend the trip while on administrative leave, and Plaintiff did not inquire about her ability to attend at any time," Docket # 284 at 20. But it is unclear whether she in fact could have attended or participated in the agenda, given that plaintiff was prohibited from "performing any services on behalf of Coloplast" or having "any contact with Coloplast customers or employees relating to ... any Coloplast business." Docket # 283–11 at 2.

10

with her.  She also responds that the new accounts have significantly smaller growth prospects, and therefore smaller earning potential, as compared to Byram and ABC, and she disputes Coloplast's evidence regarding the new accounts' growth.

First, the record is clear that Coloplast's decision to remove Lestage from the Byram and ABC accounts was not materially adverse.  It is undisputed that Coloplast did not return ABC to Lestage due to the client's preference not to work with her and because ABC was undergoing an acquisition that would result in a new KAM located on the west coast.  Moreover, as to Byram, plaintiff's counsel specifically informed Coloplost prior to her return that "it would be impossible for [her] to return to an account position where she would be handling clients, like Byram and Liberator, that she had handled prior to the qui tam action.  And [she] would not be comfortable returning to work alongside colleagues that she implicated in the qui tam complaint."  Docket # 282 ¶ 30.

However, whether the assignment of new accounts was materially adverse is properly a question for the jury.  Plaintiff has proffered evidence, albeit in the form of her own deposition testimony, contradicting Coloplast's account growth statistics.  She states that the "new accounts are far smaller in terms of revenue, do not fit the company profile, and have little growth potential"; that "she went from being the number one ranked KAM in 2014 to being the last ranked KAM today, in terms of performance"; and that as a result of her new, low-growth accounts "she will perform at 80-85% of her objective, leaving her with little to no commission dollars for her new accounts."  Docket

11

# 288 (citing Docket # 283-2). The conflicting evidence is for the jury to resolve.[5] See Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc., 473 F.3d 11, 18 (1st Cir. 2007) ("[P]rovided that the nonmovant's deposition testimony sets forth specific facts, within [her] personal knowledge, that, if proven, would affect the outcome of the trial, the testimony must be accepted as true for purposes of summary judgment.").

### iii. Counterclaims Against Lestage

Finally, Coloplast argues its counterclaims claims cannot be materially adverse actions because "a counterclaim alleging violations of confidentiality obligations is not a discharge, demotion, suspension, or threat, and is not discrimination or harassment …." Docket # 284. Plaintiff contends that the counterclaims are harassment within the meaning of the FCA's anti-retaliation provision because they are "unfounded and [brought in] bad faith." Docket # 281 at 14.

Contrary to Coloplast's argument, the counterclaims may be materially adverse actions sufficient to support a claim for retaliation if Lestage shows they were filed with retaliatory motive and lack a reasonable basis in fact or law. Bill Johnson's Rests., Inc. v. N.L.R.B., 461 U.S. 731, 748–49 (1983); Smith v. Miami-Dade Cty., 621 F. App'x 955, 960 (11th Cir. 2015); Darveau v. Detecon, Inc., 515 F.3d 334, 341 (4th Cir. 2008).

---

[5] Plaintiff does not dispute that her previous "above average performance was mainly attributable to her principal account, Byram," Docket # 282 ¶ 17, or that "KAMS' sales commissions fluctuate year over year due to a number of factors including key account mergers or acquisitions; a volatile economy; changes in contractual obligations; account performance; KAM's individual performance such as his or her frequency and quality of meetings with accounts, and collaborating with other Coloplast teams such as field sales and marketing; or pre-existing inventory at the key accounts." Id. ¶ 13. A jury—not the court—will need to weigh those concessions against the rest of the evidence in determining whether the assignment of new accounts was materially adverse and, if necessary, in determining damages.

The claims seek unspecified damages, costs, and attorney's fees for plaintiff's alleged disclosure of confidential information and violations of her Employment Agreement. While the parties do not dispute that plaintiff sent emails or that they contained certain confidential information, there is a paucity of evidence in the record regarding what, if any, damages Coloplast suffered as a result of plaintiff's conduct.[6] If there was no support for defendant's damages claims, a jury could find the countersuit was brought without a basis in fact or law and could infer a retaliatory motive. See Ambs v. Sir Home Imp., No. 1:11-CV-332, 2012 WL 1909355, at *5 (W.D. Mich. May 25, 2012) (concluding that fact issues precluded summary judgement on plaintiff's claim that employer retaliated by filing a baseless counterclaim in FMLA case).

## B.  Lestage's Evidence of Pretext

In response to plaintiff's prima facie case of retaliation, Coloplast has asserted "proper nonretaliatory justification[s]" for placing her on leave and for reassigning her accounts.[7] See U.S. ex rel. Hamrick v. GlaxoSmithKline LLC, 814 F.3d 10, 18 (1st Cir. 2016). As to the leave, Coloplast argues this was done so that "it could investigate the demands of Byram and understand why it was refusing to communicate with Plaintiff as [Coloplast] did not know if there were liability issues or if there was unlawful conduct taking place." Docket # 272 at 10. As to the account reassignment, it says that it "gave

---

[6]  For instance, with respect to five emails that Lestage forwarded to her own personal email address, Coloplast admits it does not know what, if anything, Lestage did with the information after it was sent. See Docket # 285 at 34. And Coloplast's president testified that he did not know whether Coloplast had been damaged by the alleged disclosure of confidential information. Id. ¶ 161.

[7]  Coloplast did not advance a nonretaliatory justification for its counterclaims; rather, its brief focused on arguing that the counterclaims were not adverse employment actions. Lestage, therefore, need not show pretext to avoid summary judgment.

her four additional accounts [it] felt had sufficient growth opportunity to replicate her prior accounts." Id.

At this stage, plaintiff can only avoid summary judgment by "adduc[ing] sufficient evidence of pretext and retaliatory animus to make out a jury question … as to whether retaliation was the real motive" underlying the leave and account reassignment. Hamrick, 814 F.3d at 18 (internal quotation marks omitted). When a plaintiff makes out a prima facie case and the question becomes one of pretext and animus, the First Circuit warns that "courts must be particularly cautious about granting the employer's motion for summary judgment." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998) (applying FMLA's anti-retaliation provision).

### i. Administrative Leave

As evidence of pretext, Lestage points to the close temporal proximity between Coloplast's knowledge of her status as a relator and her being placed on leave and she highlights evidence casting doubt on Coloplast's proffered justifications.

Coloplast's president testified that the company decided Lestage should return to work in January 2016 because "at that time the [whistleblower] case had been through the majority of its machinations and was moving toward resolution and there was an expectation that now was the time to bring [her] back to work because there was no longer going to be the pending investigation. There was an outcome that was being delivered and so it would be okay for her to return." Docket # 285 ¶ 123. When asked whether Coloplast's settlement with the government and relators impacted Coloplast's

decision to have Ms. Lestage return, Mr. Verome testified: "Ultimately, yes, but previous to that I think we had had conversations that we were nearing a conclusion of the case and so there was an expectation that we could work towards bringing her back to the organization."  Id. ¶ 125.  A jury could find this evidence suggests that the leave was due to plaintiff's role in the qui tam action, and not because Coloplast was conducting an investigation into Byram's stated objections to communicating with her.  This evidence, especially when combined with the undisputed fact that Lestage was placed on leave close in time to Coloplast discovering she was a relator, raises triable issues as to whether Coloplast's proffered justification for the leave was "a pretext calculated to mask retaliation."  Harrington, 668 F.3d at 31.

### ii. Reassignment of Accounts

There is also sufficient evidence to support a jury finding that Coloplast's proffered justification for assigning her new accounts was pretext for retaliation.  While Coloplast contends the accounts were given because they had growth potential sufficient to replace her old accounts, Lestage counters that the "new accounts are far smaller in terms of revenue, do not fit the company profile, and have little growth potential."  Docket # 288.  As an experienced Coloplast KAM, Lestage offers sworn testimony that two of the accounts are "maintenance" accounts with very little growth potential and one is a "house" account not previously serviced by a KAM.  Docket # 283-3 at 4-5.[8]  As above, this testimony is not mere allegation but rather speaks to facts

---

[8] The parties' warring declarations on this topic merely create jury issues that preclude summary judgment.  Coloplast's evidence includes the sworn declaration of Morten Hansen, Vice President of Channel Sales and Marketing at Coloplast.  Docket # 286-2.  He contends that Lestage "has been assigned accounts with appropriate growth targets based on the methodology used for the entire KAM group;" that Coloplast does not use the term "maintenance accounts" and generally does not use the

15

within Lestage's knowledge that, if proven, could affect the outcome of the trial. See Velazquez-Garcia, 473 F.3d at 18. It is sufficient to raise a jury question on pretext.

## IV. Conclusion

Coloplast's Motion for Summary Judgment (Docket # 271) is DENIED.

    February 26, 2018                                                    /s/Rya W. Zobel
               DATE                                                                RYA W. ZOBEL
                                                                         SENIOR UNITED STATES DISTRICT JUDGE

---

term "house account;" and that Geriatric Medical, the account assigned to Lestage which previously had not been with a KAM, was given to her "because the account had seen significant recent growth, and Coloplast believed it could capitalize on that growth with the addition of a KAM," and that Lestage had a past relationship with the client from prior work. Id. at 2-3. Lestage's own declaration, Docket # 283-3, responds that, inter alia, some of the new accounts "do not engage in marketing programs" "which is how KAMs typically work with accounts to grow sales" and that "Geriatric Medical is a long term care distributor, and Coloplast does not focus, as a business, on marketing in the long term care field."