UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-12131-RWZ

UNITED STATES OF AMERICA
and THE STATE OF CALIFORNIA,
*ex rel.* KIMBERLY HERMAN, *et al.*

v.

COLOPLAST CORP., *et al.*

MEMORANDUM OF DECISION

August 17, 2018

ZOBEL, S.D.J.

Defendant Shield California Health Care Center, Inc. ("Shield"), moves pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings. See Docket # 302. It argues that plaintiff-relators' action should be dismissed under the False Claims Act's ("FCA") "government action bar," 31 U.S.C. § 3130(e)(3), and the analogous provision of California's FCA statute, Cal. Gov't Code § 12652(d).[1]

## I.   Factual and Procedural Background

Following are the notable procedural events of this case and the relevant facts contained in the pleadings, which I view in the light most favorable to the non-moving relators. See R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 182 (1st Cir. 2006).

---

[1] This Memorandum of Decision addresses the 12(c) motion only and does not concern Shield's pending motion for summary judgment, Docket # 301, or its pending motion to strike and exclude, Docket # 317.

### A. Relators' Case

This is a False Claims Act case brought by three qui tam relators. They allege that defendant, a medical supply provider to beneficiaries of California's Medicaid Program ("Medi-Cal"), perpetrated a phony invoicing scheme to evade Medi-Cal's "Upper Billing Limit" ("UBL") regulation.[2] The regulation limits claims for reimbursement for an item to a 100% markup of supplier's "net purchase price," defined as the item's "actual cost to the provider ... including any rebates ... known by the provider at the time of billing ... that reduces the item's invoice amount." Docket # 121 ¶ 38-39. In circumvention of this rule, Shield allegedly arranged to pay very high invoice prices to one of its medical supply manufacturers, Coloplast Corp., while also arranging for steep and essentially guaranteed "back-end" volume-based rebates on these sales. When calculating a product's "net purchase price" and billing Medi-Cal, Shield did not disclose the rebates; it used only the inflated invoice prices.

Relators' operative complaint covers three Shield/Coloplast supplier agreements: the first was effective June 1, 2008 to September 30, 2010; the second, which relators Herman and Roseff helped negotiate, covered the period from October 1, 2010 through February 15, 2014; and the third, the period from February 16, 2014 through February 29, 2016. See Docket # 121 ¶¶ 157, 158, 163, 167.

Relators' original complaint was filed under seal on December 2, 2011. On August 21, 2014, the case was unsealed. Since that time, relators have filed three amended complaints. See Docket ## 21 (November 20, 2014); 40 (June 1, 2015); 121

---

[2] These allegations form the basis of Counts IV, V, VI, and VII of relators' Third Amended Complaint and are the only claims brought against Shield. See Docket # 121 at 57-60.

2

(May 20, 2016).  The United States and California declined to intervene.  See Docket # 55.  On February 5, 2016, Shield moved to dismiss the relators' claims as prohibited under the FCA's first-to-file bar.  The government opposed, Docket # 84, and the court therefore denied the motion.  See 31 U.S.C.A. § 3730(e)(4)(A).

### B. The Donath Litigation

In support of the pending motion, defendant now argues that relators' case is barred because of the government's involvement in an earlier similar case, United States ex. rel. Donath v. Whitestone Corp., No. SACV 07-0995 (C.D. Cal. 2007).  In that case, qui tam relator Terry Donath on August 23, 2007 filed a complaint alleging, inter alia, that Shield violated the FCA by submitting false claims to Medi-Cal.  The modus operandi of that scheme was, in relevant part, identical to the one alleged by relators in this case, i.e. that Shield evaded the Medi-Cal UBL regulation by submitting reimbursement claims that omitted large off-invoice volume rebates from the net purchase price of products it supplied to patients.

Donath worked for Whitestone Corporation, a medical supply manufacturer, from December 1994 to February 2007.  He handled Whitestone's account with Shield from the time he started until December 2000, and his original complaint concerned Shield's dealings with Whitestone and false claims "starting in or around March 2003 to the present," i.e. August 2007.  Docket # 90-2 at 143, 150.  On April 19, 2010, Donath filed an amended complaint which included allegations that, in addition to its arrangement with Whitestone, "Shield also entered into sham volume rebate agreements with ... most or all of its other suppliers" including Coloplast.  Docket # 302-4 ¶ 148.  It further alleged that Shield's invoice scheme "continues ... to this day," i.e. April 19, 2010.  Id. ¶

3

61.

Shield settled the Donath litigation with the United States, California, and the relator in November 2011.  Docket # 121-1 at 165.  The government entities had intervened in the action in conjunction with the settlement, which pertained to certain "Covered Conduct": "Shield's overbilling the Medi-Cal program by ... violat[ing] the [UBL regulation] during the period from March 2, 2003 to June 30, 2009."  Shield paid five million dollars.

## II.     Legal Standard

A party may move for judgment on the pleadings at any time "[a]fter the pleadings are closed but within such time as not to delay the trial."  Fed. R. Civ. P. 12(c).  In ruling on such a motion, "the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom to the nonmovant's behoof."  R.G. Fin. Corp., 446 F.3d at 182.  In addition to the pleadings, the court may also "consider[] documents fairly incorporated therein and facts susceptible to judicial notice."  Cruz v. Puerto Rico, 558 F. Supp. 2d 165, 178 (D.P.R. 2007).  "The court may not grant a defendant's Rule 12(c) motion 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) (quoting George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 553 (2d Cir. 1977)).

## III.    Discussion

The FCA's qui tam provisions authorize private persons to bring civil enforcement actions on behalf of the United States and to collect a portion of damages

4

that may be awarded if an FCA violation is proven.  See 31 U.S.C. § 3730(b); U.S. ex rel. Duxbury v. Ortho Biotech Prod., L.P., 719 F.3d 31, 33 (1st Cir. 2013).  "Although this financial incentive encourages would-be relators to expose fraud, it also attracts parasitic relators who bring FCA damages claims based on information within the public domain or that the relator did not otherwise discover."  Duxbury, 719 F.3d at 33 (internal citations omitted).  Congress has therefore frequently amended the FCA in an attempt "to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior."  U.S. ex rel. S. Prawer & Co. v. Fleet Bank of Maine, 24 F.3d 320, 326 (1st Cir. 1994).  To that end, the FCA contains several restrictions on the actions a relator may pursue.

The restriction at issue in this case, the government action bar, prohibits any suit "based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party."  31 U.S.C. § 3730(e)(3).  Defendant contends that plaintiffs' suit is prohibited under this bar because of the United States' and California's involvement in the Donath litigation.  To prevail on its motion, Shield must therefore show both that (i) plaintiffs' case is "based upon" the same "allegations or transactions" involved in Donath (a civil suit); and (ii) the government "is already a party" to that now-concluded case.

### A. Whether Relators' Case is "Based Upon" "Allegations or Transactions" Which "Are the Subject of" Donath

In support of its motion, Shield argues that relators' complaint puts forth "the exact same allegations made by Donath in his amended complaint"; that "Relators used language identical to that in Donath's amended complaint"; and that "arbitrary temporal

5

distinctions" between relators' allegations and Donath's are insufficient to clear the government action bar. Docket # 302-1 at 12. Relators respond that they "are not parasites of the Donath litigation, even though they readily concede that they mirrored the allegations from the Donath complaint in drafting their UBL claims against Shield." Docket # 315 at 6. They argue that their case "does not merely allege different time periods" from Donath but instead goes further, alleging that "Shield executed an affirmative settlement of the fraudulent conduct at issue in Donath (covering the period of 2003-2009) and then continued to commit the very same fraudulent scheme ...." Id.

In Prawer, the First Circuit analyzed the government action bar and recognized that "the breadth with which we should read the phrase 'allegations or transactions which are the subject of a civil suit' is not readily apparent from the text of the statute." Prawer, 24 F.3d at 326. Because of this vagueness, the court instructed trial courts to "proceed with caution before applying the statutory bar of § 3730(e)(3) in ambiguous circumstances." Id. at 328.

Proceeding cautiously, therefore, this court determines applicability of the government action bar by "look[ing] first to whether the two cases can properly be viewed as having the qualities of a host/parasite relationship," i.e., "whether the qui tam case is receiving 'support, advantage, or the like' from the 'host' case (in which the government is a party) 'without giving any useful or proper return' to the government (or at least having the potential to do so)." Id. The FCA's "twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own" guide the court throughout its analysis. United States ex rel. Estate of Gadbois v. PharMerica Corp., No. CV 10-471-JJM-LDA,

6

2017 WL 5466659, at *5 (D.R.I. Nov. 13, 2017) (quoting Prawer, 24 F.3d at 326). Applying these principles, I am persuaded that relators' action is not based upon allegations or transactions which are the subject of the Donath litigation.

> i. **Whether Relators Are Receiving "Support, Advantage, or the Like" From Donath**

Several factors distinguish this action. First and foremost, the present case is not receiving meaningful "support advantage, or the like" from the Donath litigation. While relators freely admit that Donath involved fraud by the same modus operandi as alleged in this case, Donath primarily concerned Shield's arrangements with Whitestone during the 2003 to 2010 time period. By contrast, this case focuses on Shield's dealings with a different manufacturer (Coloplast) and a largely different period (2010-2016). These disparities are significant and distinguishing. Cf. U.S. ex rel. Booker v. Pfizer, Inc., 9 F. Supp. 3d 34, 46 (D. Mass. 2014) (FCA's "public disclosure provision is not meant to deprive whistleblowers of their role as 'private attorneys-general,' when they come forward with evidence of new fraudulent activity—even new fraud that is perpetrated by old modus operandi.") (citations omitted) (quoting U.S. ex rel. Poteet v. Medtronic, Inc., 552 F.3d 503, 507 (6th Cir. 2009)).

To be sure, Donath's April 2010 amended complaint alleged on information and belief that Shield was employing the fraudulent invoicing scheme with "most or all of its other suppliers." It also mentioned Coloplast and alleged that the fraud was, at that time, continuing. But these general statements do not lead to an inevitable conclusion that relators' case is meaningfully supported by the Donath litigation. The crux of relators' case here is that, subsequent to the November 2011 Donath settlement,

7

"Shield has continued to defraud Medi-Cal" with a different supplier. Docket # 121 ¶143. Plaintiffs did not receive this information from the Donath litigation.

In comparison to Donath, relators' case goes far beyond the "unimpressive" differences which courts find insufficient to distinguish a claim from a previous complaint. See Bellevue v. Universal Health Servs. of Hartgrove, Inc., 867 F.3d 712, 721 (7th Cir. 2017), cert. denied, No. 17-842, 2018 WL 1369159 (Mar. 19, 2018) (public disclosure bar case in which plaintiff's claims were barred where the "allegations pertain[ed] to the same entity and describe[d] the same contested conduct" as had been previously publicly disclosed); U.S. ex rel. Bogina v. Medline Indus., Inc., 809 F.3d 365, 370 (7th Cir. 2016) (mere allegation of continuing fraud insufficient to surmount public-disclosure bar).

Nor is this case like U.S. ex rel. Poteet v. Bahler Medical, Inc. (a public disclosure bar case), in which the First Circuit upheld the district court's finding that the plaintiff's case was based on previously disclosed allegations or transactions. 619 F.3d 104 (1st Cir. 2010). There, a prior suit had alleged the defendant "improperly influenced" doctors to purchase its products and bill Medicare. The new suit, plaintiff contended, went further by identifying a specific product (called "INFUSE") and a specific means of improper influence (falsely telling doctors that off-label use of the product was eligible for Medicare reimbursement). The First Circuit held this was insufficient to avoid the public disclosure bar because the alleged difference was "just a slightly more detailed version of a prior allegation." Id. Although the details "undoubtedly add[ed] some color," the public disclosure bar was nevertheless implicated because "the allegation ultimately target[ed] the same fraudulent scheme."

Id. Unlike Poteet, relators here do far more than add color to the Donath case's allegations or transactions. Indeed, they have alleged specific instances of fraud between 2011 and 2016, after the Donath litigation had ceased.

### ii. Whether Relators' Case Provides a "Useful or Proper Return to the Government"

I am further persuaded that whatever support or advantage relators have received from the Donath case is balanced by "useful or proper return to the Government." Prawer, 24 F.3d at 328. "What now constitutes potential useful or proper return to the government will not always be easily answered and must necessarily be addressed on a case-by-case basis." Id. Although a suit's "potential for adding funds to the government's coffers" is, by itself, insufficient to render viable an otherwise derivative qui tam action, the relators in this case clearly do more. See id.

Relators have alerted the government to allegations that, in the wake of its settlement in the Donath case, Shield persisted in evading the UBL and submitting false claims—in effect, it allegedly "doubled down." The government benefits from rooting out recidivist FCA violators, especially where, as here, "this case is seeking to remedy a fraud that the government has not yet attempted to remedy." Id.; see Booker, 9 F. Supp. 3d at 45 ("The government's awareness of fraud that occurred entirely in the past, by contrast, may not alert the government to future fraud, and thus that awareness 'does not bar other potential qui tam litigants from bringing additional instances of fraud to light.'") (quoting U.S. ex rel. Hoggett v. Univ. of Phoenix, No. 10–02478–MCE, 2012 WL 2681817, at *5 (E.D.Cal. July 6, 2012)). While Donath's vague allegations as to Coloplast might have put the government on notice of potential

9

fraud, notice is not the touchstone of the government action bar (or any other FCA prohibition against parasitic claims). See Prawer, 24 F.3d at 328 ("Congress has explicitly deemed a "notice" regime insufficient to protect the government against false claims (indeed, it was precisely such a regime that Congress sought to abandon in enacting the 1986 amendments ....").

Finally, I note that the government itself does not view this case as parasitic of the Donath litigation. See Docket # 84 (United States objecting to dismissal of action under 3730(e)(4)(A) and stating that provision allows government "to inform the court that it does not view a particular qui tam action as parasitic"). While the government action bar does not provide the government with veto power over a defendant's motion as is effectively the case in the public disclosure bar context, the United States' perception is nevertheless instructive here because it goes directly to the question of "useful or proper return to the Government." See Berntsen v. Prime Healthcare Servs., Inc., No. 11-CV-8214 PJW, 2014 WL 12480026, at *3 (C.D. Cal. Nov. 20, 2014) ("[W]here the Government indicates that it supports the relator's action, it would be illogical for the Court to conclude that the relator's action was parasitic.").

## IV. Conclusion

Because relators' case is not based upon the same allegations or transactions at issue in Donath, I need not decide the further question of whether, under language of the statute, the government "is a party" to the now-concluded Donath case. Shield has not shown this case should be dismissed under the government action bar. Its motion, Docket # 302, is therefore denied.

| **August 17, 2018** | **/s/Rya W. Zobel** |
|---|---|
| DATE | RYA W. ZOBEL |
| | SENIOR UNITED STATES DISTRICT JUDGE |