# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, and<br>THE STATE OF CALIFORNIA,<br>*ex rel.* KIMBERLY HERMAN, AMY<br>LESTAGE and KEVIN ROSEFF,<br><br>Plaintiffs,<br><br>v.<br><br>COLOPLAST CORP., *et al.*<br><br>Defendants. | Civil Action No. 11-12131-RWZ |

## MEMORANDUM OF LAW IN SUPPORT OF COLOPLAST CORP.'S FRCP 50 MOTION FOR JUDGMENT AS A MATTER OF LAW

## INTRODUCTION

Defendant Coloplast, Corp. ("Coloplast") moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) on Plaintiff's retaliation claim under the federal False Claims Act, 31 U.S.C. § 3730(h).

## STANDARD FOR GRANTING JUDGMENT AS A MATTER OF LAW

Judgment as a matter of law is called for when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). Judgment as a matter of law should be entered when the court, viewing the evidence and all permissible inferences in favor of the non-moving party, determines that a reasonable jury could not render a verdict for that party. *Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2010). In deciding a motion for judgment as a matter of law, the court may not consider the credibility of witnesses, weigh the evidence, nor

resolve evidentiary conflicts. *Id.* However, when the non-moving party bears the burden of proof, as is the case here, it must "present 'more than a mere scintilla' of evidence and may not rely on conjecture or speculation." *Id.* (quoting *Katz v. City Metal Co.*, 87 F.3d 26, 28 (1st Cir. 1996)).

## I.   ARGUMENT

No reasonably jury could find, based on the evidence presented at trial, that Coloplast retaliated against Plaintiff by (1) placing her on a paid administrative leave; or (2) assigning her low-performing accounts following her return from administrative leave.

The False Claims Act ("FCA") permits an employee to relief if an employer "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against" the employee "in the terms and conditions of employment" "because of lawful acts done by the employee." 31 U.S.C. § 3730(h)(1).

Retaliation under the FCA follows the same burden shifting analytical framework as other employee retaliation claims. *Harrington v. Aggregate Industries-Northeast Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012). To establish a *prima facie* case of FCA retaliation, Plaintiff must show that (i) she was engaged in conduct protected under the FCA; (ii) Coloplast knew that she engaged in this conduct; and (iii) Coloplast retaliated against her because of this conduct through a materially adverse employment action. *Id.* (citing *Mann v. Heckler & Koch Def., Inc.,* 630 F.3d 338, 343 (4th Cir. 2010), and *Maturi v. McLaughlin Research Corp.,* 413 F.3d 166, 172 (1st Cir. 2005)). If Plaintiff is able to establish a prima facie case, then the burden shifts to Coloplast to articulate a legitimate, non-retaliatory reason for any adverse action. *U.S. ex re. Hamrick v. GlaxoSmithKline LLC*, 814 F.3d 10, 18 (1st Cir. 2016). The burden would then shift back to Plaintiff to show Coloplast's reason was pretext for retaliation. *Id.* Because Plaintiff has failed to make this showing, her claims fail as a matter of law.

A.  <u>Plaintiff Has Not Established She Suffered A Materially Adverse Employment Action.</u>

Following summary judgment, the question before the jury is whether Coloplast's decision to place Plaintiff on a paid administrative leave and assign her certain accounts following her return to work constitute a materially adverse employment action. "An adverse employment action is one that affects employment or alters the conditions of the workplace, and typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Morales-Vallellanes v. Potter*, 605 F.3d 27 (1st Cir. 2010); *see also Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996) ("Workplaces are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action."). Pure speculation that a plaintiff is disadvantaged is not sufficient. *Flanagan-Uusitalo v. D.T. Indus.*, 190 F.Supp.2d 105, 116-17 (D. Mass. 2001).

1.  *Plaintiff Did Not Establish Her Administrative Leave Was A Materially Adverse Employment Action.*

Preliminarily, Plaintiff's fully-paid administrative leave does not constitute being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against" as required for a retaliation claim under the FCA. 31 U.S.C. § 3730(h)(1).

But further, no reasonable jury could find based on the evidence presented at trial that Plaintiff's paid administrative leave was a materially adverse employment action akin to hiring, firing, failing to promote, or reassigning with significantly different responsibilities. *Morales-Vallellanes*, 605 F.3d at 27. To the contrary, the evidence shows that throughout the duration of her administrative leave, Plaintiff was paid her full salary (including a merit increase) and 100% of her commission, retained all of her employee benefits, continued to accrue PTO and receive holiday pay, drove the company-issued car and filled the car with gas using Coloplast's fuel card:

Q. I think we heard testimony earlier today that during your leave and that again is December 23rd it begins in 2014, that you were paid your full salary, correct?

A. Correct.

Q. And that you were paid $80,000 which represents 100 percent of commissions correct?

A. Correct.

Q. And that you had no other car other than the company car, correct?

A. Correct.

Q. And although you weren't providing -- well were you providing any services for Coloplast?

A. No.

Q. And you yet drove the car and used their fuel card to fill the car with gas is that right?

A. Correct.

Q. And to do maintenance on the car?

A. Correct.

Q. And did you receive your full benefits during this time?

A. Yes.

Q. Did you also accrue PTO or vacation time?

A. Yes.

Q. You continued to receive 401(k) contributions?

A. Yes.

Q. You also received your health insurance benefits, life insurance benefits and so forth, correct?

A. Correct.

Q. And then did you also receive a raise during this period of time?

A. I believe there was a small raise, yes.

(Trial Tr. Day 3, p.32-33.[1])

The Court allowed this claim to survive summary judgment based on Plaintiff's argument that she was not able to grow herself professionally, was not able to attend the President's Circle trip, and was denied the opportunity to earn commissions above 100%, as she had done the two prior fiscal years. Dkt. 320 at 9-10. The evidence following the conclusion of Plaintiff's case does not support any of these theories of adverse action.

---

[1] All exhibits cited herein are attached to the accompanying Declaration of Nicole A. Truso in support of this motion.

The evidence contains no testimony from Plaintiff regarding how being placed on administrative leave precluded her from growing herself professionally in a way that amounted to a material change in the terms and conditions of her employment.

With regard to the President's Circle Trip, the evidence establishes that no one at Coloplast told Plaintiff she was prohibited from attending. (Trial Tr. Day 1, 34-35). To the contrary, the evidence shows Plaintiff was provided instructions regarding booking travel along with a handwritten note and small gift congratulating her on being invited.  (*Id.*[2]). Ultimately, Plaintiff elected to not attend.

Finally, Plaintiff's testimony that she should have been given the opportunity to continue working and earning above 100% commissions as she had done the two prior fiscal years fails to establish materially adverse action for three main reasons. First, the evidence shows that individual account performance and KAM commissions vary dramatically from year to year, and there is no guarantee Plaintiff's above-average commission earnings would have continued in any given year. (Trial Tr. Day 3, 145-48). In fact, the evidence shows that in FY 14/15, while Plaintiff was on a paid administrative leave, her accounts (as well as the accounts of four of five other KAMs) performed significantly below target, likely do to market activity. JX 4. And finally, the evidence shows Plaintiff's above-average commissions in FYs 12/13 and 13/14 were largely due to the growth rate of her largest account, Byram Healthcare ("Byram"). (Trial Tr. Day 3, 148-49). The evidence further shows Byram refused to work with Plaintiff beginning in December 2014, pulled back its sales relationship with Coloplast, and subsequently missed its sales target by over $1 million. (Trial Tr. Day 4, 36-37; Joint Exhibit ("JX") 5, 18.) In light of this, Plaintiff's speculation

---

[2] Plaintiff does not dispute she received this. (Trial Tr. Day 3, 33-34).

that she should have been allowed the opportunity to earn above 100% in commission does not establish her paid administrative leave materially altered a term or condition of her employment.

Plaintiff has failed to established evidence sufficient for a reasonable jury to find that her paid administrative leave constitutes a materially adverse employment action.

2. *Plaintiff Did Not Establish Her Assignment of Accounts Following her Return to Work was a Materially Adverse Employment Action.*

Similarly, no reasonable jury could find beyond a preponderance of the evidence that the accounts Coloplast assigned to her following her paid administrative leave constitute materially adverse employment action. The evidence shows that prior to Plaintiff's leave, her accounts were Claflin, Home Care Delivered, Buffalo, Byram, and ABC. (JX 4). The evidence further shows that following Plaintiff's return to work, Coloplast returned her to Claflin, Home Care Delivered, and Buffalo. (JX 6). In addition, Coloplast assigned Plaintiff to Geriatric, AmeriSource Bergen, Blackburns, and Concordance. (JX 6).

| Prior to Leave FY 14/15 | Accounts Following Leave FY 15/16 | |
|---|---|---|
| Claflin | Claflin | Geriatric |
| Home Care Delivered | Home Care Delivered | AmeriSource Bergen |
| Buffalo | Buffalo | Blackburns |
| Byram | ~~Byram~~ | Concordance |
| ABC | ~~ABC~~ | |

The evidence shows Coloplast did not return Plaintiff to either ABC Medical or Byram following their requests that they be assigned a new KAM. JX 18, 46. Indeed, in its Order on Summary Judgment, the Court stated as a matter of law that "Coloplast's decision to remove Lestage from the Byram and ABC accounts was not materially adverse." Dkt. 320 at 11.

The evidence shows Coloplast's decision to assign certain accounts to Plaintiff was not retaliatory. Plaintiff, through counsel, negotiated her return to work from administrative leave by

stating, in part, that it would be "impossible" for her to return to working with Byram, and that she would not relocate geographically. (Trial Day 3, 19). Accordingly, the evidence shows Coloplast assigned Plaintiff to every key account, excluding Byram, in the northeast region. (Trial Day 4, 27-28). Recognizing Plaintiff required time to get "up to speed" with her new accounts, the evidence shows Coloplast guaranteed Plaintiff's commission for a period of six months, or through the end of FY 16/17. (Trial Day 4, 50-51).

Plaintiff testified that the new accounts assigned to her following her return to work were small accounts that did not fit the company profile and had no opportunity for growth.

First, the record was clear that the size of an account in terms of revenue has no bearing on the amount of commission earned by a KAM. (Trial Day 3, 103). Rather, a KAM earns commission based on his or her portfolio's growth relative to the assigned portfolio growth target.  (*Id.*).

Second, both Mr. Hansen testified, and Ms. Lestage admitted, that Coloplast does not have a "company profile" for key accounts. Rather, Coloplast has "loose" or "fluid" guidelines it uses to decide whether or not an account may be added as a key account. (Trial Tr. Day 1, 31; Trial Tr. Day 2, 72). Mr. Hansen testified that generally, an account may be assigned a KAM if it has more than $1 million in revenue. (Trial Tr. Day 1, 31). Mr. Hansen also testified that accounts with as little as $100,000 may be assigned a KAM, particularly if the account has products in multiple business areas. (*Id.*) The evidence shows all of the accounts assigned to Plaintiff following her return from work have a net baseline revenue exceeding $1 million. (JX 7.)

Third, and most importantly, the evidence shows all of the accounts assigned to Plaintiff following her return from administrative leave have grown. (Trial Tr. Day 4, 55-56). In fact, in FY 17/18, Plaintiff's two accounts with the highest growth were Geriatric and Concordance, two accounts assigned to her after her leave. (*Id.*; JX 7.) In both FY 16/17 and FY 17/18, the new

accounts assigned to Plaintiff grew at a rate consistent with all Coloplast key accounts. (JX 6 and JX 7.)

    B. <u>Plaintiff Has Not Established that Coloplast Took Any Alleged Adverse Employment Action Against Her Because of Any Protected Conduct.</u>

        1. *Plaintiff Did Not Establish Coloplast Placed Her On Paid Administrative Leave Because of Her Protected Conduct.*

Plaintiff failed to establish an essential element of her claim that the individuals at Coloplast who decided to put Plaintiff on paid administrative leave knew about her protected conduct before making that decision.  Even if, as Plaintiff seemed to attempt to argue at trial, outside counsel for Coloplast knew about an FCA investigation, that knowledge is not imputed to the individuals—Hansen and Veome—who made the decision to place Plaintiff on paid administrative leave.  Courts have held that "[t]he knowledge of someone who had no role in the decision is irrelevant to the motive for the decision. If no one in the termination decision-making process knew of the plaintiff's protected activity, then the protected activity could not be the cause of the termination." *Armstrong v. Arcanum Grp., Inc.*, 897 F.3d 1283, 1290 (10th Cir. 2018).  The evidence showed that Byram.—one of Coloplast's largest accounts and Plaintiff's largest account—sent via email on December 19, 2014 a letter dated December 18, 2019 stating: "Effective immediately, I respectfully request that you provide Byram Healthcare with a different account representative.  We no longer wish to work with Amy Lestage regarding our business together.  Any questions Coloplast may have regarding the issue should be directed to Byram's Legal Officer …." (JX 18).  The letter was directed to Mr. Veome of Coloplast.

Hansen's  testimony did not establish that he knew about Plaintiff's lawsuit around the time that Coloplast place Plaintiff on paid administrative leave:

    Q. On December 19th of 2014 did you become aware that Amy Lestage and former coworkers were plaintiffs in a lawsuit against Coloplast and other distributors?

A. I became aware of this sometime around that time frame of the latter half of December.

(Trial Tr. Day 1, 45).

Plaintiff also did not establish that Veome, who received the letter from Byram, knew that Plaintiff had filed the FCA claim against Coloplast.

Q. And is it your position as today that at the time you made the decision or the decision was made to place Amy Lestage on this indefinite paid administrative leave that you were not aware of the whistleblower lawsuit that she had filed against Coloplast?

A. I'm not sure what the time frame was for that. I just know that the genesis of putting her on paid administrative leave was generated by Perry Bernocchi's letter to us saying that they no longer wanted to work with her.

(Trial Tr. Day 2, 31).

The evidence showed that Coloplast made the decision to place Plaintiff on paid administrative leave following receipt of Byram's letter on December 19, 2014. (Trial Tr. Day 2, 2-7). Coloplast notified Plaintiff of its decision on December 23, 2014. (JX16). As noted above, Veome testified that "I just know that the genesis of putting her on paid administrative leave was generated by Perry Bernocchi's letter to us saying that they no longer wanted to work with her." (Trial Tr. Day 2, 31).

Hansen also testified that Byram's letter caused Coloplast to make the decision to place Plaintiff on leave:

Q. Is it a fair statement to say that it was the Byram letter to you that caused Amy to be placed on administrative leave?

A. It was the Byram letter that caused us to internally discuss what we should do about the situation and eventually led to the determination to put her on paid administrative leave.

(Trial Tr. Day 2, 33).

As the Court stated during the trial, "unlike with respect to an employer who may not retaliate against an employee who files a whistleblower lawsuit, there is no such prohibition in the statute against other people like distributors[]." (Trial Tr. Day 2, 27). Because Mr. Veome and Mr. Hansen testified that Byram's demand to remove Plaintiff from the account caused Coloplast to be placed to paid administrative leave, Plaintiff failed to establish evidence sufficient for a reasonable jury to find that Coloplast took such action "because of" her protected conduct.

> a.   *Plaintiff Did Not Establish that the Choice of Accounts Assigned to her Upon Her Return was Because of her Protected Conduct.*

The evidence showed that, after Plaintiff returned from her paid administrative leave of absence, FMLA leave, and her subsequent vacation, she retained three of her old accounts: Home Care, Claflin, and Buffalo. (JX 6). Coloplast removed Byram and ABC. The Court already held that the record is clear that Coloplast's decision to remove Lestage from the Byram and ABC accounts was not materially adverse." (ECF 320 at 11).

Plaintiff must prove, then, that the four new accounts that Coloplast assigned—Geriatric, AmeriSource Bergen, Blackburns, and Concordance—would not have been assigned to her but for her protected conduct. Plaintiff, however, offered no documentary evidence or testimony that the assignment of these accounts had any relation whatsoever to Plaintiff's protected conduct. Plaintiff contended that these accounts were low performing or "house accounts." But the record showed that (1) these four accounts were determined to be key accounts by Coloplast; and (2) all key accounts had the potential to be assigned to key account managers.

Hansen testified at length during trial about the methodology used to assign accounts, including the following factors:

> the key account managers generally work out of their home and in order to try to reduce travel cost and make it more feasible for us to stay closer to the accounts, have gone through a deliberate effort of slowly making changes over time when

that seemed feasible to do to get the territories more geographically assigned. In terms of other factors that play into the assignment of accounts, I look at past relationship, past performance, of course if request desires of the account, those are some of the factors that would go into this."

(Trial Tr. Day 3, 132-133).

Critically, the record shows Coloplast has no incentive to have failing key accounts. Hansen also testified that it is in Coloplast's (and his own) financial interest for the key accounts to perform well: "the key accounts represent about 95 percent of our total revenue base in the U.S. for the business areas that we're responsible for. Which means that if these accounts are not successful, then the U.S. organization will not be successful." (Trial Tr. Day 3, 133).

C. <u>Plaintiff Has Not Established She Suffered Damages as a Result of Coloplast's Conduct.</u>

Plaintiff has not established evidence sufficient that a reasonable jury could find, by a preponderance of the evidence, that she suffered any damages as a result of any conduct by Coloplast.

First, the evidence shows Plaintiff did not suffer any damages as a result of Coloplast placing her on a paid administrative leave. Plaintiff testified that she was paid her full salary (including a merit increase) and 100% of her commission, retained all of her employee benefits, continued to accrue PTO and receive holiday pay, drove the company-issued car and filled the car with gas using Coloplast's fuel card. (Trial Tr. Day 3, 32-33). As explained above, any testimony that Plaintiff should have been paid *more* than 100% commission is pure speculation and is not supported by the evidence in the record reflecting the inconsistent nature of KAM commission payments.

Second, the evidence shows Plaintiff did not suffer any damages as a result of the accounts Coloplast assigned to her following her return from paid administrative leave. In its April 3, 2019

Order, the Court stated that Plaintiff's measure of damages was limited to "the difference between the compensation she would have received but for defendant's retaliatory actions and the compensation she, in fact, received from the beginning of any retaliatory conduct until such conduct and any effect thereof ceases." (ECF 403 at 2-3). Fundamentally, the evidence does not show what Plaintiff's compensation would have been but for the alleged retaliatory action. Instead, the evidence shows KAM commissions vary from year to year in an unpredictable way based on a variety of factors, including account reassignments. (Trial Tr. Day 3, 145-48). The evidence further shows Plaintiff's compensation was naturally set to decrease in light of Byram's decision not to work with her shortly after the beginning of FY 14/15. (JX 18).  Notwithstanding, Mr. Hansen testified he assigned Plaintiff four new accounts he believed had the ability to grow, and that all of the accounts have shown growth since Plaintiff's return from leave. (Trial Tr. Day 4, 49). The evidence shows Plaintiff's new accounts are growing at a rate consistent with all key accounts, and that she has consistently earned commissions at or above the historical average for KAMs. (Trial Tr. Day 4, 55-56). Importantly, after four days of trial, there were no documents or no testimony anywhere in the record establishing that any damages alleged by Plaintiff would continue any time into the future.

Finally, the evidence shows Plaintiff is not entitled to emotional distress damages. Plaintiff testified only that being on a paid administrative leave caused her to be anxious, gain weight, and sleep poorly. (Trial Tr. Day 2, 104-105). Notwithstanding, Plaintiff testified she used her time while on a fully-paid administrative leave to spend a lot more time with her children, join a ministry group at church, teach Vacation Bible School, get engaged, plan a wedding, and have a baby.  (*Id.* at 105-109.)  Plaintiff further testified she began experiencing nervousness "every day" when she initially filed the FCA claim in 2011 – several years prior to her alleging Coloplast knew of her

protected conduct. (Trial Tr. Day 2, 88.) In fact, in connection with Coloplast putting her on a leave, Plaintiff testified she was relieved.  (*Id*.at 96.) The record clearly establishes Plaintiff was not plagued by emotional distress that affected her day to day life in any meaningful way. *Travers v. Flight Servs. & Systems, Inc.*, 808 F.3d 525 (1st Cir. 2015) (finding the evidence insufficient to support emotional distress damages where "[t]here was no testimony. . . the plaintiff was compelled to curtail his life activities in any way due to stress from the . . . retaliatory action.") (citing *DeRoche v. Massachusetts Commission Against Discrimination*, 848 N.E.2d 1197, 1203 (Mass. 2006)).

## II.    CONCLUSION

Plaintiff has presented her evidence and there is simply no evidence to allow a reasonable jury to find that Coloplast retaliated against her by placing her on paid administrative leave and assigned her poorly performing accounts upon her return to work. Her compensation remained the same - indeed, she received a greater sum in commissions - her benefits remained the same, she received a raise and even use of the company car. Thus, she has failed to present any evidence of an adverse employment action. Even if she had, Coloplast had a legitimate non-retaliatory reason for placing her on leave and geographically realigning her assigned accounts. Lastly, there is no evidence of economic or emotional damages. For the foregoing reasons, Plaintiff's claims fail as a matter of law and there is no issue of fact for the jury to consider.

Respectfully submitted,

**Coloplast Corp.**

Dated:  April 11, 2019

*/s/ Brian P. Dunphy*
Brian P. Dunphy (BBO #670902)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, PC
One Financial Center
Boston, MA 02111

US.122399975.03

Direct: 617.348.1810
BDunphy@mintz.com

Jacqueline A. Mrachek
Nicole A. Truso
(admitted *Pro Hac Vice*)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
Minneapolis, MN 55402-3901
(612) 766-8619
Jacqueline.Mrachek@FaegreBD.com
Nicole.Truso@FaegreBD.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2019, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will automatically send email notification of such filing to the attorneys of record for Plaintiff.

/s/ *Brian P. Dunphy*_____

86780111v.1

US.122399975.03