UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 11-12131-RWZ


THE UNITED STATES OF AMERICA, and THE STATE OF CALIFORNIA, *ex rel.*
KIMBERLY HERMAN, AMY LESTAGE and KEVIN ROSEFF

v.

COLOPLAST CORP., *et al.*


<u>ORDER</u>

September 13, 2019


ZOBEL, S. D.J.

After a five-day trial, a jury returned a verdict for plaintiff Amy Lestage, finding

that defendant Coloplast Corp. retaliated against her for reporting company conduct

that allegedly violated the False Claims Act ("FCA").  It awarded damages in the

amount of $762,525 as compensation for (1) Coloplast's decision to place Lestage on

paid administrative leave, and (2) the manner in which Coloplast reassigned accounts

to Lestage when she returned to work.  Coloplast has renewed its motion for judgment

as a matter of law (Docket # 459) and moves alternatively for a new trial (Docket #

462).  Both motions are denied.

I.      **Background**[1]

Coloplast develops, manufactures, and markets medical devices and services

---

[1]  In its review, the court relies on stipulated facts and uncontroverted trial testimony.

1

related to medical conditions and surgeries like incontinence and ostomy.  It sells its products to distributors and dealers, and to this end employs Key Account Managers ("KAMs") to maximize sales to, and manage the relationship with, its most profitable customers.  It compensates each KAM with a base salary as well as commission based on the growth of their account portfolio.  Plaintiff began working for Coloplast as a sales and services representative in 2004 and was promoted to KAM in 2011.

In December 2011, Lestage and two former Coloplast employees filed a False Claims Act *qui tam* lawsuit against Coloplast and several other entities including Byram Healthcare, one of its largest distributors.  The *qui tam* action alleged that Coloplast, Byram, and others had engaged in an illegal kickback scheme to inflate their Medicare and Medicaid reimbursement amounts and thereby defraud the federal government.  As required in *qui tam* cases, the complaint was initially filed under seal.  An unsealed amended complaint filed on November 20, 2014, for the first time publicly identified Lestage as a relator.

At this time, in November 2014, plaintiff's accounts at Coloplast included Byram, ABC Home Medical, Home Care Delivered, Buffalo Hospital Supply, Inc., and Claflin Medical Equipment Co.  On December 19, 2014, Perry Bernocchi, the CEO of Byram, notified Coloplast that it no longer wanted to work with Lestage and asked for a different KAM to be assigned.  Around this time, Coloplast also learned of Lestage's role in the *qui tam* case.  On December 23, 2014, it placed plaintiff on an indefinite, fully-paid, administrative leave.  In December 2015, Coloplast and the federal government settled the *qui tam* action.  On January 15, 2016, Coloplast asked plaintiff to return to work. Having delivered her third child less than two months earlier, plaintiff elected to take

twelve weeks of leave under the Family and Medical Leave Act ("FMLA") before returning to work on April 12, 2016.  At that point she was assigned three of her old accounts—Claflin, Home Care Delivered and Buffalo—plus four new ones—Geriatric, AmeriSource Bergen, Blackburns, and Concordance.  Neither Byram nor ABC were returned to her.

On June 1, 2015, Lestage filed the instant FCA retaliation claim against Coloplast.  She alleges the company took adverse action against her because of her role as a *qui tam* relator by (1) placing her on paid administrative leave for 388 days, and (2) assigning her a portfolio of low-growth accounts upon her return.  In February 2018, this court denied Coloplast's motion for summary judgment and in April 2019 the dispute was tried to a jury.  Before resting its case Coloplast moved for judgment as a matter of law, on which the court reserved.  The jury returned a special verdict in favor of plaintiff and awarded $762,525 in compensatory damages.  Coloplast subsequently renewed its motion for judgment as a matter of law, and, in the alternative, filed a motion for new trial.

## II.    Standard

"The standard for granting a Rule 50 motion is stringent.  'Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party.'"  Malone v. Lockheed Martin Corp., 610 F.3d 16, 20 (1st Cir. 2010) (quoting Rivera Castillo v. Autokirey, Inc., 379 F.3d 4, 9 (1st Cir. 2004)).  In making its determination, the court may not weigh the evidence, determine the credibility of the witnesses presented, or attempt to resolve conflicting testimony.

MacQuarrie v. Howard Johnson Co., 877 F.2d 126, 128 (1st Cir. 1989).

Under Federal Rule of Civil Procedure 59(a), a court may order a new trial "only if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice."  Crowe v. Marchand, 506 F.3d 13, 19 (1st Cir. 2007) (quoting Casillas-Díaz v. Palau, 463 F.3d 77, 81 (1st Cir. 2006)).

## III.    Discussion

In reaching its verdict, the jury made five specific findings that mirror the elements of an FCA retaliation claim: (1) plaintiff engaged in protected conduct under the FCA (by filing a *qui tam* action); (2) Coloplast knew of plaintiff's protected conduct on or before December 23, 2014 (the date the alleged retaliation began); (3) Coloplast retaliated against plaintiff because of her protected conduct by both (a) placing her on indefinite administrative leave, and (b) the choice of accounts assigned to her upon her return in 2016; (4) defendant's conduct caused plaintiff to suffer damages as a result of one or both (a) the administrative leave, and (b) the assignment of accounts; and (5) plaintiff should be awarded compensatory damages in the amount of $762,525.

### A.    Judgment as a Matter of Law

Coloplast challenges the sufficiency of the evidence adduced at trial.  Yet the evidence sufficiently supports the jury's verdict in this case.

#### 1.    Reason for Administrative Leave

Coloplast argues that the company placed plaintiff on leave solely because of Byram's request that it assign a different KAM to its account.  It is true that the two Coloplast executives who testified at trial, Ed Veome and Morton Hansen, identified Byram's request as a motivating factor in their decision to place Lestage on leave.

While that fact was clearly important, the evidence also showed that Byram was Coloplast's largest account and that it was a co-defendant in the *qui tam* case. Moreover, the testimony of Hansen and Veome supported the conclusion that Coloplast knew about plaintiff's role in the *qui tam* litigation at the time it decided to place her on leave.  Tr. Day 1, 139:4-8 (Hansen); Tr. Day 2, 34:7-17 (Veome).  And Veome testified that the decision was precipitated by a conversation with counsel, including Coloplast's outside counsel who also represented the company in the *qui tam* litigation.  Tr. Day. 2, 25-26 (Veome).  A reasonable jury could infer that it was not simply the isolated request of one of her customers, but rather Lestage's involvement in the FCA case, that prompted Coloplast to place her on leave.

### 2.    **Damages During Administrative Leave**

Coloplast next argues that because the company fully paid plaintiff while she was on leave, she could not have accrued any damages during this time.  This argument discounts plaintiff's and her husband's detailed testimony regarding the anxiety and emotional strain occasioned by Coloplast's closeted management of the leave, including Coloplast's prohibition of plaintiff's communication with her colleagues during the leave, and the continued uncertainty about the duration of the leave and the fate of her career at the company. *E.g.*, Tr. Day 2 at 106:4-7, 106:14-18, 107:17-108:8, 109:3-12, 110-111 (Lestage); Tr. Day 3 at 126:14-21, 127:4-11 (Lord).  Lestage also detailed the damage to her client relationships created by Coloplast's apparent failure to communicate her absence to her clients.  Tr. Day 2, 126.  On this basis a reasonable jury could find Lestage incurred damages while on leave.

3.     **Retaliation Via Account Assignments**

Coloplast emphatically argues that no reasonable jury could have determined the company's assignment of accounts upon Lestage's return was retaliatory.  Both Byram and ABC had asked not to work with Lestage, Coloplast contends, and there was no evidence that the new accounts negatively impacted her compensation or deprived her of any non-pecuniary employment benefit.

Again, Coloplast's argument ignores plaintiff's own testimony, which the jury was fully entitled to credit.  Plaintiff detailed how her boss, Morton Hansen, stymied her efforts to take back the ABC account.  Though ABC did initially ask that Henrik Wurgler (the KAM who had been covering for Lestage) continue when Lestage returned, when Wurgler moved out of the country Lestage saw an opportunity to rebuild her relationship with the client.  But Hansen shut down Lestage's inquiry and instead assigned the Pennsylvania-based ABC account to a KAM who lived in California.  Tr. Day 2, 130:23-134:5.  In addition, Lestage explained that some of the accounts she was assigned were considered "house accounts"—accounts not previously managed by a KAM—and some larger ones were "maintenance accounts" with low growth potential.  Tr. Day 2, 134:6-136:2.  She also stated that some of her customers were not willing to engage in campaigns with Coloplast and did not have an outside sales force, which are important factors in driving sales.  Tr. Day 2, 135:17-136:2; 138:9-24; 141:10-19.  Though the Coloplast executives' testimony conflicted with Lestage's take on these points, whose explanation to believe, and whether to credit defendant's proffered nondiscriminatory justifications, are decisions properly left for the jury.  Likewise, the pecuniary or non-pecuniary adverse impact of Coloplast's treatment, if any, was properly reserved for the

jury to address.[2]

### B.    New Trial

Alternatively, Coloplast requests a new trial.  Here it tries to revive an argument previously made and ultimately rejected by the court: that plaintiff's damages expert should be excluded under Rule 702 of the Federal Rules of Evidence.  Coloplast thus requests the court remit the damages award as plainly excessive.

Coloplast first challenged plaintiff's expert, Dr. Judith Roberts, in a pretrial motion *in limine* (Docket # 370).  In addition to disputing her overall qualifications, defendant critiqued Roberts' reliance on Lestage's two highest commission years to project but-for compensation.  Coloplast also argued that Roberts' extension of the damages projection was based on a faulty assumption that plaintiff would still feel the impact of Coloplast's retaliation at retirement twenty years down the road.

The court reserved ruling until trial where, after a *voir dire*, Dr. Roberts was found to be qualified and allowed to testify.  Coloplast presents no adequate reason to reconsider this decision.  Although Dr. Roberts may not have presented the <u>best</u> damages model, the model she presented reflected a straight-forward and rational method for approximating otherwise opaque sums.  Indeed, even Coloplast's rebuttal expert agreed that, accepting Roberts' assumptions as true, she used a well-accepted calculation method that was correctly executed.

---

[2]  To the extent that Coloplast seeks to import factual findings from the court's summary judgment decision, neither the jury nor the court is bound by such pretrial findings.  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment ("The fact is considered undisputed only for purposes of the motion; if summary judgment is denied, a party who failed to make a proper Rule 56 response or reply remains free to contest the fact in further proceedings. And the court may choose not to consider the fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute.").

Coloplast's objections, then, boil down to a criticism of Dr. Roberts' <u>assumptions</u>.

The jury, however, was well-prepared to assess the facts presented and decide

whether to adopt her assumptions or those of defendant's expert.

When Dr. Roberts took the stand, the court explained to the jury its "two jobs" in

evaluating the expert's testimony: first, "[e]ven though there may be a ruling that she

can testify because she's qualified, you have to make a separate judgment as to

whether she's qualified to answer the specific questions that are relevant to your

determination of this case," and second, "[i]f there is a question that has to do with her

making certain assumptions, you have to be very clear that the assumptions she is

asked to make accord with the facts as you find them."  Tr. Day. 3, 68:10-19.

Defendant later conducted a rigorous cross-examination, pointing out many

alleged flaws in Dr. Roberts' damages model.[3]  And the next day defendant called a

rebuttal expert, Frances McCloskey, who tackled Dr. Roberts' assumptions one-by-

one.[4]  "It [was] well within the fact-finder's province to determine the weight accorded to

---

[3]  For example, defendant solicited that no KAM has had a consistent year-over-year increase in commissions (Tr. Day 3, 107:9-19), Dr. Roberts did not look at the actual performance of Lestage's accounts while she was on leave (<u>id</u>. 112:10-16), Lestage exceeded her target incentive commissions in 2013 and 2014 yet Dr. Roberts exclusively used those years to predict her future salary (<u>id</u>. 114:12-15), the FCA complaint asserted a highly lucrative scheme that could have contributed to Lestage's particularly good years in 2013 and 2014 (<u>id</u>. 117:11-16), Roberts did not assess the accounts that were available to Lestage upon her return to Coloplast (<u>id</u>. 118:17-119:20), and Roberts did not account for changes in commission structure, tax law, or any other potential future events (<u>id</u>. 121:4-123:2).

[4]  First, she criticized Dr. Roberts' starting point of using Lestage's average compensation for 2013 and 2014 to predict her but-for compensation, explaining that commissions are not repeatable year after year.  Tr. Day 4, 110:22-116:17.  McCloskey proposed her own model, which used an average of the commissions earned by other KAMs over four (rather than only two) years, finding a $68,600 average commission, which would result in zero damages to Lestage.  Tr. Day 4, 116:20-117:18.  Second, she faulted Dr. Roberts for predicting that Lestage's compensation would grow at a consistent rate year over year, noting that such a model is "inconsistent with the facts and it's inconsistent with the way commissions are earned."  Tr. Day 4, 114:24-115:13.  Finally, McCloskey criticized Dr. Roberts' decision to project damages out for over twenty years, explaining that "[b]ecause of the nature of the way commissions are paid, because of the nature of the health care industry and uncertainty about the health

expert witnesses." <u>United States v. Shelton</u>, 490 F.3d 74, 79 (1st Cir. 2007).  Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579, 595 (1993); <u>see also</u> Fed. R. Evid. 702 advisory committee's note to 2000 amendment (the rule "is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise").

Given the admissibility of Dr. Roberts' testimony, Coloplast's remaining arguments for a new trial fall by the wayside.  Lestage's testimony provided sufficient evidence of tangible and intangible loss both while on leave and after she returned to work.  And, with the support of Dr. Roberts' testimony, the jury's damages award is not excessive.

## IV.    Conclusion

Coloplast's renewed motion for judgment as a matter of law (Docket # 459) and motion for new trial (Docket #462) are denied.

| | |
|---|---|
| ___September 13, 2019___ | ___/s/ Rya W. Zobel___ |
| DATE | RYA W. ZOBEL |
| | SENIOR UNITED STATES DISTRICT JUDGE |

---

care industry, because of the nature of reimbursement and pricing in the health care industry, I don't think it's reasonable or even reasonably certain that you could predict much more than a few years, maybe five years out."  Tr. Day 4, 119:2-8.